UNITED STATES DISTRICT COURT
NORTHERN DISTRICT TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAN BUETTGEN, on Behalf of Himself and All Others Similarly Situated, | § § § | |
| | § | CIVIL ACTION NO. 3:09-cv-791 |
| Plaintiff, | § § | |
| v. | § § | |
| KATHERINE J. HARLESS, ANDREW COTICCHIO, SAMUEL D. JONES, FRANK P. GATTO, and SCOTT W. KLEIN, | § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following based on the investigation of his counsel, except as to allegations specifically pertaining to Plaintiff and his counsel, which are based on personal knowledge. The investigation of counsel is predicated on, among other things, a review of public filings by Idearc, Inc. ("Idearc" or the "Company") with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media reports about the Company, and publicly available trading data relating to the price and volume of Idearc common stock.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the common stock of Idearc between August 10, 2007 and March 31, 2009, inclusive (the "Class Period") for violation of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Jurisdiction exists pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

3.      Venue is proper in this District because Defendants have their principal executive offices in this District, and many of the wrongful acts alleged herein took place or originated in this District.

4.      Defendants used the instrumentalities of interstate commerce, the U.S. mails and the facilities of the national securities markets in connection with the wrongful activity alleged herein.

## PARTIES

5.      Plaintiff Jan Buettgen purchased Idearc common stock as set forth in the attached certification, which is incorporated herein by reference, and was damaged thereby.

6.      Defendant Katherine J. Harless ("Harless") was, at all relevant times, President and Chief Executive Officer ("CEO") of the Company from 2000 through February 16, 2008.

7.      Defendant Andrew Coticchio ("Cotichio") was, at all relevant times, Executive Vice President, Chief Financial Officer and Treasurer of the Company from 2003 through November 26, 2007.

8.      Defendant Samuel D. Jones ("Jones") was, at all relevant times, acting Chief Financial Officer ("CFO") and Treasurer of the Company from November 2007 to September 2008, and Executive Vice President and Chief Financial Officer and Treasurer since September 2008.

9.    Defendant Frank P. Gatto ("Gatto") was, at all relevant times, Executive Vice President from January 2008 (with responsibility for the Company's operations, including sales operations, customer care, billing and collections, printing management, publishing, distribution and print information technology) to February 2008.  Between February 2008 and May 2008, Defendant Gatto served as acting Chief Executive Officer.

10.    Defendant Scott W. Klein (Klien") was, at all relevant times, Chief Executive Officer since June 2008.

11.    Idearc is a media company that manages and delivers print, online and wireless publishing and advertising services on multiple platforms.  These include yellow pages, white pages, online directory and search services, web site design and hosting services, magazines, direct mail and directory and information services for wireless subscribers.  Idearc is not named as a defendant in this action because on March 3, 2009, the Company filed for protection under the U.S. bankruptcy laws.

12.    Defendants Harless, Coticchio, Jones, Gatto, and Klein ("Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Idearc's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and

that the positive representations being made were then materially false and misleading. Defendants are liable for the false statements pleaded below.

## CLASS ACTION ALLEGATIONS

13.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired the common stock of Idearc between August 10, 2007 and March 31, 2009, inclusive. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, and assigns, and any entity in which defendants have or had a controlling interest.

14.    The members of the Class are so numerous and geographically disperse across the country so that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, there are over 146,679,450 shares of Idearc common stock outstanding, and Plaintiff believes that there are hundreds, if not thousands, of Class members. Members of the Class may be identified from records maintained by Idearc or its transfer agent and may be notified of the pendency of this action by mail.

15.    Plaintiff's claims are typical of the claims of the other members of the Class in that all members of the Class have been damaged by the acts of Defendants, which caused members of the Class to purchase Idearc common stock at artificially inflated prices.

16.    Plaintiff will fairly and adequately protect the interests of the other members of the Class. To assist him in that endeavor, Plaintiff has retained counsel competent and experienced in class and securities litigation. Plaintiff is not aware of any interest which is antagonistic to the interests of the Class.

17.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants' acts, as alleged herein;

(b)    whether any materially false or misleading statements were made and/orDefendants omitted material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

18.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to pursue individual redress for the damages caused to them by Defendants' acts. Plaintiff is not aware of any difficulty that will be presented in managing this action as a Class action.

## SUBSTANTIVE ALLEGATIONS

19.    At year end 2006 and during 2007, the Company touted the fact that stringent policies, process re-engineering and system improvements in its credit and collections between 2003 and 2006 caused bad debts to steadily decline as follows:

Bad debt expense as a percent of total operating revenue for the year:

2003 -- 8.1%
2004 -- 6.6%
2005 -- 4.9%
2006 -- 4.3%

20.     Unbeknownst to the investment community, during 2007, while touting the Company's ever-improving "stringent" credit and collection policies, the Company "relaxed" its credit policies in order to increase the dollar amount of the revenue which it reported to stockholders.

21.     The Company, by selling to non-credit-worthy customers effectively reported tens of millions of dollars of sales that it otherwise would not have reported while accumulating tens of millions of dollars of uncollectible receivables.  The Company carried these uncollectible receivables on its books as though they were collectible until mid-2008, when the Company admitted to a "relaxation of certain aspects of the Company's credit policy in mid-2007" and began to write off these uncollectible receivables in a piecemeal fashion over several quarters.

22.     Between mid-2008 and year end 2008, the Company wrote off $47 million of worthless receivables that it attributed to its relaxation of credit policies in mid-2007.  This incremental $47 million write-off of receivables (an amount that was material to the Company's reported $279 million pre-tax income for 2008) had a profound effect because (i) it represented the non-collection of $47 million of cash that the investment community expected the Company to collect and (ii) it materially contributed to the Company's need to file for bankruptcy protection.

23.     On March 8, 2007, the Company filed its Form 10-K for the year ended December 31, 2006 with the SEC (the "2006 Form 10-K").  This document stated:

> Billing and Credit Control
>
> Currently, we direct bill more than 80% of our customers.  By the end of 2007, we anticipate migrating our remaining customers to our direct billing systems.  We have a billing and collection agreement with Verizon.  Under the agreement, Verizon bills and collects from our customers who have not yet migrated to our billing systems.  These remaining customers, who are also Verizon

local telephone customers, consist primarily of smaller customers serviced by our telephone call center.

In 2003, in order to reduce our bad debt expense, we implemented a new credit and collections program, which resulted in more stringent policies, process reengineering and system improvements. By the end of 2004, some aspects of the program were implemented. These initial efforts helped reduce our bad debt expense as a percent of total operating revenue from 8.1% in 2003 to 6.6% in 2004. During 2005, we continued to implement additional new processes, which further reduced our bad debt expense as a percent of total operating revenue to 4.9% in 2005. In 2006, these enhancements were fully implemented and our bad debt expense as a percent of total operating revenue was 4.3%. Because most directories are published on 12-month cycles, we bill most of our customers, many of which are small or medium-sized businesses, over the course of that 12-month period. Fees for national advertisers are typically billed upon issue of each directory in which advertising is placed by CMRs, after deduction of commissions. Because we do not usually enter into contracts with our national advertisers, we are subject to the credit risk of CMRs on sales to those advertisers, to the extent we do not receive fees in advance.

We manage collection of accounts receivable by conducting initial credit checks of new customers (under certain circumstances) and, where appropriate, requiring personal guarantees from business owners. We check all new orders from existing customers for payments that are past due to us prior to publishing the new order. When applicable, based on our credit policy, we use both internal and external data to decide whether to sell to a prospective customer. In some cases, where appropriate, we may also require the customer to prepay part or all of the amount of its order. Beyond efforts under certain circumstances to assess credit risk, we employ well-developed collection strategies using an integrated system of internal, external and automated means to engage with customers concerning payment obligations.

24.     On May 11, 2007, the Company filed its Form 10-Q for the quarterly period

ended March 31, 2007 with the SEC (the "March 31, 2007 Form 10-Q"). This document, which

was signed by Defendants Harless and Coticchio, incorporated the above specified

representations regarding the Company's "Billing and Credit Control" 2006 that appeared in the

2006 Form 10-K by reference by stating: "These interim financial statements do not contain all

information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States, and should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2006."

25.    The March 31, 2007 Form 10-Q reported a continued improvement in the Company's bad debts as a result of the Company's stringent policies, process re-engineering and credit/collection system improvements stating that "[b]ad debt expense as a percentage of revenue was 4.0% and 4.4% for the three months ended March 31, 2007 and 2006, respectively."

26.    On August 10, 2007, the beginning of the Class Period, the Company filed its Form 10-Q for the quarterly period ended June 30, 2007, with the SEC (the "June 30, 2007 Form 10-Q"). This document, which was signed by Defendants Harless and Coticchio, incorporated the above specified representations regarding the Company's "Billing and Credit Control" 2006 that appeared in the 2006 Form 10-K by reference by stating:  "These interim financial statements do not contain all information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States, and should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2006."

27.    The June 30, 2007 Form 10-Q strongly inferred that the Company's stewardship over its credit function had kept the level of bad debts to the 4% figure which was reported at March 31, 2007, stating that "[b]ad debt expense as a percentage of revenue was 4.0% and 4.5% for the six months ended June 30, 2007 and 2006, respectively."

28.    Moreover, the June 30, 2007 Form 10-Q reported a favorable change in bad debts in terms of dollars written off, stating: "Bad debt expense of $32 million for the three months

ended June 30, 2007 decreased by $4 million, or 11.1%, compared to $36 million for the three

months ended June 30, 2006 . . . . Bad debt expense of $64 million for the six months ended

June 30, 2007 decreased by $8 million, or 11.1%, compared to $72 million for the six months

ended June 30, 2006."

29.     Unbeknownst to the investing public, the June 30, 2007 Form 10-Q was

materially false and misleading because it failed to disclose that the Company had relaxed its

credit policy in order to enable the Company to report increased revenue, and that it would take a

year or longer for the full extent of the adverse consequences of this action to become known.

30.     Disclosure of this critical change in credit policy was required by SEC

regulations, and the June 30, 2007 Form 10-Q failed to contain the required disclosure.

31.     On May 18, 1989, the SEC issued an interpretive release (Securities Act Release

No. 6835) which stated in relevant part:

> The MD&A requirements are intended to provide, in one section
> of a filing, material historical and prospective textual disclosure
> enabling investors and other users to assess the financial condition
> and results of operations of the registrant, with particular emphasis
> on the registrant's prospects for the future.   As the Concept
> Release states:
>
>> The Commission has long recognized the need for a
>> narrative explanation of the financial statements, because a
>> numerical presentation and brief accompanying footnotes
>> alone may be insufficient for an investor to judge the
>> quality of earnings and the likelihood that past performance
>> is indicative of future performance. MD&A is intended to
>> give the investor an opportunity to look at the company
>> through the eyes of management by providing both a short
>> and long-term analysis of the business of the company.
>> The Item asks management to discuss the dynamics of the
>> business and to analyze the financials.
>
> As the Commission has stated, "[i]t is the responsibility of
> management to identify and address those key variables and other
> qualitative and quantitative factors which are peculiar to and
> necessary for an understanding and evaluation of the individual
> company."

32.     Regulation S-X requires the MD&A to contain a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.

33.     The SEC stated in FRR 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

34.     Item 7 of Form 10-K and Item 2 of Form 10-Q, also requires the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. § 229.303].  In discussing results of operations, Item 303 of Regulation S-K requires the registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable or unfavorable impact on net sales or revenues or income from continuing operations" and any "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."

35.     The Instructions to Paragraph 303(a) further state, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

36.     Thus, under these standards, the management of a public corporation must disclose in its periodic reports filed with the SEC, "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results.  17 C.F.R. § 229.303(a)(l)-(3) and Instruction 3.

37.     As described above, unbeknownst to Plaintiff and the investment community, the MD&A contained within the Company's June 30, 2007 Form 10-Q failed to comply with the above disclosure requirements because it failed to disclose the change in the Company's credit policies that were effected in order to enable the Company to report additional revenue, and the resultant adverse future ramifications (decreased future earnings and liquidity) thereof.

38.     The June 30, 2007 Form 10-Q contained certifications signed by Defendants Harless and Coticchio which stated in relevant part:

(a)     "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

(b)     I have "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the

disclosure controls and procedures as of the end of the period covered by this report based on such evaluation."

39.     Unbeknownst to Plaintiff, the foregoing certifications were materially false and misleading because, as specified above, the June 30, 2007 Form 10-Q failed to disclose material facts necessary to make the statements made in the June 30, 2007 Form 10-Q, in light of the circumstances under which such statements were made, not misleading.

40.     On November 11, 2007, the Company filed its Form 10-Q for the quarterly period ended September 30, 2007, with the SEC (the "September 30, 2007 Form 10-Q").   This document, which was signed by Defendants Harless and Coticchio, incorporated the above specified representations regarding the Company's "Billing and Credit Control" 2006 that appeared in the 2006 Form 10-K by reference by stating: "These interim financial statements do not contain all information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States, and should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2006."

41.     The September 30, 2007 Form 10-Q stated the following concerning the Company's receivables:

> Our primary source of funds continues to be cash generated from operations.  Net cash provided by operating activities of $334 million for the nine months ended September 30, 2007 decreased $460 million, compared to $794 million for the nine months ended September 30, 2006, primarily due to interest payments on debt incurred and separation costs associated with our spin-off from our former parent and an anticipated one-time increase in accounts receivable resulting from our decision to shift billing from Verizon to our own direct billing platform.  In the past, amounts billed and collected by Verizon were received well in advance of normal customer payment experience.  Now that we are direct billing all customers, the new higher account receivable balance represents

actual customer collection experience. These unfavorable items are partially offset by lower income tax payments and other working capital items.

42.     Discussing bad debts, the September 30, 2007 Form 10-Q stated that "[b]ad debt expense as a percentage of revenue was 4.6% and 4.2% for the nine months ended September 30, 2007 and 2006, respectively." However, the September 30, 2007 Form 10-Q failed to disclose the relaxation of the credit policies that were effected in order to enable the Company to report increased revenue, or the imminent adverse consequences (decreased future earnings and liquidity) thereof. Accordingly, the September 30, 2007 Form 10-Q was materially false and misleading.

43.     The September 30, 2007 Form 10-Q Form 10-Q contained certifications signed by Defendants Harless and Coticchio, which were substantially identical to the above discussed certifications that appeared in the June 30, 2007 Form 10-Q, the foregoing certifications were materially false and misleading because, as specified above, the September 30, 2007 Form 10-Q Form 10-Q failed to disclose material facts necessary to make the statements made in the September 30, 2007 Form 10-Q, in light of the circumstances under which such statements were made, not misleading.

44.     In addition, as described above, unbeknownst to Plaintiff and the investment community, the MD&A contained within the Company's September 30, 2007 Form 10-Q failed to comply with the above specified MD&A requirements because it failed to disclose the change in the Company's credit policies that were effected in order to enable the Company to report additional revenue, and the resultant adverse future ramifications (decreased future earnings and liquidity) thereof.

45.     On February 29, 2008, the Company filed its Form 10-K for the year ended December 31, 2007 with the SEC (the "2007 Form 10-K"). This document, which was signed

by Defendants Gatto, Jones, and Harless, disclosed an increase in bad debts which the Company

attributed to the "economic downturn [. . .] we are currently experiencing":

> As of December 31, 2007, approximately 83.9% of our print
> directory advertising revenues were derived from selling
> advertising to local businesses, which are generally small-and
> medium-sized businesses. In the ordinary course of our directory
> operations, we bill most of these customers over the course of a
> 12-month period. Full collection of delinquent accounts can take
> many months or may never occur. For 2007, bad debt expense
> represented approximately 5.0% of our net revenue, an increase
> from 4.3% in 2006. Small and medium-sized businesses tend to
> have fewer financial resources and higher rates of failure than
> larger businesses, in particular during periods of economic
> downturn, such as we are currently experiencing. These factors
> increase our exposure to delinquent accounts by our customers.

46.     The 2007 Form 10-K failed to disclose the relaxation of the credit policies that

were effected in order to enable the Company to report increased revenue, or the imminent

adverse consequences (decreased current and future earnings and liquidity) thereof.

Accordingly, the 2007 Form 10-K was materially false and misleading.

47.     The 2007 Form 10-K contained certifications signed by Defendants Gatto and

Jones which were substantially identical to the above discussed certifications that appeared in the

June 30, 2007 Form 10-Q. These certifications were materially false and misleading because, as

specified above, the 2007 Form 10-K failed to disclose material facts necessary to make the

statements made in the 2007 Form 10-K, in light of the circumstances under which such

statements were made, not misleading.

48.     In addition, as described above, unbeknownst to Plaintiff and the investment

community, the MD&A contained within the Company's 2007 Form 10-K failed to comply with

the above specified MD&A requirements because it failed to disclose the change in the

Company's credit policies that were effected in order to enable the Company to report additional

revenue, and the resultant adverse future ramifications (decreased current and future earnings and liquidity) thereof.

49.     On May 6, 2008, the Company issued a press release announcing its financial results for the three months ended March 31, 2008. It quoted Defendant Gatto as stating: "The economic softness that began in the latter half of 2007 continues to impact our results and, while the first quarter proved to be challenging, we remain committed to our multi-product strategy, which we believe will ultimately maximize value to our investors."

50.     Defendant Gatto's remarks were materially false and misleading because Defendant Gatto failed to disclose the change in the Company's credit policies that were effected in order to enable the Company to report additional revenue, and the resultant adverse ramifications (decreased earnings and liquidity) that the change in the Company's credit policies had on the Company's reported earnings for the three months ended March 31, 2008, and would continue to have on subsequent periods.

51.     On May 8, 2008, the Company filed its Form 10-Q for the quarterly period ended March 31, 2008, with the SEC (the "March 31, 2008 Form 10-Q"). This document, which was signed by Defendants Gatto and Jones, incorporated the above specified representations regarding the Company's bad debts that appeared in the 2007 Form 10-K by reference by stating: "These interim financial statements do not contain all information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States, and should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2007."

52.     The March 31, 2008 Form 10-Q disclosed a sharp ($7 million, or 21.9%) increase in bad debts, without disclosing the fact that the sharp increase was due to the relaxation of the

credit policies that were effected in order to enable the Company to report increased revenue, and without disclosing the resultant current and future adverse consequences (decreased earnings and liquidity) of the relaxed credit policies. Accordingly, the March 31, 2008 Form 10-Q was materially false and misleading.

53.     The March 31, 2008 Form 10-Q Form 10-Q contained certifications signed by Defendants Gatto and Jones, which were substantially identical to the above discussed certifications that appeared in the June 30, 2007 Form 10-Q. These certifications were materially false and misleading because, as specified above, the March 31, 2008 Form 10-Q failed to disclose material facts necessary to make the statements made in the March 31, 2008 Form 10-Q, in light of the circumstances under which such statements were made, not misleading.

54.     In addition, as described above, unbeknownst to Plaintiff and the investment community, the MD&A contained within the Company's March 31, 2008 Form 10-Q failed to comply with the above specified MD&A requirements because it failed to disclose the change in the Company's credit policies that were effected in order to enable the Company to report additional revenue, and the resultant adverse future ramifications (decreased earnings and liquidity) thereof.

55.     On July 29, 2008, the Company issued a press release announcing its financial results for the three months and six months ended June 30, 2008. The Company reported net income of $76 million for the second quarter 2008, a decrease of 30.3 percent versus the same period in 2007, and the Company reported a six month net income of $187 million, an 11.8 percent decrease compared to the same period in 2007.

56.     On July 29, 2008, the Company also held a conference call during which the following dialogue took place:

*Unidentified Analyst*: Hi, I want to make sure I had a better understanding of the increase in expenses in the quarter on the G&A line. Is it . . . the increase in 20 . . . of about 21 million or so for the quarter, is that almost exclusively bad debt related? Is that what you were saying before Dee?

*Dee Jones -- Acting Chief Financial Officer, Senior Vice President Investor Relations*: Yes, as I said, the vast majority of it is the increase in the bad debt provision along with some collection costs and outside collection agency fees that we also incurred in showing up our crediting and collection activities. There was also some small amount of timing around the couple of items that we did incur in the second quarter but the vast majority of it was the bad debt.

\*       \*       \*

*Unidentified Analyst*: Okay. On the margins, great. And this rather dramatic increase in bad debt from a year ago, obviously there . . . the economy is not great out there. But is this partially your credit practices or are there many customers that were bad debt and how you're going to be able to grow your revenue if that many customers that are not paying, I guess, is sort of the other concern?

*Scott Klein, Chief Executive Officer*: Yes Bob, it's Scott. Quite simply, our credit practices a year ago were not what they should have been. The credit policy was not as tight as it needed to be. And as is the nature of our business, it will take some time for some of those mistakes that were made to work their way through the system. But rest assured our credit policy is appropriate today and is as tight as it should be. And our credit and collections team is all over this having put in place some very new and creative ways to perhaps collect money that much more quickly.

*Unidentified Analyst*: So do you perceive bad debt remaining in that 6% range for the balance of the year? Or is it . . . or should we start to see those improvements already in the second half of the year?

*Dee Jones - Acting Chief Financial Officer, Senior Vice President Investor Relations*: Yes, as you know with bad debt and that aspect of things, it does take time to impact things. I think the year-to-date rate at 5.7 will continue to assess and watch our write-off rates with respect to that. As I did mention, the second quarter did see a step-up in the write-off rates but in that range of the 5.7, 6.26 is what we're kind of looking at. We'll continue to assess as we look through the remainder of the year.

57.   The disclosure of the Company's credit policy "mistakes" and their adverse impact on the Company's second quarter earnings as well as their anticipated adverse impact on subsequent quarters had a immediate and decisive effect on the price of the Company's stock. The price dropped 40% with an unprecedented volume of 23,659,000 shares traded.

58.   On August 11, 2008, the Company filed its Form 10-Q for the quarterly period ended June 30, 2008 with the SEC (the "June 30, 2008 Form 10-Q"). It reported:

> Bad debt expense of $48 million for the three months ended June 30, 2008, increased by $16 million, or 50.0%, compared to $32 million for the three months ended June 30, 2007. The increased bad debt expense was influenced by the current weak economic environment, as well as a temporary relaxation of certain aspects of the Company's credit policy in mid-2007 associated with the transition of billing activities from Verizon. Bad debt expense as a percent of total operating revenue was 6.3% for the three months ended June 30, 2008 compared to 4.0% for the three months ended June 30, 2007.

> *     *     *

> Bad debt expense of $87 million for the six months ended June 30, 2008, increased by $23 million, or 35.9%, compared to $64 million for the six months ended June 30, 2007. The increased bad debt expense was influenced by the current weak economic environment, as well as a temporary relaxation of certain aspects of the Company's credit policy in mid-2007 associated with the transition of billing activities from Verizon. Bad debt expense as a percent of total operating revenue was 5.7% for the six months ended June 30, 2008 compared to 4.0% for the six months ended June 30, 2007.

59.   The June 30, 2008 Form 10-Q Form 10-Q contained certifications signed by Defendants Klein and Jones, which were substantially identical to the above discussed certifications that appeared in the June 30, 2007 Form 10-Q. These certifications were materially false and misleading because, as specified above, the June 30, 2008 Form 10-Q failed to disclose material facts necessary to make the statements made in the June 30, 2008, in light of the circumstances under which such statements were made, not misleading.

60.    In addition, as described above, unbeknownst to Plaintiff and the investment community, the MD&A contained within the Company's June 30, 2008 Form 10-Q failed to comply with the above specified MD&A requirements because it failed to disclose that the change in the Company's credit policies that were effected in order to enable the Company to report additional revenue had had, and would continue to have, a material impact on subsequent quarters' liquidity.

61.    On October 30, 2008, the Company held a conference call during which the following dialogue took place:

> **Dee Jones**:  Yeah, as I said when I was going through the early part of the call, we are feeling more pressure on the margins side relative to the bad debt issue and the bad debt activities that we are seeing.  As I noted the provision rate for the third quarter was about 8.2% for bad debt, the year-to-date level is at 6.5.  And so we are seeing additional pressure on margins as we look at through the remainder of the year, associated with that activity.
>
> **Andrew Finkelstein**:  Okay.  And do you think that the 8.8% plus charge-off rate is going higher, as you look at in your fourth quarter and can you talk about payment collections activity there?
>
> **Dee Jones**:  Well I would say that you know, the 8.2% in the third quarter, we haven't seen significant change as yet, it's a little early to tell with respect to the fourth quarter and what the economics are that we end up dealing with.  So we are feeling more pressure there.  It's just a little bit too early to tell exactly where it's going to head in the fourth quarter.

62.    The disclosure of the Company's run-away bad debts and the ominousness of an officer's admission that management could not tell "where it's going to head" had an immediate and decisive effect on the price of the Company's stock.  The price dropped 36% in heavy trading.

63.    Although certain partial disclosures were made, Defendants knew or recklessly failed to know and failed to disclose that bad debts for the year would approximate 7% and that

the adverse ramifications of the non-collection of tens of millions of dollars of receivables had

had and would continue to have, a materially adverse impact on the Company's liquidity.

     64.    On November 6, 2008, the Company filed its Form 10-Q for the quarterly period

ended September 30, 2008 with the SEC (the "September 30, 2008 Form 10-Q"). It reported:

> Bad debt expense of $60 million for the three months ended
> September 30, 2008, increased by $13 million, or 27.7%,
> compared to $47 million for the three months ended September 30,
> 2007. The increased bad debt expense was influenced by the
> current weak economic environment, as well as the continuing
> effect of a temporary relaxation of certain aspects of our credit
> policy in mid-2007 associated with the transition of billing
> activities from Verizon. Bad debt expense as a percent of total
> operating revenue was 8.2% for the three months ended September
> 30, 2008 compared to 5.9% for the three months ended September
> 30, 2007. Our bad debt has increased over the past several
> quarters, both in dollar amount and as a percentage of revenue.
> Given the current economic environment, our bad debt could
> continue to increase.
>
>         \*     \*     \*
>
> Bad debt expense of $147 million for the nine months ended
> September 30, 2008, increased by $36 million, or 32.4%,
> compared to $111 million for the nine months ended September
> 30, 2007. The increased bad debt expense was influenced by the
> current weak economic environment, as well as a temporary
> relaxation of certain aspects of our credit policy in mid-2007
> associated with the transition of billing activities from Verizon.
> Bad debt expense as a percent of total operating revenue was 6.5%
> for the nine months ended September 30, 2008 compared to 4.6%
> for the nine months ended September 30, 2007. Our bad debt has
> increased over the past several quarters, both in dollar amount and
> as a percentage of revenue. Given the current economic
> environment, our bad debt could continue to increase.

     65.    The September 30, 2008 Form 10-Q Form 10-Q contained certifications signed by

Defendants Klein and Jones, which were substantially identical to the above discussed

certifications that appeared in the June 30, 2007 Form 10-Q. These certifications were materially

false and misleading because, as specified above, the September 30, 2008 Form 10-Q failed to

disclose material facts necessary to make the statements made in the September 30, 2008 Form 10-Q, in light of the circumstances under which such statements were made, not misleading.

66. In addition, as described above, unbeknownst to Plaintiff and the investment community, the MD&A contained within the Company's September 30, 2008 Form 10-K failed to comply with the above specified MD&A requirements because it failed to disclose that the change in the Company's credit policies that were effected in order to enable the Company to report additional revenue had had, and would continue to have, a material impact on subsequent quarters' liquidity.

67. On March 12, 2009, the Company filed its Form 10-K for the year ended December 31, 2008 with the SEC (the "2008 Form 10-K"). This document which was signed by Defendant Klein, disclosed that the Company's bad debts had mushroomed to 6.9%, a number well above 5.7 to 6.26 range that Defendant Dee Jones had disclosed on July 29, 2008.

> For 2008, bad debt expense represented 6.9% of our net revenue, an increase from 5.0% in 2007. Small-and-medium-sized businesses tend to have fewer financial resources and higher rates of failure than larger businesses, in particular during periods of economic downturn, such as we are currently experiencing. These factors increase our exposure to delinquent accounts by our clients.
>
> \*   \*   \*
>
> Bad debt expense of $206 million for the year ended December 31, 2008, increased by $47 million, or 29.6% compared to $159 million for the year ended December 31, 2007. The increased bad debt expense was influenced by the current weak economic environment, as well as the continuing effect of a temporary relaxation of certain aspects of our credit policy in mid-2007 associated with the transition of billing activities from Verizon. Bad debt expense as a percent of total operating revenue was 6.9% for the year ended December 31, 2008 compared to 5.0% for the year ended December 31, 2007.
>
> \*   \*   \*
>
> Our primary source of funds continues to be cash generated from operations. Net cash provided by operating activities of $363 million in 2008 decreased $6 million, compared to $369 million in

2007, primarily due to lower cash collections coupled with higher bad debt write-offs, and a contract settlement with a former reseller of our advertising.  These unfavorable items were partially offset by reduced transition costs related to our spin-off, lower income tax payments, as well as lower interest payments.

\*       \*       \*

Bad debt expense as a percentage of revenue was 6.9%, 5.0%, and 4.3%, for the years 2008, 2007 and 2006, respectively.

68.     The 2008 Form 10-K was materially false and misleading because it failed to disclose that the Company was on the verge of bankruptcy due to the relaxation of the Company's credit policies during mid-2007.

## ADDITIONAL SCIENTER ALLEGATIONS

69.     As alleged herein, Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Idearc, their control over, and/or receipt and/or modification of Idearc' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Idearc, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

70.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Idearc common stock and operated as a fraud or deceit on Class Period purchasers of Idearc common stock by failing to disclose the material adverse facts detailed herein.  As a result of their

purchases of Idearc common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

71.    By failing to disclose the material facts detailed herein, Defendants presented a misleading picture of Idearc's business and prospects.    Defendants' false and misleading statements had the intended effect and caused Idearc common stock to trade at artificially inflated levels throughout the Class Period.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE

72.    At all relevant times, the market for Idearc common stock was an efficient market for the following reasons, among others:

(a)    Idearc common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange ("NYSE"), a highly efficient and automated market (the Company's common stock was delisted from the NYSE and currently is quoted over-the-counter);

(b)    as a regulated issuer, Idearc filed periodic public reports with the SEC;

(c)    Idearc regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Idearc was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.    Each of these reports was publicly available and entered the public marketplace.

73.     As a result of the foregoing, the market for Idearc common stock promptly digested current information regarding Idearc from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Idearc common stock during the Class Period suffered similar injury through their purchase of Idearc common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

74.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Idearc who knew that those statements were false when made.

## COUNT I

### For Violation of § 10(b) of the Exchange Act
### and Rule 10b-5 Against Defendants

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Idearc common stock during the Class Period.

78.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Idearc common stock. Plaintiff and the Class would not have purchased Idearc common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

79.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Idearc common stock during the Class Period.

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### Against Defendants

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     Defendants acted as a controlling person of Idearc within the meaning of § 20(a) of the Exchange Act.  By reason of their positions at Idearc, Defendants had the power and authority to cause Idearc to engage in the wrongful conduct complained of herein.  By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as class counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including prejudgment and post-judgment interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

Dated:  April 30, 2009.

Respectfully submitted,


Thomas E. Bilek
State Bar No. 02313525
**THE BILEK LAW FIRM, L.L.P.**
808 Travis, Suite 802
Houston, Texas  77002
(713) 227-7720
FAX (713) 227-9404
tbilek@bileklaw.com

*Local Counsel for Plaintiff*

Thomas J. McKenna
**GAINEY & McKENNA**
295 Madison Avenue
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gaineyandmckenna.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF

To:     Thomas J. McKenna, Esq.          Tel:    212-983-1300
        Gainey & McKenna                 Fax:    212-983-0383
        295 Madison Avenue, 4th Floor    e-mail: timckenna@gaineyandmckenna.com
        New York, New York 10017

I, **JAN BUETTGEN** ("Plaintiff") hereby retain Gainey & McKenna and such co-counsel it deems appropriate to associate with, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff reviewed the draft complaint to be filed in this matter and authorized the filing.

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *Idearc Inc.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| See attached | | | | |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring suit to recover for investment losses.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of April, 2009

Signature: *Jan Buettgen*                Address: Holzhaeusern strasse 3

Print Name (& Title if applicable): Jan Buettgen    City, State, Zip: Menzingen, Zug, 6313 SWITZERLAND

E-mail: jan.buettgen@sunrise.ch          Phone: +41 78 635 8494

Other telephone numbers: +41 41 755 0665

**Exhibit A to Jan Buettgen Certification**

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 2,900 | IDAR | Buy | 7/22/08 | $1.84 |
| 3,250 | IDAR | Buy | 7/22/08 | $1.8399 |
| 8,306 | IDAR | Buy | 7/22/08 | $1.83 |
| 300 | IDAR | Buy | 7/22/08 | $1.825 |
| 500 | IDAR | Buy | 7/22/08 | $1.84 |
| 894 | IDAR | Buy | 7/22/08 | $1.8399 |
| 12,000 | IDAR | Buy | 7/22/08 | $1.84 |
| 12,000 | IDAR | Buy | 7/22/08 | $1.84 |
| 13,850 | IDAR | Buy | 7/22/08 | $1.82 |
| 3,000 | IDAR | Buy | 7/24/08 | $1.9699 |
| 2,840 | IDAR | Sold | 7/24/08 | $2.09 |
| 10,000 | IDAR | Sold | 7/25/08 | $2.20 |
| 20,000 | IDAR | Sold | 7/25/08 | $2.19 |
| 22,464 | IDAR | Sold | 7/25/08 | $2.282 |
| 1696 | IDAR | Sold | 7/25/08 | $2.28 |
| 20,652 | IDAR | Sold | 7/25/08 | $2.25 |
| 23,642 | IDAR | Buy | 7/25/08 | $2.23 |
| 706 | IDAR | Buy | 7/25/08 | $2.24 |
| 2,900 | IDAR | Buy | 7/28/08 | $2.22 |
| 6,100 | IDAR | Buy | 7/28/08 | $2.2199 |
| 2,700 | IDAR | Sold | 10/30/08 | $0.49 |
| 100 | IDAR | Sold | 10/30/08 | $0.4601 |
| 7200 | IDAR | Sold | 10/30/08 | $0.46 |
| 100 | IDAR | Sold | 10/30/08 | $0.4603 |
| 2,800 | IDAR | Sold | 10/30/08 | $0.4525 |

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 41,100 | IDAR | Sold | 10/30/08 | $0.45 |
| 3,200 | IDAR | Sold | 11/03/08 | $0.4099 |
| 25 | IDAR | Buy | 11/03/08 | $0.4094 |
| 6,775 | IDAR | Buy | 11/03/08 | $0.41 |
| 10,000 | IDAR | Buy | 11/03/08 | $0.40 |
| 10,000 | IDAR | Buy | 11/03/08 | $0.39 |
| 30,000 | IDAR | Buy | 11/04/08 | $0.40 |
| 137,867 | IDAR | Buy | 11/18/08 | $0.10 |
| 51,137 | IDAR | Buy | 11/19/08 | $0.10 |
| 310,996 | IDAR | Buy | 11/20/08 | $0.10 |
| 22,532 | IDAR | Sold | 3/31/09 | $0.045 |
| 26,500 | IDAR | Sold | 3/31/09 | $0.046 |
| 350,968 | IDAR | Sold | 3/31/09 | $0.042 |
| 139,000 | IDAR | Sold | 3/31/09 | $0.042 |
| 21,000 | IDAR | Sold | 3/31/09 | $0.041 |