UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

|  |  |
|---|---|
| JAN BUETTGEN, on Behalf of Himself and All Others Similarly Situated, <br><br>              Plaintiff, <br><br> vs. <br><br> KATHERINE J. HARLESS, et al., <br><br>              Defendants. | Civil Action No. 3:09-cv-00791-K (Consolidated with Nos. 3:09-cv-00938-K; 3:09-cv-1049-K and 3:09-cv-1552-K) <br><br> <u>CLASS ACTION</u> |

REPORT ON MARKET EFFICIENCY AND LOSS CAUSATION

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

NOVEMBER 1, 2010

**TABLE OF CONTENTS**

SCOPE OF PROJECT AND REPORT .................................................................................. 1

CREDENTIALS .................................................................................................................. 1

CONCLUSIONS .................................................................................................................. 3

FACTUAL BACKGROUND ................................................................................................. 4

    About the Company ........................................................................................................ 4

EFFICIENT MARKET DEFINED........................................................................................ 6

    The *Cammer* Factors ................................................................................................... 7

    The *Unger* Factors ....................................................................................................... 9

EFFICIENCY OF THE MARKET FOR IDEARC COMMON STOCK ................................... 10

    Trading Volume ............................................................................................................ 10

    Analyst Coverage and Other Avenues of Information Dissemination ............................. 11

        Analyst Coverage.................................................................................................... 11

        Institutional Ownership and Buy-Side Analysis...................................................... 12

        Rating Agencies ...................................................................................................... 12

        News Coverage and Other Information Dissemination Vehicles ............................. 13

    Market Makers .............................................................................................................. 13

    S-3 Registration Eligibility ........................................................................................... 15

        Float ........................................................................................................................ 15

        Financial Filings...................................................................................................... 16

    *Unger* Factors ............................................................................................................. 16

        Market Capitalization.............................................................................................. 16

        Float ........................................................................................................................ 17

        Bid-Ask Spread ...................................................................................................... 18

EMPIRICAL EVIDENCE OF IDEARC COMMON STOCK MARKET EFFICIENCY .......... 19

    F-Test and Ansari-Bradley Volatility Test Conducted on Earnings Announcements............. 20

        Earnings Announcement Dates............................................................................... 20

        F-Test ...................................................................................................................... 21

        Ansari-Bradley Test................................................................................................ 22

    Event Study ................................................................................................................... 23

        Selection of Events ................................................................................................. 24

        Isolating the Impact of Company-Specific Information .......................................... 25

        *T*-test .................................................................................................................... 28

Event Study Results:  7 February 2008..................................................................... 29

Event Study Results:  29 July 2008 ......................................................................... 29

Event Study Results:  30 October 2008 ................................................................... 30

Event Study Summary ............................................................................................. 30

Market Efficiency Summary and Conclusion................................................................ 30

LOSS CAUSATION ........................................................................................................ 31

Timeline of Important Events ....................................................................................... 31

9 August 2007:  Q2 2007 Earnings Announcement and Conference Call ........................ 31

17 September 2007:  Acquisition of Switchboard.com ............................................... 32

1 November 2007:  Q3 2007 Earnings Announcement and Conference Call ................... 32

27 November 2007:  CFO Andy Coticchio Resigns..................................................... 34

7 February 2008:  Q4 and Fiscal Year 2007 Earnings Announcement and Conference Call
.................................................................................................................................. 34

11 February – 17 March 2008:  Ratings, Resignations, and Reversals .............................. 38

11-27 March 2008:  Presentations at Investor Conferences ........................................... 39

3 April 2008:  Credit Rating Downgrade..................................................................... 42

6 May 2008:  Q1 2008 Earnings Announcement and Conference Call............................. 42

2 June 2008:  New CEO Appointed............................................................................. 44

29 July 2008:  Q2 2008 Earnings Announcement and Conference Call ........................... 44

30 October 2008:  Q3 2008 Earnings Announcement and Conference Call ..................... 47

31 March 2009:  Idearc Declares Bankruptcy ............................................................. 50

The Plaintiff's Allegations ............................................................................................ 51

Alleged Misrepresentations and Omissions Caused the Idearc Stock Price to be Artificially
Inflated ....................................................................................................................... 54

Financial Principles...................................................................................................... 54

The Valuation Impact of Collectibles, Bad Debt, Earnings, and Cash Flow...................... 54

Misrepresenting Credit Policy and Bad Debt Obscures Secular and Cyclical Trends ......... 57

The Special Importance of Bad Debt, Earnings, and Cash Flow Due to the Company's
Leverage and Tax Sharing Agreement ........................................................................ 58

Company Statements About the Materiality of the Alleged Misrepresentations and Omissions
.................................................................................................................................. 58

Analysts Deemed the Alleged Misinformation Material ................................................. 60

Empirical Confirmation of Loss Causation ...................................................................... 69

Event Study Analysis.................................................................................................... 69

Event Study Analysis:  7 February 2008 ...................................................................... 70

Stock Price Reaction ...................................................................................................... 72

Accounting for Potentially Confounding Information .......................................................... 72

Event Study Analysis:  29 July 2008 ...................................................................................... 76

Stock Price Reaction ...................................................................................................... 78

Accounting for Potentially Confounding Information .......................................................... 78

Event Study Analysis:  30 October 2008 ................................................................................ 79

Stock Price Reaction ...................................................................................................... 82

Accounting for Potentially Confounding Information .......................................................... 82

Loss Causation Summary and Conclusion .............................................................................. 83

SUMMARY .............................................................................................................................. 84

LIMITING FACTORS AND OTHER ASSUMPTIONS ............................................................ 85

APPENDIX 1 ............................................................................................................................ 86

APPENDIX 2 ............................................................................................................................ 87

## SCOPE OF PROJECT AND REPORT

1. I was asked by Robbins Geller Rudman & Dowd LLP, counsel for the Plaintiff, to determine whether or not the common stock of Idearc Inc. ("Idearc," or the "Company") traded in an efficient market during the Class Period, 9 August 2007 to 30 October 2008.  I was also asked to determine whether investors suffered losses as a result of the Defendants' alleged misdeeds described in Plaintiff's Consolidated Class Action Complaint for Violations of the Federal Securities Laws, dated 11 February 2010 ("Complaint").

2. Toward this end, I analyzed the market for Idearc common stock and the price behavior of the stock, focusing on the factors that are generally accepted to be indicative of market efficiency.  I examined Company press releases, conference call transcripts, equity analyst reports, news articles, SEC filings, trading volume, the performance of the overall stock market, and the performance of Idearc's peers, as well as other pertinent data and documents.  Exhibit-1 lists the documents I reviewed and relied upon in the course of this engagement.

3. This report presents my methodology, findings, and conclusions.

4. I understand that discovery is ongoing in this case.  I may revise my report as additional information becomes available and as I conduct further analyses.

## CREDENTIALS

5. I, Steven P. Feinstein, am an Associate Professor of Finance at Babson College, and the Managing Principal of Crowninshield Financial Research, LLC, a financial economics consulting firm.

6. I have a Ph.D. in Economics from Yale University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College.  I also hold the Chartered Financial Analyst ("CFA") designation, granted by the CFA Institute.

7. At Babson College I have taught undergraduate and MBA level courses in Valuation, Investments, Equity Analysis, Fixed Income Analysis, Financial Management, Risk Management, and Quantitative Methods.  I have also taught executive courses on

1

investments and corporate financial management for numerous corporations.  Other courses I have taught are listed in my curriculum vitae, which is attached as Exhibit-2.

8.  At Babson College, I have held the Chair in Applied Investments and served as the Director of the Stephen D. Cutler Investment Management Center, a research and education center dedicated to the study and teaching of investments and capital markets.

9.  Prior to my joining the faculty at Babson College, I taught finance at Boston University. Prior to that I was an Economist at the Federal Reserve Bank of Atlanta where my primary responsibilities were to monitor financial markets, analyze proposed regulation, and advise the Bank President in preparation for his participation in meetings of the Federal Open Market Committee – the government body responsible for monetary policy in the United States.

10.  I have published extensively in the field of finance.  My finance articles have appeared in *The Journal of Forensic Economics*, *Atlanta Federal Reserve Bank Economic Review*, *Derivatives Quarterly*, *Derivatives Weekly*, *The Engineering Economist*, *The Journal of Risk*, *The American Bankruptcy Institute Journal*, *The Journal of Financial Planning*, *Risk Management*, and *Primus*.  A recent article has been accepted for publication and is forthcoming in *Managerial Finance*.  I am the author of *Finance and Accounting for Project Management*, published by the American Management Association.  I wrote two chapters in the book *The Portable MBA in Finance and Accounting* – one on corporate financial planning and the other on risk management.  I have presented research at the annual conventions of the American Finance Association, the Academy of Financial Services, the Multinational Finance Society, the Financial Management Association, and the International Conference on Applied Business Research.  Co-authored papers of mine have been presented at the Eastern Finance Association meetings and the Midwestern Finance Association meetings.

11.  I have been selected to review papers for numerous finance journals and conferences, and I have reviewed finance textbook manuscripts for Prentice-Hall and Southwestern Publishing.  I have been quoted on matters relating to finance and investments in *The Wall Street Journal*, *The Washington Post*, *The New York Times*, *The Financial Times*, and *The Boston Globe*, and my research relating to financial analysis and valuation has been discussed in *The Wall Street Journal*, *Bond Buyer*, and *Grant's Municipal Bond Observer*.

2

12. I am a member of the American Finance Association, the Financial Management Association, the North American Case Research Association, the CFA Institute, and the Boston Security Analysts Society, where I have served as a member of the education committee and ethics subcommittee.  I served on the Fixed Income Specialization Examination Committee of the CFA Institute.

13. The CFA designation is the premier credential for financial analysts, worldwide.  In order to receive this credential, applicants must pass a series of three exams covering such topics as equity analysis, financial valuation, business analysis, quantitative methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards.  I have taught in the Boston University CFA Review Program and the Boston Security Analysts Society CFA Review Program – two of the leading review programs that help candidates prepare for the CFA exams.  In both of these programs I taught the most advanced level.

14. In addition to my teaching, research, CFA, and academic community responsibilities, I practice extensively as a financial consultant.  Past and present clients include the United States Securities and Exchange Commission, the Internal Revenue Service, the Attorney General of the State of Illinois, and the National Association of Securities Dealers.  As a financial consultant, I have conducted analyses and presented opinions related to market efficiency, artificial inflation, loss causation, and damages in over 50 securities cases.  Exhibit-3 lists my prior testimony appearances over the past four years.

15. In accordance with recognized professional ethics, my professional fees for this service are not contingent upon the opinions expressed herein.  My services in this matter are being charged at the rate of $675 per hour.  I am the managing principal of the consulting firm Crowninshield Financial Research, which receives compensation for the work performed by analysts who assist me on this case.  I have no present or intended financial interest in the outcome of this matter.

## CONCLUSIONS

16. Idearc stock traded in an efficient market over the course of the Class Period.

17. Idearc common stock satisfied the *Cammer* and *Unger* factors, which consistent with financial economic principles and empirical research, indicate market efficiency.

3

18. Statistical tests prove that there was a cause and effect relationship between the release of new material information and movements in the Idearc stock price, which not only indicates market efficiency, but demonstrates the essence of market efficiency.

19. Over the course of the Class Period, the alleged misrepresentations and omissions caused the price of Idearc stock to be artificially inflated.  This conclusion is based on an analysis of Company statements, analyst reports, analysts' valuation models, generally accepted principles of valuation, and event studies focusing on the corrective disclosure events.

20. Event study analysis, which controlled for potentially confounding information, proves that the alleged misrepresentations and omissions caused the price of Idearc stock to be artificially inflated during the Class Period, and that the corrective disclosures caused the inflation to dissipate, thereby causing the stock price to fall and causing investor losses.

## FACTUAL BACKGROUND

### About the Company

21. Throughout the Class Period, Idearc was a publisher of yellow pages directories.  The Company generated revenue by selling media advertising for the print yellow pages, superpages.com, and superpages mobile.[1]  According to the Company's 10-K for the fiscal year ended 31 December 2008, filed 12 March 2009, over 90% of the Company's revenues were derived from the sale of advertising in print directories, with the remaining 10% generated by internet products and services.

22. Idearc was spun-off from Verizon Communications Inc. ("Verizon") on 17 November 2006.  Verizon shareholders received one share of Idearc stock for every 20 shares of Verizon common stock they owned.  The new Company comprised the yellow pages and related businesses formerly owned by Verizon.  Along with the transfer of assets, however, Idearc assumed $9 billion of Verizon's debt.

23. The spin-off was structured in a tax advantageous manner.  However, among the terms of the transaction was an agreement that Idearc would bear responsibility for any tax consequences should the tax-free status of the deal be revoked.  The "Tax Sharing

---

[1] Idearc Inc. Form 10-K for the Fiscal Year Ended 31 December 2008, filed 12 March 2009, p. 1.

Agreement" restricted Idearc from certain actions that would jeopardize the tax-free status. Restrictions were placed on Idearc's ability to prepay debt, issue equity, or dispose of assets for two years following the transaction.

24. Idearc common stock began trading on the New York Stock Exchange ("NYSE") on 20 November 2006.[2]  That same day, Idearc sold $2.85 billion of 8% coupon bonds, with maturity date 15 November 2016.[3]  The original issue of unregistered bonds was exchanged for registered bonds in May 2007.[4]

25. The Company reported operating revenue of $2.90 billion in 2007 and $2.67 billion in 2008.[5]  Net income was $429 million 2007 and $183 million in 2008.[6]

26. As of the close of trading on 8 August 2007, the day prior to the start of the Class Period, Idearc's market capitalization (the aggregate value of all outstanding common shares) was $4.7 billion.[7]  The market capitalization climbed to a Class Period peak of $5.2 billion on 4 September 2007.  By 31 October 2008, the day following the end of the Class Period, the Company's market capitalization had fallen to $56.1 million.  The decline in market capitalization from the peak during the Class Period to the day after the Class Period was $5.1 billion, representing a loss of 98.9% of the Company's equity value.

27. Idearc's market capitalization of $4.7 billion as of the start of the Class Period placed it in the 4th decile by size among companies whose stock is traded on American stock exchanges – meaning that Idearc was larger than at least 60% of all other publicly-traded companies in the United States at that time.[8]

28. At the close of trading on the day before the Class Period, 8 August 2007, Idearc's common stock price was $32.02 per share.  The peak share price during the Class Period was $35.13 per share on 4 September 2007.  By 31 October 2008, the day after the Class Period, the stock price had fallen to $0.38 per share, representing a decline of 98.8% from the start of the Class Period, and a decline of 98.9% from the Class Period high.

---

[2] "Idearc Inc. Launches with New IAR Ticker Symbol; Board of Directors Announced," *Business Wire,* 20 November 2006.
[3] "Idearc Inc. Sells $2.85 Billion 10 Year Notes-Reuters," *Reuters Significant Developments*, 20 November 2006.
[4] Idearc Inc., Form 424B3 Prospectus for $2,850,000,000 Registered 8% Senior Notes due 2016, dated 7 May 2007.
[5] Idearc Inc. Form 10-K for the Fiscal Year Ended 31 December 2008, filed 12 March 2009, p. 58.
[6] *Ibid.*
[7] Common stock price data obtained from CRSP.
[8] *Ibbotson 2008 Stocks, Bonds, Bills & Inflation (SBBI) 2008 Yearbook (Valuation Edition).*

5

29. Following the end of the Class Period, at the close of trading on 20 November 2008, Idearc's common stock was delisted from the NYSE.[9]

30. Later, on 31 March 2009, Idearc filed for Chapter 11 bankruptcy protection. The Company restructured and reorganized, emerging from bankruptcy on 31 December 2009. On 4 January 2010, the company changed its name from Idearc Inc. to SuperMedia, Inc.[10]

## EFFICIENT MARKET DEFINED

31. The definition of market efficiency set forth by Judge Alfred J. Lechner, Jr. in the 1989 *Cammer v. Bloom* decision is often cited as a legal authority on the meaning of market efficiency and is consistent with the definition generally accepted by the academic finance community:

> "As relevant here, courts have permitted a rebuttable presumption of reliance in the case of securities traded in 'efficient markets' (*i.e.*, markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price.)"
> **Cammer Opinion, 711 F. Supp. at p. 1273 (parentheses as in original).**

32. Judge Lechner also cited the definitions offered by commentators Alan R. Bromberg and Lewis D. Lowenfels, and by finance professor Eugene Fama:

> "An efficient market is one which rapidly reflects new information in price."
> **Bromberg and Lowenfels, cited in the *Cammer* Opinion, 711 F. Supp. at p. 1276.**

> "A market in which prices always 'fully reflect' available information is called 'efficient.'"
> **Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work,"**
> ***Journal of Finance*, 1970, cited in the *Cammer* Opinion, 711 F. Supp. at p. 1280.**

33. The Supreme Court in the *Basic v. Levinson* decision focused on the same important characteristic at the heart of these definitions of market efficiency:

---

[9] "Idearc Announces Common Stock Trading Over The Counter With New Symbol IDAR," *Business Wire,* 21 November 2008.
[10] Idearc Inc. Form 10-K for the Fiscal Year Ended 31 December 2009, filed 26 February 2010, pp. 1-2.

6

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…"
> **Supreme Court in *Basic* case, 108 S. Ct. at 988-89 (quoted in the *Cammer* Opinion, 711 F. Supp. at p. 1276).**

34. An efficient market, as defined by *Cammer, Basic,* Bromberg and Lowenfels, and Fama, is a market in which available information is rapidly incorporated into the prices of securities such that the trading price reflects all available information.  Market efficiency is relevant to a securities case as it addresses the question of whether or not false information (whether in the form of an alleged misrepresentation or omission) would likely have impacted the prices at which investors bought and sold.

The *Cammer* Factors

35. The *Cammer* opinion lays out five factors that would suggest the market for a security is efficient.  As described below, economic rationales support each factor as an indicator of market efficiency.  The five factors are: 1) trading volume, 2) coverage by securities analysts, 3) number of market makers, 4) eligibility for S-3 registration, and 5) empirical evidence that the security price reacts to material information.

36. Empirical research has confirmed that volume, number of market makers, and analyst coverage are indicative of market efficiency:

> "Consistent with the efficiency indicators used recently by the courts, the inefficient firms have lower mean trading volume, fewer market makers, lower analyst following, and lower institutional ownership (number and percentage) than efficient firms."
> **"The Fraud-on-the-Market Theory and the Indicators of Common Stock Efficiency," by Brad M. Barber, Paul A. Griffin, and Baruch Lev, *Journal of Corporation Law*, 1994, p. 302.**

37. Barber, *et al.*, did not test S-3 registration eligibility as an indicator of market efficiency, but it is noteworthy that the S-3 eligibility criteria include a minimum market capitalization requirement, and large firm size is correlated with high institutional ownership, a factor which Barber, *et al.* did find to be indicative of market efficiency.  With respect to the empirical factor, Barber, *et al.* used empirical tests as the standard for market efficiency by

7

which to judge the significance of the other variables.  Consequently, they acknowledge the importance of the empirical factor.

38.   Consistent with financial economic theory and empirical research, the language used by the *Cammer* Court describes the factors not as five **necessary** factors, but rather as indicative of the degree to which the security market is expected to be efficient:

> "There are several different characteristics pertaining to the markets for individual stocks which are probative of the degree to which the purchase price of a stock should reflect material company disclosures."
> **Cammer Opinion, 711 F. Supp. at p. 1283.**

39.   In fact, the way the five factors are described in the *Cammer* opinion suggests that these five conditions are more akin to sufficient conditions individually, rather than necessary conditions collectively – again, consistent with economic theory.  The *Cammer* opinion describes the nature of the five factors as follows:

> "There are several types of facts which, if alleged, might give rise to an inference that Coated Sales traded in an efficient market.  It is useful to set forth an explanation of how the existence of such facts would cause the understanding that disclosed company information (or misinformation) would be reflected in the company's stock price, the underpinning of the fraud on the market theory.  *Peil, supra, 806 F.2d at 1160*"
> **Cammer Opinion, 711 F. Supp. at pp. 1285-86 (footnote omitted).**

> "First, plaintiffs could have alleged there existed an average weekly trading volume during the class period in excess of a certain number of shares."
> **Cammer Opinion, 711 F. Supp. at p. 1286.**

> "Second, it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."
> **Cammer Opinion, 711 F. Supp. at p. 1286.**

> "Third, it could be alleged the stock had numerous market makers."
> **Cammer Opinion, 711 F. Supp. at p. 1286.**

> "Fourth, as discussed it would be helpful to allege the Company was entitled to file an S-3 Registration in connection with public offerings…"
> **Cammer Opinion, 711 F. Supp. at p. 1287.**

8

"Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."
**_Cammer_ Opinion, 711 F. Supp. at p. 1287.**

"As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate over time, a cause and effect relationship between company disclosures and resulting movements in stock price."
**_Cammer_ Opinion, 711 F. Supp. at p. 1291.**

<u>The _Unger_ Factors</u>

40. In addition to the five _Cammer_ factors that indicate market efficiency, the district court in _Krogman v. Sterritt_, and the Fifth Circuit Court of Appeals in _Unger v. Amedisys_ concluded three additional factors were also indicative of market efficiency.

41. These additional factors, the _Unger_ factors, are: 1) the company's market capitalization, 2) the stock's float, and 3) the typical bid-ask spread.

42. Market capitalization is the total value of all outstanding shares. It equals the number of shares outstanding times the price per share. Reasonably, the larger the market capitalization, the more prominent and well known the company will be. Larger companies tend to attract more analyst and news media coverage, and gain the attention of greater numbers of investors, including very large institutional investors. All of these characteristics, which accompany a large market capitalization, promote market efficiency.

43. The stock's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities. It is generally the number of shares available for trading by outside investors in the open market. Of course, float is highly correlated with market capitalization, but it focuses on the shares available for trading rather than all shares outstanding. Stocks with large levels of float tend to trade more actively, attract more analyst and news media coverage, and garner the attention of greater numbers of investors, including very large institutional investors. All of these characteristics, which accompany a high float level, promote market efficiency.

44.  The bid-ask spread is the difference between the price at which market makers are offering to buy a security and the price at which they are offering the security for sale.  If a security is actively traded and information about the security is readily available, the bid-ask spread will tend to be narrow.  Moreover, a narrow bid-ask spread makes trading in the security less costly for investors, and thereby tends to attract greater interest, greater coverage, and greater volume, which in turn are factors that are generally considered to promote market efficiency.

## EFFICIENCY OF THE MARKET FOR IDEARC COMMON STOCK

45.  To assess whether or not the market for Idearc common stock was an efficient market, I analyzed the market and behavior of Idearc common stock, focusing on factors that are generally accepted to be indicative of market efficiency for a publicly traded security.

### Trading Volume

46.  Throughout the Class Period, Idearc's common stock traded regularly and actively.  On average, 2.9 million shares changed hands daily.[11]  On one day, 29 July 2008, over 23.6 million shares traded.  Idearc common stock trading volume data is presented in Exhibit-4.

47.  In addition to average daily trading volume, another volume metric to consider in determining market efficiency is the percentage of outstanding shares that turn over each week.  During the Class Period, the average weekly trading volume was 9.9% of shares outstanding.[12]  This level of trading activity is above levels accepted by courts as being indicative of market efficiency for common stocks.[13]  In the case of the common stock of Coated Sales, Inc., the *Cammer* Court cited the conclusion of Alan R. Bromberg and Lewis D. Lowenfels that "weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one."[14]  Trading volume for Idearc common stock during the Class Period was nearly five times greater than that threshold.

---

[11] Financial data provided by CRSP.
[12] Estimated by dividing the average daily volume by the average number of shares outstanding, times 5 (the number of trading days in a typical week).
[13] *Cammer* Opinion, 711 F. Supp. at p. 1286.
[14] *Cammer* Opinion, 711 F. Supp. at p. 1293.

48.   Both in terms of average daily trading volume and also on the basis of the percentage of outstanding shares traded weekly, the market for Idearc common stock was very active. Consistent with the *Cammer* opinion and economic theory, the active trading volume in Idearc common stock is evidence of the efficiency of the market for Idearc common stock over the course of the Class Period.

### Analyst Coverage and Other Avenues of Information Dissemination

Analyst Coverage

49.   Securities analysts disseminate and interpret information about the companies they cover. They conduct research and provide valuation opinions, helping market participants acquire relevant information and understand the implications of that information for valuation and investment decisions.  Consequently, securities analysts facilitate the flow of information and the digestion of information within the marketplace.  These functions promote market efficiency.

50.   Idearc was the subject of broad analyst coverage during the Class Period.  The Thomson Research database provides analyst reports on Idearc published during the Class Period by six different firms:  C.L. King and Associates; Deutsche Banc Alex. Brown Fixed Income; Deutsche Bank Securities; JP Morgan; Natixis Bleichroeder; and Wachovia Securities.

51.   The Company's conference call transcripts for 9 August 2007, 17 September 2007, 1 November 2007, 7 February 2008, 6 May 2008, 29 July 2008, and 30 October 2008 show that the following additional 19 firms also were covering Idearc:  Angelo Gordon; Bear Stearns; Canaccord Capital; Credit Suisse; Evergreen Investment; Goldman Sachs; KBS Financial; Lehman Brothers; Merrill Lynch; MetLife; Morgan Stanley; Perennial; RBC Capital Markets; Royal Bank of Scotland; SCM Advisors; Thomas Weisel Partners; UBS; Wedbush Morgan; and Wolf Point Capital.

52.   Three more firms following Idearc were cited in the press – those firms being Gimme Credit, KDP Investment Advisors, and CreditSights.[15]

53.   Consequently, at least 28 firms covered Idearc during the Class Period.

---

[15] "Earnings Miss Spooks Idearc Bondholders," by Anastasija Johnson, *Reuters News*, 31 July 2008.

54.   Consistent with the *Cammer* opinion and financial economic principles, the widespread analyst coverage of Idearc is evidence of the efficiency of the market for Idearc common stock during the Class Period.

Institutional Ownership and Buy-Side Analysis

55.   Vickers Stock Research Corporation ("Vickers") provides data on institutional ownership of Idearc common stock. The data is compiled from the 13-F filings that major investment institutions are required to submit to the SEC. Major institutions are defined as firms or individuals that exercise investment discretion over the assets of others in excess of $100 million. Large investment firms generally employ financial analysts who conduct their own research on the stocks they buy. According to the Vickers data, at least 853 major institutions owned Idearc common stock during the Class Period.[16]

Rating Agencies

56.   Analyst coverage on Idearc was also provided by the bond rating agencies Moody's and Standard & Poor's ("S&P").

57.   To arrive at bond ratings, these ratings agencies perform detailed analyses of issuers, taking into account a vast array of business and financial information. Through their ratings, the agencies convey information and analysis to the marketplace. According to S&P literature, the agency will "assign a rating only when adequate information is available." Moreover, S&P monitors and periodically updates company ratings. As described in the following quote from the S&P website, S&P collects and disseminates material information about the companies it rates:

> "Once a rating is assigned, we maintain on-going review of material factors that could affect the rating, such as changes in the capital structure, an acquisition or other major economic developments. Generally, an issuer credit rating is reviewed formally at least once a year at the time of a meeting with the issuer's management. We expect management to provide to us prompt notice of material financial and operational changes that could affect the rating."
> **Fact Sheet – Understanding Credit Ratings, on www.standardandpoors.com, 12 April 2004.**

---

[16] At least 853 institutional investors held Idearc common stock according to filings that reported holdings as of 31 December 2007, 31 March 2008, 30 June 2008, and 30 September 2008. Additional institutions may have held Idearc common stock during the Class Period, though not on the quarterly reporting dates.

58. Coverage by S&P and Moody's are channels through which information about Idearc reaches investors and is subsequently incorporated into the prices of all Idearc securities, including its stock.

<u>News Coverage and Other Information Dissemination Vehicles</u>

59. The news media also facilitate the flow of material information to the marketplace thereby promoting market efficiency. In the case of Idearc, coverage by the news media was extensive. A search of the Factiva database established that there were at least 278 articles published about the Company during the 448-day Class Period.[17]

60. The articles obtained from Factiva include published news articles and press releases. Information also emerged throughout the Class Period in the form of SEC filings, conference calls, and presentations. Therefore, during the Class Period, information about Idearc was readily available to market participants as there was a consistent flow of news provided by news media, analysts, and various other sources.

61. Idearc was not an obscure company, escaping the notice of the news media, analysts, and investors. Rather, Idearc was large, well known, widely covered, and widely held. These facts strongly support a finding that the market for Idearc common stock was an efficient market during the Class Period.

**<u>Market Makers</u>**

62. The number of market makers is one of the factors the *Cammer* Court determined indicates market efficiency. The company that was the subject of the lawsuit in the *Cammer* case was Coated Sales, Inc., which was listed on the NASDAQ stock exchange. The NASDAQ is an electronic exchange that makes use of multiple competing market makers. Market makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with investors and institutions. Consequently, for a NASDAQ-listed stock, a large number of market makers indicates that there are many market participants trading that particular stock. A large number of market makers also indicates that there is a high degree of liquidity. With a large number of market makers it is generally easy for investors to execute trades in a timely fashion with reasonable transaction costs.

---

[17] Based on a Factiva search of "All Sources" for articles published during the Class Period where "SuperMedia Inc." was the "Company" search field parameter.

63. The *Cammer* Court's understanding that the market-making infrastructure of a stock market is indicative of its efficiency or lack thereof, makes the fact that Idearc common stock traded on the venerable New York Stock Exchange highly relevant.

64. The NYSE is one of the most renowned, most liquid, and most efficient forums for trading stocks in the world.  Stocks on the NYSE are traded under the supervision of a lead market maker known as a "specialist."  Specialists are responsible for maintaining a fair and orderly market for the security to which they are assigned.[18]

65. In fact, citing Bromberg and Lowenfels, the *Cammer* Court explicitly acknowledged the importance of an NYSE listing and the implications of such a listing on market efficiency:

> "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."
> **Bromberg and Lowenfels, cited in the *Cammer* Opinion, 711 F. Supp. at p. 1292.**

66. While specialists are the most important market makers for NYSE stocks, they are not the only market makers.  Generally, numerous brokers and dealers also make markets in NYSE-listed stocks, and the NYSE specialist facilitates their market making activity.

67. During the Class Period, according to Bloomberg, there were at least 117 market makers for Idearc common stock in addition to the NYSE specialist.  Some of the other market makers include:  Barclays Capital; Citigroup Global Markets; Goldman Sachs; JP Morgan; Jefferies & Co.; Merrill Lynch; RBC Capital Markets; UBS Securities; Wells Fargo; Brown Brothers Harriman; Morgan Keegan; and State Street Global Markets.

68. The facts that Idearc common stock traded on the NYSE and that numerous financial institutions also served as market makers are strong evidence that Idearc common stock traded in an efficient market.

---

[18] "Organization and Functioning of Securities Markets," by Frank Reilly and Keith Brown, in *Equity and Fixed Income CFA Program Curriculum*, vol. 5, Pearson Custom Publishing, 2008.

14

**S-3 Registration Eligibility**

69.   The *Cammer* opinion noted that S-3 registration is indicative of market efficiency because a company is entitled to S-3 registration when, among other things, it has filed Exchange Act reports for a specified length of time and has outstanding float above a certain sizable value.  At the time of the *Cammer* opinion, the conditions for S-3 registration were that a company filed financial reports with the SEC for 36 months, and had outstanding float over $150 million held by non-affiliates, or $100 million of such float coupled with annual trading volume exceeding 3 million shares.  The rules as of today require 12 months of filings and $75 million of float.  Satisfying such conditions on filings and float, according to the *Cammer* Court, indicates that the subject company would be well known in the marketplace and information about it would be readily available, fostering the efficiency of the market for the company's stock.

Float

70.   A company's float is the number or value of shares that can potentially trade freely in the marketplace.  It is generally defined as the number or value of outstanding shares, minus insider holdings and shares owned by affiliated corporate entities.[19]

71.   I computed Idearc's common stock float from data in Idearc's SEC filings and data provided by CRSP.[20]

72.   Idearc common stock float averaged $1.7 billion during the Class Period, far exceeding the level required for S-3 registration.  Between the start of the Class Period and 23 October 2008, float ranged between $5.2 billion and $103.3 million.  These levels exceed the minimum requirement for S-3 registration.

73.   At the end of the Class Period, Idearc's float was less than what it had been previously on account of its declining share price.  On 24 October 2008 and 27 October 2008, the float was $94.4 million and $82.6 million, respectively, still above the required threshold.

74.   On the last three trading days of the Class Period, 28 October 2008 through 30 October 2008, the float was $73.8 million, $73.8 million, and $47.5 million, respectively.  Even

---

[19] For a discussion of the generally accepted definitions of shares outstanding and float, see "Float Adjustment Methodology," *Standard & Poor's,* August 2006.
[20] Float value is based on closing prices provided by CRSP.  Share data obtained from SEC filings.  According to Proxy Statements filed 9 March 2007 and 17 March 2008, insiders held 3,613 shares and 169,010 shares as of 1 March 2007 and 10 March 2008, respectively.

15

though these levels are below the $75 million minimum required for S-3 registration, the very high daily trading volume on those three days, ranging between 2.3 million and 7.9 million shares, clearly indicates that market participants had the benefit of an efficient flow of information about the Company and were able to execute trades, indicating market efficiency through the last day of the Class Period.

Financial Filings

75.  Subsequent to the spin-off on 17 November 2006, the Company regularly filed financial reports with the SEC, and remained current during the Class Period.

76.  At the start of the Class Period, Idearc may not have been eligible for S-3 registration because it had not filed financial reports for a full 12 months on account of the Company being an independent entity for less than 12 months.  However, in conjunction with the spin-off from Verizon, Idearc filed a registration statement of its common stock on 1 November 2006.  That registration statement presented over three years of financial information from when the Company was a subsidiary of Verizon.[21]

77.  Similarly, in the bond prospectus, dated 7 May 2007, Idearc again presented over three years of historical financial information.[22]

78.  Consequently, even during the first three months of the Class Period, the public had access to far more financial information about the Company than the S-3 registration minimum requirement, albeit not in the form required for S-3 registration eligibility.

79.  To the extent that S-3 registration eligibility indicates company characteristics associated with market efficiency, the Company clearly possessed those particular characteristics throughout the Class Period.

***Unger* Factors**

80.  In addition to the five *Cammer* factors that indicate market efficiency, I also examined Idearc stock and its market with respect to the three additional *Unger* factors.

Market Capitalization

81.  During the Class Period, Idearc's market capitalization averaged over $1.7 billion.

---

[21] Idearc Inc. Form 10-12B/A, filed 1 November 2006.
[22] Idearc Inc., Form 424B3 Prospectus for $2,850,000,000 Registered 8% Senior Notes due 2016, dated 7 May 2007.

82. In its Ibbotson SBBI publications, Morningstar publishes annual statistics that rank the size of all public companies. [23]  Ibbotson groups public companies into deciles, so that the 1st decile contains the largest 10% of all public companies listed on the NYSE, American Stock Exchange, and NASDAQ, while the 10th decile contains the smallest 10%.

83. A market capitalization of $1.7 billion ranks in the 6th decile relative to all other publicly-traded companies in 2007 and 2008, meaning that Idearc's average market capitalization was larger than the market capitalizations of more than 40% of all other publicly-traded companies in the United States.

84. At the start of the Class Period, Idearc's market capitalization was $4.7 billion, placing it in the 4th decile—meaning that Idearc was larger than at least 60% of all other publicly-traded companies in the United States at that time.

85. Idearc's market capitalization fell over the course of the Class Period as its stock price declined.  Through 20 June 2008, Idearc's market capitalization remained larger than at least 20% of all other publicly-traded companies in the U.S.  On 23 June 2008 it fell into the 9th decile, and on 29 July 2008 it fell into the 10th decile.  The market capitalization fell below $100 million on 24 October 2008, near the end of the Class Period.  Following the final disclosure on 30 October 2008, Idearc's market capitalization was $47.6 million.

86. Consistent with the *Unger* Court opinion, Idearc's large initial and average market capitalizations are further evidence of the efficiency of the market for Idearc stock.

87. Whereas for some companies, a low market capitalization indicates that a company may be obscure, which could make the market for its securities inefficient, that was not the case for Idearc ever.  The low market capitalization at the end of the Class Period resulted from market participants revaluing the Company in response to new information, which is the essence of market efficiency.

Float

88. The magnitude of Idearc's float is indicative of market efficiency, as discussed above in relation to the S-3 eligibility factor.

89. For Idearc, the number of insider shares was a relatively small percentage of all outstanding shares.  The maximum number of insider shares over the course of the Class Period divided

---

[23] *Ibbotson SBBI 2008 Valuation Yearbook*; and *Ibbotson SBBI 2009 Classic Yearbook.*

17

by the minimum number of shares outstanding is 0.12%.  This ratio implies that float comprised nearly all outstanding shares throughout the Class Period.

90.  The *Krogman* opinion cited a high ratio of float to outstanding shares as an indicator of market efficiency.  With respect to this indicator, Idearc exhibited market efficiency.

Bid-Ask Spread

91.  I obtained from CRSP daily closing bid and ask quotes for Idearc stock.

92.  I measured the percentage bid-ask spread as the difference between the ask and bid quotes, divided by the average of the bid and ask quotes, which is the standard way of measuring percentage bid-ask spreads in the finance literature.  Exhibit-4 presents the bid-ask spread data.

93.  The average bid-ask spread for Idearc stock over the course of the Class Period was 0.59%.

94.  By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database was 1.23%.  Idearc's bid-ask spreads were therefore narrower than the mean level among all other CRSP stocks, which comprised stocks traded on the NYSE, Amex, NASDAQ, and NYSE Arca.

95.  In dollar terms, Idearc's average bid-ask spread during the Class Period was $0.03 per share.  The CRSP dollar bid-ask spread average was $0.19.

96.  There were only 26 days out of the Class period's 311 trading days on which Idearc's bid-ask spread was wider than the average for all other CRSP stocks.  Notably, these observations were generally at the tail end of the Class Period when the stock price was low.  The average dollar bid-ask spread over these 26 days was $0.04, representing a relatively low bid-ask spread in absolute terms.  Moreover, the average trading volume on these 26 days was 3.6 million shares, indicating that the bid-ask spread was no impediment to active trading.

97.  The average and vast majority of all daily bid-ask spreads in the market for Idearc stock over the course of the Class Period were lower than the typical bid-ask spreads exhibited by other publicly-traded stocks in the U.S.  Idearc's narrow bid-ask spreads support a conclusion of market efficiency.

## EMPIRICAL EVIDENCE OF IDEARC COMMON STOCK MARKET EFFICIENCY

98.   Of the five *Cammer* factors, the empirical factor was cited by the *Cammer Co*urt as "one of the most convincing ways to demonstrate efficiency":

> "As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate over time, a cause and effect relationship between company disclosures and resulting movements in stock price."
> **Cammer Opinion, 711 F. Supp. at p. 1291.**

99.   The special importance the *Cammer* Court placed on the empirical factor is justified by economic principles, as the empirical factor focuses on the essence of market efficiency whereas the other four factors are indicators that generally signal market efficiency.

100.  I conducted two types of empirical tests of the efficiency of the market for Idearc common stock.  The first type comprised the F-test and Ansari-Bradley volatility test, which examined whether or not Idearc common stock exhibited market efficiency by responding to the increased flow of information that transpired on earnings announcement dates.

101.  It is a widely accepted principle of finance that earnings announcements contain material information.[24]  Consequently, testing to determine whether or not Idearc common stock reacted to earnings announcements by moving more on earnings announcement dates than on other dates indicates whether or not the market for Idearc stock was efficient.

102.  The F-test and Ansari-Bradley test measure whether Idearc stock price movements were significantly greater on earnings announcement dates than on other dates, which determines whether or not Idearc stock efficiently reacted to the greater flow of information that transpired on those dates.

103.  The second type of test I conducted was an event study.  An event study investigates whether or not a security price reacts appropriately to the release of new information.  A significant and appropriate reaction to new material information indicates market efficiency.  Whereas the F-test and Ansari Bradley volatility test determine whether or not Idearc stock responded efficiently to earnings announcements collectively, the event study focused on the reaction of the stock to individual events.  By focusing the event study on

---

[24] For example: *Financial Reporting an Accounting Revolution*, 3rd ed., William H. Beaver, 1998; and "Earnings Management to Exceed Thresholds," by Francois Degeorge, Jayendu Patel, and Richard Zeckhauser, *Journal of Business*, 1999.

corrective disclosure events, one is able to ascertain whether the market for Idearc stock was efficient with respect to the particular information at issue in this case.

**F-Test and Ansari-Bradley Volatility Test Conducted on Earnings Announcements**

104. A company's financial results and forecasts are among the most important considerations to investors assessing the value of its stock.  Consequently, such announcements typically contain material information that could cause the stock price to change.

105. By examining whether or not the Company's common stock price moved more on earnings announcement days than on other days, one can determine whether the stock reacted to new material information.  This cause and effect relationship is the essence of market efficiency.  Consequently, greater stock price movement on earnings announcement days is indicative of market efficiency.

Earnings Announcement Dates

106. The following is the list of the earnings announcement dates for Idearc during the Class Period:

    i.  9 August 2007, before the start of trading – Idearc reported financial results for Q2 2007 (quarter ending 30 June 2007).

    ii. 1 November 2007, before the start of trading – Idearc reported financial results for Q3 2007 (quarter ending 30 September 2007).

    iii. 7 February 2008, before the start of trading – Idearc reported financial results for Q4 2007 and fiscal 2007 (quarter and fiscal year ending 31 December 2007).

    iv. 6 May 2008, before the start of trading – Idearc reported financial results for Q1 2008 (quarter ending 31 March 2008).

    v.  29 July 2008, before the start of trading – Idearc reported financial results for Q2 2008 (quarter ending 30 June 2008).

    vi. 30 October 2008, before the start of trading – Idearc reported financial results for Q3 2008 (quarter ending 30 September 2008).

107. There may have been additional material information aside from earnings information disseminated on these event dates to which the stock price reacted.  For example, Idearc routinely announced forward guidance and dividends on earnings announcement dates.

20

Stock price reactions to such additional information would be further confirmation of market efficiency.

108. Announcements of financial results and guidance sometimes constitute unexpected good news and sometimes constitute unexpected bad news. If a stock price rises in value following unexpected good news and falls following unexpected bad news – that is, reacts quickly to new material information – then the dispersion of returns in a sample of such days would differ significantly from the dispersion of returns in the sample of all other days.

109. Dispersion is measured by the statistical standard deviation in the distribution of returns.

110. I conducted two tests to determine whether the standard deviation of Idearc returns on earnings announcement days was significantly different from the standard deviation of Idearc returns on all other days in the Class Period: an F-test and an Ansari-Bradley test, both described below. I ran both tests on the "residual returns" for Idearc's common stock, that is the computed portion of the stock returns remaining after controlling for the impact of market and peer group effects. The computation of residual returns is described below in the Event Study section of this report. Running the tests on residual returns focuses the tests more precisely on the effects of Company-specific information on the Company stock price.

F-Test

111. The sample standard deviation of the earnings announcement day residual returns was 34.0%. The sample standard deviation of all other days' returns was 6.0%. Clearly, the earnings announcement days' sample standard deviation was greater than the sample standard deviation for all other days—over five times greater.

112. An F-test assesses whether the difference between the two sample standard deviations is statistically significant, or alternatively, a potentially random result. The F-statistic for these two samples is 31.80, which is greater than the 95% confidence level critical F-statistic value of 2.24 (for a one-tail F-test with 5 and 304 degrees of freedom), indicating that the difference in sample standard deviations is statistically significant.

113. The F-test finds that the volatility of earnings days' returns is significantly greater than the volatility of returns for all other days. This result demonstrates that the price of Idearc common stock moved more on earnings days than on other days. This statistical result

indicates that there was a cause and effect relationship between the release of new information and reactions in the Idearc common stock price, which therefore establishes that Idearc common stock traded in an efficient market.

Ansari-Bradley Test

114. The Ansari-Bradley test is another test that determines whether or not two data samples have the same or significantly different dispersions (*i.e.* standard deviation in the distribution of returns). The Ansari-Bradley test is a well regarded and generally accepted test for this purpose and is presented and described in numerous authoritative textbooks.[25] Unlike the F-test, which is also commonly used to test for differences in standard deviations, the Ansari-Bradley test makes no assumption about the normality of the return distributions.[26]

115. Applied to the earnings announcement returns and the sample of all other returns observed during the Class Period, the Ansari-Bradley test, like the F-test, finds with an extremely high degree of statistical certainty that the volatility of earnings announcement day returns was significantly greater than the volatility of returns on all other days. The Ansari-Bradley C-statistic for the two samples of Idearc stock residual returns is -3.19, the absolute value of which is greater than the critical C-statistic threshold of 1.96 for significance at the 95% confidence level. This result is further proof that the price of Idearc common stock moved more on earnings announcement days than on other days during the Class Period.

116. This statistical test result indicates that there was a cause and effect relationship between the release of new information and reactions in the Idearc common stock price, which therefore establishes that Idearc common stock traded in an efficient market during the Class Period.

---

[25] For example: *Practical Nonparametric Statistics,* 2nd edition, by J.W. Conover, John Wiley & Sons, 1980; *Applied Nonparametric Statistics*, by Wayne W. Daniel, Houghton Mifflin, 1978; *Nonparametric Statistical Methods*, by Wolfe Hollander, John Wiley & Sons, 1973; *Beyond ANOVA: Basics of Applied Statistics*, by Rupert, G. Miller, Jr., John Wiley & Sons, 1986; and *Biostatistical Analysis*, 3rd edition, by Jerrold H. Zar, Prentice-Hall, 1996.
[26] In this particular case, however, the F-test gives the same result as the Ansari-Bradley test, which is that the event day return distribution has significantly greater volatility than does the return distribution for all other days – indicating market efficiency.

**Event Study**

117. I also ran event study tests to investigate the efficiency of the market for Idearc common stock.  The event study is the paramount tool for testing market efficiency, as Eugene Fama attests:

> "The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns.  When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration.  As a result, event studies give a clear picture of the speed of adjustment of prices to information."
> **"Efficient Capital Markets: II," by Eugene F. Fama, *Journal of Finance*, 1991, p. 1607.**

118. While the F-test and Ansari-Bradley test prove that Idearc common stock demonstrated market efficiency generally, an event study focusing on corrective disclosure events tests the efficiency of Idearc stock with respect to the specific information at issue in this case.

119. Event study analysis is one of the most commonly used analytic methodologies employed by finance researchers.  Campbell, Lo, and MacKinlay [1997] present an excellent description and examples of the methodology and write about how it is generally accepted and widely used in academic research.[27]  Tabak and Dunbar [2001] write about how the methodology is generally accepted and widely used in forensic applications.[28]

120. An event study measures how much a stock price rises or falls in response to new information.  It first determines how much of a stock price change cannot be explained by market and peer group factors.  The portion of a stock price change that cannot be attributable to market and peer group factors is called the residual stock price movement or "residual return."  The event study isolates the residual return and also tests whether or not the residual return can reasonably be explained as merely a random fluctuation.

121. If the stock return over an event period is statistically significant, it indicates that the stock price movement cannot be attributed to market and peer group factors, or to random volatility, but rather was likely caused by company-specific information.  Such proof of a

---

[27] Chapter 4 of *The Econometrics of Financial Markets*, by John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, Princeton University Press, 1997.
[28] "Materiality and Magnitude: Event Studies in the Courtroom," by David Tabak and Frederick Dunbar, in *Litigation Services Handbook*, 3rd edition, John Wiley & Sons, New York, 2001.

cause and effect relationship between new material information and the reaction in the stock price establishes market efficiency.

122. Not only did the *Cammer* Court single out the empirical factor as "one of the most convincing ways to demonstrate efficiency," but it also recognized the special importance of the specific information allegedly misrepresented that is the subject of the litigation:

> "The central question under the fraud on the market theory is whether the stock price, *at the time a plaintiff effected a trade*, reflected the 'misinformation' alleged to have been disseminated."
> **Cammer Opinion, 711 F. Supp. (emphasis in original).**

123. Consequently, the empirical behavior of Idearc common stock following curative disclosures is important for determining whether or not the market for Idearc common stock was efficient for purposes of the fraud-on-the-market principle.

124. Forensic financial analysts David Tabak and Frederick Dunbar concur that disclosure events are reasonable choices for the focus of the event study:

> "Many texts discuss how to perform an event study.  While there are some differences in exposition, there is uniform agreement in the literature on the necessary steps and general procedures to be followed.  First, one must identify the event or events to be studied.  In securities fraud cases, the events of interest usually include all the alleged disclosures of fraud and/or the dates when fraudulent statements were made."
> **"Materiality and Magnitude:  Event Studies in the Courtroom," by David Tabak and Frederick Dunbar, in *Litigation Services Handbook*, 3rd ed., John Wiley & Sons, New York, 2001, p. 7.**

Selection of Events

125. I reviewed a wide variety of information sources, including news articles, press releases, analyst reports, and SEC filings to determine when information emerged related to the alleged misrepresentations and omissions, and which events were reasonably corrective disclosure events.  Based on this analysis and the Plaintiff's allegations, the relevant event dates to test in this case are 7 February 2008, 29 July 2008, and 30 October 2008.

126. On 7 February 2008, before the market opened, Idearc issued a press release reporting financial results for Q4 2007 and fiscal 2007.  Later that morning, the Company held a conference call to elaborate and answer questions.  From the press release and conference

24

call, the market learned that bad debt was accruing at a higher rate than previously reported, which contributed to disappointing EBITDA and free cash flow results and lowered forward expectations.

127. On 29 July 2008, Idearc issued a press release and held a conference call announcing financial results for Q2 2008.  The market learned that the bad debt situation was even worse than previously disclosed.  Bad debt caused quarterly and year-to-date EBITDA to fall far short of the market's prior expectations.  In addition, Defendants disclosed that the root cause of Idearc's poor performance was not simply cyclical economic or secular industry trends, but rather previously undisclosed operational problems plaguing the Company.

128. On 30 October 2008, , Idearc issued a press release and held a conference call announcing financial results for Q3 2008.  Investors were informed that the bad debt situation was again substantially worse than previously reported.  Uncollectibles had eroded earnings to such an extent that EBITDA not only fell short of even the market's reduced expectations, but the Company's ability to satisfy debt covenants and remain solvent was in question.

129. As the information provided in these three announcements specifically related to the alleged misrepresentations and omissions, the announcements constituted partially corrective disclosures.  These events may not necessarily be the only partially corrective disclosures.  For example, investors may have discerned some of the previously concealed information about the Company's true condition from the series of executive resignations.  Nonetheless, an analysis of these three events, which are undeniably partially corrective disclosures, serves to determine whether or not Idearc stock reacted significantly to the information at issue in this case, and that the market for Idearc was an efficient market with respect to that particular information.

Isolating the Impact of Company-Specific Information

130. Event study analysis determines how much of the Company's stock return following each of the events was driven by Company-specific information as opposed to the market and peer group factors.

131. The method, which is generally accepted and widely used in econometric modeling, involves running a regression to determine how Idearc common stock typically behaved in relation to the overall stock market and its peer group, and then using the regression model

to determine how much of each event day's actual return is explained by the market and peer group factors ("the explained return").

132. The explained return is then subtracted from the actual return, to isolate the residual return, which is the stock's return after controlling for market and peer group effects.

133. I ran a regression modeling the return of Idearc common stock as a function of: 1) a constant term, 2) the returns of the overall stock market, and 3) a peer group index return.

134. For the overall stock market factor I used the CRSP Market Total Return Index ("Market Index"), which is a generally accepted and widely used measure of the overall stock market performance. The CRSP Market Total Return Index appropriately incorporates payment of dividends by the constituent companies.

135. In its 10-K for the fiscal year ended 31 December 2006, filed 8 March 2007, Idearc compared its performance to a Company-selected peer group compose of 12 companies.[29] The 12 companies identified as peers by Idearc were: Banta Corporation; Belo Corporation; Dow Jones & Company; The Dun & Bradstreet Corporation; E.W. Scripps Company; McGraw- Hill Companies; New York Times Company; Primedia; Reader's Digest Association; R.H. Donnelley Corporation; Scholastic Corporation; and Tribune Company.[30]

136. I constructed a peer group index ("Peer Index") from the prices and returns of these 12 companies to measure the daily performance of Idearc's peer group, as the Company itself identified these companies as the appropriate peer group. While the Company 10-K filing did not indicate how the comparable companies were consolidated into a peer group index, I applied the methodology used in the construction of the CRSP Market Total Return Index and generally applied by Standard and Poor's in the construction of its indices. Specifically, I constructed a value-weighted index of the constituent companies. Each trading day's return for the peer group index is the value-weighted average of the constituent company returns, inclusive of dividends.

---

[29] Idearc Inc., Form 10-K for the fiscal year ended 31 December 2006, filed 8 March 2007, p. 32.
[30] According to the Company's Form 10-K for the fiscal year ended 31 December 2008, filed 12 March 2009, p. 32, four companies (Banta Corporation, Dow Jones & Company, Inc., The Reader's Digest Association, Inc. and Tribune Company) were removed from the peer group as a result of being acquired. I similarly removed those constituents from the construction of the Peer Index following the respective dates of their acquisitions.

137. Idearc stock prices, dividends, trading volume, and returns are shown in Exhibit-4.  The index levels and returns of the CRSP Market Total Return Index and the Peer Index are presented in Exhibit-5.

138. I ran the regression on daily returns covering the period 6 February 2007 through 5 February 2008.  This control period constitutes one full year of trading data, ending two days prior to the first alleged corrective disclosure.  The choice of a one year control period, ending just prior to the event date of interest, is widely used and generally accepted in event study analysis.

> "Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window. The most common choice places the estimation window before the event."
> **"Materiality and Magnitude: Event Studies in the Courtroom," David I. Tabak and Frederick C. Dunbar in *Litigation Services Handbook, The Role of the Financial Expert*, 3rd ed., edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons, Inc., 2001, p. 19.19.**

> "Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window."
> **"Event Studies in Economics and Finance," A. Craig MacKinlay, *Journal of Economic Literature*, 1997, pp. 14-16.**

> "The period -250 through -11 is the estimation period in which the parameters of expected return models are estimated."
> **"Measuring Security Price Performance Using Daily NASDAQ Returns," Cynthia J. Campbell and Charles E. Wasley, *Journal of Financial Economics*, 1993, p. 77.**

139. I ended the estimation period two days prior to the first event date to allow for the possibility that there may have been leakage of the information provided in the earnings announcement on 7 February 2008.[31]

140. All returns used in the regression are logarithmic returns – that is, the natural logarithm of the ratio of the current day's closing price plus dividends to the previous day's closing price.  Logarithmic returns are commonly used in event studies and equity analysis.

---

[31] Leakage is addressed in numerous articles in the academic literature for example "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," by Mark L. Mitchell and Jeffrey M. Netter, *The Business Lawyer*, February, 1994.

Analysts and researchers generally use logarithmic returns instead of percent price changes because of various computational advantages.[32]

141. The regression results in Exhibit-6 show that Idearc's stock returns were significantly related to the returns of the overall stock market and its peer group, but the stock also exhibited a substantial amount of independent movement.

142. I computed the explained portion of the Idearc common stock return on each event date by adding: 1) the estimated regression intercept term, 2) the respective day's Market Index return multiplied by the Market Index coefficient estimated by the regression, and 3) that day's Peer Index return multiplied by the regression's Peer Index coefficient.

143. I then computed the residual return for each event date by subtracting the respective explained return from the actual return.

*T*-test

144. For each event, a statistical test called a *t*-test was conducted to determine whether the residual return of Idearc's stock can be explained by random volatility, or alternatively must have been caused by Company-specific information. A *t*-test compares the residual return on an event date to the typical residual return exhibited over the control period. If the event date residual return is far greater (positively or negatively) than the typical residual return, the *t*-test indicates that the residual return in question cannot have been caused by random volatility alone – *i.e.*, it is statistically significant.[33]

145. The event study results for the common stock are presented below and summarized in Exhibit-7.

146. Appendix 2 presents an analysis that shows that all empirical results and conclusions are robust to test modifications addressing volatility changes over the course of the Class Period.

---

[32] The Appendix presents the mathematical formula for the logarithmic return and a discussion of the measure.

[33] The test is called the *t*-test because it involves the computation of a *t*-statistic, which is the event date residual return divided by the standard deviation of residual returns from the control period. If the absolute value of the *t*-statistic is greater than the critical t-statistic value (1.97 for large samples), the likelihood that the residual return could have been caused by random volatility alone is less than 5%, which is generally accepted to be so unlikely that the random volatility explanation can be rejected.

Event Study Results:  7 February 2008

147. On 7 February 2008, Idearc stock fell 27.51% (on a logarithmic return basis).  That day, the Market Index return was 0.77% and the Peer Index return was 0.73%.  According to the regression results, the explained portion of Idearc's stock return on any particular day equals -0.26%, plus 0.376 times the Market Index return, plus 0.289 times the Peer Index return.  This model gives an explained return for Idearc stock of 0.24% on 7 February 2008.  The difference between the actual return of -27.51% and the explained return of 0.24% is -27.75%, which is the residual return for Idearc stock that day – the portion of the return that is unexplained by the market and peer group effects.

148. A residual return of -27.75% is an unusually large negative one-day return for Idearc common stock.  That residual return is associated with a $t$-statistic value of -13.25, which indicates that the residual return was too severe to have been a random fluctuation.  The likelihood of obtaining a residual return of this magnitude and associated $t$-statistic given that particular explanation is virtually nil.  Therefore, the stock return is deemed statistically significant.

149. The magnitude of the residual return on 7 February 2008 and its statistical significance indicate that to a high degree of statistical certainty, Company-specific information, which included Defendants' disclosures, are what caused Idearc's stock price to decline that day.

Event Study Results:  29 July 2008

150. On 29 July 2008, Idearc stock fell 51.08%.  That day, the Market Index return was 2.11% and the Peer Index return was 4.68%.  According to the regression model, the explained return for Idearc stock was 1.89% and the residual return was -52.97%.

151. A residual return of -52.97% is an unusually large negative one-day return for Idearc common stock.  The t-statistic associated with the residual return is -25.29, indicating that the large negative residual return is highly statistically significant, proving that the -52.97% residual return was caused by Company-specific information and not random volatility, the overall stock market, or a peer group effect.

Event Study Results:  30 October 2008

152. On 30 October 2008, Idearc stock fell 44.01%.  That day, the Market Index return was 3.13% and the Peer Index rose 6.38%.  According to the regression model, on 30 October 2008, the explained return for Idearc stock was 2.76% and the residual return was -46.77%.

153. A residual return of -46.77% is an unusually large negative one-day return for Idearc stock. That residual return is associated with a $t$-statistic value of -22.33, which indicates that the residual return was too severe to have been a random fluctuation.  The probability that a residual return of this magnitude and associated $t$-statistic could be caused by random volatility alone is virtually nil.  Therefore, the stock return is deemed statistically significant.

154. The magnitude of the residual return on 30 October 2008 and its statistical significance indicate that, to a high degree of statistical certainty, Defendants' disclosures caused the Idearc stock price to decline that day.

Event Study Summary

155. The statistically significant reaction of the Idearc common stock price to the release of important information related to the substance of Plaintiff's allegations proves that Idearc common stock traded in an efficient market, and that the market was efficient not only generally but specifically with respect to the misrepresentations and omissions at issue in this case.

156. The event study tests show that the Company-specific information disclosed on the disclosure event dates did indeed impact the stock price.  This cause and effect relationship between the release of important information and movements in the common stock price proves that the market for Idearc common stock was efficient.


**Market Efficiency Summary and Conclusion**

157. Idearc stock traded on the NYSE and numerous market makers facilitated trading in Idearc common stock.  The Company was widely covered by analysts and the news media. Institutional ownership of Idearc stock was widespread.  Trading was active.  Market capitalization and float were high.  Current and historical financial information about the

Company were readily available to investors and analysts.  The stock's bid-ask spread was narrow.

158. Not only did Idearc stock exhibit the *Cammer* and *Unger* factors that indicate market efficiency, but it also satisfied the empirical *Cammer* factor, which demonstrates the essence of market efficiency.  The F-test, Ansari-Bradley test, and event study each proved that there was a cause and effect relationship between material information and movements in the Idearc stock price.

Given these facts, I conclude that Idearc common stock traded in an efficient market over the course of the Class Period.


## LOSS CAUSATION

### Timeline of Important Events

159. Among the important events relevant to an understanding of the Plaintiff's allegations and the Company's experience over the course of the Class Period are the following.

#### 9 August 2007:  Q2 2007 Earnings Announcement and Conference Call

160. On 9 August 2007, Idearc announced Q2 2007 earnings.  Defendants characterized Idearc's strategy as "successful" and its cash flow as "strong" and "healthy."

161. Defendants declared Idearc would pay a $0.3425 per share quarterly dividend, which they claimed was made possible by the Company's "strong cash flow."

162. Defendants stated that the quarter's OIBITDA (operating income before interest, taxes, depreciation, and amortization – an earnings measure that is widely used as a proxy for cash flow) grew 3.4% compared to Q2 of 2006.[34]  OIBITDA as a percentage of revenue (OIBITDA margin) was 48.6% in Q2 2007, which was a substantial improvement from the 47.1% OIBITDA margin realized in Q2 2006.

163. Defendants represented that over the course of the first half of 2008, Idearc's bad debt as a percentage of revenue remained in the low 4% range, the same level as full year 2007.

---

[34] Prior to Idearc's Q1 2008 earnings announcement, Idearc used the term "OIBITDA" to refer to the financial metric more commonly known and referred to as "EBITDA."

<u>17 September 2007:  Acquisition of Switchboard.com</u>

164.  On 17 September 2007, the Company announced the acquisition of the online directory business Switchboard.com from InfoSpace for $225 million.

165.  Defendants stated that Idearc would fund the transaction with a mix of cash and borrowing from its revolving credit facility.

166.  Defendants represented that the acquisition would be cash flow accretive and have no material impact on Idearc's leverage ratio:

> "The acquisition is expected to be cash-flow accretive in the first year, have no impact on Idearc's dividend policy and will not have a material impact on Idearc's proforma leverage ratio."
> **"Idearc to Acquire Switchboard.com and Other Directory Assets from InfoSpace ; Acquisition Significantly Expands Idearc's Local Search Platform and Traffic,"** *Business Wire***, company press release, 17 September 2007.**

<u>1 November 2007:  Q3 2007 Earnings Announcement and Conference Call</u>

167.  On 1 November 2007, Idearc announced Q3 2007 earnings.  Defendants characterized Idearc's OIBITDA and net income as "strong," and its cash flow as "healthy."[35]

> "[Andy Coticchio, EVP & CFO:]  One, we experienced strong OIBITDA and net income results. Two, we once again delivered double-digit Internet revenue growth both on a quarterly and year-to-date basis. Three, we were prudent in managing our expenses, which resulted in efficient cost control and contributed to our OIBITDA and net income performance. Four, our work continued strong cash flow enabled us to declare a dividend to be paid in the fourth quarter."
> **Andy Coticchio, "IAR – Q3 2007 IDEARC INC Earnings Conference Call,"** *Thomson StreetEvents***, 1 November 2007.**

168.  Defendants again declared Idearc would pay a $0.3425 per share quarterly dividend, made possible by its "strong cash flow."

> "[Andy Coticchio, EVP & CFO:] Our strong cash flow again allowed us to declare a quarterly dividend.  Yesterday, the Idearc Board of Directors declared a quarterly dividend of $0.3425 per outstanding share to be paid

---

[35] "Idearc Announces Third-Quarter Earnings ; Reiterates Full-Year Guidance and Delivers another Quarterly Dividend," *Business Wire*, 1 November 2007.

on or about December 13, 2007 to our stockholders of record at the close of business on November 21, 2007."
**Andy Coticchio, "IAR – Q3 2007 IDEARC INC Earnings Conference Call,"** *Thomson StreetEvents***, 1 November 2007.**

169. Defendants stated that Idearc's bad debt experience had not changed substantially and that a slight quarterly increase in bad debt was the result of "one-time" factors related to the switchover from the Verizon billing system.

> "[Andy Coticchio, EVP & CFO:] Our reserve [for] bad debt this year we're running in the mid 4 range. It is very similar to what we saw last year year-to-date. It is just a little over 4.5%."
> **Andy Coticchio, "IAR – Q3 2007 IDEARC INC Earnings Conference Call,"** *Thomson StreetEvents***, 1 November 2007.**

> "[Jeff Shelton, Natixis Securities:] Is there anything specific to the quarter that would have resulted in the higher percentage?

> [Andy Coticchio, EVP & CFO:] Yes, Jeff, what we did is that was a onetime adjustment. As we looked at some of the activity around the branding switch, the coming off the telco building platform, working through all those issues and dealing with some level of customer confusion, I felt the need to make a onetime adjustment in the quarter to bring things in line for the full year. So that was not an indication of a falling off a cliff."
> **"IAR – Q3 2007 IDEARC INC Earnings Conference Call,"** *Thomson StreetEvents***, 1 November 2007.**

170. Internet margins are less than print advertising margins, and the Company's product mix was shifting toward internet. In the conference call, Defendants reaffirmed Idearc's prior OIBITDA guidance for the remainder of 2007, which represented a relatively small decrease from the prior year. Defendants attributed the projected decline to a slight contraction in the OIBITDA margin, which it anticipated due to the changed revenue mix.

> "[Andy Coticchio, EVP & CFO:] Looking ahead through the remainder of 2007, we are positioned to deliver on what we have projected for the full-year 2007, and we are reiterating guidance noting close to flat multiproduct revenues expected for the year and only slight OIBITDA margin contraction from 2006 on an adjusted pro forma basis because of continued changes in our revenue mix."
> **Andy Coticchio, "IAR – Q3 2007 IDEARC INC Earnings Conference Call,"** *Thomson StreetEvents***, 1 November 2007.**

171. When asked about the effects of the anticipated industry shift from print to electronic media platforms, CEO Kathy Harless expressed confidence and reassured analysts and investors that all was going according to plan:

> "[Anthony DiClemente, Lehman Brothers:]  I guess our view here at Lehman has always been that Idearc could potentially grow those EBITDA dollars in '08 despite the margin compression. But my question is, and I apologize for being long-winded, my question is, does the transformation to electronic happening faster than expected, does that preclude you from actually growing EBITDA dollars in '08? How do you suggest that us as analysts and investors think about that going into next year? Thank you.
>
> [Kathy Harless, President & CEO:]  Let me just first start to say – talk a little bit about the transformation of the business. I would tell you that it is not faster than we expected. We feel very comfortable with where we are in our platforms and our multiproduct ... and we feel very comfortable where we are in that stage."
> **"IAR – Q3 2007 IDEARC INC Earnings Conference Call,"** *Thomson StreetEvents*, 1 November 2007.

### 27 November 2007:  CFO Andy Coticchio Resigns

172. On 27 November 2007, Idearc's Chief Financial Officer, Andy Coticchio, suddenly resigned.  The Company did not disclose the reason for his resignation.

173. Idearc's stock price fell on the news.

### 7 February 2008:  Q4 and Fiscal Year 2007 Earnings Announcement and Conference Call

174. Idearc announced Q4 2007 and FY2007 financial results on 7 February 2008.

175. Defendants reported higher bad debt expense and disappointing revenue, EBITDA, and cash flow for the quarter and full year.

> "The massive deterioration both YoY and QoQ in print ad sales (the forward looking metric) in 4Q caught us off guard, as did Idearc's 4Q online growth of just 19% versus guidance of "mid-20's" growth. ... FCF (OCF - CapEx) in FY07 was $323m versus previous 3/07 guidance of about $450m. We estimate about $75m of the miss was due to the one-time investment in working capital, as Idearc replaces Verizon's billing system with its own, but also hurting is the decline in revenue."
> **"Concerned About Trends And Balance Sheet Cutting to Sell,"** by Paul Ginocchio, *et al.*, Deutsche Bank, analyst report, 7 February 2008.

"IAR reported 4Q EBITDA fell 7% yoy to $350M vs. our $369M est (Street: $376M) on higher expenses. ... FCF finished the year at $323M, well below our $463M estimate, primarily due to a large one-time use of working capital related to a shift in billing from Verizon to IAR's own direct billing platform."
**"IAR: 4Q Miss; Lowering Estimates On Deteriorating Print Trends," by Jaime Neuman, Wachovia, analyst report, 7 February 2008.**

"Adjusted EBITDA was $350 million versus our $378 million estimate with the shortfall due in part to an unexpected increase in uncollectibles during the quarter. Management had indicated in 2Q that a spike in uncollectibles was a one-time event, but this proved not to be the case. EPS was $0.68 versus our $0.71 estimate and $0.63 consensus, but was helped by a better-than expected effective tax rate. Free cash flow for the quarter was also light at $35 million versus our $142 million estimate, which may be due to timing but management was not clear on this."
**"IAR: A Disappointing Quarter; Reducing Target Price to $12, Rating to HOLD," by Jeffrey Shelton, *et al.*, Natixis Bleichroeder, analyst report, 7 February 2008.**

"While we expected to see a moderate decline on the top line, Adjusted PF EBITDA decreased more than anticipated, posting a 6.9% decline year-over-year (with margins dipping from 46.9% in 4Q06 to 44.5% in 4Q07). For the full year, revenue was $3,189mm, down 0.8% from $3,214mm in 2006 and in-line with guidance calling for close to flat multi-product revenues. Adjusted PF EBITDA for 2007 was $1,518mm, representing a 2.8% decline from $1,561mm in 2006, a bigger dip than expected given the company's guidance of "slight OIBITDA margin contraction"(due in part to changes in product mix)."
**"Idearc Inc.: Fourth Quarter Declines Accelerate," by Aaron Watts and Margaret Keenan, Deutsche Bank, analyst report, 8 February 2008.**

176. EBITDA and cash flow fell in part because revenue fell and the EBITDA margin declined. Defendants attributed the decline in the EBITDA margin to additional bad debt, a change in the revenue mix, and a previously implemented and disclosed accounting change.

"[Dee Jones, CFO:]  On an adjusted pro forma basis, 2007 OIBITDA was $1.518 billion, a decrease of 2.8% compared to the prior year. Adjusted pro forma OIBITDA margins were 47.6% for 2007, as compared to 48.6% for 2006. This decline was attributed primarily to the relative impact of the accounting change, additional exposure in bad debt, and continued mix shift in revenue, partially offset by the various expense initiatives."
**Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 7 February 2008.**

35

177. Defendants reported that Idearc had increased its accrual for bad debt to 5% and that it had experienced an increase in accounts receivable and days sales outstanding (both of which are metrics impacted by slower collections) primarily due to the billing system switchover.

> "[Dee Jones, CFO:]  As we moved away from TELCO settlement process to direct billing, we saw an increase in our days' sales outstanding from that activity because we were relying on the actual timing of the cash in from the customer. And so we did see a one time bump up in working capital associated with the increase in days' sales outstanding on the receivables side."
> **Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 7 February 2008.**

> "[Meredith Allen, Bear Stearns:]  And then where does your bad debt stand now in terms of percentage of sales?
>
> [Dee Jones, CFO:]  Yes, we booked up a little bit in the fourth quarter. We ended the year with a 5% accrual rate, and we feel like that's the appropriate level as to where we're at in the current circumstance we're in. ...but the 5% level is where we're at right now, and that's what we're looking at, I believe somewhere in that range for 2008."
> **"IAR – Q4 2007 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 7 February 2008.**

178. Analysts expressed surprise that bad debt had increased again, negatively impacting EBITDA and cash flow.  The prior quarter's increase in bad debt had been attributable to "one-time" factors related to billing system changes.  While Defendants had previously represented that this factor would not have an ongoing impact, they again cited this factor.

> "[Jeff Shelton, Natixis Securities:]  And a follow-up on a previous question about your provision for bad-debt expense in the fourth quarter; it was very similar to what you showed in the third quarter, but if I recall, the third quarter was sort of a one-time step-up because of the billing switch-over. Are you seeing increased delinquencies from your existing accounts that's causing you to be more cautious on that line?

> "[Dee Jones, CFO:]  Well, I think with respect to the days' sales outstanding and the risk profiles of our accounts receivable, we felt like getting to the 5% level for the full year in bad debt was the appropriate thing to do, and that's why you did see an additional booking in the fourth quarter."
> **"IAR – Q4 2007 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 7 February 2008.**

"[Jeff Shelton, Natixis Securities:]  And last questions; if I look at the cash flow from operations in the fourth quarter, it seemed to have been impacted on the negative side from a big change in working capital. You did talk earlier about the billing changeover, but that we really a second quarter event. Is there a timing issue involved in the fourth quarter, and we should see some reversal in the first quarter?

[Dee Jones, CFO:]  Yes I think the best way to look at the cash flow I think is taking a look at the full annual levels, and adjusting for the transition items and then the element of the days' sales outstanding and the shift from TELCO Billing to direct billing. I think it's a better view from the full year as opposed to looking at the individual quarter, because there are some timing aspects there.
**"IAR – Q4 2007 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **7 February 2008.**

179.  Defendants reassured analysts and investors that while bad debt had increased, the situation would not get worse and would likely improve as initiatives to address the problem had been implemented.

"[Dee Jones, CFO:]  We've seen the collection activity and those days' sales outstanding flatten out as we've gotten to the end of the year, so we are optimistic that the cash flows will not see that additional impact as we look into 2008."
**Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **7 February 2008.**

"[Dee Jones, CFO:]  Like I said earlier, we've got some initiatives in place, some activities underway in the collection side as well as the credit, so we believe that the 5% level is the appropriate one as of the end of the year, and that as we look forward, we believe that it will be in that range, and that some of the initiatives will start to take effect and start providing us a little more better view with respect to the bad debt number."
**Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **7 February 2008.**

180.  Despite the bad news, Defendants again declared a quarterly dividend and represented that Idearc would continue to enjoy strong free cash flow and was prepared to address the economic challenges it faced.

"[Dee Jones, CFO:]  Consistent with our established balanced capital allocation program, and current view of continued strong and stable cash flow, we are maintaining our dividend to stockholders.  Throughout 2007, we allocated free cash flow to maintaining a strong dividend program and to servicing our debt, and we invested in growth opportunities such as the Switchboard.com acquisition, and funded it internally with our free cash flow. We achieved all that we said we would do with our capital allocation program, and we intend to be consistent and steadfast with capital allocation in 2008."

**Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents***, 7 February 2008.**

"[Dee Jones, CFO:]  As we discussed, current softness in the economy continues to impact our multi-product ad sales.  It is important to note that our long-term view of the business, and the underlying fundamentals are unchanged. While we are currently facing cyclical economic headwinds, we have a number of initiatives in place to mitigate the impact."

**Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents***, 7 February 2008.**

<u>11 February – 17 March 2008:  Ratings, Resignations, and Reversals</u>

181.  On 11 February 2008, the rating agency Standard & Poor's lowered its outlook on Idearc from stable to negative.[36]

182.  On 19 February 2008, the Company replaced CEO and President Kathy Harless with Chairman John Mueller.  The move was effective immediately.

183.  On 27 February 2008, Mr. Mueller resigned as Chairman and CEO, citing health reasons. The Company's Executive Vice President, Frank Gatto was appointed interim CEO.

184.  On 27 February 2008, rating agency Moody's placed Idearc's debt ratings under review for a possible downgrade.  Moody's cited Idearc's disappointing cash flow and lower EBITDA:

"The review for possible downgrade is prompted by the company's recent financial performance which has not produced the level of free cash flow or reduced leverage to the extent anticipated by Moody's when ratings were initially assigned in October 2006.
The review will consider whether Idearc's new senior management team will succeed in revitalizing the company's free cash flow generation or

---

[36] "Standard & Poor's Lowers Outlook on Idearc to Negative from Stable on Economic Worries," *Associated Press Newswires*, 11 February 2008.

otherwise reduce debt in the near term below a 5.5 times multiple of EBITDA, calculated in accordance with Moody's standard metrics." **"Moody's Places Idearc's Ratings Under Review for Possible Downgrade,"** *Moody's Investors Service Press Release*, **27 February 2008.**

185. On 28 February 2008, R.H. Donnelly, a peer of Idearc's that distributes print and online directories surprised the market by reporting a fourth quarter loss and disappointing forward guidance. R.H. Donnelly attributed its poor results and outlook to weak economic conditions. A number of analysts downgraded R.H. Donnelly, and its share price plummeted. Idearc's share price fell in sympathy, as investors incorporated the information about the weak economic environment into their valuations of Idearc.

186. On 17 March 2008, Yellowpages.com, owned by AT&T, replaced Idearc's Superpages.com as a provider of ad listings to Microsoft's local search websites. AT&T's stock price rose and Idearc's fell on the news.

<u>11-27 March 2008:  Presentations at Investor Conferences</u>

187. On 11 March 2008, Idearc presented at the Bear Stearns Media Conference. At the conference, Defendants were questioned about the sustainability of Idearc's dividend and liquidity position.

> "Can you talk a little bit about the sustainability of your dividend payout? I think your yield right now is over 25% or so, and they've given in yield, but the question is, is it sustainable, and then I have a follow-up.
>
> [Dee Jones, CFO:]  ... With respect to capital allocation, obviously, in this environment–I mean, I talk about the fact that our underlying view of the business and the long-term prospects–all that are unchanged. ...Now, having said that, the board always debates that dividend. The board is always deliberating with respect to capital allocation, how to deploy capital. You know, one of the beauties, and it's a nice problem to have–we have cash. We have, you know, a good amount of cash available to us. We have to figure, [audio difficulties] you know, one of the beauties and most efficient and effective fashion.  As far as sustainability of the dividend, and your question with respect to that in that context and touched on in that vein, a step over sort of to the liquidity requirements that we have as we look forward over the next several years. In 2008, our mandatory debt repayment is $48 million; in 2009, it is $123 million; in 2010, it is $199

39

million; in 2011, it is $274 million. ***Clearly, I don't have any [immediate] liquidity demands with respect to my cash flows as I look out over the horizon***."
**"Idearc, Inc. at Bear, Stearns & Co. Inc. Media Conference – Final,"** *Voxant FD Wire*, **11 March 2008 (emphasis added).**

188. CFO Dee Jones later repeated, in no uncertain terms, that Idearc did not have a liquidity problem:

> "[Dee Jones, CFO:]  I want to reiterate–I don't have liquidity issues. If anybody didn't hear that, I don't have 2008 liquidity issues or medium or near-term liquidity issues."
> **Dee Jones, "Idearc, Inc. at Bear, Stearns & Co. Inc. Media Conference – Final,"** *Voxant FD Wire*, **11 March 2008.**

189. In response to these representations, an audience member at the conference asked about liquidity and challenged the sustainability of Idearc's dividend payments.  In reply, CFO Jones insisted the business was healthy enough to service the Company's debt and there was no liquidity problem.

> "While you may not have liquidity issues, there are some calculations that indicate you probably did have to borrow to pay your dividend this last quarter, and that you did not generate enough free cash flow to pay the dividend last quarter, and expectations are in the first quarter you may not as well, and while you did have a significant amount of cash, the acquisition of Switchboard.com used up all but $50 million or so of that cash. So I think that's part of what the market is trying to tell you is that you don't have the liquidity that you did have, and there are questions about that burn rate, so that's–
>
> [Dee Jones, CFO:] ... when you look at that picture from a total perspective -- look at any of the public forecasts with respect to my business, around that, and you compare that against my mandatory debt requirement, I don't think you come to a different conclusion than the ones that I just reiterated.
> **"Idearc, Inc. at Bear, Stearns & Co. Inc. Media Conference – Final,"** *Voxant FD Wire*, **11 March 2008.**

190. Regarding the recent increase in uncollected receivables, Defendants again stated that the prior increase was an explainable and isolated event, and that they did not foresee the situation worsening.

"[Dee Jones, CFO:]... We talked about on the call the fact that we had the shift from Verizon or telco billing to our own direct billing and a ramp in day sales outstanding associated with that. And then you had some geography on the statement -- on the cash flow statement between deferred taxes and that as a result of FIN 48 and the way that flows through the cash flow statement -- so along with the activity around the transition costs.  As we look into 2008, we see all those elements and that they have stabilized. We see our day sales outstanding and our working capital being relatively stable as we look out. We don't expect any significant use of cash from a working capital perspective on the receivables front."

**Dee Jones, "Idearc, Inc. at Bear, Stearns & Co. Inc. Media Conference – Final," *Voxant FD Wire*, 11 March 2008.**

191. The next day, 12 March 2008, Defendants continued to reassure investors that Idearc did not have a liquidity problem and would not in the future:

"[Dee Jones, CFO:]... I will point to the fact that I do not have liquidity issues in '08 by any means.  I do not have – I do not foresee liquidity issues in the near term as I look into '09 and beyond."

**Dee Jones, "Idearc, Inc. at Lehman Brothers High Yield Bond & Syndicated Loan Conference – F," *FD (Fair Disclosure) Wire*, 12 March 2008.**

192. On 27 March 2008, Idearc presented at the Credit Suisse 2008 Global Leveraged Finance Conference.  Defendants announced that Idearc's Board of Directors had decided to cease payment of dividends.  Defendants acknowledged the "challenging economic environment."  In addition, Defendants reiterated information previously provided, that they expected operating margins to contract "due to the mix shift in revenues."

193. On the positive side, at the 27 March 2008 conference, Defendants described Idearc's business as "still sound and still solid," and again assured investors that despite the challenging economic environment they did not foresee any liquidity issues:

"Idearc Inc.'s acting chief financial officer, Samuel 'Dee' Jones, presenting at the Credit Suisse 2008 Global Leveraged Finance Conference in Scottsdale, Az., told investors that the Company's underlying fundamentals and long-term prospects are unchanged. ... The set of assets that made this business an attractive investment are still there, still sound and still solid," Mr. Jones said. Mr. Jones made it clear that he does not foresee any near-term liquidity issues for the Company."

**"Idearc Executive Tells Investors Underlying Business Fundamentals Sound," *Business Wire*, 27 March 2009.**

41

3 April 2008:  Credit Rating Downgrade

194.  On 3 April 2008, Moody's downgraded Idearc's rating from Ba3 to B1.

6 May 2008:  Q1 2008 Earnings Announcement and Conference Call

195.  On 6 May 2008, Defendants reported that in the first quarter of 2008 Idearc earned $111 million of net income, which was up from $103 million in the first quarter of the prior year. This net income represented per share earnings of 76 cents, which beat analysts' expectations of 63 cents per share.  Revenue was $770 million in the quarter, down 4.5% from the $806 million generated the prior year.

196.  Quarterly EBITDA (adjusted on a pro forma basis to be comparable to the prior year) was $367 million, down 3.2% compared to 2007.  However, the EBITDA margin was up, increasing to 47.7% from 47.0% the prior year, resulting in EBITDA performance better than what analysts expected.

> "**Q1 EBITDA and EPS Thrash Expectations:** IAR's $0.76 EPS ($0.79 ex. separation costs) thrashed the Street at $0.63 and CL King at $0.58; last year's pro forma EPS were $0.82.  EBITDA at $359MM PF adjusted beat the Street's $340MM and CL King's $332MM; compared to the prior year's $381MM."
> **"Idearc Inc. (IAR-NYSE)," by James B. Boyle, CL King & Associates, analyst report, 6 May 2008 (emphasis in original).**

197.  On the conference call, Defendants stated that Idearc had not increased its provision for bad debt from the prior quarter and that they remained "comfortable" with the 5% accrual rate.

> "[Peter Salkowski, Goldman Sachs:]  What was your bad debt as a percentage of revenue in the quarter?
>
> [Dee Jones, CFO:]  In the quarter, we accrued at a 5% rate. We had write-offs in the 4.25% range. We are accruing a little bit higher than what the actual experience was because we are a little bit cautious about the economic environment that we are dealing with, but as we have said before, we expect the full year in that 5% range and I think from what we are seeing at this point, we are still comfortable with that."
>  **"IAR – Q1 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **6 May 2008.**

42

198. Defendants elaborated that "bad debt within the G&A line was up $7 million or so,"[37] but despite the increase, they remained confident that the previous accrual rate of 5% was appropriate going forward.

> "[Dee Jones, CFO:]  What we have seen with respect to days sales outstanding is a relatively flattening out of that as we've moved beyond that transition activity and we have continued that 5% level in the first quarter. We had write-offs that were a little better than that.  If you look at the cash flow statement, you can derive that, but we are a little bit cautious with respect to the economic environment such that we maintain that 5% accrual level.
>
> [Steve Flynn, Morgan Stanley:]  It sounds like most of the change to 5% was a change in systems absent any sort of economic changes and even that 5% you think it is a pretty good rate even given some of the economic challenges?
>
> [Dee Jones, CFO:]  Yes, as I said before, I think that 5% rate is where we should be parked right now and we will assess it as we move through the remainder of the year."
> **"IAR – Q1 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **6 May 2008.**

199. On the 6 May 2008 conference call, Defendants acknowledged that "economic softness" had impacted Idearc's financial results, but that the Company's experience to date had not been any worse than anticipated.

> "[Frank Gatto, CEO:]  With regard to our first-quarter results, the downturn in the US economy, as anticipated, impacted our business."
> **Frank Gatto, "IAR – Q1 2008 Idearc, Inc. Earnings Conference Call," Thomson** *StreetEvents*, **6 May 2008.**
>
> "[Dee Jones, CFO:]...as we've talked about before, we expected the economic softness to continue to impact us through the first half of the year in 2008 at least and I wouldn't say that we are seeing anything terribly different than that."
> **Dee Jones, "IAR – Q1 2008 Idearc, Inc. Earnings Conference Call," Thomson** *StreetEvents*, **6 May 2008.**

---

[37] Dee Jones, "IAR – Q1 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 6 May 2008.

<u>2 June 2008:  New CEO Appointed</u>

200.  On 2 June 2008, Scott Klein was named Idearc's CEO, effective immediately, replacing interim CEO Frank Gatto.[38]

<u>29 July 2008:  Q2 2008 Earnings Announcement and Conference Call</u>

201.  On 29 July 2008, Defendants reported Idearc's Q2 2008 financial results.  The Company's revenue, EBITDA, and earnings substantially missed analysts' expectations.

> "On a year-to-date basis, Idearc reported multi-product revenues of $1,529 million, a 5.1 percent decrease compared to the same period in 2007.  ... The Company reported second quarter 2008 multi-product revenues of $759 million, a 5.7 percent decrease compared to the same period in 2007. ...
> The Company reported year-to-date earnings before interest, taxes, depreciation and amortization (EBITDA) of $658 million, an 8.4 percent decrease compared to the same period in 2007.  Reported year-to-date EBITDA margins were 43.0 percent, compared to 44.6 percent in the same period in 2007. On an adjusted pro forma basis, year-to-date EBITDA was $683 million, an 11.3 percent decrease compared to the same period in 2007. Adjusted pro forma EBITDA margins were 44.7 percent, compared to 47.8 percent in the same period in 2007."
> **"Idearc Announces Year to Date and Second Quarter 2008 Results," *Business Wire,* 29 July 2008.**

> "**Q2 EBITDA and EPS Missed Expectations Considerably:**  IAR's $0.52 EPS reported ($0.60 ex. onetime costs) dramatically missed the Street at $0.68 EPS and CL King at $0.70, compared to last year's $0.87 PF EPS. EBITDA at $316MM PF adjusted and $299MM reported fell very short of the Street's $347.2MM and CL King's $352MM EBITDA, compared to the prior year's $391MM PF and $364MM reported EBITDA. Q2 revenue was $759MM versus the Street's $764.4MM projection and CL King at $766MM, compared to last year's PF $805MM."
> **"Idearc Inc. (IAR-NYSE)," by James B. Boyle, CL King & Associates, analyst report, 30 July 2008 (emphasis in original).**

202.  On the conference call, Idearc's new CEO, Scott Klein, painted a less attractive picture of Idearc's state of operations than had been previously provided to analysts and investors.

---

[38] "Idearc Names Scott W. Klein Chief Executive Officer," *Business Wire,* 2 June 2008.

Mr. Klein largely attributed Idearc's poor performance to internal factors and poor execution, not just cyclical and secular business conditions.

> "[Scott Klein, CEO:]  I'm disappointed that the Company got into the shape it was in when I arrived, but we have a team of committed leaders that are ready to do the things that need to be done to correct our situation. ...
> It was very clear to me that the Company had turned a very simple business into brain surgery. We have lost sight of the fact that we sell advertising to small and medium businesses and deliver it online and primarily in the yellow pages. Multiplication had become the organizational strategy. Instead of dealing with problems at a core level, additional people were thrown at it. The Company was segmented into various parts and pieces and, as a result, sharing was not in vogue throughout the organization.  Expense reduction was driven by a short-term view instead of looking at the business holistically to understand where cross-functional opportunities existed to take cost out.
> **Scott Klein, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents***, 29 July 2008.**

203.  Analysts noticed the change in management's tone with respect to the cause of Idearc's poor performance.

> "While the company continued to point to the impact of the difficult advertising environment on its top line, newly appointed CEO Scott Klein sang a bit of a different tune regarding the cause of Idearc's bleak performance than we have heard in the past. Klein, who was appointed CEO in June and brings a fresh set of eyes and perspective to the company, charged that IAR has several internal issues and inefficiencies which have been hampering its performance on top of the soft economy."
> **"Idearc Inc.: Top Line Erosion Accelerates; Bad Debt Rising," by Aaron Watts and Margaret Keenan, Deutsche Bank, analyst report, 31 July 2008.**

204.  Defendants said that an increase in bad debt expense was the "primary driver" of the substantial shortfall in EBITDA:

> "[Dee Jones, CFO:]  In addition to the revenue declines previously discussed, the primary driver in the EBITDA change, both for the quarter and on a year-to-date basis, was changes in our bad debt provision. We talked about an increase in our bad debt provision in the first quarter to 5%. Based on write-off experience through the second quarter, we increased our provision to approximately 6.25% in the second quarter, resulting in a year-to-date provision rate of 5.7%, versus bad debt

45

provision rates of slightly over 4% in 2007. This change drove the
majority of the variance in the G&A expense line for the quarter and on a
year-to-date basis."
**Dee Jones, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call," *Thomson
StreetEvents*, 29 July 2008.**

205.   Analysts were surprised by the sharp increase in bad debt and asked Defendants if there
was a problem with Idearc's credit practices.  Defendants confirmed that the dramatic
increase in bad debt was responsible for the "vast majority" of the sudden increase in G&A
expenses and disclosed that its credit practices were not as strong as they should have been.

> "[Bob Kricheff, Credit Suisse:]  Hi. I wanted to make sure I had a better
> understanding of the increase in expenses in the quarter on the G&A line.
> Is the increase of about $21 million or so for the quarter--is that almost
> exclusively bad debt-related? Is that what you were saying before, Dee?
>
> [Dee Jones, CFO:]  Yes. As I said, the vast majority of it is the increase in
> the bad debt provision, along with some collection costs and outside
> collection agency fees that we also incurred in shoring up our credit and
> collection activity. It was also some small amount of timing around a
> couple of items that we did incur in the second quarter, but the vast
> majority of it was the bad debt.
> ...
> [Bob Kricheff, Credit Suisse:]  And this rather dramatic increase in bad
> debt from a year ago, obviously the economy is not great out there, but is
> this partially your credit practices? Are there that many customers that
> were bad debt? And how are you going to be able to grow your revenue if
> there are that many customers that are not paying I guess is sort of the
> other concern.
>
> [Scott Klein, CEO:]  Yeah, Bob, it's Scott. Quite simply, our credit
> practices a year ago were not what they should have been. The credit
> policy was not as tight as it needed to be. And as is the nature of our
> business, it will take some time for some of those mistakes that were made
> to work their way through the system. But rest assured, our credit policy is
> appropriate today and as tight as it should be, and our credit and
> collections team is all over this, having put in place some very new and
> creative ways to perhaps collect money that much more quickly."
> **"IAR – Q2 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 29
> July 2008.**

206.   Defendants sought to assure investors that the Company's credit policies were good, its
ability to service debt was secure, and that it did not have a major liquidity problem.

46

"[Scott Klein, CEO:]  We need to increase our focus on accounts receivable because, as you all know in these kinds of economic times, this becomes an important measure of performance for our Company. We need to make sure that our credit policies are in place, and we've already done that. We've also taken steps to step our collection efforts up."
**Scott Klein, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 29 July 2008.**

"[Scott Klein, CEO:]  I want you all to know the problems are clear and the solutions are in motion. Speed is everything, and we are committed to catching up quickly--very quickly.  Our organization at the most senior level will be finalized this quarter. Our ability to deal with our debt obligations is absolutely secure.
**Scott Klein, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 29 July 2008.**

"[Dee Jones, CFO:]  As we have discussed before, we foresee no near term liquidity issues and continue to be confident in our ability and capacity to service our debt."
**Dee Jones, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 29 July 2008.**

<u>30 October 2008:  Q3 2008 Earnings Announcement and Conference Call</u>

207.  On 30 October 2008, Defendants again announced disappointing financial results for Idearc, with declining revenues and a massive 24% quarterly decline in adjusted EBITDA.

"[Scott Klein, CEO:]  Total revenues declined 7.1% in the third quarter and 5.7% year-to-date. Year-to-date internet revenues were up 6.2% and up 8.7% in the third quarter. Adjusted EBITDA declined 24.1% in the quarter and 15.7% year-to-date, primarily driven by declining revenue and increased bad debt expense."
**Scott Klein, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 30 October 2008.**

208.  Defendants elaborated on the impact of Idearc's increasing bad debt.  Bad debt was responsible for the "majority" of the increase in G&A expenses, and bad debt was expected to remain at high levels for the remainder of the year.

"[Dee Jones, CFO:]  In addition to the revenue results previously discussed, the primary drivers in EBITDA change, both for the quarter and

47

on a year-to-date basis, included changes in our bad debt provision, the favorable impact of the sale of our L.A. printing plant in the third quarter of 2007, a one-time charge associated with the exit of a national reseller sales contract, partially offset by the initial impacts of our expense reduction initiatives.  With regard to bad debt, our provision in the third quarter was 8.2%. The year-to-date provision of 6.5% compares to the provision rate of 4.6% for the same period in 2007. This change drove the majority of change in the G&A expense line for the quarter and on a year-to-date basis."
**Dee Jones, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **30 October 2008.**

"[Dee Jones, CFO:]  As I noted, the provision rate for the third quarter was about 8.2% for bad debt. The year-to-date level is at 6.5% and so, we are seeing additional pressure on margins as we look out through the remainder of the year associated with that activity."
**Dee Jones, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **30 October 2008.**

209. Defendants announced that Idearc had engaged strategic advisors to explore "alternatives" regarding the Company's capital structure.

"[Scott Klein, CEO:]  As mentioned in the release this morning, we've retained Merrill Lynch & Company and Moelis & Company as financial advisors in connection with the review of alternatives related to our capital structure. Our objective is to help ensure that Idearc has an appropriate capital structure to support our strategic business objectives. We intend to look closely at all available opportunities to strengthen our balance sheet and improve our risk profile."
**Scott Klein, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **30 October 2008.**

"[Scott Klein, CEO:]  ...[B]ecause of the strategic review, we intend to enter into a quiet period in which we will not participate in any investor conferences."
**Scott Klein, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **30 October 2008.**

210. Defendants also disclosed that Idearc had drawn down nearly its entire $250 million credit facility, which surprised investors given the Company's cash balances and Defendants' previous assurances of ample liquidity.

48

"[Scott Klein, CEO:]  In the earnings release, we noted that the Company had cash and cash equivalents of $304 million as of September 30th, 2008. In addition, on October 24th, 2008 the Company initiated borrowings of $247 million under our existing $250 million revolving credit facility. We did this to increase our cash position and preserve our financial flexibility during these challenging economic times.  Fortunately, despite the challenging economic environment, we continue to generate a significant amount of cash."
**Scott Klein, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **30 October 2008.**

"[Peter Salkowski, Goldman Sachs:] Good morning, everybody. First of all, I'd just like to start with the revolver, if you could give an idea of what your reasoning was there to draw that down at this point. It seems like you have a fair amount of cash at the end of the quarter and why you felt it was necessary to draw down the $247 million?

[Dee Jones, CFO:]  Yes, Peter. Good morning. With respect to the revolver, as we stated in the release, we drew it down for general corporate purposes. Given the current market environment and our current situation as well as the current status of the credit markets, maximizing liquidity and flexibility by going ahead and drawing down that revolver we believe to be a prudent action."
 **"IAR – Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **30 October 2008.**

"[Joe Stein, Wells Fargo:]  Hi, guys. I know that you were asked a question on the revolver before. I was just hoping I could get a little bit more clarity. If you're throwing off as much cash flow as you're throwing off, with the real rationale -- and investment banks who are committed, they are theoretically in good stead at this point and there's no concern about them going under and limiting your liquidity in that fashion -- what the rationale is for drawing down your entire revolver at this point? Thanks.

[Dee Jones, CFO:]  Yes, Joe. As we said in the release, we talked about the fact that we drew it down for general corporate purposes. There's really not a lot more to say than what I responded to with respect to the last question around that in that maximizing liquidity and flexibility in this environment was in our view the prudent thing to do."
**"IAR – Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **30 October 2008.**

"After the quarter close (on October 24th), IAR drew down $247mm on its $250mm revolver for 'general corporate purposes.'  Management did

49

not provide a deeper explanation for this besides stating that it believed it was prudent for IAR to maximize its liquidity and flexibility in this environment. Given that the company had plenty of liquidity on hand (~$304mm) and is set to generate cash for the foreseeable future, this move was unexpected."
**"Idearc 3Q08 Review," by Aaron Watts and Margaret Keenan, Deutsche Bank, analyst report, 3 November 2008.**

211.  In response to the disappointing financial results and revelations about bad debt, liquidity, and capital structure issues, analysts noted that the outlook for Idearc was bleak:

> "Despite having over $300M of cash on its balance sheet at quarter end, IAR borrowed $247M under its $250M revolver, boosting its cash to almost $550M, and taking advantage of all current available liquidity. Still, based on our estimates, we forecast the company will break its 7.25x net leverage covenant by mid-'09."
> **"IAR: 3Q EBITDA Miss--Exploring Capital Structure Alternatives," by Jaime Neuman, Wachovia, analyst report, 30 October 2008.**

> "Thus, while we recognize that IAR generates free cash flow and has no looming maturities, 3Q results and the '09 outlook lead us to believe that covenant concerns creep into the picture faster than the mid-2010 timeline we had previously anticipated."
> **"Idearc 3Q08 Review," by Aaron Watts and Margaret Keenan, Deutsche Bank, analyst report, 3 November 2008.**

<u>31 March 2009:  Idearc Declares Bankruptcy</u>

212.  On 31 March 2009, Idearc filed for Chapter 11 bankruptcy protection.  Idearc's CEO, Scott Klein, reported that the Company had a "terminally-ill" balance sheet and needed to restructure its debt obligations.

> "'Essentially we have a company with good potential being held back by a terminally ill balance sheet,' Chief Executive Scott Klein said in a statement."
> **"Yellow Pages Publisher Idearc Files For Bankruptcy,"** *Reuters News***, 31 March 2009.**

213.  Idearc reported that through bankruptcy it sought to eliminate approximately $6 billion, nearly two-thirds, of its existing debt levels.

"Under the agreement in principle with the agent bank and steering committee, the Company's total debt will be reduced from approximately $9 billion today to a pro forma level of $3 billion of secured bank debt, with a 12 percent interest rate and a six-year term."
**"Idearc Inc - Initiates Voluntary Chapter 11 Proceeding To Implement Debt Restructuring," *Market News Publishing*, 31 March 2009.**


**The Plaintiff's Allegations**

214. The Plaintiff alleges that Defendants made material misrepresentations and omissions, which misled investors about the Company's financial health and operating condition throughout the Class Period. Defendants allegedly concealed that Idearc's bad debt had risen and that its bad debt and receivables would continue to rise for a variety of reasons, including the virtual elimination of the collections department, customer confusion caused by the billing system switchover, and a relaxation of credit policies. Further, the Plaintiff alleges that Idearc's financial reports and earnings announcements throughout the Class Period were false and misleading. As a result, investors' cash flow and earnings expectations were unduly optimistic.

215. The Plaintiff alleges that by at least February 2007, Idearc was already experiencing a substantial increase in bad debt and that it knew, or should have known, that uncollectible receivables would increase.

> "...[Defendants] Harless, Coticchio, Jones and Gatto knew by at least February 2007, as described in ¶¶131-132, that Idearc's bad debt levels were rising and that no concerted efforts were being made within Idearc to collect overdue receivables."
> **Complaint, paragraph 33.**

> "Harless, Coticchio, Jones and Gatto knew by at least February 2007 that Idearc's bad debt levels were rising and were going to continue to rise."
> **Complaint, paragraph 131.**

216. The Plaintiff further alleges that by April 2007, Defendants deliberately hid Idearc's growing bad debt levels by manipulating accounts receivable and bad debt expense levels.

51

"Therefore beginning in at least April 2007, defendants began to manipulate Idearc's accounts receivable and bad debt levels, as described in ¶148, to mask Idearc's growing bad debt levels."
**Complaint, paragraph 33.**

"Knowing that the bad debt levels were rising as described by CW1, Harless and Coticchio took affirmative measures to alter Idearc's books to reflect a lower level of bad debt receivables. According to a source who had face to face conversations with Chief Executive Accounting Officer Dane Beck ("Beck") during the Class Period and the timeframe immediately proceeding it ("CW5"), beginning in April 2007, Harless and Coticchio instructed Beck to 'alter accounts receivable and doubtful accounts to look like Verizon.' According to CW5, Beck said that this meant he was asked to move doubtful accounts into accounts receivable so that they appeared collectible on Idearc's financial statements. On that particular day in April 2007, Beck informed CW5 that he moved $3 million of doubtful accounts to accounts receivable."
**Complaint, paragraph 148.**

217.   The Plaintiff alleges that by August 2007, and specifically in connection with Idearc's 9 August 2007 announcement and 10 August 2007 10-Q filing, Defendants deceived investors with false and misleading statements and material omissions about bad debt, the condition of the business, business practices, the elimination of the collections department, a lack of effort to collect past due receivables, improper accounting of bad debt and accounts receivable, the Company's credit policies, improper revenue recognition, and deficiencies in internal controls:

"The positive statements, assurances and forecasts, outlined in ¶¶38-43, made by defendants were materially false and misleading when made and failed to disclose material information concerning Idearc's business and business practices. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As more fully described in ¶¶131-132, 139-141, defendants knew that Idearc's bad debt levels were rising and would continue to rise, in part as a result of the deliberate elimination of Idearc's collection department. Defendants knew that no concerted efforts were being made within Idearc to collect past due receivables;

(b) Defendants were reducing Idearc's bad debt levels by millions of dollars by transferring delinquent and uncollectible receivables – that should have been written off – to current accounts receivable, as described

52

in ¶148. Thus defendants knew that the bad debt levels they reported to the market were grossly understated;

(c) As described in ¶¶136-137, 142-143, defendants also knew that the transition from the Verizon-based billing platform to Idearc's direct billing system was being poorly handled and resulted in customer confusion, account cancelation and disputed billings. However, it was because of the poor handling of this transition and the lack of effort in collecting the amounts due, not because of routine delay caused by the billing cycle, that contributed to Idearc's increasing bad debt levels;

(d) Further contributing to the increasing bad debt levels were defendants' extreme relaxation of Idearc's credit policies, as described in ¶¶132-134, 144-145; and

(e) As described in ¶¶155-186, Idearc's financial statements were false and misleading due to improper revenue recognition and a pervasive lack of internal accounting controls."
**Complaint, paragraph 44.**

218. The Plaintiff alleges that these misrepresentations and omissions made the 1 November 2007 announcement and 5 November 2007 10-Q filing of 3Q 2007 financial results false and misleading with respect to earnings, cash flow, liquidity, and the strength and stability of the business.

219. Similarly, the Plaintiff alleges that Defendants made material misrepresentations and omissions in the Company's 7 February 2008 announcement and 29 February 10-K filing of 4Q 2007 and FY2007 financial results. The Plaintiff alleges that by this timeframe, Idearc had hired temporary staff to address the issue of uncollectible receivables, but Defendants continued to conceal the problem and its growing severity.

"By 2008, customer collections became 'a very big issue,' according to CW1, because by then it was crystal clear that uncollectible receivables was 'an identifiable, growing issue.' Though some temporary staff was brought in to focus on collections during the first half of 2008, the Company's systems were so inefficient that it was taking a lot of the sales staff's time just to identify which accounts were delinquent, in addition to sending out notices of delinquency and then seeking payments from customers, in order to allow for new listing and advertising renewal sales to be made."
**Complaint, paragraph 135.**

220. The Plaintiff alleges that statements made at the March 2008 investor conferences about liquidity, "sound" and "solid" underlying fundamentals, and representations that uncollectible receivables and bad debt were not worsening were materially false and misleading.[39]

221. The Plaintiff alleges that how the Defendants described Idearc to analysts and investors was a stark contrast to the Company's true operating and financial condition. The Plaintiff alleges that Defendants' misrepresentations and omissions in the Q1 and Q2 2008 earnings announcements, conference calls, and filings continued the deception.

**Alleged Misrepresentations and Omissions Caused the Idearc Stock Price to be Artificially Inflated**

222. Over the course of the Class Period, the alleged misrepresentations and omissions caused the price of Idearc stock to be artificially inflated. This conclusion is based on a careful analysis of Defendants' statements, Company statements, analyst reports, analysts' valuation models, generally accepted principles of valuation, and an event study focusing on the empirical reaction of the stock price to corrective disclosure events, as described next.

**Financial Principles**

The Valuation Impact of Collectibles, Bad Debt, Earnings, and Cash Flow

223. The alleged misrepresentations and omissions portrayed the Company's situation with collectibles and bad debt as better than it actually was, and caused expected earnings and cash flow to be overstated.

224. The Plaintiff alleges that Defendants misled investors about Idearc's growing receivables and bad debt. Growing receivables and bad debt negatively impact cash flow and earnings. When accounts receivable rises, sales that would otherwise generate cash flow do not. Understating bad debt causes future cash flow to be overestimated as funds otherwise expected to be received from customers will never be received.

---

[39] Complaint, paragraphs 85-86.

225. Moreover, a provision for bad debt, which ultimately must correspond to recognized bad debt, is charged against revenue as an expense, thereby reducing profit margin and earnings.  If bad debt is underestimated, operating and net income (both current and forecasted) will be overstated.

226. The cash flow and earnings a company generates are primary drivers of the value of the company and its securities.

227. The following quotes from the academic literature attest to the central role of earnings in valuation:

> "Earnings power is a chief driver of investment value, and EPS [earnings per share], the denominator of the P/E ratio, is perhaps the chief focus of security analysts' attention."
> **Analysis of Equity Investments: Valuation, by John Stowe, Thomas Robinson, Jerald Pinto, and Dennis McLeavey, Association for Investment Management and Research (CFA Institute), 2002, p. 183.**

> "The most familiar market value multiple is the price/earnings (P/E) multiple."
> **The Market Approach to Valuing Businesses, by Shannon Pratt, John Wiley & Sons, 2001, p. 4.**

> "First, a stock's earnings per share over the forthcoming year $E_1$ are estimated, and then the analyst (or someone else) specifies a 'normal' price-earnings ratio for the stock. The product of these two numbers gives the estimated future price $P_1$."
> **Investments, 5th edition, by William Sharpe, Gordon Alexander, and Jeffrey Bailey, Prentice Hall, 1995, p. 581.**

> "Much of the real-world discussion of stock market valuation concentrates on the firm's price-earnings multiple, the ratio of price per share to earnings per share, commonly called the P/E ratio."
> **Investments, 8th edition, by Zvi Bodie, Alex Kane and Alan Marcus, McGraw-Hill Irwin, 2000, p. 604.**

228. The importance of cash flow to valuation is documented in the following quotes from the literature:

55

"In finance, the value of the firm is its ability to generate financial cash flow."
**Corporate Finance, 8th edition, by Stephen A. Ross, Randolph W. Westerfield, and Jeffrey Jaffe, McGraw-Hill Irwin, 2008, p. 29.**

"One way to think about the question of how much a firm is worth is to calculate the present value of its future cash flows."
**Corporate Finance, 8th edition, by Stephen A. Ross, Randolph W. Westerfield, and Jeffrey Jaffe, McGraw-Hill Irwin, 2008, p. 116.**

"The free cash flow approach is the one [valuation model] used most often in corporate finance. The analyst first estimates the value of the entire firm as the present value of expected future cash flows to the entire firm and then subtracts the value of all claims other than equity. Alternatively, the free cash flows to equity can be discounted at a discount rate appropriate to the risk of the stock."
**Investments, 8th edition, by Zvi Bodie, Alex Kane, and Alan J. Marcus, McGraw-Hill Irwin, 2009, p. 619.**

"The discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset. We just discount the cash flows by the return that can be earned in the capital market on securities of comparable risk."
**Principles of Corporate Finance, 8th edition, by Richard A. Brealey, Stewart C. Myers, and Franklin Allen, McGraw-Hill Irwin, 2006, p. 61.**

"As another example, suppose the company is managing inventory and receivables carefully, but rapid sales growth is necessitating an ever-larger investment in these assets. Then, even though the company is profitable, it may have too little cash to meet obligations. The company will literally be 'growing broke.' These brief examples illustrate why a manager must be concerned at least as much with cash flows as with profits."
**Analysis for Financial Management, 9th edition, by Robert C. Higgins, McGraw-Hill Irwin, 2009, p. 5.**

229. Based on fundamental principles of financial economics, if expected earnings or cash flow are overstated, the value of the company and its securities will likely be overvalued.

230. In describing these fundamental principles, finance professor and author Robert Higgins described an adverse scenario similar to what unfolded at Idearc, unbeknownst to investors due to the alleged misrepresentations and omissions:

"Cash – and the timely conversion of cash into inventories, accounts receivable, and back into cash – is the lifeblood of any company.  If this cash flow is severed or significantly interrupted, insolvency can occur.  Yet the fact that a company is profitable is no assurance that its cash flow will be sufficient to maintain solvency.  To illustrate, suppose a company loses control of its accounts receivable by allowing customers more and more time to pay, or suppose the company consistently makes more merchandise than it sells.  Then, even though the company is selling merchandise at a profit in the eyes of an accountant, its sales may not be generating sufficient cash soon enough to replenish the cash outflows required for production and investment.  When a company has insufficient cash to pay its maturing obligations, it is insolvent."
*Analysis for Financial Management*, **9th edition, by Robert C. Higgins, McGraw-Hill Irwin, 2009, p. 5.**

231. According to principles of finance, the alleged misinformation about collectibles and bad debt would cause analysts and investors to overestimate future cash flow and earnings, and misgauge solvency, which in turn leads to overvaluation of the company's stock.

<u>Misrepresenting Credit Policy and Bad Debt Obscures Secular and Cyclical Trends</u>

232. From the time of the spinoff, investors and analysts understood that Idearc faced business challenges.  The nature of advertising was undergoing a secular shift, as print advertising was steadily giving way to the internet and mobile media.  Though Idearc also sold internet and mobile advertising, the profit margins on these very competitive platforms were lower than for print yellow pages.

233. Coupled with the secular trend was a difficult cyclical environment, as the U.S. economy slipped into recession.

234. Investors and analysts were well aware of these secular and cyclical trends, and consequently forecasted revenue to be flat or decline, and earnings to steadily decline.  To value Idearc, however, it was incumbent on investors and analysts to gauge how steeply revenue, earnings, and cash flow would decline.

235. Concealment of a lax customer credit policy would convey an overly optimistic impression of revenue and earnings (both reported and forecasted).  Combined with legitimate sales would be some sales made more easily due to inappropriate extension of customer credit, sales for which the prospect of receiving payment was unlikely.  Thusly inflated sales and earnings would obscure the true impact of the negative secular and cyclical trends.

236. On account of such misinformation, analysts and investors would overestimate future sales, earnings, and cash flow.  They would therefore overvalue the Company's stock.

<u>The Special Importance of Bad Debt, Earnings, and Cash Flow Due to the Company's Leverage and Tax Sharing Agreement</u>

237. While earnings and cash flow are performance variables key to the valuation of any company's stock, in the case of Idearc these variables took on even greater importance on account of the Company's heavy debt burden and the terms of the Tax Sharing Agreement.

238. At its inception as an independent company, Idearc was saddled with $9.115 billion of debt.  The interest expense in 2007 alone came to $676 million, which was more than half the Company's reported operating income that year.[40]

239. At the time of the spin-off, the Company was essentially described as a "cash cow," a generator of sizable and predictable cash flow.  But, in order to be able to service the heavy debt burden, the Company would have to continue to be a cash cow.

240. The consequences of a large cash flow shortfall would be catastrophic for Idearc.  If it came up short, Idearc would be unable to restructure its debt or sell assets the way other companies potentially could because of the terms of the Tax Sharing Agreement.  Violating those terms would incur an enormous tax liability.

241. As a result of its debt and constraints, the importance of earnings and cash flow to Idearc was intensified.  A large cash flow shortfall would not only hurt the value of the Company via the standard valuation formulas, but would also reduce its value on account of the potential tax levy, the costs of financial distress, bankruptcy risk, or even liquidation.

**Company Statements About the Materiality of the Alleged Misrepresentations and Omissions**

242. The Company itself frequently acknowledged that cash flow and earnings were important performance metrics.  For example:

> "Idearc's industry-leading business model, recurring revenue streams and strong cash flow enable the company to provide a solid cash return to

---

[40] Idearc Inc., Form 10-K for the Fiscal Year Ended 31 December 2007, filed 29 February 2008.

shareholders, service debt and be opportunistic in evaluating investment opportunities.

…

Dividend Declaration - Strong cash flow allows dividend payment."

**"Idearc Reports Strong Earnings and Cash Flow,"** *Business Wire***, company press release, 8 February 2007.**

"[Andy Coticchio, CFO:]  We are in a good financial position with OIBITDA margins around 48%. Our recurring revenue streams and strong cash flow give us the ability to pay this dividend while at the same time investing in our business and servicing our debt."

**Andy Coticchio, "Idearc Inc Conference Call – Final,"** *Fair Disclosure Wire***, 8 February 2007.**

"[Kathy Harless, CEO:]  Second, we are reporting a healthy cash flow that will fund another dividend to stockholders."

**Kathy Harless, "Q1 2007 IDEARC INC Earnings Conference Call – Final,"** *Fair Disclosure Wire***, 3 May 2007.**

"The acquisition is expected to be cash-flow accretive in the first year, have no impact on Idearc's dividend policy and will not have a material impact on Idearc's proforma leverage ratio."

**"Idearc to Acquire Switchboard.com and Other Directory Assets from InfoSpace ; Acquisition Significantly Expands Idearc's Local Search Platform and Traffic,"** *Business Wire***, company press release, 17 September 2007.**

"[Kathy Harless, CEO:]  2007 was our first full year as an independent Company. It was a year of transformation and investment. I want to highlight 3 key metrics that indicate the value that we are building as stockholders. We achieved Internet revenue growth of approximately 24%. We maintained strong OIBITDA margins, and we increased net income and earnings per share on an adjusted pro forma basis.

…

Now, let's start with our print business.  As you know, this business accounts for the majority of our revenues, and it is a strong free cash flow business.

**Kathy Harless, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents***, 7 February 2008.**

243. It follows logically from the Company's own statements that any information bearing on cash flow and earnings was material information, and misrepresentations and omissions that gave an unduly positive depiction of these metrics would inflate the stock price.

244. In addition, the Plaintiff alleges that Defendants misled investors about the effectiveness of Idearc's billing and collection operations after the spinoff.  The Company had specifically

cited as material the risk that it might not effectively execute such services previously handled by Verizon.

> "—risks associated with our ability to replicate services provided to us by Verizon Communications Inc. prior to our spin-off and currently under the transition services agreement."
> **"Idearc Reports Strong Earnings and Cash Flow,"** *Business Wire*, **company press release, 8 February 2007.**

245. While the Company may have warned investors of the general risk with regard to executing these functions, Defendants allegedly did not inform investors that the risk had materialized, impairing the Company's value.

246. CEO Scott Klein emphasized specifically the materiality of accounts receivables:

> "[Scott Klein, CEO:]  We need to increase our focus on accounts receivable because, as you all know in these kinds of economic times, this becomes an important measure of performance for our Company."
> **Scott Klein, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **29 July 2008.**

247. Being indisputably material and important, as evident in the Company's and Defendants' own statements, concealing problems with billing and collections would have artificially inflated the price of Idearc stock.

**Analysts Deemed the Alleged Misinformation Material**

248. Analysts deemed information bearing on the Company's earnings and cash flow material information.  This importance and emphasis is evident in their reports, commentary, and valuation models.

> "The key multiple for these directory companies, though, is cash flow per share.  Donnelley trades at a free cash-flow yield, or free-cash flow as a percentage of the company's market value, of about 13%, while Idearc trades at about 10%, based on 2007 estimates by Lehman Brothers. That compares with approximately 6% for large media stocks."
> **"Heard on the Street Can Yellow Pages Sustain Their Tear?," by Gregory Zuckerman,** *The Wall Street Journal*, **17 July 2007.**

"[Anthony Diclemente, Analyst, Lehman Brothers]: But I think if margins on a blended basis are definitely going to see further compression in '08, it brings to bear the question of whether EBITDA dollars can grow in '08. And I think that is probably the key concern from an investor standpoint." **"Q3 2007 Idearc Inc Earnings Conference Call – Final,"** *Fair Disclosure Wire*, **1 November 2007.**

"Our DCF analysis suggests a $34 fair value while we believe the premium '08 EBITDA valuation at 8.6x to RHD's 8.1x is near peak." **"Switchboard.com adds a lot of traffic," by Paul Ginocchio,** *et al.*, **Deutsche Bank, analyst report, 1 November 2007.**

"Our $28 price target is based on three methods: comparable dividend yield, DCF and relative valuation. IAR should trade at a discount to RHD rather than in-line (8.0x '08E EV/EBITDA, 6.5x '08 P/FCF), and its current 5.4% dividend yield is just about where we believe it should be." **"Revenue trends a concern, lowering estimates (Amended)," by Paul Ginocchio,** *et al.*, **Deutsche Bank, analyst report, 1 November 2007.**

"Our 6-12 month $29 target is based on 8.7x '08 EBITDA, a modest discount to the low end of private comparables; the $29 target also implies a 10.5x P/E, which is the mid-point of its past P/E range." **"Mixed Q3 Due to National Ad Turmoil Cutting Estimates as Print Worsens and Near-Recession Looms," by James B. Boyle, CL King & Associates, analyst report, 2 November 2007.**

"Our 6-12 month $24 target is based on 8.3x 2008 EBITDA, a significant discount to the low end of private comparables; the $24 target also implies merely a 8.5x P/E, which is still below its earlier P/E range." **"Cutting Estimates as Local Ad Fears Still Loom; Stock is Cheap, Big 7% Dividend," by James B. Boyle, CL King & Associates, analyst report, 21 November 2007.**

**"IAR Inexpensive at 8.1x EBITDA and 6.4x '07 P/E**: IAR is priced at 8.1x TEV/08 EBITDA versus private market deals in the 9x-12x range. Its 1H07 stock price had a pro forma P/E range in its short public life that had been 9x-13x. So now that it has dipped to a 6.4x P/E, the stock is deep into new territory, albeit with its prospects lower than before as the economy has significantly cooled and might tip into a recession." **"Cutting Estimates as Local Ad Data and Macro Economic Trends Cool Further," by James B. Boyle, CL King & Associates, analyst report, 9 January 2008 (emphasis in original).**

61

**"Valuation Range: $10 to $11**
Our $10-11 range is based on 7.1x 2008E EV/EBITDA and our DCF analysis, which assumes compression from current levels. Risks: (1) economy does not deteriorate; (2) short interest squeeze; (3) strategic investors unlock value through M&A."
**"Initiated With Underperform Rating, $10-11 Valuation Range," by Jaime Neuman, Wachovia, analyst report, 7 February 2008 (emphasis in original).**

**"Valuation Range: $8 to $9**
Our $8-$9 valuation range is based on an average of 7.1x our '08E EBITDA and our DCF analysis. Risks: 1) Economy does not deteriorate; 2) Short interest squeeze; 3) Strategic investors unlock value through M&A."
**"IAR: 4Q Miss; Lowering Estimates On Deteriorating Print Trends," by Jaime Neuman, Wachovia, analyst report, 7 February 2008 (emphasis in original).**

"Our $6 price target is based on DCF and relative valuation. IAR should trade at a discount to RHD's '08 EV/EBITDA multiple of 6.6x, versus IAR's current 7.4x, due to its large market exposure."
**"Concerned about trends and balance sheet, cutting to Sell," by Paul Ginocchio, et al., Deutsche Bank, analyst report, 7 February 2008.**

"Valuation Range: $8 to $9 Our $8-$9 valuation range is based on an average of 7.1x our '08E EBITDA and our DCF analysis. Risks: 1) Economy does not deteriorate; 2) Short interest squeeze; 3) Strategic investors unlock value through M&A."
**"IAR: 4Q Miss; Lowering Estimates On Deteriorating Print Trends," by Jaime Neuman, Wachovia, analyst report, 7 February 2008.**

"Due to the lower growth assumptions, we are lowering our target price to $12 from $20 and our rating to HOLD from BUY. While the shares look attractive on a free cash flow basis, given uncertainty around this number and a lack of near-term catalysts we have returned to a cautious stance. Based on our revised numbers, we estimate IAR shares are trading at about 7.5x 2008E and 2009E EBITDA."
**"IAR: A Disappointing Quarter; Reducing Target Price to $12, Rating to HOLD," by Jeffrey Shelton, et al., Natixis Bleichroeder, analyst report, 7 February 200[8].**

"Our new $14 target is based on 7.7x 2008E EBITDA, a comparable multiple to the Radio Industry with similar ad share loss and about 1.5x

premium to newspapers' multiple, which have had the longest, worst erosion of the media."
**"Cutting Target Price, Revising Estimates as Print Erosion Accelerates and Economy Cools," by James Boyle, CL King & Associates, analyst reports, 8 February 2008.**

"Valuation Range: $8 to $9 Our $8-9 valuation range is based on an average of 7.1x our 2008E EBITDA and our DCF analysis. Risks: (1) economy does not deteriorate; (2) short interest squeeze; (3) strategic investors unlock value through M&A."
**"IAR: Appoints New CEO, But Weak Fundamentals Remain Key Focus," by Jaime Neuman, Wachovia, analyst report, 28 March 2008.**

"Our target price of $12 per share is based on a discounted cash flow analysis, which incorporates a 8.0x terminal EBITDA multiple, an 8.0% WACC, and a 10% public market haircut (versus our standard 20% due to our view that further consolidation in the industry is likely)."
**"IAR: R.H. Donnelley Results Point to Further Weakness; Dropping Coverage," by Jeffrey Shelton, *et al.*, Natixis Bleichroeder, analyst report, 4 March 2008.**

"Our $1.50-2.00 valuation range is based on the average of a somewhat conservative DCF analysis, 6.7x our 2008E EBITDA and 2.0x '08E FCF per share. Risks: (1) economy stabilizes or improves; (2) short interest squeeze; (3) strategic investors unlock value through M&A."
**"IAR: Expect Further Downside--Lowering Ests/Valuation Range," by Jaime Neuman, Wachovia, analyst report, 28 March 2008.**

"IAR Inexpensive at 7.0x EBITDA and 2.0x 2008 P/E:"
**"Slashing Estimates and Target Price as Print Erosion Accelerates; Dividend Suspended," by James Boyle, CL King & Associates, 28 March 2008.**

**"Valuation Range: $2 to $2.5**
Our $2.00-2.50 valuation range is based on the average of a somewhat conservative DCF analysis, 6.8x our 2008E EBITDA and 2.0x '08E FCF per share. Risks: (1) economy stabilizes or improves; (2) short interest squeeze; (3) strategic investors unlock value through M&A.
**"IAR: Eliminates Dividend; Lowering Rev And EBITDA Ests Again," by Jaime Neuman, Wachovia, analyst report, 28 March 2008 (emphasis in original).**

"IAR Inexpensive at 6.8x EBITDA and 1.7x 2008 P/E:"
**"Big Boost to Our Estimates as Surprisingly Good Q1 Suggests Prior Fears Overdone, Print Erosion Not as Bad and Internet Growth Better than We Expected," by James Boyle, CL King & Associates, 6 May 2008.**

"**Valuation Range: $2 to $2.5**

Our $2.00-2.50 valuation range is based on the average of a somewhat conservative DCF analysis, 7.5x our 2009E EBITDA and 2.5x '09E FCF per share. Risks: (1) economy stabilizes or improves; (2) short interest squeeze; (3) strategic investors unlock value through M&A.

**"IAR: 1Q Better Than Expected, Adjusting Ests, But Reiterate UP," by Jaime Neuman, Wachovia, analyst report, 6 May 2008 (emphasis in original).**

"IAR is Relatively, Historically Inexpensive at 6.5x EBITDA: IAR is priced at 6.5x TEV/'08E EBITDA versus admittedly much earlier private market deals in the 9x-12x range. A better comparison would be to Radio's 8.6x."

**"How Bad Would Economic and Ad Trends Have to Get Before IAR Is in Trouble? Truly Tough Times and Long Recession, According to Our Stress Test," by James Boyle, CL King & Associates, analyst report, 3 July 2008.**

"**Fair Valuation at 7.3x EBITDA:** IAR is priced at 7.3x TEV/08E EBITDA versus the Radio industry's ~8.5x and Newspapers' ~6x, two other mature media that are doing comparable to worse than yellow pages."

**"Downgrading IAR, Cutting Estimates as H2 Looks Weaker**
**New CEO Tries to Cut Costs and Headcount," by James Boyle, CL King & Associates, analyst report, 14 October 2008 (emphasis in original).**

"**Valuation Range: $0.5 to $1**

Our $0.50-$1.00 valuation ranges assumes only option value for IAR shares. With leverage at ~7x in '08, increasing to 8.5x in '09, there is little value for equity holders in our view. Risks: (1) economy stabilizes or improves; (2) short squeeze."

**"IAR: Upgrading to Market Perform; Tweaking Ests Higher Risk Reward More Balanced," by Jaime Neuman, Wachovia, analyst report, 17 September 2008 (emphasis in original).**

"**Full Valuation at 7.2x EBITDA:**

Idearc is priced at 7.2x TEV/08E EBITDA versus the Radio industry's ~8x and Newspapers' ~5x, two other mature media that are doing comparable to worse than yellow pages."

**"Cutting Estimates; H2 Looks Even Weaker with Internal and External Challenges," by James Boyle, CL King & Associates, analyst report, 14 October 2008 (emphasis in original).**

"**Valuation Range: $0.5 to $1**

Our $0.50-$1.00 valuation ranges assumes only option value for IAR shares. With leverage at ~7x in '08, increasing to over 8x in '09, there is

64

little value for equity holders in our view. Risks: (1) economy stabilizes or improves; (2) short squeeze."
**"IAR: 3Q EBITDA Miss--Exploring Capital Structure Alternatives," by Jaime Neuman, Wachovia, analyst report, 30 October 2008 (emphasis in original).**

**"Full Valuation at 7.5x EBITDA**: Idearc is priced at 7.5x TEV/08E EBITDA versus the Radio industry's ~8x and Newspapers' ~4x, two other mature media that are doing comparable to worse than yellow pages."
**"Q3 EBITDA Missed, Revenue Topped Street; Cutting Estimates as Margins Fading Faster," by James Boyle, CL King & Associates, analyst report, 30 October 2008 (emphasis in original).**

249. Rating agency Standard & Poor's concurred on the materiality of earnings and cash flow, when downgrading Idearc's bond rating:

> "The downgrade also reflects our expectation that EBITDA is likely to decline by about 25% in 2009, and this follows an EBITDA decline in 2008 that we expect (and previously stated in October 2008) will have been near 20%. We anticipate that the decline in 2009 EBITDA would result in free cash flow generation that would be in the $200 million area (down from more than $400 million expected in 2008), reducing Idearc's ability to reduce debt over the intermediate term. We estimate leverage net of cash balances was near 7x at December 2008, and expect this metric to rise to near 9x by the end of 2009. We also believe that Idearc will violate its 7.25x net leverage covenant during 2009, given our current expected pace of EBITDA decline. EBITDA coverage of interest was just under 2.0x at December 2008 by our estimation, and we expect this measure would deteriorate to less than 1.5x under existing bank facilities pricing by the end of 2009."
> **"Mcgraw Hill Companies Inc - Idearc Inc. Rating Cut To 'CCC'; Outlook Negative," *Market News Publishing*, 3 February 2009.**

250. That analysts deemed information specifically about the Company's receivables and bad debt material information is evident in the questions they asked during conference calls.

> "[Jake Newman, CreditSights:]  A few questions -- one, bad debt expense. Can you say what it was in the second quarter and how it compared, second quarter and year to date, to last year?"
> **Jake Newman, "IAR - Q2 2007 Idearc Inc Earnings Conference Call," *Thomson StreetEvents*, 9 August 2007.**

65

"[Chris Heintz, Perennial:]  This is Chris Heintz for Jason. It looks like your reserve for bad debt as a percent of sales has come down this year. Is that correct?"
**Chris Heintz, "IAR - Q3 2007 Idearc Inc Earnings Conference Call." *Thomson StreetEvents*, 1 November 2007.**

"[Jeff Shelton, Natixis Securities:]  The bad debt expense, it seemed to have shot up to about 6% of sales in the third quarter versus 4% in the first two. Is there anything specific to the quarter that would have resulted in the higher percentage?"
**Jeff Shelton, "IAR - Q3 2007 Idearc Inc Earnings Conference Call." *Thomson StreetEvents*, 1 November 2007.**

"[Meredith Allen, Bear Stearns:]  Analyst And then where does your bad debt stand now in terms of percentage of sales?"
**Meredith Allen, "IAR - Q4 2007 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 7 February 2008.**

"[Jeff Shelton, Natixis Securities:]  And a follow-up on a previous question about your provision for bad-debt expense in the fourth quarter; it was very similar to what you showed in the third quarter, but if I recall, the third quarter was sort of a one-time step-up because of the billing switch-over. Are you seeing increased delinquencies from your existing accounts that's causing you to be more cautious on that line?"
**Jeff Shelton, "IAR - Q4 2007 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 7 February 2008.**

"[Peter Salkowski, Goldman Sachs:]  Excellent. And on bad debt side, you mentioned credit cancels and things like that. What was your bad debt as a percentage of revenue in the quarter?"
**Peter Salkowski, "IAR - Q1 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 6 May 2008.**

"[Steve Flynn, Morgan Stanley:]  Number one, with regard to the bad debt expense, it looks like you guys were accruing about 5.8%. It looks like it was 4% for the first two quarters last year, stepping up to 5.8% as a percentage of revenues and then 6.4% in the fourth quarter, but now you're back down to 5.0%. Am I looking at that correct? Why -- are the results better than expected? Is the economic impact not having the impact that you thought it did? Can you talk about that trend and where you see that going forward?"
**Steve Flynn, "IAR - Q1 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 6 May 2008.**

"[Bob Kricheff, Credit Suisse:]  Hi. I wanted to make sure I had a better understanding of the increase in expenses in the quarter on the G&A line. Is the increase of about $21 million or so for the quarter--is that almost exclusively bad debt-related? Is that what you were saying before, Dee?"
**Bob Kricheff, "IAR - Q2 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **29 July 2008.**

"[Bob Kricheff, Credit Suisse:]  And this rather dramatic increase in bad debt from a year ago, obviously the economy is not great out there, but is this partially your credit practices? Are there that many customers that were bad debt?
**Bob Kricheff, "IAR - Q2 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **29 July 2008.**

"[Andrew Finkelstein, Barclays Capital:]  And do you think that the 8.8% plus charge-off rate is going higher as you look into the fourth quarter and can you talk about payment collection activity there?"
**Andrew Finkelstein, "IAR - Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents,* **30 October 2008.**

251. That analysts deemed information about the Company's receivables and bad debt material information is also evident in their reports and commentary.   Many analysts highlighted these factors in response to disclosure events, often linking the information released about receivables and bad debt to cash flow and earnings, and in turn to the stock valuation.

"Free cash flow was below expectations at negative $75 million versus our positive $10 million estimate as negative WC changes were only partially offset by lower capital expenditures. Much of the shortfall, we believe, is timing related, although a portion is from higher A/R as IAR converts to direct customer billing and DSOs get extended from 30 days to about 50 days."
**"IAR: Ad Sales On Target, Margins Strong," by Jeffrey M. Shelton,** *et al.***, Natexis Bleichroeder, analyst report, 9 August 2007.**

"While nearly washed out at the EBITDA line by a $15m (DB est.) bad debt adjustment, the underlying cost trends in 3Q were good (-1.3%) but not great (-6.7% reported). Unless IAR brings costs down at a faster rate while the business is still in 'transition', we don't see how EBITDA dollars can grow."
**"Idearc Inc.: Revenue Trends A Concern, Lowering Estimates (Amended)," by Paul Ginocchio,** *et al.***, Deutsche Bank, analyst report, 1 November 2007.**

"Adjusted EBITDA was $350 million versus our $378 million estimate with the shortfall due in part to an unexpected increase in uncollectibles during the quarter. Management had indicated in 2Q that a spike in uncollectibles was a one-time event, but this proved not to be the case." **"IAR: A Disappointing Quarter; Reducing Target Price to $12, Rating to HOLD," by Jeffrey M. Shelton, *et al.*, Natexis Bleichroeder, analyst report, 7 February 200[8].**

"An increase in Idearc's bad debt as a percent of revenues (to approximately 5%) highlights our concern. Increasing bad debt is an indication of a rising number of companies going out of business – a reality during difficult economic conditions. These advertisers are very difficult to replace. We lowered our EBITDA estimates for 2008/09/10 to $1,408mn/$1,340mn/$1,288mn from $1,425mn/$1,417mn/$1,383mn." **"Disappointing Ad Sales And Weak Beginning To 2008 Weigh On Stock," by Peter M. Salkowski and Peter P. Appert, Goldman Sachs, analyst report, 7 February 2008.**

"While print revs were in line, online fell short ($7M), up a slight 2.7% yoy. The bigger miss was on EBITDA, which came in at $316M vs. our $343M, primarily due to higher bad debt exp. EBITDA margins contracted 700bps yoy to 41.6%. Given disappointing 2Q results and our belief that local economic trends have deteriorated further, we are lowering ests, again, and maintain our UP rating." **"IAR: 2Q08 Results Miss Expectations; Lowering Estimates, Again," by Jaime Neuman, Wachovia, analyst report, 29 July 2008.**

"**EBITDA and margins much worse than expected.** 2Q EBITDA of $309m (after $7m of separation costs) was 11% below our $348m estimate (DB $1m est. separation costs) and consensus of $346m. The normalized EBITDA margin was 41.6% (40.7% reported), -690bp YoY, which the company states was partly due to "expense timing" in 2Q. **Costs** (ex-separation expenses) were $443m (+7.0% YoY) versus our $417m estimate (+0.8% YoY), including $101m of G&A (+53% YoY) versus our $76m due largely to an increase in the bad debt provision in the quarter from 5% to 6.25%." **"2H Misses Big and Outlook Gets Even Worse, Maintain Sell," by Matt Chesler, Deutsche Bank, analyst report, 29 July 2008 (emphasis in original).**

"Top line erosion combined with an increase in bad debt expense were the main culprits behind a material (19.2%) fall-off in EBITDA.
...
Idearc increased its bad debt provision to 6.25% in 2Q which is up from 5% in the first quarter 2008 (resulting in a 5.7% YTD rate) and 4% in 2007. Management noted that its prior credit policies were not as tight as

68

they should have been and while more stringent procedures have been put in place and the collections team is working to collect money more quickly, it will take some time for prior mistakes to work their way through the system."
**"Top Line Erosion Accelerates; Bad Debt Rising," by Aaron Watts and Margaret Keenan, Deutsche Bank, analyst report, 31 July 2008.**

"IAR reported 3Q EBITDA of $302M, well below our/Street expectations ($338M). Margins fell over 900bps in the quarter, and while management sounds focused on cutting costs, we question if they can be cut to the degree and speed necessary to offset the declines in revenue and increased bad debt the company is faced with in the current environment."
**"IAR: 3Q EBITDA Miss--Exploring Capital Structure Alternatives," by Jaime Neuman, Wachovia, analyst report, 30 October 2008.**

"Adjusted EBITDA landed at $302mm for 3Q08, down a hefty 24.1% from $398mm in the prior-year period. The double whammy of a top line dip and higher expenses depressed margins in the quarter by 590 bps year-over-year to 41.1%. On its call, management indirectly took down its guidance on margins stating that it is seeing additional pressure as a result of bad debt-related expenses. We remind investors that IAR initially guided to 'some' product shift-related margin contraction in 2008, and on its 2Q call said that, due to the timing of certain expenses incurred in the second quarter (in which margins were 41.6%) YTD margins of 44.7% (through the first half of the year) were more indicative of margins on an ongoing basis for '08."
**"Idearc 3Q08 Review," by Aaron Watts and Margaret Keenan, Deutsche Bank, analyst report, 3 November 2008.**

252. In light of analysts' commentary, it is undeniable that the substance of the alleged misrepresentations and omissions was material, served to artificially inflate Idearc's stock price, and caused investor losses when corrected.

## EMPIRICAL CONFIRMATION OF LOSS CAUSATION

### Event Study Analysis

253. The stock price reactions to the 7 February 2008, 29 July 2008, and 30 October 2008 disclosures, each of which partially corrected the alleged misrepresentations and omissions, empirically confirm the materiality of the alleged misrepresentations and omissions. This analysis provides compelling proof that those misrepresentations and omissions had

artificially inflated the price of Idearc's stock during the Class Period and caused investor losses when corrected.

254.  The event study analysis indicates that Idearc's stock price declined significantly in response to each of the three partially corrective disclosure dates examined.  Analysis of the information disseminated on those dates, including an accounting for potentially confounding information, establishes that disclosures correcting the alleged fraud caused the stock price to fall.


**Event Study Analysis:  7 February 2008**

255.  On 7 February 2008, Defendants announced Idearc's Q4 and FY 2007 financial results. Defendants surprised the market with Idearc's disappointing revenue, EBITDA, free cash flow, bad debt, and reduced guidance.

256.  Specifically, Defendants reported that adjusted pro-forma EBITDA (a non-GAAP measure consistent and therefore comparable with earlier performance numbers) was $1.518 billion for 2007 and $350 million for the fourth quarter.  Revenue on an adjusted pro-forma basis was $3.189 billion for the year and $787 million for the quarter.  Free cash flow for the year was $323 million.  Defendants announced that for the full year, the appropriate accrual rate for bad debt was 5% of revenue.

257.  Regarding forward guidance, Defendants were less precise:

> "[Dee Jones, CFO:]  With that in mind, we expect slightly lower amortized multi-product revenues, primarily to economic softness in the second half of 2007 continuing into the first half of 2008.  We also expect some operating margin contraction due to the continued transformation of the business, and associated changes in the revenue mix."
> **Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 7 February 2008.**

258.  Three months prior, when Defendants announced Idearc's Q3 results, they had forecasted 2007 revenue would be "close to flat" relative to 2006, which was $3.214 billion.  Reported 2007 revenue of $3.189 billion was 0.8% below that figure.

259.  Revenue for the first three quarters of 2007 had already been reported at $2.402 billion (the realized annual $3.189 billion minus the fourth quarter reported $787 million).  Previous

guidance that 2007 revenue would be in line with 2006 implied a forecast for Q4 2007 revenue of $812 million (the annual forecast of $3.214 billion minus the nine month's realized $2.402 billion).  The reported quarterly revenue of $787 million therefore represented a shortfall for the fourth quarter of $25 million ($812 million minus $787 million).

260.  The Company also missed on EBITDA.  Reported 2007 EBITDA of $1.518 billion represented a decline of $43 million from 2006 EBITDA of $1.561 billion.[41]  EBITDA margin in 2006 had been 48.57% ($1.561 billion divided by $3.214 billion).  On 1 November 2007, during the Q3 2007 conference call, Defendants projected "only slight" EBITDA margin contraction for 2007 versus the prior year.[42]  At the time, Defendants did not define "slight," but in Idearc's Q4 2007 conference call, Defendants described a 0.2% decline as "slight."[43] Using this definition, Defendants' guidance was for Idearc's 2007 EBITDA to be approximately $1.555 billion (48.37% margin times $3.214 billion of projected revenue).  The actual 2007 EBITDA reported on 7 February 2007 was therefore a shortfall of $37 million from the expected EBITDA ($1.555 billion forecast minus 1.518 billion actual).

261.  Moreover, because EBITDA had already been reported for the first three quarters of 2007, the miss relative to the annual forecast was necessarily concentrated in the fourth quarter.  EBITDA for the first three quarters of 2007 was $1.168 billion (the realized annual $1.518 billion EBITDA minus the fourth quarter reported $350 million).  The implied forecast for Q4 2007 EBITDA was therefore $387 million (the 2007 forecast of $1.555 billion minus the nine month's realized $1.168 billion).  The reported Q4 EBITDA of $350 million therefore represented a shortfall for the fourth quarter of $37 million ($387 million minus $350 million), or 9.6%.

262.  Idearc's third quarter 2007 10-Q reported that bad debt for the first nine months of 2007 was 4.6% of revenue.[44]  Bad debt realized over that period was therefore $110 million (4.6% times $2.402 billion of revenue).  When asked about the bad debt rate during the Q3

---

[41] "Idearc Announces 2007 Results," *Business Wire*, company press release, 7 February 2008.
[42] Andy Coticchio, "IAR – Q3 2007 IDEARC INC Earnings Conference Call," *Thomson StreetEvents*, 1 November 2007.
[43] "[Dee Jones, CFO:]  Excluding the effect of the account[ing] change, 2007 adjusted pro forma OIBITDA margins reflect a slight margin contraction at 47.6% compared to 47.8% in 2006."  Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 7 February 2008.
[44] Idearc, Inc., Form 10-Q for the Quarter Ended 30 September 2007, filed 5 November 2007, p. 22.

2007 conference call, CFO Andy Coticchio answered, "Our reserve [for] bad debt this year we're running in the mid 4 range." Consequently, investors would have reasonably expected the 4.6% rate to continue going forward. Forecasted bad debt for the full year and fourth quarter 2007 would therefore have been $148 million (4.6% times $3.214 billion expected annual revenue) and $37 million (4.6% time $812 million expected Q4 revenue), respectively.

263. The actual bad debt results, however, were substantially higher. In the 7 February 2008 conference call, Defendants disclosed that the bad debt rate for the year was 5% of revenue, resulting in annual bad debt of $159 million (5% times annual revenue of $3.189 billion). Q4 bad debt was $49 million ($159 million annual bad debt minus $110 million Q1-Q3 bad debt). Bad debt was therefore $11 million more than expected.[45]

Stock Price Reaction

264. On this news, the price of Idearc stock fell 27.5% (on a logarithmic return basis). Given the rise in the market and peer index that occurred that day, the residual return on Idearc stock, which factors out the market and peer effects, was a significant -27.8%, a decline of $3.69 per share.

265. That the residual return was statistically significant indicates that Company-specific news caused this decline.

Accounting for Potentially Confounding Information

266. Some of the negative news released on 7 February 2008 was clearly fraud-related, in particular the surprises with respect to bad debt and accounts receivable. One might argue, however, that the revenue miss and reduced revenue guidance were caused by unforeseen market conditions.

267. To account for this potentially confounding information, I conducted an attribution analysis to disaggregate how much of the stock price decline was caused by the bad debt surprise as opposed to the revenue miss. One must keep in mind, however, that some portion of the revenue miss, as well as the bad debt surprise, was fraud-related, as the alleged misrepresentations and omissions inflated revenue forecasts.

---

[45] The slight arithmetic discrepancy in the quarterly bad debt calculation is due to rounding.

268. As explained above, the EBITDA shortfall was $37 million, of which $11 million was due to the unexpected increase in bad debt.  The bad debt surprise therefore was responsible for 30% of the annual and quarterly EBITDA shortfall.

269. With respect to forward guidance, as was the case with reported EBITDA, the negative surprise is attributable both to bad debt and to other factors such as revenue and profit margins.  The following analysis disaggregates the factors.

270. Defendants announced that the Company's bad debt would likely be 5% of revenue in 2008, up from the 4.6% rate they had reported for the first three quarters prior to the announcement.  Defendants also announced that "slightly lower" revenue, commensurate with the second half of 2007 would continue into 2008.  Defendants added that they expected "some operating margin contraction."

271. Defendants' guidance indicated a 2008 EBITDA projection of approximately $1.493 billion, computed as follows.  A reasonable forecast for 2008 revenue, based on Defendants' new guidance, would be twice that generated in the second half of 2007, or $3.156 billion.[46]  To estimate the projected 2008 EBITDA margin, a reasonable interpretation of "some contraction" would be in the neighborhood of 0.5% or less.  The 1.0% contraction experienced in 2007 relative to 2006 was considered by analysts to be a large contraction, while Defendants had described a 0.2% contraction as "slight."  A reasonable forecast for 2008 EBITDA, therefore, based on Defendants' statements would be $1.487 billion (47.6% 2007 EBITDA margin minus 0.5%, times $3.156 billion expected 2008 revenue).

272. To quantify the guidance surprise, I estimated analysts' expectations for 2008 EBITDA prior to the February 7th announcement.  Previously, Defendants had projected that Idearc's 2007 revenue would be close to 2006 revenue of $3.214 billion.  Investors' and analysts' forecasts for 2008 would therefore have been similar or lower, as there were numerous indications of a secular trend toward lower revenue and EBITDA in the business.  Prior to the February 7th announcement, expected EBITDA margin would have been in the range

---

[46] Adjusted pro-forma revenue for the first six months of 2007 was $1.611 billion, according to "Idearc Announces Second-Quarter Multi-Product Revenue and OIBITDA Growth; Superpages.com Generates 33 Percent Revenue Growth," *Business Wire*, company press release, 9 August 2007.  Revenue for the last six months of 2007 therefore was $1.578 billion ($3.189 billion minus $1.611 billion).  $1.578 billion times two equals $3.156 billion.

achieved in the first and second halves of 2007, 47.8% and 47.4%, respectively.[47]
Applying the 47.6% midpoint, which is also the EBITDA margin achieved for the full year
2007, to the stable revenue forecast produces an estimated 2008 EBITDA forecast of
$1.530 billion prior to the February 7th guidance revision.

273. Therefore, the Defendants' new guidance issued on February 7th effectively lowered 2008
projected EBITDA approximately $43 million, from approximately $1.530 billion to
$1.487 billion.

274. As noted above, prior to the February 7th announcement, investors would have reasonably
expected the previously stated bad debt rate of 4.6% to continue.  Therefore, prior to the
announcement, forecasted bad debt for 2008 would have likely been $148 million (4.6%
times $3.214 billion).  With the newly announced bad debt rate of 5%, and the new revenue
guidance, the updated forecast for 2008 bad debt would have been $158 million (5% times
$3.156 billion).  The new guidance, therefore, implied a disappointing increase in 2008 bad
debt of $10 million.

275. Putting these pieces together, at least 23% ($10 million / $43 million) of the $43 million
reduction in 2008 EBITDA is attributable to the $10 million increase in the forecast for bad
debt.

276. This attribution of a major portion of the EBITDA shortfall to bad debt is consistent with
and confirmed by Defendants' own analysis and explanation.  According to Defendants,
additional exposure to bad debt was a "primary" factor responsible for the decline in
EBITDA.

> "[Dee Jones, CFO:]  On an adjusted pro forma basis, 2007 OIBITDA was
> $1.518 billion, a decrease of 2.8% compared to the prior year. Adjusted
> pro form OIBITDA margins were 47.6% for 2007, as compared to 48.6%
> for 2006. This decline was attributed *primarily* to the relative impact of
> the accounting change, additional exposure in *bad debt*, and continued mix
> shift in revenue, partially offset by the various expense initiatives."
> **Dee Jones, "IAR – Q4 2007 Idearc, Inc. Earnings Conference Call," Thomson
> StreetEvents, 7 February 2008 (emphasis added).**

---

[47] On the 1 November 2007 Q3 2007 earnings conference call, Defendants had projected "only slight" EBITDA
margin contraction from 2006.  Using actual EBITDA margins from 2007 would therefore have been a reasonable
forecast for 2008 because the 2007 EBITDA margins were indeed lower than those achieved in 2006.

277. This attribution is further supported by analysts' computations of the portion of the EBITDA surprise attributable to the bad debt increase. Wachovia reported that the 4th quarter adjusted pro-forma EBITDA of $350 million fell short of street consensus forecasts of $376 million by $26 million. The Deutsche Bank analyst reported that 4Q 2007 bad debt of $48 million was $16 million higher than his anticipated $32 million. Using these figures, 62% of the negative EBITDA surprise was reasonably caused by the surprise in bad debt ($16 million / $26 million).

278. The 7 February 2008 announcements surprised analysts with respect to Q4 and annual 2007 EBITDA, and forecasted 2008 EBITDA. The surprises related to bad debt account for 23% to 62% of the EBITDA miss, depending on the period of focus and method of calculation.

279. Because EBITDA is a fundamental valuation metric, and because at least 23%-62% of the EBITDA shortfall is attributable to the bad debt disclosure, I conclude that at least 23-62% of the Idearc stock residual return on 7 February 2008 was caused by the bad debt disclosures. This portion represents a loss of $0.85 to $2.29 per share.

280. Additionally, analysts and investors were clearly surprised by disappointing free cash flow and the increased accounts receivable, which the company largely attributed to the billing system switchover.

> "**Cash flow trends a real concern as we get to '09 and '10**
> FCF (OCF - CapEx) in FY07 was $323m versus previous 3/07 guidance of about $450m. We estimate about $75m of the miss was due to the one-time investment in working capital, as Idearc replaces Verizon's billing system with its own, but also hurting is the decline in revenue. We estimate Idearc producing $423m of FCF in 2008, a significant improvement on 2007."
> **"Concerned About Trends And Balance Sheet, Cutting To Sell," by Paul Ginocchio, et al., Deutsche Bank, analyst report, 7 February 2008 (emphasis in original).**

> "**'07 FCF Below Expectations on Step Up in Working Capital.** FCF finished the year at $323M, well below our $463M estimate, primarily due to a large one-time use of working capital related to a shift in billing from Verizon to IAR's own direct billing platform."
> **"IAR: 4Q Miss; Lowering Estimates On Deteriorating Print Trends," by Jaime Neuman, Wachovia, analyst report, 7 February 2008 (emphasis in original).**

75

281. The Deutsche Bank analysts computed that 59% of the cash flow miss was due to issues surrounding the collections processes and collectibles, which are fraud-related issues.  The Wachovia analyst concludes that most of the cash flow miss was due to this factor.  To the extent that cash flow rather than EBITDA drove the valuations of some investors and analysts, the fraud-related factors account for an even larger share of the price declines than the results of the analysis focusing on EBITDA.

282. To the extent that any amount of the revenue declines, realized or projected, were anticipated by investors, then the relative weight of the revenue factor on the security price declines would be less, and the weight of the bad debt and increased receivables would be greater.  Moreover, had Defendants been more forthcoming about Idearc's increased bad debt and collectibles, analysts and investors would have been able to better predict the declines in revenue.  Consequently, some of the revenue surprise is a result of the alleged misrepresentations and omissions.  For these reasons, my 23-62% estimate of the portion of the stock price decline caused by the partially corrective disclosures on 7 February 2008 is conservative.

**Event Study Analysis:  29 July 2008**

283. On 29 July 2008, Defendants presented Idearc's year-to-date and quarterly results for Q2 2008.  Revenue was in line with prior guidance, but EBITDA was a severe disappointment due to bad debt.

284. Year-to-date revenue was $1.529 billion, which was down 5.1% from the same period in 2007.  Similarly, Q2 revenue was $759 million, a 5.7% decrease compared to the same quarter in 2007.

285. These revenue declines were anticipated.  On its prior earnings conference call, on 6 May 2008, Defendants had stated:

> "[Dee Jones, CFO:]  Looking forward through the remainder of the year, as we previously communicated on March 27, our view of 2008 is such that we anticipate mid single digit percentage point declines in multiproduct amortized revenue and we anticipate some operating margin contraction due to the shift in our mix of revenues."
> **Dee Jones, "IAR – Q1 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 6 May 2008.**

76

286. While revenue was consistent with expectations, Defendants surprised investors with disappointing news about EBITDA and bad debt. Defendants reported that on the adjusted pro-forma basis, year-to-date EBITDA was $683 million, an 11.3% decrease compared to the same period in 2007. For the quarter, EBITDA was $316 million, a 19.2% decrease from the same quarter in 2007. EBITDA margin for the quarter, on an adjusted pro-forma basis, was 41.6%, a striking 7.0% decline from the 48.6% margin in the same quarter of 2007.

287. Defendants attributed the poor EBITDA result to bad debt:

> "[Dee Jones, CFO:] In addition to the revenue declines previously discussed, the primary driver in the EBITDA change, both for the quarter and on a year-to-date basis, was change in our bad debt provision. We talked about an increase in our bad debt provision in the first quarter to 5%. Based on write-off experience through the second quarter, we increased our provision to approximately 6.25% in the second quarter, resulting in a year-to-date provision rate of 5.7%, versus bad debt provision rates of slightly over 4% in 2007."
> **Dee Jones, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 29 July 2008.**

288. Analysts, too, attributed the surprising negative news primarily to bad debt:

> "**2Q08 results miss big**. IAR reported 2Q08 revs of $759M vs. our $763M (FC: $764M). While print revs were in line, online fell short ($7M), up a slight 2.7% yoy. The bigger miss was on EBITDA, which came in at $316M vs. our $343M, primarily due to higher bad debt exp. EBITDA margins contracted 700bps yoy to 41.6%."
> **"IAR: 2Q08 Results Miss Expectations; Lowering Estimates, Again," by Jaime Neuman, Wachovia, analyst report, 29 July 2008 (emphasis in original).**

> "**Q2 EBITDA and EPS Missed Expectations Considerably:** IAR's $0.52 EPS reported ($0.60 ex. onetime costs) dramatically missed the Street at $0.68 EPS and CL King at $0.70, compared to last year's $0.87 PF EPS. EBITDA at $316MM PF adjusted and $299MM reported fell very short of the Street's $347.2MM and CL King's $352MM EBITDA, compared to the prior year's $391MM PF and $364MM reported EBITDA. Q2 revenue was $759MM versus the Street's $764.4MM projection and CL King at $766MM, compared to last year's PF $805MM."
> **"Idearc Inc. (IAR-NYSE)," by James B. Boyle, CL King & Associates, analyst report, 30 July 2008 (emphasis in original).**

289. In addition to the financial metrics, Defendants disclosed that the root cause of Idearc's poor performance was not simply cyclical economic or secular industry trends, but rather previously undisclosed operational problems plaguing the Company.

> "[Scott Klein, CEO:]  Yeah, Bob, it's Scott. Quite simply, our credit practices a year ago were not what they should have been. The credit policy was not as tight as it needed to be. And as is the nature of our business, it will take some time for some of those mistakes that were made to work their way through the system. But rest assured, our credit policy is appropriate today and as tight as it should be, and our credit and collections team is all over this, having put in place some very new and creative ways to perhaps collect money that much more quickly."
> **Scott Klein, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 29 July 2008.**

Stock Price Reaction

290. On this news, the price of Idearc stock fell 51.1% (on a logarithmic return basis).  Given the rise in the overall stock market and peer index that occurred that day, the residual return on Idearc stock, which factors out the market and peer effects, was a significant -53.0%, a decline of $0.90 per share from the prior closing price of $2.20 per share.

291. That the residual return was statistically significant indicates that the Company news caused these declines.

292. Despite the poor realized performance, Defendants maintained their prior guidance for the full year, implying conditions would improve going forward.  This positive news partially offset the impact of the partially corrective disclosures.  Consequently, the economic value of the negative news was even greater than the magnitude of the observed residual price decline.

Accounting for Potentially Confounding Information

293. While Defendants and analysts attributed the poor results "primarily" to disclosures about bad debt and collection operation problems, which were partially curative of alleged misrepresentations and omissions, a small portion of the EBITDA surprise could conceivably be attributed to unforeseen deterioration in revenue.  To be conservative, I quantified the maximum possible impact of the revenue factor, a portion of which could potentially be considered non-fraud related confounding information.

78

294. Both the Wachovia and CL King analysts reported that the consensus estimate for Q2 2008 revenue was $764 million, while the actual result was $5 million less at $759 million. Multiplying this $5 million revenue shortfall by the EBITDA margin indicates that at most $2.4 million of the EBITDA shortfall could feasibly be attributed to the slight revenue miss.

295. The CL King analyst stated that the Street's expectation for quarterly EBITDA was missed by $31.2 million. The $2.4 million portion of the EBITDA miss attributable to revenue is 8% of the total $31.2 million EBITDA

296. Conservatively discounting the impact of the offsetting positive news, and the fact that some of the revenue shortfall would have been anticipated had Defendants been more forthcoming about Idearc's internal problems, bad debt, and collections, this analysis suggests that up to 8% of the -53.0% residual return could have been caused by non-fraud related confounding information. At a minimum, therefore, a 48.8% share price decline (92% times 53.0%), or $0.83 per share (92% times $0.90), was caused by the partially corrective disclosures that day regarding bad debt and collections.


**Event Study Analysis:  30 October 2008**

297. On 30 October 2008, Defendants again reported revenues for Idearc that were in line with their prior guidance and market expectations. However, EBITDA and profit margin again severely disappointed because of bad debt.

298. Idearc's year-to-date revenue was $1.2264 billion, which was down 5.7% from the same period in 2007. Idearc's Q2 2008 revenue was $735 million, a 7.1% decrease compared to the same quarter in 2007. The revenue results were consistent with Defendants' and analysts' forecasts of single-digit percentage revenue declines. On Idearc's prior earnings conference call, on 29 July 2008, Defendants stated:

> "[Dee Jones, CFO:]  Looking forward through the remainder of the year, as we previously communicated on May 6, our view of 2008 is such that we anticipate mid-single-digit percentage point declines in multi-product amortized revenue.  And we anticipate some operating margin contraction due to the shift in our mix of revenues."
> **Dee Jones, "IAR – Q2 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 29 July 2008.**

299.  While revenue was consistent with expectations, the information disclosed about EBITDA and bad debt was even worse than before.  Defendants reported that on the adjusted pro-forma basis, year-to-date EBITDA was $985 million, a 15.7% decrease compared to the same period in 2007.  For the quarter, EBITDA was $302 million, representing a 24.1% decrease from the same quarter in 2007.  EBITDA margin for the quarter, on an adjusted pro-forma basis, was 41.1%, an astounding 9.2% decline from the 50.3% margin in the same quarter of 2007.

300.  Defendants admitted that most of the EBITDA shortfall was due to increased bad debt:

> "[Dee Jones, CFO:]  In addition to the revenue results previously discussed, the **primary** drivers in EBITDA change, both for the quarter and on a year-to-date basis, included changes in our bad debt provision, the favorable impact of the sale of our L.A. printing plant in the third quarter of 2007, a one-time charge associated with the exit of a national reseller sales contract, partially offset by the initial impacts of our expense reduction initiatives.  With regard to bad debt, our provision in the third quarter was 8.2%. The year-to-date provision of 6.5% compares to the provision rate of 4.6% for the same period in 2007. This change **drove the majority of change** in the G&A expense line for the quarter and on a year-to-date basis."
>
> **Dee Jones, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 30 October 2008 (emphasis added).**

301.  Analysts, too, attributed the surprising negative EBITDA news primarily to bad debt.  In fact, the Deutsche Bank analyst attributed all of the EBITDA shortfall to bad debt:

> "On October 30, 2008, Idearc (IAR), publisher of Verizon Yellow Pages and operator of online directory site Superpages.com, reported results for the third quarter of 2008. Consolidated (multi-product) net revenues came in at $735mm for the three month period, a decline of 7.1% from 3Q07 (in-line with consensus expectations). While this continued top line erosion was expected, rising costs (notably bad debt expense) during the quarter effectively wiped out any cost savings achieved, causing Adjusted EBITDA to drop 24.1% year-over-year to $302mm (well below consensus expectations).
> ...
> While the 3Q top line was relatively in-line with expectations, higher expenses caused a notable bottom line miss. We anticipated that the implementation of the company's cost savings plan would result in lower overall expenses in the quarter, but the mid-teen millions amount in cost saves that were achieved were only enough to partially offset costs

including increases in bad debt-related expenses, which caused G&A to increase 17.8% (exrestructuring) in the period."
**"Idearc 3Q08 Review," by Aaron Watts and Margaret Keenan, Deutsche Bank, analyst report, 3 November 2008.**

302.  Defendants disclosed that as a result of the poor financial performance, they had engaged strategic advisors to explore "alternatives" with regard to Idearc's capital structure. Moreover, the Company had drawn down nearly all of its $250 million credit facility, which surprised investors given the Defendants' previous assurances of ample liquidity:

> "[Scott Klein, CEO:]  As mentioned in the release this morning, we've retained Merrill Lynch & Company and Moelis & Company as financial advisors in connection with the review of alternatives related to our capital structure. Our objective is to help ensure that Idearc has an appropriate capital structure to support our strategic business objectives. We intend to look closely at all available opportunities to strengthen our balance sheet and improve our risk profile."
> **Scott Klein, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 30 October 2008.**

> "[Scott Klein, CEO:]  In the earnings release, we noted that the Company had cash and cash equivalents of $304 million as of September 30th, 2008. In addition, on October 24th, 2008 the Company initiated borrowings of $247 million under our existing $250 million revolving credit facility. We did this to increase our cash position and preserve our financial flexibility during these challenging economic times.  Fortunately, despite the challenging economic environment, we continue to generate a significant amount of cash."
> **Scott Klein, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 30 October 2008.**

303.  As a result of the disappointing financial results and revelations about bad debt, liquidity, and capital structure issues, analysts concluded that the outlook for Idearc was bleak.

> "Despite having over $300M of cash on its balance sheet at quarter end, IAR borrowed $247M under its $250M revolver, boosting its cash to almost $550M, and taking advantage of all current available liquidity. Still, based on our estimates, we forecast the company will break its 7.25x net leverage covenant by mid-'09."
> **"IAR: 3Q EBITDA Miss--Exploring Capital Structure Alternatives," by Jaime Neuman, Wachovia, analyst report, 30 October 2008.**

81

"Thus, while we recognize that IAR generates free cash flow and has no looming maturities, 3Q results and the '09 outlook lead us to believe that covenant concerns creep into the picture faster than the mid-2010 timeline we had previously anticipated."
**"Idearc 3Q08 Review," by Aaron Watts and Margaret Keenan, Deutsche Bank, analyst report, 3 November 2008.**

Stock Price Reaction

304.  From the bad news about EBITDA and bad debt, the market learned that Idearc's ability to satisfy its debt covenants was in jeopardy, and therefore its solvency and ability to survive as a going concern were threatened.  On this news, the price of Idearc stock fell 44.0% (on a logarithmic return basis).  Given the rise in the overall stock market and peer index that occurred that day, the residual return on Idearc stock, which factors out the market and peer effects, was a significant -46.8%, a decline of $0.19 per share from the prior closing price of $0.50 per share.

305.  The statistically significant residual return indicates that the Company news caused these declines.

Accounting for Potentially Confounding Information

306.  Defendants offered some countervailing positive news about cost-cutting initiatives which would reduce expenses going forward, and strategic improvements that were proving successful.

"[Scott Klein, CEO:]  [W]e've worked swiftly and strategically on implementing more programs to secure a successful long-term future for Idearc.  As I mentioned before, we're seeing progress."
**Scott Klein, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 30 October 2008.**

307.  Also, Defendants stated that there was a "favorable impact" related to the sale of a printing plant.[48]

308.  The positive news about cost cutting, success on strategic initiatives, and sale of the printing plant partially offset the impact of the negative news about bad debt, EBITDA, and

---

[48] Dee Jones, "IAR – Q3 2008 Idearc, Inc. Earnings Conference Call," *Thomson StreetEvents*, 30 October 2008.

liquidity.  The economic value of the negative news was therefore even greater than the observed residual price decline.

309.   Analysts focused on the bad news regarding EBITDA, bad debt, persistent problems related to customer credit and collections, and solvency, all of which were partially curative of the alleged misrepresentations and omissions.  Analysts and Defendants attributed these poor results primarily to bad debt and collections.

310.   However, some small portion of the EBITDA surprise was due to the "one-time charge associated with the exit of a national reseller sales contract."  The valuation impact of this item, however, is negligible.  First, because it is non-recurring, it plays little role in the forward-looking valuation formulas.  Second, Defendants refused to provide the amount. The exchange during the conference call on this topic went as follows:

> [Avi Steiner, JPMorgan:]   How much was that charge again?
> [Dee Jones, CFO:]   I didn't isolate the specific amount.
> [Avi Steiner, JPMorgan:]   Could you tell us the specific amount?
> [Dee Jones, CFO:]   I'm not going to.
> **"IAR – Q3 2008 Idearc, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **30 October 2008.**

311.   Moreover, analysts did not apportion any significant amount of the EBITDA shortfall to the contract exit charge.

312.   In light of the de minimis impact of the contract exit charge, and taking into account the countervailing positive factors impacting EBITDA, I conclude that all of the residual stock price decline on 30 October 2008 was caused by the corrective disclosures relating to the alleged misrepresentations and omissions.

313.   Based on the event study and analysis of potentially confounding information, I conclude that the curative disclosures on 30 October 2008 caused the price of Idearc stock to fall 46.8%, or $0.19 per share.


**Loss Causation Summary and Conclusion**

314.   The substance of the alleged misrepresentations and omissions was material information. Because Defendants allegedly concealed adverse material information over the course of the Class Period, the price of Idearc's stock was artificially inflated.  When information

was disclosed that partially corrected the alleged misrepresentations and omissions, the stock price fell significantly, thereby causing investors to suffer losses.

315. This conclusion is robust to a careful analysis of potentially confounding information released concurrently with the corrective disclosures.  Consequently, the alleged misrepresentations and omissions caused investors to sustain damages.

316. The three partially corrective disclosures discussed above are not necessarily the only corrective disclosure events during the Class Period.  They do, however, provide clear proof that the misrepresentations and omissions were material, caused the stock price to be artificially inflated, and caused investors to suffer losses.

## **SUMMARY**

317. Over the course of the Class Period, Idearc was a large company whose stock was listed and actively traded on the NYSE.  An NYSE specialist and numerous market makers provided liquidity and fostered the efficiency of the market for Idearc stock.  The Company was widely covered by securities analysts, rating agencies, and the news media.  Institutional ownership of Idearc stock was widespread.  Share float was above the threshold required for S-3 registration eligibility.  Several years of financial results were available to analysts and investors throughout the Class Period.  Trading volume was consistently high, both in terms of the absolute number of shares traded daily and in terms of the percent of outstanding shares traded weekly.  The bid-ask spread was narrow.  Market capitalization was high.

318. Idearc common stock satisfied the *Cammer* and *Unger* factors, which consistent with financial economic principles and empirical research, indicate market efficiency.

319. Importantly, Idearc stock satisfied the empirical *Cammer* factor, which demonstrates the essence of market efficiency.  The F-test, Ansari-Bradley test, and event study each proved that there was a cause and effect relationship between material information and movements in the Idearc stock price.

320. Given these facts, I conclude that Idearc stock traded in an efficient market throughout the Class Period.

84

321. Over the course of the Class Period, the alleged misrepresentations and omissions caused the price of Idearc stock to be artificially inflated.  This conclusion is based on a careful analysis of Defendants' statements, analyst reports, analysts' valuation models, generally accepted principles of valuation, and event studies focusing on the empirical reactions of the stock price to corrective disclosure events.

322. Event study analysis, which controlled for potentially confounding information, proves that the alleged misrepresentations and omissions had caused the price of Idearc stock to be artificially inflated during the Class Period, and that the corrective disclosures caused the inflation to dissipate, thereby causing the stock price to fall and causing investor losses.


## LIMITING FACTORS AND OTHER ASSUMPTIONS

323. This report is furnished solely for the purpose of court proceedings in the above named matter and may not be used or referred to for any other purpose.  The analysis and opinions contained in this report are based on information available as of the date of this report.  I reserve the right to supplement or amend this report, including in the event additional information becomes available.


Steven P. Feinstein, Ph.D., CFA

**APPENDIX 1:**

**LOGARITHMIC RETURNS**

Logarithmic returns, rather than percent change returns are commonly used in stock return regressions and event study analysis.  The formula for a logarithmic return is:

$$R_t = \ln\left(\frac{P_t + d_t}{P_{t-1}}\right)$$

where:

        $R_t$ is the logarithmic return on day t;
        $P_t$ is the stock price at the end of day t;
        $P_{t-1}$ is the stock price from the previous day, day t-1;
        $d_t$ is the dividend on day t, if any.

The formula for converting a logarithmic return into a dollar return is:

$$DR_t = P_{t-1} \cdot (e^{R_t} - 1)$$

where:

        $DR_t$ is the dollar return on day t;
        $P_{t-1}$ is the stock price from the previous day, day t-1;
        e is natural e (approximately 2.7);
        $R_t$ is the logarithmic return on day t.

If a stock falls from $20 to $18, the percent change in price is -10%, equal to the $2 decline divided by the original $20 price.  The logarithmic return, however, is -10.54%, equal to ln($18/$20).

The logarithmic return relates a price change to an average of the original, final, and intervening prices over the course of a price decline.  As such, for large price declines, it is possible for a logarithmic price decline to exceed 100%, since the price decline may be greater than the average of the beginning and ending prices.

An attractive feature of a logarithmic return is that it can be decomposed into contributing factors linearly.  That is, the portion of a logarithmic return caused by company-specific information is isolated by subtracting from the total logarithmic return the portion of the total return caused by market and peer group factors.

## APPENDIX 2:

## RESULTS ARE ROBUST TO RISING VOLATILITY

Examination of the Idearc stock residual returns suggests that Idearc's volatility increased over the course of the regression estimation period and Class Period.  The news analysis bears out that, as the truth about the Company emerged, the frequency and perceived importance of new information increased.  Consequently, the increase in volatility appears to be fully consistent with market efficiency and was partially induced by the emergence of the information allegedly concealed.

Estimating the regression on a period preceding the corrective disclosures, as I did, prevents the possibility of using data that were perturbed by the very alleged fraud and corrective events one wishes to test for significance.  If the alleged fraud and disclosures induced price changes and volatility, the exacerbated volatility induced by the alleged fraud could potentially cloak the price reactions from detection as significant by statistical tests.  The potential bias from the error of estimating the regression over a data sample contaminated with induced volatility can cause rejection of statistical significance when in fact the alleged fraud and corrective disclosures caused statistically significant price movements.

Nonetheless, it is important to note that, in this particular case, the Idearc stock price declines following the corrective disclosures were so large that they prove to be statistically significant, even when compared against the highest period of volatility during the Class Period.

I applied a statistical methodology known as "change point analysis" to identify when, according to the data, it appears that the volatility of the Idearc stock residual returns increased.  The method involves analyzing the time series of residual returns and making comparisons of sub-sample volatilities, to detect intervals with significant volatility differences.  The approach is generally accepted and widely used.[49]

According to this analysis, the Class Period can be divided into 4 separate volatility regimes, each with successively larger volatility than the prior period.  The periods identified by the

---

[49] See, for example, "Use of Cumulative Sums of Squares for Retrospective Detection of Changes of Variance," by Carla Inclan and George C. Tiao, in *Journal of the American Statistical Association*, September 1994.

change point algorithm are: 8/9/07-11/26/07, 11/27/07-2/7/08, 2/8/08-9/8/08, and 9/9/08-10/30/08.  The residual return standard deviations for each of these sub-periods are 1.80%, 3.40%, 5.80%, and 11.87%, respectively.

If the increases in stock return volatility were exogenously induced, rather than having been caused by information or events related to the alleged fraud, it would arguably be appropriate to compare events within each period to the volatility estimated within that same period for the purpose of establishing the statistical significance of that event.  For example, the 29 July 2008 disclosure event residual return could be compared against the residual return standard deviation within the sub-period 2/8/08-9/8/08.

The 29 July 2008 event date residual return was –52.97%.  The sub-period standard deviation was 5.80%.  The event date t-statistic is therefore -9.14% (-52.97% divided by 5.80%).  The absolute value of this t-statistic is greater than the critical value of 1.98, so the residual return is statistically significant.

Applying these same adjustments, the t-statistics for the 7 February 2008 and 30 October 2008 disclosure events are -8.16 and -3.94, respectively.  These absolute values of these t-statistic values are each well above the critical thresholds necessary to establish statistical significance (2.01 and 2.03, respectively), proving that even when compared against higher, more contemporaneous, volatilities, the residual returns following all three disclosure events still prove to be statistically significant.

The event study results presented in the report are therefore confirmed and robust.  Company-specific news, rather than a market effect, peer group effect, or random volatility, caused the Idearc stock price to fall on each of the three partially corrective disclosure event dates.

Similarly, the F-test and Ansari-Bradley test, which compare earnings announcement residual returns to non-announcement date residual returns, reach the same conclusions, even after the adjustment for increased volatility.  I compared the Class Period earnings announcement dates to the sub-period with the highest volatility (9/9/08-10/30/08).

The standard deviation of all non-announcement dates in the 9/9/08-10/30/08 sub-period was 11.87%. The standard deviation of the earnings announcement residual returns was 2.86 times greater at 33.99%. The F-statistic for these two samples is 7.99, which is greater than the 95% confidence level critical F-statistic value of 2.48 (for a one-tail F-test with 5 and 36 degrees of freedom), indicating that earnings announcement dates had significantly greater volatility than non-announcement dates.

The Ansari-Bradley C-statistic for the same two samples of returns is -2.14, the absolute value of which is greater than the critical C-statistic threshold of 1.96 for significance at the 95% confidence level, proving with an extremely high degree of statistical certainty that the volatility of earnings announcement day returns is significantly different from the volatility of returns on all other days.

This statistical test result demonstrates that there was a cause and effect relationship between the release of new information and reactions in the Idearc common stock price, which therefore establishes that Idearc common stock traded in an efficient market during the Class Period. The empirical market efficiency results presented in the report are therefore confirmed and robust.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

### LEGAL DOCUMENTS

- Consolidated Class Action Complaint for Violations of The Federal Securities Laws and Jury Demand, dated 11 February 2010.
- Defendants' Motion to Dismiss The Consolidated Amended Class Action Complaint and Brief In Support, 12 April 2010.
- Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss The Consolidated Amended Class Action Complaint, dated 27 May 2010.
- Defendants' Reply Brief In Support of Their Motion to Dismiss The Consolidated Amended Class Action Complaint, dated 24 June 2010.

### NEWS ARTICLES / PRESS RELEASES

- "Verizon's Board Approves Spinoff of Directories," *The New York Times Abstracts*, 19 October 2006.
- "Standard & Poor's Announces Changes to U.S. Indices," *PR Newswire*, 13 November 2006.
- "Standard & Poor's Announces Changes to U.S. Indices," *M2 Presswire*, 14 November 2006.
- "Idearc to Begin Trading Under Symbol 'IAR' on Nov. 20; Regular Way Trading in 'VZ' Includes Idearc Stock Dividend Through Close of Business Today as Spin-off Is Completed," *PR Newswire*, 17 November 2006.
- "Idearc shares could hold promise- Barron's," *Reuters News,* 19 November 2006.
- "Verizon Communications - Idearc to Begin Trading," *Regulatory News Service,* 20 November 2006.
- "Idearc Inc. Launches with New IAR Ticker Symbol; Board of Directors Announced," *Business Wire,* 20 November 2006.
- "UPDATE 1-Verizon spin-off Idearc rises in debut," *Reuters News,* 20 November 2006.
- "Idearc begins trading on NYSE," *Associated Press Newswires,* 20 November 2006.
- "RESEARCH ALERT-RBC Capital cuts Verizon price target," *Reuters News,* 20 November 2006.
- "Idearc Incorporated - CEO Interview," *CNBC/Dow Jones Business Video,* 20 November 2006.
- "Idearc Inc. To Begin Trading On New York Stock Exchange," *Reuters,* 20 November 2006.
- "Idearc Inc. Sells $2.85 Billion 10 Year Notes-Reuters," *Reuters,* 20 November 2006.
- "Verizon Communications: Idearc Inc. To Begin Trading On New York Stock Exchange," *Reuters,* 20 November 2006.

90

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "RESEARCH ALERT-Prudential cuts Verizon price target," *Reuters News,* 20 November 2006.
- "RESEARCH ALERT-Citigroup cuts Verizon price target," *Reuters News,* 22 November 2006.
- "Ahead of the Bell: RH Donnelley, Idearc," *Associated Press Newswires,* 27 November 2006.
- "Deutsche Bank starts Idearc with "sell" rating," *Reuters News,* 27 November 2006.
- "Ahead of the Bell: RH Donnelley, Idearc," *Associated Press Newswires,* 27 November 2006.
- "Verizon says will increase share repurchases to 1.7 bln usd in 2006," *AFX Asia,* 6 December 2006.
- "Verizon CFO Provides Updates on Initiatives to Enhance Shareholder Value; Share Repurchases to Increase by $200 Million to Total $1.7 Billion for 2006," *PR Newswire,* 6 December 2006.
- "Idearc Inc. Announces Additional Member to Board of Directors," *Business Wire,* 6 December 2006.
- "Idearc Inc. Responds to Below Market 'Mini-Tender' Offer By TRC Capital Corporation," *Business Wire,* 15 December 2006.
- "Idearc Inc. Responds To Below Market 'Mini-Tender' Offer By TRC Cap Corp," *Dow Jones News Service,* 15 December 2006.
- "Idearc recieves 'mini-tender' from TRC Capital," *Reuters News,* 15 December 2006.
- "TRC Capital Corp makes 'mini-tender' offer for 3 million shares of Idearc," *Associated Press Newswires,* 15 December 2006.
- "Idearc Inc. Announces Election Of Additional Member To Bd Of Directors," *Dow Jones News Service,* 2 January 2007.
- "Idearc Inc. Announces Election of Additional Member to Board of Directors," *Business Wire,* 2 January 2007.
- "Idearc Inc. Names New Chief Information Officer," *Business Wire,* 4 January 2007.
- "Correction; News," *Texas Lawyer,* 8 January 2007.
- "Idearc Executives Address Citigroup 17th Annual Entertainment, Media and Telecommunications Conference," *Business Wire,* 10 January 2007.
- "Idearc Inc - IAR: To Present At Citigroup Conference @ 18:10 ET," *Knobias,* 11 January 2007.
- "Idearc Announces Proxy Deadlines for 2007 Annual Shareholders Meeting," *Business Wire,* 19 January 2007.
- "Idearc CEO Gets $556,959 Award," *Dow Jones Corporate Filings Alert,* 24 January 2007.
- "2nd UPDATE: Verizon 4Q Net Down 38% On Spinoff, Sale Chgs," *Dow Jones News Service,* 29 January 2007.

91

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Inc. to Report Earnings on Feb. 8," *Business Wire,* 29 January 2007.
- "Yellow Pages Tgt Cut By Dundee On Industry Revaluation," *Dow Jones News Service,* 31 January 2007.
- "Idearc Reports Strong Earnings and Cash Flow," *Business Wire,* 8 February 2007.
- "Idearc Inc - IAR: Q4 Earnings Call @ 10:00 ET Today," *Knobias,* 8 February 2007.
- "Idearc 4th-quarter earnings fell sharply following split from Verizon," *Associated Press Newswires,* 8 February 2007.
- "Idearc Inc. Announces First Quarterly Dividend," *Reuters,* 8 February 2007.
- "Idearc Inc. Reiterates FY 2007 Guidance," *Reuters,* 8 February 2007.
- "IDEARC INC Conference Call - Final," *Voxant FD Wire,* 8 February 2007.
- "Idearc Executives Address Bear Stearns 20th Annual Media Conference," *Business Wire,* 5 March 2007.
- "Idearc Inc - IAR: To Present At Bear Stearns Conf @ 09:25 ET," *Knobias,* 6 March 2007.
- "Equity Report - LOCM: Signs Distribution Agreement w/Idearc," *Knobias,* 6 March 2007.
- "Clear Channel, Harrah's, among entrants to HY index," *Reuters News,* 9 March 2007.
- "The Philadelphia Stock Exchange to begin trading twelve new options on Monday, March 12," *M2 Presswire,* 9 March 2007.
- "The Philadelphia Stock Exchange To Begin Trading Twelve New Options On Monday, March 12," *Exchange News Direct,* 9 March 2007.
- "Idearc Executive Addresses Lehman Brothers 2007 High Yield Bond and Syndicated Loan Conference," *Business Wire,* 27 March 2007.
- "Idearc Inc - IAR: To Present At Lehman High Yield Bond Conference @ 10:30 ET," *Knobias,* 28 March 2007.
- "Morning Alert for Idearc Inc," *M2 Presswire,* 5 April 2007.
- "ABCSearch and Idearc Media Partnership Boosts Local Advertiser Listings Distribution for Superpages.com," *ENP Newswire,* 9 April 2007.
- "Idearc Inc - IAR: To Present At Search Engine Strategies Conference @ 13:30 ET," *Knobias,* 11 April 2007.
- "Idearc Inc. to Report Earnings on May 3," *Business Wire,* 16 April 2007.
- "Idearc Inc - IAR: Conference call regarding Annual Meeting of Stockholders @ 10:00 ET Today," *Knobias,* 19 April 2007.
- "2nd UPDATE: Verizon 1Q Net Down On Asset Sales, Merger Costs," *Dow Jones News Service,* 30 April 2007.
- "3rd UPDATE: Verizon 1Q Net Down On Asset Sales, Merger Costs," *Dow Jones News Service,* 30 April 2007.
- "4th UPDATE: Verizon 1Q Net Down On Asset Sales, Merger Costs," *Dow Jones News Service,* 30 April 2007.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Reports Revenue Growth Driven By Multi-Platform Products," *Business Wire,* 3 May 2007.
- "Idearc Inc - IAR: Q1 Earnings Call @ 10:00 ET Today," *Knobias,* 3 May 2007.
- "Q1 2007 IDEARC INC Earnings Conference Call - Final," *Voxant FD Wire,* 3 May 2007.
- "Idearc Executive Addresses UBS 2007 Leveraged Finance Conference," *Business Wire,* 4 May 2007.
- "Ad nixed after Mental health group complains," *Boston Herald,* 4 May 2007.
- "Idearc Inc. Reiterates FY 2007 Guidance-Conference Call," *Reuters,* 4 May 2007.
- "Idearc Executive Addresses UBS 2007 Leveraged Finance Conference," *Business Wire,* 4 May 2007.
- "Idearc Inc - IAR: To Present At UBS 2007 Leveraged Finance Conference @ 17:30 ET," *Knobias,* 9 May 2007.
- "Directories turn a new page," *The Salt Lake Tribune,* 26 May 2007.
- "Market Commentary on Idearc Inc," *M2 Presswire,* 30 May 2007.
- "Idearc Inc. Delivers Compact-Sized Directory," *M2 Presswire,* 31 May 2007.
- "Idearc Executives Address 2007 Deutsche Bank Media and Telecom Conference," *Business Wire,* 1 June 2007.
- "Idearc Inc - IAR: To Present At Deutsche Bank 2007 Media Conference @ 08:20 ET," *Knobias,* 5 June 2007.
- "Idearc Announces Additional Member to Board of Directors," *Business Wire,* 11 June 2007.
- "Idearc says Jonathan F. Miller joins board, expanding its total to eight members," *Associated Press Newswires,* 11 June 2007.
- "Idearc Announces Successful Closing of Exchange Offer for $2.85 Billion 8% Senior Notes Due 2016," *Business Wire,* 11 June 2007.
- "Idearc closes offering to exchange old notes with new ones, nearly $2.85B in notes exchanged," *Associated Press Newswires,* 11 June 2007.
- "Idearc Inc. Announces Closing of Exchange Offer for $2.85 Billion 8% Senior Notes Due 2016," *Reuters,* 11 June 2007.
- "Idearc Inc. and Jingle Networks, Inc., Partner On Local Voice-Search," *Reuters,* 16 July 2007.
- "Can Yellow Pages Sustain Their Tear?," *The Wall Street Journal,* 17 July 2007.
- "Donnelley, Idearc yellow pages battle for survival," *Ventura County Star,* 22 July 2007.
- "Idearc Inc. to Report Earnings on August 9," *Business Wire,* 23 July 2007.
- "Delivering Quality Leads to Platform Neutral Advertisers Webinar," *ENP Newswire,* 6 August 2007.
- "Idearc 2Q EPS 75c Vs EPS $1.44," *Dow Jones News Service,* 9 August 2007.

93

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Announces Second-Quarter Multi-Product Revenue and OIBITDA Growth ; Superpages.com Generates 33 Percent Revenue Growth," *Business Wire,* 9 August 2007.
- "Idearc Inc - IAR: Q2 Earnings Call @ 10:00 ET Today," *Knobias,* 9 August 2007.
- "Idearc 2nd-quarter profit declines on one-time costs, adjusted results top Wall Street," *Associated Press Newswires,* 9 August 2007.
- "Idearc Inc. Board Declares Dividend," *Reuters,* 9 August 2007.
- "Q2 2007 IDEARC INC Earnings Conference Call - Final," *Voxant FD Wire,* 9 August 2007.
- "Idearc 2Q EPS 75c Vs EPS $1.44," *Dow Jones News Service,* 9 August 2007.
- "Idearc Announces Second-Quarter Multi-Product Revenue and OIBITDA Growth ; Superpages.com Generates 33 Percent Revenue Growth," *Business Wire,* 9 August 2007.
- "Idearc Inc - IAR: Q2 Earnings Call @ 10:00 ET Today," *Knobias,* 9 August 2007.
- "Idearc 2nd-quarter profit declines on one-time costs, adjusted results top Wall Street," *Associated Press Newswires,* 9 August 2007.
- "Tekelec Names Jerry Elliott to Board," *Wireless News,* 14 August 2007.
- "Idearc Inc - IAR: Conference call regarding Delivering Quality Leads to Platform Neutral Advertisers Webinar @ 13:00 ET Today," *Knobias,* 16 August 2007.
- "Idearc Enters Interest Rate Swap,"  *Dow Jones News Service,* 17 August 2007.
- Idearc Enters Interest Rate Swap," *Business Wire,* 17 August 2007.
- "Idearc Media Brings Out Bilingual Verizon Yellow Pages in the Bronx," *Wireless News,* 19 August 2007.
- "Idearc Inc - IAR: To Present At Search Engine Strategies 2007 Conference @ 16:30 ET," *Knobias,* 21 August 2007.
- "Idearc Media Distributes Portsmouth Verizon Yellow Pages," *Wireless News,* 23 August 2007.
- "Idearc Media Rolls Out Verizon Yellow Pages to Burlington-Middlebury Residents," *Wireless News,* 24 August 2007.
- "Idearc Media Delivers the Verizon Yellow Pages to Monroe County," *Wireless News,* 25 August 2007.
- "Idearc Delivers The Verizon Yellow Pages To Portland Area Residents," *Wireless News,* 28 August 2007.
- "Idearc Media Distributes New Ventura County Verizon Yellow Pages Directories," *Wireless News,* 29 August 2007.
- "Idearc Media Distributes Verizon Yellow Pages Companion Directory to Rockland County," *Wireless News,* 30 August 2007.
- "Superpages.com Offers Local Mobile Application," *Travel & Leisure Close-Up,* 7 September 2007.
- "Idearc Inc.'s Idearc Media Corp. Acquires LocalSearch.com URL," *Reuters,* 12 September 2007.

94

**Exhibit-1**

## Documents and Other Information Reviewed and Relied Upon

- "Idearc To Acquire Switchboard.com And Other Directory Assets From InfoSpace," *Dow Jones News Service,* 17 September 2007.
- "Idearc to Acquire Switchboard.com and Other Directory Assets from InfoSpace; Acquisition Significantly Expands Idearc's Local Search Platform and Traffic," *Business Wire,* 17 September 2007.
- "Idearc Executives Discuss Switchboard.com and Other Directory Assets Acquisition from InfoSpace ; Acquisition Significantly Expands Idearc's Local Search Platform and Traffic," *Business Wire,* 17 September 2007.
- "Idearc to buy online directory assets from Infospace for 225 mln usd," *AFX Asia,* 17 September 2007.
- "UPDATE 3- InfoSpace to sell online directory business to Idearc," *Reuters News,* 17 September 2007.
- "Idearc purchasing Switchboard.com, other online directory assets from InfoSpace for $225M," *Associated Press Newswires,* 17 September 2007.
- "Idearc Executives Address Goldman Sachs Communacopia XVI Conference," *Business Wire,* 17 September 2007.
- "Before the Bell- InfoSpace shares up on asset sale," *Reuters News,* 17 September 2007.
- "RPT-Before the Bell- InfoSpace shares up on asset sale," *Reuters News,* 17 September 2007.
- "Idearc purchasing Switchboard.com and other online directory assets from InfoSpace for $225M," *Associated Press Newswires,* 17 September 2007.
- "Idearc buying some InfoSpace assets," *AFX Asia,* 17 September 2007.
- "Idearc Inc - IAR: Conference call regarding To Acquire Switchboard.com and Other Directory Assets from InfoSpace @ 11:00 ET Today," *Knobias,* 17 September 2007.
- "Online Business Sells for $225m Pushing INSP Up 28%,*" M2 Presswire,* 17 September 2007.
- "Online search companies trade mixed, InfoSpace jumps with deal to sell Web directory business," *Associated Press Newswires,* 17 September 2007.
- "Sector roundup: Online search providers mixed; airline shares fall as market dips, oil rises," *Associated Press Newswires,* 17 September 2007.
- "Sector Snap: Online Search Mixed," *Associated Press Newswires,* 17 September 2007.
- "Idearc Inc. To Acquire Switchboard.com And Other Directory Assets from InfoSpace Inc," *Reuters,* 17 September 2007.
- "Idearc to Acquire Switchboard.com and Other Directory Assets from InfoSpace - Conference Call - Final," *Voxant FD Wire,* 17 September 2007.
- "In Brief," *The Wall Street Journal,* 18 September 2007.
- "Sale sparks InfoSpace,"   Chicago Sun-Times  , 18 September 2007.
- "InfoSpace to sell online directory business to Idearc for $225M," *Associated Press Newswires,* 18 September 2007.

95

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- "Stocks in the spotlight,"   The Providence Journal  , 18 September 2007.
- "InfoSpace to Sell Online Directory Business for $225 Million in Cash," *Wireless News,* 18 September 2007.
- "InfoSpace Sells SwitchBoard.com to Idearc in $225 million Deal," *Communications Daily,* 18 September 2007.
- "Idearc Inc - IAR: To Present At Goldman Sachs Communacopia XVI Conference @ 10:25 ET," *Knobias,* 19 September 2007.
- "Idearc to Buy Switchboard.com and Other Directory Assets from InfoSpace," *Wireless News,* 20 September 2007.
- "Infospace jumps Monday on divestiture; Harman drops Friday on scuttled takeover plan," *Associated Press Newswires,* 21 September 2007.
- "InfoSpace stock skyrockets on online directory sale," *RCR Wireless News,* 24 September 2007.
- "R.H. Donnelley Chairman and CEO David Swanson Tapped as Yellow Pages Association Board Chairman," *Wireless News,* 29 September 2007.
- "Idearc Chairman John J. Mueller and Hawaiian Telcom CFO Paul H. Sunu to Join Centennial Communications' Board of Directors," *Market Wire,* 1 October 2007.
- "Idearc Chairman John J. Mueller and Hawaiian Telcom CFO Paul H. Sunu to Join Centennial Communications' Board of Directors," *ENP Newswire,* 1 October 2007.
- "Centennial Communications names Mueller, Sunu to its board of directors," *Associated Press Newswires,* 1 October 2007.
- "Centennial Communications Corp - Idearc Chairman John J. Mueller and Hawaiian Telcom CFO Paul H. Sunu to Join Centennial Communications' Board of Directors," *Market News Publishing,* 1 October 2007.
- "Centennial Directors," *TR Daily,* 1 October 2007.
- "Idearc Executives Address Natixis Bleichroeder Hidden Gems Conference," *Business Wire,* 5 October 2007.
- "Idearc Inc - IAR: Conference call regarding Natixis Bleichroeder Hidden Gems Conference @ 08:30 ET Today," *Knobias,* 9 October 2007.
- "Idearc Inc - IAR: To Present At Natixis Bleichroeder Conference @ 08:30," *Knobias,* 9 October 2007.
- "Idearc Inc. to Report Earnings on November 1," *Business Wire,* 11 October 2007.
- "Mobile Services House Motricity Buys Rival InfoSpace," *TelecomWeb News Break,* 15 October 2007.
- "Antitrust regulators clear Idearc's $225M purchase of InfoSpace's online directory business," *Associated Press Newswires,* 17 October 2007.
- "Idearc Inc - Idearc Media And Multiplied Media Extend Local Search," *Market News Publishing,* 25 October 2007.
- "Idearc Inc. Reports Third Quarter Earnings Today," *Business Wire,* 1 November 2007.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Announces Third-Quarter Earnings ; Reiterates Full-Year Guidance and Delivers another Quarterly Dividend," *Business Wire,* 1 November 2007.
- "Idearc Inc - IAR: Q3 Earnings Call @ 10:00 ET Today," *Knobias,* 1 November 2007.
- "Idearc 3rd-quarter profit drops 52 percent with accounting change and declining print sales," *Associated Press Newswires,* 1 November 2007.
- "Idearc to pay regular quarterly dividend of 34.25 cents," *Associated Press Newswires,* 1 November 2007.
- "Idearc Inc. Reiterates FY 2007 Guidance; Declares Quarterly Dividend," *Reuters,* 1 November 2007.
- "Q3 2007 IDEARC INC Earnings Conference Call - Final," *Voxant FD Wire,* 1 November 2007.
- "Dividends," *Corpus Christi Caller Times,* 3 November 2007.
- "Idearc Executive Addresses Beacon Street Group Southwestern Showcase," *Business Wire,* 12 November 2007.
- "Idearc Executive Addresses Credit Suisse Leveraged Finance Media & Telecom Conference," *Business Wire,* 13 November 2007.
- "FirstAlert: 2:40-5 P.M. Investrend Bestcalls," *FinancialWire,* 14 November 2007.
- "InfoSpace Announces Special $300 M Cash Distribution," *Dow Jones News Service,* 15 November 2007.
- "InfoSpace board approves special cash distribution of $300M, or $9 per share," *Associated Press Newswires,* 15 November 2007.
- "InfoSpace Sets Special Dividend of $9 Per Share - up 12% in First Pre-Market Matches," *MidnightTrader,* 15 November 2007.
- "Idearc Inc - IAR: To Present At Southwestern Showcase Conference @ 14:40 ET," *Knobias,* 15 November 2007.
- "Granting of Request for Early Termination of the Waiting Period Under the Premerger Notification Rules," *Federal Register,* 19 November 2007.
- "Granting of Request for Early Termination of the Waiting Period Under the Premerger Notification Rules - Federal Register Extracts," *Consumer Product Safety Commission Documents,* 19 November 2007.
- "Idearc Names Samuel D. Jones Acting CFO And Treasurer," *Dow Jones News Service,* 27 November 2007.
- "Idearc Names Samuel D. Jones Acting CFO and Treasurer," *Business Wire,* 27 November 2007.
- "Idearc CFO steps down," *Reuters News,* 27 November 2007.
- "Idearc Chief Financial Officer Andy Coticchio steps down, acting CFO named," *Associated Press Newswires,* 27 November 2007.
- "Clickable Names Former AOL CEO to Board of Directors," *Wireless News,* 27 November 2007.

97

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Inc. Appoints Samuel D. Jones Acting CFO," *Reuters,* 27 November 2007.
- "Idearc CFOO Coticchio to leave: Jones named acting CFO," *AFX Asia,* 28 November 2007.
- "CORRECTION: Idearc CFO Coticchio to leave: Jones named acting CFO," *AFX Asia,* 28 November 2007.
- "Stock News You Can Use,*" M2 Presswire,* 28 November 2007.
- "Wells Fargo, Pep Boys among big movers on stock market Wednesday," *Associated Press Newswires,* 28 November 2007.
- "Idearc Cfo," *TR Daily,* 28 November 2007.
- "Idearc Appoints Jones Acting CFO," *Penton Insight,* 28 November 2007.
- "Clickable Names Jonathan Miller to Board," *Entertainment Close-Up,* 28 November 2007.
- "Idearc Executive Addresses Bank of America 2007 Credit Conference," *Business Wire,* 29 November 2007.
- "Idearc Executives Address UBS 35th Annual Global Media & Communications Conference," *Business Wire,* 29 November 2007.
- "Stocks in the spotlight," *The Providence Journal,* 29 November 2007.
- "Market Movers," *The Record,* 29 November 2007.
- "Idearc Inc - IAR: To Present At Bank of America Credit Conference @ 16:40 ET," *Knobias,* 3 December 2007.
- "Idearc Inc.: Idearc Media Collaborates With TurnHere And Denver MultiMedia For Online Video Production," *Reuters,* 3 December 2007.
- "Aggressive Stock Alert: AOGN! December 10, 2007," *Market Wire,* 10 December 2007.
- "Aggressive Stock Alert: AOGN! December 10, 2007," *ENP Newswire,* 10 December 2007.
- "Idearc Inc. to Report Earnings on Feb. 7, 2008," *Business Wire,* 20 December 2007.
- "Business Services Industry News At a Glance," *NewsTrak Daily,* 17 January 2008.
- "Idearc Inc - Idearc Media and Call Genie Sign Audio Ad Distribution Agreement," *Market News Publishing,* 21 January 2008.
- "Idearc Inc. to Report Earnings on February 7, 2008," *Business Wire,* 31 January 2008.
- "Wachovia Securities," *JagNotes.com,* 1 February 2008.
- "Multiplied Media launches Poynt on AOL Instant Messenger; Superpages.com's Full Directory of Local Business Listings Available to AOL Instant Messenger Users in the United States," *PR Newswire,* 4 February 2008.
- "Idearc 4Q EPS 68c Vs EPS 73c," *Dow Jones News Service,* 7 February 2008.
- "Idearc Announces 2007 Results," *Business Wire,* 7 February 2008.
- "Idearc shares tumble to all-time low following 4Q results, FY08 guidance," *AFX Asia,* 7 February 2008.

98

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Inc - IAR: Q4 Earnings Call @ 10:00 ET Today," *Knobias,* 7 February 2008.
- "UPDATE 2-Idearc sees lower rev in '08; shares hit life-time low," *Reuters News,* 7 February 2008.
- "Idearc Inc. Declares Dividend," *Reuters,* 7 February 2008.
- "Q4 2007 Idearc, Inc. Earnings Conference Call - Final," *Voxant FD Wire,* 7 February 2008.
- "Standard & Poor's lowers outlook on Idearc to negative from stable on economic worries," *Associated Press Newswires,* 11 February 2008.
- "US RESEARCH NEWS-Capstone raises ICO to buy from hold," *Reuters News,* 11 February 2008.
- "Mcgraw Hill Companies Inc - S&P: Idearc 'BB' Rating Outlook Revised To Negative From Stable," *Market News Publishing,* 11 February 2008.
- "Idearc Names John J. Mueller Chief Executive Officer," *Dow Jones News Service,* 19 February 2008.
- "Idearc Names John J. Mueller Chief Executive Officer," *Business Wire,* 19 February 2008.
- "Idearc names Chairman John J. Mueller CEO, effective immediately," *AFX Asia,* 19 February 2008.
- "Idearc Chief Executive Kathy Harless replaced by Chairman John Mueller," *Associated Press Newswires,* 19 February 2008.
- "Idearc Inc - IAR: Conference call regarding to appoint the company's current Chairman of the Board @ 08:30 ET Today," *Knobias,* 19 February 2008.
- "UPDATE: Idearc names Chairman John J. Mueller CEO, effective immediately," *AFX Asia,* 19 February 2008.
- "US JUNK DEBT: Market Quiet, Softer After Holiday," *Dow Jones International News,* 19 February 2008.
- "Idearc Ceo," *TR Daily,* 19 February 2008.
- "Idearc Inc. Names John J. Mueller As Chief Executive Officer," *Reuters,* 19 February 2008.
- "Idearc Names John J. Mueller Chief Executive Officer," *M2 Presswire,* 20 February 2008.
- "Progressive Following on Idearc Inc," *M2 Presswire,* 20 February 2008.
- "US JUNK DEBT: High Yield Fades; Risk Premiums Get Wider," *Dow Jones International News,* 21 February 2008.
- "Idearc Sets New CEO's Salary At $900,000," *Dow Jones Corporate Filings Alert,* 21 February 2008.
- "Idearc Executives Address Bear Stearns 21(st) Annual Media Conference," *Business Wire,* 26 February 2008.
- "Progressive Following on Idearc Inc," *M2 Presswire,* 27 February 2008.

99

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "John J. Mueller Resigns As Idearc Chmn And CEO For Unforeseen Health Reasons," *Dow Jones News Service,* 27 February 2008.
- "John J. Mueller Resigns as Idearc Chairman and Chief Executive Officer for Unforeseen Health Reasons ; Frank P. Gatto Appointed Interim CEO," *Business Wire,* 27 February 2008.
- "Idearc names Frank Gatto interim CEO after current CEO resigns on health grounds," *AFX Asia,* 27 February 2008.
- "Idearc Chairman, CEO Mueller resigns for health reasons, Gatto named interim chief," *Associated Press Newswires,* 27 February 2008.
- "Idearc says CEO resigns on health grounds," *Reuters News,* 27 February 2008.
- "UPDATE: Idearc CEO Leaves After 8 Days, Citing Health," *Dow Jones News Service,* 27 February 2008.
- "Idearc CEO Resigns," *FinancialWire,* 27 February 2008.
- "Moody's places Idearc's ratings under review for possible downgrade," *Moody's Investors Service Press Release,* 27 February 2008.
- "Moody's places Idearc's ratings under review for possible downgrade," *AFX Asia,* 27 February 2008.
- "Idearc Ceo," *TR Daily,* 27 February 2008.
- "John J. Mueller Resigns As Idearc Inc.'s Chairman And Chief Executive Officer," *Reuters,* 27 February 2008.
- "Idearc's Chief Resigns, Citing Health Reasons," *The Wall Street Journal,* 28 February 2008.
- "R.H. Donnelley shares hit 9-year low on 4Q results and downgrades," *AFX Asia,* 28 February 2008.
- "Credit Default Swaps: Indexes Massively Wider TMT/Fin'ls Weak," *Market News International,* 28 February 2008.
- "R.H. Donnelley shares plummet; brokerage trio downgrades stock after weak 4Q," *AFX Asia,* 29 February 2008.
- "US JUNK DEBT: Directory Cos' Bonds Drop; Charter Put On Watch," *Dow Jones International News,* 29 February 2008.
- "Seven risky bets with big potential gains-Barron's," *Reuters News,* 2 March 2008.
- "Idearc Execs to Address Bear Stearns Media Conference," *Wireless News,* 2 March 2008.
- "John J. Mueller Resigns as Idearc Chairman and CEO," *Wireless News,* 4 March 2008.
- "Idearc Executive Addresses Lehman Brothers High Yield Bond and Syndicated Loan Conference," *Business Wire,* 6 March 2008.
- "Idearc to Host Annual Meeting of Stockholders on May 1, 2008," *Business Wire,* 10 March 2008.

100

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc, Inc. at Bear, Stearns & Co. Inc. Media Conference - Final," *Voxant FD Wire,* 11 March 2008.
- "Idearc Inc - IAR: To Present At Lehman Bros. High Yield Bond Conference @ 12:00 ET," *Knobias,* 12 March 2008.
- "Idearc, Inc. at Lehman Brothers High Yield Bond & Syndicated Loan Conference," *Fair Disclosure Wire*, 12 March 2008.
- "Idearc to Host Annual Meeting of Stockholders," *Wireless News,* 12 March 2008.
- "AT&T's Yellowpages.com To Sell Ads On Microsoft Web Sites," *Dow Jones News Service,* 17 March 2008.
- "UPDATE: AT&T's Yellowpages.com To Post Ads On Microsoft Sites," *Dow Jones News Service,* 17 March 2008.
- "AT&T's Yellowpages.com to list on Microsoft sites," *Reuters News,* 17 March 2008.
- "AT&T in business listings deal," *Financial Times,* 18 March 2008.
- "Idearc Executive Addresses Credit Suisse 2008 Global Leveraged Finance Conference," *Business Wire,* 21 March 2008.
- "Idearc Executive Tells Investors Underlying Business Fundamentals Sound," *Business Wire,* 27 March 2008.
- "Idearc Executive Tells Investors Underlying Business Fundamentals Sound," *Dow Jones News Service,* 27 March 2008.
- "Idearc: Underlying fundamentals and long-term prospects unchanged," *AFX Asia,* 27 March 2008.
- "UPDATE: Idearc To Suspend Dividends, Improve Risk Profile," *Dow Jones News Service,* 27 March 2008.
- "UPDATE 1-Idearc to suspend dividend payment; shares fall," *Reuters News,* 27 March 2008.
- "Lehman Brothers Inc," *JagNotes.com,* 28 March 2008.
- "Idearc shares down after dividend cut; analyst slashes estimates, sees dip in ad sales," *Associated Press Newswires,* 28 March 2008.
- "Idearc Names Briggs Ferguson As Pres - Internet," *Dow Jones News Service,* 2 April 2008.
- "Idearc Names Briggs Ferguson as President - Internet," *Business Wire,* 2 April 2008.
- "Idearc Appointment," *TR Daily,* 3 April 2008.
- "Moody's downgrades Idearc's CFR to B1; outlook negative," *Moody's Investors Service Press Release,* 3 April 2008.
- "Idearc Inc. - Company News," *NewsTrak Daily,* 20 April 2008.
- "Idearc Media Distributes The Monrovia Verizon Yellow Pages," *Wireless News,* 21 April 2008.
- "Idearc to Report Earnings on May 6, 2008," *Business Wire,* 22 April 2008.

101

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc to Host Annual Meeting of Stockholders on May 1, 2008," *Business Wire,* 29 April 2008.
- "FirstAlert: 10-10:30 A.M. Investrend Bestcalls," *FinancialWire,* 1 May 2008.
- "Idearc Inc - IAR: Q1 Earnings Call @ 10:00 ET Today," *Knobias,* 6 May 2008.
- "Idearc 1Q EPS 76c Vs EPS 70c," *Dow Jones News Service,* 6 May 2008.
- "Idearc Announces First Quarter 2008 Results," *Business Wire,* 6 May 2008.
- "UPDATE: Idearc 1Q Net Up 7.8% On Higher Prior-Yr Charges," *Dow Jones News Service,* 6 May 2008.
- "FirstAlert: 10-10:50 A.M. Investrend Bestcalls," *FinancialWire,* 6 May 2008.
- "UPDATE 3-Idearc Q1 profit increases, shares rise," *Reuters News,* 6 May 2008.
- "Idearc 1Q adjusted earnings 79 cents a share; revenue falls 4.5%," *AFX Asia,* 6 May 2008.
- "Idearc Boosted 10.5% in Pre-Bell Trade on Better-than-Expected Q1 Earnings," *MidnightTrader,* 6 May 2008.
- "MidnightTrader's Pre-Market Trading Ranges," *MidnightTrader,* 6 May 2008.
- "Stocks Seen Pressured By Financials, Housing Stocks and High Oil," *MidnightTrader,* 6 May 2008.
- "Idearc increases 1Q earnings despite revenue decline," *Associated Press Newswires,* 6 May 2008.
- "Progressive Following on Idearc, Inc,*" M2 Presswire,* 6 May 2008.
- "BellwetherReport.com Initiates Analyst Coverage on APC, AMD, IAR and RAS," *Market Wire,* 6 May 2008.
- "Mid-Day: Stocks Decline on Disappointing Earnings, Record Oil Prices," *MidnightTrader,* 6 May 2008.
- "Idearc shares rally after 1Q profit jumps despite sales drop," *Associated Press Newswires,* 6 May 2008.
- "Movers roundup: AMD, Legg Mason," *Associated Press Newswires,* 6 May 2008.
- "Q1 2008 Idearc, Inc. Earnings Conference Call - Final," *Voxant FD Wire,* 6 May 2008.
- "MidnightTrader's Pre-Market News Movers," *MidnightTrader,* 6 May 2008.
- "STOCKWATCH Yell Group top FTSE 250 riser on read across from Idearc Q1," *AFX Asia,* 7 May 2008.
- "Lehman Brothers Inc," *JagNotes.com,* 7 May 2008.
- "Mid-Day: Stocks Higher In Choppy Trading As Investors Weigh Retail Sales, Record Oil," *MidnightTrader,* 8 May 2008.
- "Closing Update: Higher Finish on Better-Than-Expected Retail Results Amid Ongoing Economic Uncertainty," *MidnightTrader,* 8 May 2008.
- "Idearc Inc. - Company News," *NewsTrak Daily,* 16 May 2008.
- "Idearc Inc. - Company News," *NewsTrak Daily,* 19 May 2008.
- "Idearc Inc. - Company News," *NewsTrak Daily,* 21 May 2008.

102

**Exhibit-1**

## Documents and Other Information Reviewed and Relied Upon

- "Bad news priced into Wachovia; Bank has lost 52% of its value in past year," *National Post,* 23 May 2008.
- "Idearc Names Scott W. Klein Chief Executive Officer," *Business Wire,* 2 June 2008.
- "Idearc Names Scott Klein CEO, Last With Private Equity Firm Symphony," *MidnightTrader*, 2 June 2008.
- "UPDATE 1-Idearc names CEO," *Reuters News,* 2 June 2008.
- "Idearc (IAR) Names Klein CEO," *StreetInsider.com,* 2 June 2008.
- "Idearc Inc. Names Scott W. Klein As Chief Executive Officer," *Reuters,* 2 June 2008.
- "Idearc Appoints Klein CEO to End Turmoil at Top," *The Wall Street Journal,* 3 June 2008.
- "S&P Cuts Idearc Inc. CCR To 'B+'; Off Watch; Outlook Stable," *Dow Jones Capital Markets Report,* 13 June 2008.
- "Idearc to Report Earnings on July 29, 2008 ; CEO Scott W. Klein to Address Investors," *Business Wire,* 16 June 2008.
- "Idearc Schedules June 29 Earnings Call," *FinancialWire,* 16 June 2008.
- "Yellowing Pages," *Financial Times,* 25 June 2008.
- "Idearc Inc. The Southern Oregon Coast Verizon Yellow Pages Hits Doorsteps," *Science Letter,* 15 July 2008.
- "Mid-Day Update: Stocks Firmly in Negative Territory at Mid-Day as Housing, Jobless Data Disappoint," *MidnightTrader,* 24 July 2008.
- "Reminder: Idearc to Report Earnings on July 29, 2008 ; CEO Scott W. Klein to Address Investors," *Business Wire,* 28 July 2008.
- "Idearc Inc - IAR: Q2 Earnings Call @ 10:00 ET Today," *Knobias,* 29 July 2008.
- "Idearc Announces Year to Date and Second Quarter 2008 Results," *Business Wire,* 29 July 2008.
- "UPDATE 3-Idearc Q2 profit falls as revenue slips; shares drop," *Reuters News,* 29 July 2008.
- "Idearc 2Q profit falls bellow Wall Street forecast," *Associated Press Newswires,* 29 July 2008.
- "Revised Analyst Reports for SAP AG," *Associated Press Newswires,* 29 July 2008.
- "Mid-Day Update: Stocks Trade Near Session Highs as Oil Prices Fall to $121/BBL," *MidnightTrader,* 29 July 2008.
- "Idearc (IAR) Reports Lower Q2 Earnings; Reiterates FY08 Outlook," *StreetInsider.com,* 29 July 2008.
- "Unusual 11 Mid-Day Movers 7/29: HW, SCLN, GVHR, UAUA Higher; PRSC, IAR, NWK, PLXT Lower," *StreetInsider.com,* 29 July 2008.
- "US CORP BONDS-Merrill lifts market, but Idearc slumps," *Reuters News,* 29 July 2008.
- "Q2 2008 Idearc, Inc. Earnings Conference Call - Final," *Voxant FD Wire,* 29 July 2008.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "CL King Downgrades Idearc (IAR) to Netural," *StreetInsider.com,* 30 July 2008.
- "US CREDIT-Earnings miss spooks Idearc bondholders," *Reuters News,* 31 July 2008.
- "BellwetherReport.com Analyst Report on IAR, FIS, RL and BIG," *Market Wire,* 6 August 2008.
- "Mid-Day Update: Stocks Fighting Higher As Oil Prices Drop Below $115 Per Barrel," *MidnightTrader,* 11 August 2008.
- "Closing Update: Higher Finish After Two-Sided Day Driven By Oil," *MidnightTrader,* 11 August 2008.
- "Idearc Inc - Cash Flow from Operations for Idearc Improves 59%," *Stock Diagnostics,* 15 August 2008.
- "Idearc Inc - Free Cash Flow Improves 44% for Idearc," *Stock Diagnostics,* 15 August 2008.
- "Idearc Inc - OPS Ranking of "2" Reiteration for Idearc," *Stock Diagnostics,* 15 August 2008.
- "Idearc Inc - EBITDA for Idearc Decreases 0.6%," *Stock Diagnostics,* 18 August 2008.
- "Analyst Reports for Bristol-Myers Squibb Company, Merck & Co. Inc., Idearc Inc., and Northwest Airlines Corporation," *Market Wire,* 27 August 2008.
- "Idearc Executives to Present at CL King's Best Ideas Conference," *Business Wire,* 29 August 2008.
- "Idearc CEO Reveals New Executive Council, CFO and General Counsel; Details Sales Organization and Centralization Efforts ; Goal to Grow Revenue, Reduce Expenses and Improve Margins, Create High Performance Culture," *Business Wire,* 2 September 2008.
- "Idearc General Counsel," *TR Daily,* 2 September 2008.
- "CFOs on the Move: Week ending September 5," *CFO.com,* 4 September 2008.
- "Idearc Inc - IAR: To Present At CL King Best Ideas Conference @ 15:30," *Knobias,* 17 September 2008.
- "Wachovia Upgrades Idearc (IAR) to Market Perform," *StreetInsider.com,* 17 September 2008.
- "Deutsche Bank Securities Inc," *JagNotes.com,* 18 September 2008.
- "Beacon Equity Issues Trade Alerts on Recent Analyst Upgrades: IAR, CAM, PRGO, UNP, WYE, IEX," *PR Newswire,* 18 September 2008.
- "Idearc Inc - IAR: To Present At Goldman Sachs Communacopia Conference @ 16:10 ET," *Knobias,* 18 September 2008.
- "Deutsche Bank Upgrades Idearc (IAR) to Hold," *StreetInsider.com,* 18 September 2008.
- "New Positions," *Texas Lawyer,* 22 September 2008.
- "Idearc Reports Acquisition by Executive Vp Jones," *US Fed News,* 6 October 2008.
- "Idearc Inc. and TM Advertising; TM Advertising's OMMA Award for Superpages.Com Ad is Something to Sneeze At," *Immunotherapy Weekly,* 8 October 2008.
- "Goldman Sachs," *JagNotes.com,* 10 October 2008.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc to Report Earnings on October 30, 2008," *Business Wire,* 23 October 2008.
- "Idearc Inc. - Company News," *NewsTrak Daily,* 28 October 2008.
- "Idearc Inc - IAR: Q3 Earnings Call @ 10:00 ET Today," *Knobias,* 30 October 2008.
- "Idearc Announces Year to Date and Third Quarter 2008 Results; Company Makes Progress on Operational Initiatives; Retains Advisors to Address Capital Structure," *Business Wire,* 30 October 2008.
- "BRIEF-Idearc reports Q3 results," *AFX Asia,* 30 October 2008.
- "UPDATE 1-Idearc Q3 net drops, retains capital structure advisors," *Reuters News,* 30 October 2008.
- "Idearc Taps Most Of $250M Revolving Credit After Poor 3Q," *Dow Jones Capital Markets Report,* 30 October 2008.
- "Idearc (IAR) Reports Mixed Q3 Earnings," *StreetInsider.com,* 30 October 2008.
- "Idearc Inc. - Company News," *NewsTrak Daily,* 30 October 2008.
- "Q3 2008 Idearc, Inc. Earnings Conference Call - Final," *Voxant FD Wire,* 30 October 2008.
- "Moody's downgrades Idearc's CFR to B3; outlook negative," *Moody's Investors Service Press Release,* 6 November 2008.
- "Idearc Inc - Idearc's Cash Flow from Operations Increases 2.6%," *Stock Diagnostics,* 11 November 2008.
- "Idearc Inc - OPS Ranking of "2" for Idearc Reiterated by StockDiagnostics.com," *Stock Diagnostics,* 11 November 2008.
- "Idearc Inc - Idearc's Free Cash Flow Increases 1.1%," *Stock Diagnostics,* 11 November 2008.
- "Idearc Inc - Idearc's EBITDA Hits Two Year Low," *Stock Diagnostics,* 12 November 2008.
- "Pre-Market Most Actives: Nasdaq," *MidnightTrader,* 20 November 2008.
- "Idearc Inc - IDAR Move From NYSE OTC Security Listing Eff. 11/21/2008," *Market News Publishing,* 20 November 2008.
- "Market Maker Surveillance Report. Highest Net Sell Volume and Negative Price Friction Stocks For November 20, 2008," *M2 Presswire,* 21 November 2008.
- "Idearc Inc. Announces Exchange Change-Stock Exchange," *Reuters,* 21 November 2008.
- "Idearc Announces Common Stock Trading over the Counter with New Symbol IDAR," *Business Wire,* 21 November 2008.
- "Idearc Inc. - Company News," *NewsTrak Daily,* 24 November 2008.
- "Idearc Inc - Short Positions on 2008/11/28 30,426,391 30,426,391," *Market News Publishing,* 9 December 2008.
- "Idearc Inc - Short Positions on 2008/12/15 27,042,424 -3,383,967," *Market News Publishing,* 24 December 2008.

105

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Inc - Short Positions on 2008/12/31 26,454,946 -587,478," *Market News Publishing,* 12 January 2009.
- "Idearc Reports Disposition by Executive Vp Pawlowski," *US Fed News,* 13 January 2009.
- "Idearc Reports Disposition by Executive Vp Scaife," *US Fed News,* 13 January 2009.
- "Idearc Reports Disposition by Executive Vp Jones," *US Fed News,* 13 January 2009.
- "SEC Form 4s Filed for Companies in Texas (Jan. 14)," *Targeted News Service,* 14 January 2009.
- "AT&T Interactive and Idearc Media Enter Cross Distribution Agreement; The joint effort to provide advertisers with additional online exposure," *PR Newswire,* 22 January 2009.
- "Idearc Inc - Short Positions on 2009/01/15 26,395,470 -59,476," *Market News Publishing,* 29 January 2009.
- "Business - O'Callaghan firm's debt registers on global level," *Sunday Tribune,* 1 February 2009.
- "Mcgraw Hill Companies Inc - Idearc Inc. Rating Cut To 'CCC'; Outlook Negative," *Market News Publishing,* 3 February 2009.
- "S&P Cuts Idearc Credit Rating," *TR Daily,* 4 February 2009.
- "CORRECTED - Idearc, RH Donnelley may seek bankruptcy-Moody's," *Reuters News,* 9 February 2009.
- "MOODY'S RATINGS SERVICE - IDEARC, INC. - (CUSIP none) - (ISIN none)," *Moody's Investors Service Ratings Delivery Service,* 9 February 2009.
- "Moody's Ratings Service - Idearc, Inc. - (Cusip 451663ac2) - (Isin Us451663ac25)," *Moody's Investors Service Ratings Delivery Service,* 9 February 2009.
- "Moody's worldwide rating actions for February 9, 2009," *Moody's Investors Service Press Release,* 9 February 2009.
- "Moody's lowers Idearc's CFR to Caa2, PDR to Caa3; negative outlook," *Moody's Investors Service Press Release,* 9 February 2009.
- "Another Retailer Leads Bankruptcy Brigade," *CFO.com,* 10 February 2009.
- "Idearc Inc - Short Positions on 2009/01/30 26,522,504 127,034," *Market News Publishing,* 10 February 2009.
- "IDAR, ZILA, DBOEY, HOWWY Have Been Removed From Naked Short List Today," *M2 Presswire,* 12 February 2009.
- "Directory business loses its way," *Financial Times,* 13 February 2009.
- "Idearc Inc - Short Positions on 2009/02/13 26,268,682 -253,822," *Market News Publishing,* 25 February 2009.
- "Local.com and Idearc Media Renew, Expand Distribution Deal," *Wireless News,* 10 March 2009.

106

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Inc - Short Positions on 2009/02/27 26,261,528 -7,154," *Market News Publishing,* 11 March 2009.
- "WRAPUP 1-Idearc, R.H. Donnelley in talks to restructure debt," *Reuters News,* 12 March 2009.
- "Idearc Announces 2008 Results ; Remains Focused on Strengthening Business and Balance Sheet," *Business Wire,* 12 March 2009.
- "Idearc Inc. (OTC: IDAR) just released some important news," *M2 Presswire,* 13 March 2009.
- "Idearc Considering Bankruptcy Proceeding," *TR Daily,* 13 March 2009.
- ""Idearc, Inc.'s Largest Shareholder Challenges Bankruptcy as Unnecessary," *PR Newswire,* 16 March 2009.
- "UPDATE 1-Idearc's largest shareholder says bankrupty avoidable," *Reuters News,* 16 March 2009.
- "Idearc bonds trade near zero on restructuring fears," *Reuters News,* 17 March 2009.
- "Idearc Inc - Idearc's OPS Ranking Downgraded by StockDiagnostics.com," *Stock Diagnostics,* 17 March 2009.
- "Idearc Inc - Idearc's Cash Flow from Operations Turns Negative for its Fourth Quarter," *Stock Diagnostics,* 17 March 2009.
- "Idearc Inc - Free Cash Flow Turns Negative for Idearc's Fourth Quarter," *Stock Diagnostics,* 17 March 2009.
- "S&P Cuts Yell Group Credit Rating," *TR Daily,* 18 March 2009.
- "Idearc Inc - Idearc's EBITDA Hits Two Year Low," *Stock Diagnostics,* 18 March 2009.
- "Idearc Media LLC (OTC:IDAR) just released some important news," *M2 Presswire,* 19 March 2009.
- "Idearc's Largest Stockholder Seeks Election as a Director," *PR Newswire,* 19 March 2009.
- "Idearc Shareholder, Opposing Bankruptcy, Seeks Board Seat," *TR Daily,* 19 March 2009.
- "Idearc Inc - Short Positions on 2009/03/13 26,253,504 -8,024," *Market News Publishing,* 25 March 2009.
- "Idearc Inc - Initiates Voluntary Chapter 11 Proceeding To Implement Debt Restructuring," *Market News Publishing,* 31 March 2009.
- "UPDATE 1-Yellow pages publisher Idearc files for bankruptcy," *Reuters News,* 31 March 2009.
- "UPDATE:Idearc Files For Ch 11 Bankruptcy To Slash $9B Debt," *Dow Jones Corporate Filings Alert,* 31 March 2009.
- "2nd UPDATE: Idearc Files For Bankruptcy To Slash $9B Debt," *Dow Jones Corporate Filings Alert,* 31 March 2009.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- "ROC Pref II Corp., ROC Pref III Corp. and Connor, Clark & Lunn ROC Pref Corp. Announcement," *Canada NewsWire,* 31 March 2009.
- "RPA ROC Pref II, ROC Pref III, Connor ROC post credit event," *Canada Stockwatch,* 31 March 2009.
- "Idearc Files Bankruptcy Petition; Sets Preliminary Reorg Terms," *TR Daily,* 31 March 2009.
- "MOODY'S RATINGS SERVICE - IDEARC, INC. - (CUSIP none) - (ISIN none)," *Moody's Investors Service Ratings Delivery Service,* 31 March 2009.
- "Moody's Ratings Service - Idearc, Inc. - (Cusip 451663ac2) - (Isin Us451663ac25)," *Moody's Investors Service Ratings Delivery Service,* 31 March 2009.
- "PRESS RELEASE: Idearc Initiates Voluntary Chapter 11 Proceeding To Implement Debt Restructuring," *Dow Jones News Service,* 31 March 2009.
- "Idearc Files For Ch 11 Bankruptcy To Slash $9B Debt," *Dow Jones News Service,* 31 March 2009.
- "Idearc Inc. Initiates Voluntary Chapter 11 Proceeding To Implement Debt Restructuring," *Reuters,* 31 March 2009.
- "Idearc Inc - IDAR Company in Bankruptcy Proceedings Eff. 04/01/2009," *Market News Publishing,* 31 March 2009.
- "Isda to Publish Protocol and Auction Terms for Idearc," *States News Service,* 31 March 2009.
- "Moody's lowers Idearc's PDR to D," *Moody's Investors Service Press Release,* 31 March 2009.
- "Directory Publisher Idearc Enters Bankruptcy To Reduce $9B Debt," *Daily Bankruptcy Review,* 1 April 2009.
- "Supplement to Moody's worldwide rating actions for March 31, 2009," *Moody's Investors Service Press Release,* 1 April 2009.
- "Credit Sail Limited; Credit Sail Limited - Idearc Inc. Credit Event," *New Zealand Exchange Company Announcements,* 1 April 2009.
- "Phone Directory Firm to Restructure," *The Wall Street Journal,* 1 April 2009.
- "Generator Income Trust. - (GIN) - Portfolio Event - Idearc Inc," *Australian Stock Exchange Company Announcements,* 2 April 2009.
- "Generator Australia #1 Trust - (GNA) - Portfolio Event - Idearc Inc," *Australian Stock Exchange Company Announcements,* 3 April 2009.
- "Global DiSCS Trust 2004-1 (TSX: DST.UN) Announces Idearc Inc. Credit Event," *Market Wire,* 3 April 2009.
- "DST Global DiSCS receives credit event notice on Idearc," *Canada Stockwatch,* 3 April 2009.
- "MOODY'S RATINGS SERVICE - IDEARC, INC. - (CUSIP none) - (ISIN none)," *Moody's Investors Service Ratings Delivery Service,* 3 April 2009.

108

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- "Moody's Ratings Service - Idearc, Inc. - (Cusip 451663ac2) - (Isin Us451663ac25)," *Moody's Investors Service Ratings Delivery Service,* 3 April 2009.
- "Idearc Term Loan Rises On Voluntary Bankruptcy Filing," *Credit Investment News,* 3 April 2009.
- "Alpha Financial warns of loss in two portolfios," *Australian Company News Bites,* 6 April 2009.
- "Aria CDO I (Ireland) Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "ARIA CDOI (Jersey11) Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "Aria CDO I Jrsy N10 Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "Aria CDO IJers1/D 1 Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "Aria CDO I Jersey 2 Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "Aria CDO I Jersey 3 Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "Aria CDO IJers4/Del4 Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "Aria CDO I Jersey 5 Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "Aria CDO IJers6/Del6 Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "Aria CDO I (Jersey8) Credit Event Notice," *Regulatory News Service,* 7 April 2009.
- "MAYU B.V. Credit Event Notice," *Regulatory News Service,* 8 April 2009.
- "Creon Limited Credit Event Notice," *Regulatory News Service,* 8 April 2009.
- "Idearc Inc - Short Positions on 2009/03/31 26,088,022 -165,482," *Market News Publishing,* 9 April 2009.
- "Business News," *Telecommunications Reports,* 15 April 2009.
- "R.H. Donnelley Uses Debt Grace Period," *The Wall Street Journal,* 15 April 2009.
- "Volta Finance - March Monthly Report," *Hugin Press Release,* 16 April 2009.
- "Idearc tries to recover after bankruptcy," *British Business Monitor,* 20 April 2009.
- "Thumbs Up for the New Superpages.com iPhone App," *Wireless News,* 20 April 2009.
- "Myec, Idarq, Mxwf," *M2 Presswire,* 23 April 2009.
- "Idearc CDS worth about 1.4 pct in initial auction," *Reuters News,* 23 April 2009.
- "Idearc Inc - Short Positions on 2009/04/15 26,111,455 23,433," *Market News Publishing,* 24 April 2009.
- "Idearc LCDS Settle," *Credit Investment News,* 24 April 2009.
- "PHONE BOOK FIRM SINKS; Verizon phone books publisher Idearc Inc. hopes to reinvent itself after Chapter 11," *St. Petersburg Times,* 25 April 2009.
- "Moody's lowers ratings of Steers Credit-Linked Trust, Mast Tranche, Series 2004-1," *Moody's Investors Service Press Release,* 4 May 2009.
- "Gainey & McKenna Commences Class Action On Behalf of Investors of Idearc, Inc. -- IDARQ," *GlobeNewswire,* 8 May 2009.
- "Phone companies struggle to hold on to land-lines," *The Star-Ledger,* 11 May 2009.
- "Idearc Inc - Short Positions on 2009/04/30 20,669,033 -5,442,422," *Market News Publishing,* 11 May 2009.

109

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Law Offices of Howard G. Smith Announces Class Action Lawsuit Against Idearc, Inc," *Business Wire,* 12 May 2009.
- "Idearc Inc - StockDiagnostics.com Reiterates Idearc's OPS Ranking of "3"," *Stock Diagnostics,* 14 May 2009.
- "Idearc Inc - Idearc's Cash Flow from Operations Hits Two Year Low," *Stock Diagnostics,* 14 May 2009.
- "Idearc Inc - Three Year Low in Free Cash Flow for Idearc," *Stock Diagnostics,* 14 May 2009.
- "Omega Capital Invest Notice," *Regulatory News Service,* 14 May 2009.
- "The Brualdi Law Firm, P.C. Announces Class Action Lawsuit Against Idearc, Inc," *GlobeNewswire,* 15 May 2009.
- "Idearc Inc - Idearc's EBITDA Hits Two Year Low," *Stock Diagnostics,* 15 May 2009.
- "Donnelley Discussing Debt Restructuring," *TR Daily,* 20 May 2009.
- "Glancy Binkow & Goldberg LLP, Representing Investors Who Purchased Idearc, Inc., Announces Class Action Lawsuit and Seeks to Recover Losses," *Business Wire,* 22 May 2009.
- "Idearc Inc - Short Positions on 2009/05/15 18,840,118 -1,828,915," *Market News Publishing,* 27 May 2009.
- "Holzer Holzer & Fistel, LLC Announces That a Shareholder Class Action Has Been Filed on Behalf of Purchasers of Idearc, Inc. (PINKSHEETS: IDARQ) Securities," *Market Wire,* 1 June 2009.
- "Holzer Holzer & Fistel, LLC Files Class Action Against Idearc Inc," *Reuters,* 1 June 2009.
- "Global DiSCS Trust 2004-1 (TSX: DST.UN) Announces General Motors Corporation Credit Event," *Market Wire,* 2 June 2009.
- "DST Global DiSCS suffers credit event from GM," *Canada Stockwatch,* 2 June 2009.
- "Omega Capital Europe Notice," *Regulatory News Service,* 4 June 2009.
- "Argon Capital Plc Notice," *Regulatory News Service,* 9 June 2009.
- "Idearc Inc - Short Positions on 2009/05/29 15,722,540 -3,117,578," *Market News Publishing,* 9 June 2009.
- "Glancy Binkow & Goldberg LLP, Representing Shareholders of Idearc, Inc., Announces There are 25 Days Remaining to Move for Appointment as Lead Plaintiff -- IDARQ," *GlobeNewswire,* 12 June 2009.
- "Global Diversified Investment Grade Income Trust - Defaults and Recovery Rates in Respect of Chemtura Corporation And Idearc Inc. and Recovery Rate with Respect to General Motors," *Market News Publishing,* 14 June 2009.
- "Idearc Inc - Short Positions on 2009/06/15 15,740,311 17,771," *Market News Publishing,* 24 June 2009.

110

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Moody's downgrades notes issued by Coriolanus Series 67," *Moody's Investors Service Press Release,* 30 June 2009.
- "Global DiSCS Trust 2004-1 (TSX: DST.UN) Announces The Rouse Company Credit Event Settlement," *Market Wire,* 6 July 2009.
- "DST Global DiSCS recovers 62% from Rouse credit event," *Canada Stockwatch,* 6 July 2009.
- "Is the Yellow Pages Market Collapsing? Simba Says No," *Market Wire,* 9 July 2009.
- "Idearc Inc - Short Positions on 2009/06/30 15,717,572 -22,739," *Market News Publishing,* 10 July 2009.
- "Scott Pomeroy, CEO of Local Insight, Just Added as Featured Speaker at Simba Yellow Pages Webinar; Joins AT&T Advertising Solutions CEO Frank Jules," *Market Wire,* 14 July 2009.
- "Yellow Pages Industry Faces Economic Challenges, Bankruptcy Woes, According to New Report From Simba Information," *Market Wire,* 15 July 2009.
- "EveryCarListed.com(SM), Powered by Superpages.com, Becomes the Only All-Video Car Listing Site and One of the Only Car Listing Sites Providing Free Videos ; Superpages.com Launches a New "Cars" Tab Housing All Listings From EveryCarListed.com," *Business Wire,* 21 July 2009.
- "Credit Linked(CLEAR) Cash Settlement Notices," *Regulatory News Service,* 22 July 2009.
- "Omega Capital Europe Notice," *Regulatory News Service,* 24 July 2009.
- "Idearc Inc - Short Positions on 2009/07/15 17,217,733 1,500,161," *Market News Publishing,* 24 July 2009.
- "Acxiom Supplies Business Data for Superpages.com," *Manufacturing Close-Up,* 24 July 2009.
- "Omega Capital Invest Notice," *Regulatory News Service,* 29 July 2009.
- "Kalmar Structured Finance A/S, Calculation of Final Price Notice," *NASDAQ OMX Nordic Exchanges - Company Notices,* 31 July 2009.
- "Yellow Pages Market Not on the Brink of Collapse Despite Recent Bankruptcies, Simba Webinar Reveals; YP Executives Encourage Exploration of New Media Tools," *Market Wire,* 7 August 2009.
- "Idearc Inc - Short Positions on 2009/07/31 17,228,119 10,386," *Market News Publishing,* 11 August 2009.
- "Moody's downgrades notes of REVE SPC Series 48, 54, and 56," *Moody's Investors Service Press Release,* 14 August 2009.
- "Moody's downgrades $120M notes issued by TIERS Wolcott Synthetic CDO," *Moody's Investors Service Press Release,* 14 August 2009.
- "Moody's downgrades CSO notes issued by Steers Thayer Gate CDO Trust," *Moody's Investors Service Press Release,* 21 August 2009.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- "Idearc Inc - Short Positions on 2009/08/14 17,234,676 6,557," *Market News Publishing,* 26 August 2009.
- "QHow can I get the phone comp," *The Washington Post,* 30 August 2009.
- "Alpha reduces note interest payment to $1.48," *Australian Company News Bites,* 3 September 2009.
- "Idearc Inc - Superpages.com Brings Local Search to Twitter with the First Local Search Tool @sp411," *Market News Publishing,* 4 September 2009.
- "Moody's downgrades EUR 15.3m notes of Selecta CDO," *Moody's Investors Service Press Release,* 8 September 2009.
- "Idearc Media's "Best in Class" Directory Opt-out Program Provides Multiple Choices for Consumers to Discontinue Receiving Print Product ; Toll Free Number with Opt-out Language Appears on All Verizon Yellow Pages' Covers; Opting-out Online to Become Available on Company Website," *Business Wire,* 8 September 2009.
- "Global DiSCS Trust 2004-1 (TSX: DST.UN) Announces General Motors Corporation Credit Event Settlement," *Market Wire,* 8 September 2009.
- "Court Approves Idearc's Amended Disclosure Statement; Solicitation of Creditor Approval for Amended Joint Plan of Reorganization to Begin ; Confirmation Hearing Scheduled for Early December 2009, Positioning Idearc to Emerge from Chapter 11 before Year End," *Business Wire,* 10 September 2009.
- "Court Approves Idearc's Amended Disclosure Statement," *Dow Jones News Service,* 10 September 2009.
- "Idearc Inc - Short Positions on 2009/08/31 17,139,850 -94,826," *Market News Publishing,* 10 September 2009.
- "Idearc Sees Bankruptcy Exit in December," *TR Daily,* 11 September 2009.
- "Moody's downgrades EUR 82.5m CSO notes of Fortis Finance NV," *Moody's Investors Service Press Release,* 21 September 2009.
- "Idearc Media LLC; Idearc Media's "Best in Class" Directory Opt-out Program Provides Multiple Choices for Consumers to Discontinue Receiving Print Product," *Telecommunications Weekly,* 23 September 2009.
- "Idearc Inc - Short Positions on 2009/09/15 17,139,858 8," *Market News Publishing,* 24 September 2009.
- "USPTO Issues Trademark SUPERYELLOWPAGES to Idearc Media for Telephone Directories," *US Fed News,* 29 September 2009.
- "Idearc Inc. Court Approves Idearc's Amended Disclosure Statement; Solicitation of Creditor Approval for Amended Joint Plan of Reorganization to Begin," *Telecommunications Weekly,* 30 September 2009.
- "Moody's downgrades $125M of notes issued by M-2 SPC Series 2005-G," *Moody's Investors Service Press Release,* 30 September 2009.

112

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- "Moody's downgrades $10M of CSO notes issued by Starts (Cayman) Limited Series 2007-28," *Moody's Investors Service Press Release,* 30 September 2009.
- "Moody's axes Starts (Cayman) USD-10m debt to Caa3," *ADP Debt News,* 1 October 2009.
- "Moody's downgrades EUR 100m CSO notes of Chrome Funding Ltd," *Moody's Investors Service Press Release,* 2 October 2009.
- "Consumer Products/Marketing Expert to Speak at Whitman, Oct. 7," *Targeted News Service,* 2 October 2009.
- "Moody's publishes ratings on two CDS in STEERS Thayer Gate CDO Trust," *Moody's Investors Service Press Release,* 9 October 2009.
- "Idearc Inc - Short Positions on 2009/09/30 17,128,592 -11,266," *Market News Publishing,* 9 October 2009.
- "IRIS SPV PLC Notice," *Regulatory News Service,* 16 October 2009.
- "Outlook cloudy for directories business," *The Globe and Mail,* 16 October 2009.
- "YLO Globe says Yellow Pages feels global decline downdraft," *Canada Stockwatch,* 19 October 2009.
- "Moody's downgrades and withdraws CSO notes of Eirles Two Ltd," *Moody's Investors Service Press Release,* 21 October 2009.
- "USPTO Issues Trademark SUPERYELLOWPAGES.COM to Idearc Media for Electronic Telephone Directory Services," *US Fed News,* 26 October 2009.
- "USPTO Issues Trademark SUPERLEADS to Idearc Media for Advertising Services," *US Fed News,* 26 October 2009.
- "Idearc Inc - Short Positions on 2009/10/15 17,121,694 -6,898," *Market News Publishing,* 26 October 2009.
- "IRIS SPV PLC Notice of Credit Event and Final Valuation Notice," *Regulatory News Service,* 27 October 2009.
- "Moody's downgrades $15M of Series 2004-1 CSO notes issued by Carnegie Hill," *Moody's Investors Service Press Release,* 28 October 2009.
- "Cwa: Frontier-Verizon Transaction Shares Risk Profile with Other Ill-Fated Deals," *TR Daily,* 28 October 2009.
- "Idearc Files Motion to Enter into Standby Equity Purchase Facility with Paulson & Co. Inc," *Business Wire,* 30 October 2009.


### ANALYST REPORTS

- Deutsche Bank Securities Inc., 15 June 2007.
- Deutsche Bank Securities Inc., 9 August 2007.
- Natixis Bleichroeder, 9 August 2007.
- Deutsche Bank Securities Inc., 10 August 2007.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- Deutsche Banc Alex. Brown Fixed Income, 16 August 2007.
- J.P. Morgan, 17 September 2007.
- Deutsche Bank Securities Inc., 18 September 2007.
- Deutsche Bank Securities Inc., 17 October 2007.
- Deutsche Bank Securities Inc., 1 November 2007.
- CL King and Associates, 2 November 2007.
- Deutsche Banc Alex. Brown Fixed Income, 5 November 2007.
- CL King and Associates, 21 November 2007.
- Deutsche Bank Securities Inc., 4 December 2007.
- Natixis Bleichroeder, 5 December 2007.
- CL King and Associates, 8 January 2008.
- CL King and Associates, 9 January 2008.
- Wachovia, 31 January 2008.
- Natixis Bleichroeder, 7 February 2008.
- Wachovia, 7 February 2008.
- Goldman Sachs, 7 February 2008.
- Deutsche Bank Securities Inc., 7 February 2008.
- Wachovia, 7 February 2008.
- CL King and Associates, 8 February 2008.
- Deutsche Banc Alex. Brown Fixed Income, 8 February 2008.
- Wachovia, 19 February 2008.
- Deutsche Bank Securities Inc., 28 February 2008.
- Natixis Bleichroeder, 4 March 2008.
- Wachovia, 14 March 2008.
- Wachovia, 28 March 2008.
- CL King and Associates, 28 March 2008.
- Wachovia, 28 March 2008.
- Wachovia, 6 May 2008.
- CL King and Associates, 6 May 2008.
- Deutsche Bank Securities Inc., 6 May 2008.
- Deutsche Banc Alex. Brown Fixed Income, 7 May 2008.
- CL King and Associates, 2 July 2008.
- CL King and Associates, 3 July 2008.
- Deutsche Bank Securities Inc., 29 July 2008.
- Deutsche Bank Securities Inc., 29 July 2008.
- Wachovia, 29 July 2008.
- CL King and Associates, 30 July 2008.
- CL King and Associates, 30 July 2008.
- Deutsche Banc Alex. Brown Fixed Income, 31 July 2008.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- Deutsche Bank Securities Inc., 17 September 2008.
- Wachovia, 17 September 2008.
- CL King and Associates, 14 October 2008.
- CL King and Associates, 30 October 2008.
- Wachovia, 30 October 2008.
- Deutsche Banc Alex. Brown Fixed Income, 3 November 2008.
- Deutsche Bank Securities Inc., 5 November 2008.
- CL King and Associates, 19 November 2008.


**SEC FILINGS**

- Idearc Inc., Form 10 A.6 "Registration Statement", filed 1 November 2006.
- Idearc Inc., Form 10-K for the Fiscal Year Ended 31 December 2006, filed 8 March 2007.
- Idearc Inc., Form DEF 14A, filed 9 March 2007.
- Idearc Inc., Form 424B3 Prospectus for $2,850,000,000 Registered 8% Senior Notes due 2016, dated 7 May 2007.
- Idearc, Inc., Form 10-Q for the Quarter Ended 31 March 2007, filed 11 May 2007.
- Idearc, Inc., Form 10-Q for the Quarter Ended 30 June 2007, filed 10 August 2007.
- Idearc, Inc., Form 10-Q for the Quarter Ended 30 September 2007, filed 5 November 2007.
- Idearc Inc., Form 10-K for the Fiscal Year Ended 31 December 2007, filed 29 February 2008.
- Idearc Inc., Form DEF 14A, filed 14 March 2008.
- Idearc Inc., Form DEF 14A, filed 19 March 2008.
- Idearc, Inc., Form 10-Q for the Quarter Ended 31 March 2008, filed 8 May 2008.
- Idearc, Inc., Form 10-Q for the Quarter Ended 30 June 2008, filed 11 August 2008.
- Idearc, Inc., Form 10-Q for the Quarter Ended 30 September 2008, filed 6 November 2008.
- Idearc, Inc., Form 10-K for the Fiscal Year Ended 31 December 2008, filed 12 March 2009.
- Idearc Inc., Form 10-KA for the Fiscal Year Ended 31 December 2008, filed 27 March 2009.
- Idearc, Inc., Form 10-Q for the Quarter Ended 31 March 2009, filed 8 May 2009.
- Idearc, Inc., Form 10-Q for the Quarter Ended 30 June 2009, filed 7 August 2009.
- Idearc, Inc., Form 10-Q for the Quarter Ended 30 September 2009, filed 6 November 2009.
- SuperMedia Inc., Form 10-K for the Fiscal Year Ended 31 December 2009, filed 26 February 2010.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- SuperMedia Inc., Form 10-Q for the Quarter Ended 31 March 2010, filed 11 May 2010.
- SuperMedia Inc., Form 10-Q for the Quarter Ended 30 June 2010, filed 29 July 2010.

## ACADEMIC LITERATURE

- Barber, Brad M., Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stock Efficiency," *Journal of Corporation Law*, 1994.
- Beaver, William H., *Financial Reporting an Accounting Revolution,* third edition, Prentice Hall, 1989.
- Bodie, Zvi, Alex Kane and Alan Marcus, *Investments*, eighth edition, McGraw-Hill Irwin, 2000.
- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, eighth edition, McGraw-Hill Irwin, 2006.
- Campbell, Cynthia J., and Charles E. Wasley, "Measuring Security Price Performance Using Daily NASDAQ Returns," *Journal of Financial Economics*, 1993.
- Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997.
- Conover, W. J., *Practical Nonparametric Statistics*, 2nd edition, John Wiley & Sons, 1980.
- Daniel, Wayne W., *Applied Nonparametric Statistics*, Houghton Mifflin, 1978.
- Degeorge, Francois, Jayendu Patel, and Richard Zeckhauser, "Earnings Management to Exceed Thresholds," *Journal of Business*, 1999.
- Fama, Eugene F, "Efficient Capital Markets: II," *Journal of Finance*, 1991.
- Higgins, Robert C., *Analysis for Financial Management*, ninth edition, McGraw-Hill Irwin, 2009.
- Hollander, Wolfe, *Nonparametric Statistical Methods*, John Wiley & Sons, 1973.
- Jarrell, Gregg A. and Annette B. Poulsen, "The Returns to Acquiring Firms in Tender Offers: Evidence from Three Decades," *Financial Management*, 1989.
- MacKinlay, Craig A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, 1997.
- Miller, Rupert G. Jr., *Beyond ANOVA, Basics of Applied Statistics*, John Wiley & Sons, 1986.
- Mitchell, Mark L. and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, February, 1994.
- Pratt, Shannon, *The Market Approach to Valuing Businesses*, John Wiley & Sons, 2001.
- Reilly, Frank, and Keith Brown, "Organization and Functioning of Securities Markets," *Equity and Fixed Income CFA Program Curriculum*, Volume 5, Pearson Custom Publishing, 2008.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- Ross Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, eighth edition, McGraw-Hill Irwin, 2008.
- Sharpe, William, Gordon Alexander, and Jeffrey Bailey, *Investments*, fifth edition, Prentice Hall, 1995.
- Stowe, John, Thomas Robinson, Jerald Pinto, and Dennis McLeavey, "*Analysis of Equity Investments: Valuation*, Association for Investment Management and Research (CFA Institute).
- Tabak, David, and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook*, 3rd edition, John Wiley & Sons, 2001.
- Zar, Jerrold H., *Biostatistical Analysis*, 3rd edition, Prentice-Hall, 1996.

## CONFERENCE CALL TRANSCRIPTS

- "IAR - Q2 2007 IDEARC INC Earnings Conference Call," Thomson StreetEvents, 9 August 2007.
- "IAR - Idearc to Acquire Switchboard.com and Other Directory Assets from InfoSpace - Conference Call," Thomson StreetEvents, 17 September 2007.
- "IAR - Q3 2007 Idearc INC Earnings Conference Call," Thomson StreetEvents, 1 November 2007.
- "IAR - Q4 2007 Idearc, Inc. Earnings Conference Call," Thomson StreetEvents, 7 February 2008.
- "IAR - Idearc Names John J. Mueller Chief Executive Officer," Thomson StreetEvents, 19 February 2008.
- "IAR - Q1 2008 Idearc, Inc. Earnings Conference Call," Thomson StreetEvents, 6 May 2008.
- "IAR - Q2 2008 Idearc, Inc. Earnings Conference Call," Thomson StreetEvents, 29 July 2008.
- "IAR - Q3 2008 Idearc, Inc. Earnings Conference Call," Thomson SteetEvents, 30 October 2008.

## DATA AND DATABASES

- Bloomberg
- Capital IQ
- CRSP (Center for Research in Security Prices)
- Dow Jones
- Factiva
- FactSet
- FDA.gov

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

- LexisNexis
- Thomson Financial
- Vickers Stock Research Corp

**OTHER**

- *Cammer v. Bloom*, 711 F. Supp. 1264 (N.J., 1989).
- *Ibbotson 2008 Stocks, Bonds, Bills & Inflation (SBBI) 2008 Yearbook*.
- *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D.Tex., 2001).
- "Float Adjustment Methodology," *Standard & Poor's,* August 2006.
- *Unger v. Amedisys Inc.,* 401 F.3d 316 (C.A.5 (La.), 2005).
- Any other documents and data cited in the report.

118

Exhibit-2

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

Babson College
Finance Division
Babson Park, MA  02457
781-239-5275
Feinstein@Babson.edu

## EDUCATION

1989   YALE UNIVERSITY
         Ph.D. in Economics (Concentration in Finance)

1986   YALE UNIVERSITY
         M.Phil. in Economics

1983   YALE UNIVERSITY
         M.A. in Economics

1981   POMONA COLLEGE
         B.A. in Economics (Phi Beta Kappa, *cum laude*)

## TEACHING EXPERIENCE

1996 - present         BABSON COLLEGE
                                Babson Park, MA
                                Full-time Faculty, Finance Division
                                Associate Professor (2000-present)
                                Donald P. Babson Chair in Applied Investments (2002-2010)
                                Faculty Director of the Babson College Fund (2002-2009)
                                Director of the Stephen D. Cutler Investment Management Center
                                      (2002-2007)
                                Assistant Professor (1996-2000)

1992 - 2002         BOSTON UNIVERSITY CHARTERED FINANCIAL ANALYSTS
                                (CFA) REVIEW PROGRAM
                                Instructor
                                A 3-level program preparing financial analysts, portfolio managers,
                                brokers and other investment professionals for the examinations leading to
                                professional certification.  The core curriculum consists of the following
                                modules:
                                • Equity Securities Analysis
                                • Fixed Income Securities Analysis
                                • Portfolio Management

119

Exhibit-2

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

- Derivatives
- Financial Accounting
- Economic Analysis
- Quantitative Analysis
- Ethical and Professional Standards

| | |
|---|---|
| 1990 - 1995 | BOSTON UNIVERSITY SCHOOL OF MANAGEMENT |
| | Boston, MA |
| | Full-time Faculty, Department of Finance |
| | |
| 1993 - 1994 | WASHINGTON UNIVERSITY, OLIN SCHOOL OF BUSINESS |
| | St. Louis, MO |
| | Visiting Assistant Professor, Department of Finance |

**BUSINESS EXPERIENCE**

| | |
|---|---|
| 2008 - present | CROWNINSHIELD FINANCIAL RESEARCH, LLC |
| | Wellesley, MA |
| | Managing Principal and Senior Expert |
| | |
| 1996 - 2008 | THE MICHEL-SHAKED GROUP |
| | Boston, MA |
| | Senior Expert (2001 - 2008) |
| | Affiliated Expert (1996 - 2001) |
| | |
| 1987 - 1990 | FEDERAL RESERVE BANK OF ATLANTA |
| | Economist |

**PROFESSIONAL DESIGNATIONS**

1998   Awarded the Chartered Financial Analyst designation by the Association for Investment Management and Research.

**RESEARCH AWARDS**

1999   Greater Boston Real Estate Board/Real Estate Finance Association – Research Grant and Featured Speaker at Real Estate Finance Association Meetings.

120

**Exhibit-2**

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

## PAPERS AND PUBLICATIONS

"Distortion in Corporate Valuation: Implications of Capital Structure Changes" (with Allen Michel and Jacob Oded) *Managerial Finance* (forthcoming).

"Market Signals of Investment Unsuitability" (with Alexander Liss and Steven Achatz) *Law360.com*, June 3, 2010.  Available from http://www.law360.com/articles/170690.

"Planning Capital Expenditure," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 3rd edition 2001, and 4th edition 2009.

"Financial Management of Risks," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 2nd edition 1997, 3rd edition 2001, and 4th edition 2009.

"Fraud-on-the-market Th`eory: Is a Market Efficient?" (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, May 2005.

"Valuation of Credit Guarantees" (with Allen J. Michel and Israel Shaked).  *Journal of Forensic Economics* 17(1), pp. 17-37, 2005.

"A Better Understanding of why NPV Undervalues Managerial Flexibility," (with Diane Lander) in *The Engineering Economist*, 2002, Volume 47, Number 4.

"Teaching the Strong-Form Efficient Market Hypothesis: A Classroom Experiment," *Journal of Financial Education*, fall 2000.

*A Future for Real Estate Futures: Potential Applications of Derivatives in Real Estate Investment and Finance* (with Linda Stoller). Monograph. Boston: Real Estate Finance Association / Greater Boston Real Estate Board, May 2000.

"The Risk Budget: Using Your Human Resources," (with John Marthinsen and John Edmunds) *Risk Management*, April 2000.

"Scenario Learning: A Powerful Tool for the 21st Century Planner," (with Jeffrey Ellis and Dennis Stearns) *The Journal of Financial Planning*, April 2000.

"Protecting Future Product Liability Claimants in the Case of Bankruptcy," (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, January 2000.

"Measuring Risk with the Bodie Put When Stocks Exhibit Mean Reversion," *The Journal of Risk*, Vol. 1, No. 3, 1999.

Exhibit-2

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"Just-in-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) *Primus*, Vol. IX, No. 2, June 1999.

*Atlanta Park Medical Center v. Hamlin Asset Management.* (with Natalie Taylor). Babson Case Collection, Harvard Business School Press, 1998.

"Dealing with Delta," *Derivatives Week*, VII, No. 44, November 2, 1998.

"Expected Return in Option Pricing: A Non-Mathematical Explanation," *Derivatives Week*, VII, No. 35, August 31, 1998.

"When Hedges Fail: The Put Paradox and its Solution," *Derivatives Quarterly*, Vol. 4, No. 2, Winter 1997.

*Finance and Accounting for Project Management.* New York: American Management Association, 1996.

"International Investing," in *Irwin's Directory of Emerging Market Brokerages*. New York: Irwin, 1996.

"The Hull and White Implied Volatility." Boston University Working Paper #92-51, 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) in *Financial Systems and Risk Management*, the proceedings of the US-Japan Forum on Financial Strategy in the 1990s, sponsored by Osaka Foundation of International Exchange and Boston University, August 1991.

"Covered Call Options: A Proposal to Ease LDC Debt," (with Peter Abken) *Federal Reserve Bank of Atlanta Economic Review*, March/April 1990. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Forecasting Stock-Market Volatility Using Options on Index Futures," *Federal Reserve Bank of Atlanta Economic Review*, May/June 1989. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"The Black-Scholes Formula is Nearly Linear in Sigma for At-the-Money Options; Therefore Implied Volatilities from At-the-Money Options are Virtually Unbiased." Federal Reserve Bank of Atlanta Working Paper #88-9, December 1988.

"The Effect of the 'Triple Witching Hour' on Stock Market Volatility," (with William Goetzmann) *Federal Reserve Bank of Atlanta Economic Review*, September/October 1988. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

Exhibit-2

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"Stock Market Volatility," *Federal Reserve Bank of Atlanta Economic Review*, November/December 1987.

Book review of *In Who's Interest: International Banking and American Foreign Policy*, by Benjamin J. Cohen, Yale University Press, in *Federal Reserve Bank Of Atlanta Economic Review*, Summer 1987.

**PRESENTATIONS**

"The Computation of Damages in Securities Fraud Cases," at the Grant and Eisenhofer Institutional Investor Conference, December 2002.

"The Role of the Financial Expert in Complex Litigation," at the Financial Management Association Conference, October 2000.

"Entrepreneurial Incentives and Resource Allocation Among Corporate Venturing Initiatives," (with Joel Shulman and U. Srinivasa Rangan), Babson Entrepreneurship Research Conference, May 2000.

"Application of Real Options in Purchasing Strategies," (with Juan Orozco), presented at the International Applied Business Research Conference, March 2000.

"A Future for Real Estate Futures," (with Linda Stoller) at the Fairfield County chapter of the Real Estate Finance Association, November 1999, and at the Greater Boston Real Estate Board, November 2000.

"Atlanta Park Medical Center v. Hamlin Asset Management," (with Natalie Taylor) at the 1999 convention of the North American Case Research Association.

"Using Future Worlds™ in the Financial Planning Process," (with Jeffrey Ellis) at the Institute of Certified Financial Planners Masters Retreat, October 1999.

"Toward a Better Understanding of Real Options: A Weighted Average Discount Rate Approach," at the 1999 Financial Management Association Conference, the 1999 European Financial Management Association Conference, and the 1999 Multinational Finance Society Conference.

"Just-In-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) at the 1999 Financial Management Association Conference.

Exhibit-2

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"Alternative Dow Investments for the Individual Investor: Diamonds, Synthetics, and the Real Thing," at the 1999 Academy of Financial Services Convention.

"Evidence of Yield Burning in Municipal Refundings" at Financial Management Association Convention, October 1997; Government Finance Officers Association, 1997; and Northeast Regional Convention of the National Association of State Treasurers, 1997.

"Teaching the Strong-Form Efficient Market Hypothesis" at Conference on Classroom Experiments in the Teaching of Economics at University of Virginia, September 1995.

"Efficient Consolidation of Implied Standard Deviations," (with Shaikh Hamid) at Midwest Finance Association, March 1995.

"A Test of Intertemporal Averaging of Implied Volatilities," (with Shaikh Hamid) at Eastern Finance Association, April 1995.

"Taking Advantage of Volatility:  Non-linear Forecasting and Options Strategies," (with Hassan Ahmed) at Chicago Board of Trade / Chicago Board Options Exchange Conference on Risk Management, February 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) at Japan-U.S. Conference on Financial Strategies in the 1990s, Osaka, Japan, August 1991.

"The Hull and White Implied Volatility," at American Finance Association Convention, December 1990.


**REVIEWED ARTICLES AND BOOKS FOR:**

    Journal of Economic Education
    Journal of Forensic Economics
    Journal of Risk
    Financial Review
    North American Case Research Association
    Financial Management
    Journal of Business
    Journal of Money, Credit and Banking
    Quarterly Review of Economics and Finance
    Blackwell
    Prentice Hall
    Southwestern Publishing

Exhibit-2

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

## COURSES TAUGHT

Valuation (MBA)
Investments (MBA and Executive)
Equity Markets (MBA)
Fixed Income Analysis (Undergraduate and MBA)
Babson College Fund (Undergraduate and MBA)
Options and Futures (Undergraduate)
Advanced Derivative Securities (MBA)
Corporate Finance (MBA and Executive)
Financial Management (MBA)
Risk Management (MBA)
Corporate Financial Strategy (MBA)
Integrated Management (Undergraduate)
Cross-Functional Management (Integrated curriculum, Undergraduate)
Continuous-Time Finance (Doctoral)
Portfolio Theory / Management Information Systems (Executive)
Quantitative Methods for Investment Management (Undergraduate and MBA)
Introduction to Derivatives Securities (Executive)
International Finance (Executive)

## TEACHING AWARDS

Reid Teaching Award, Washington University, Olin School of Business, 1993-94.

## SELECT LIST OF MEDIA CITATIONS

"Hospital Move Presents Buy-Out Groups with New Risks," by Francesco Guerra, Christopher Bowe, and Rebecca Knight, *Financial Times*, July 15, 2006.

"Funds of Knowledge Add Value," by Rebecca Knight, *Financial Times*, March 12, 2006.

"City's Financial Picture Worse Than Ever, Sanders Says," by Matthew T. Hall, *San Diego Union-Tribune*, January 7, 2006.

"Downer: Stock Market Takes Another Dive," by John Chesto, *Boston Herald*, July 23, 2002.

"Banks, Developers, Are Main Beneficiaries," [editorial column] by Steven Feinstein, *The Boston Globe*, March 31, 2002, p. C4.

Exhibit-2

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"Washington Investing: What Michael Saylor is Really Worth," by Jerry Knight, *The Washington Post*, March 6, 2000.

"IBM Retools Pensions," by Stephanie Armour, *USA Today*, May 4, 1999.

"L.A. MTA's Law Firm Says Lissack Strategy Will be a Replay," by Andrea Figler, *Bond Buyer,* September 30, 1998.

"Fed Key Player in Rescue of Floundering Hedge Fund," by Andrew Fraser, Associated Press, September 25, 1998.

"Top Banks Plan Bailout for Fund," by Andrew Fraser, Associated Press, September 24, 1998.

"Clarion Call to the Small Investor," by Jo-Ann Johnston, *The Boston Globe*, March 4, 1998.

"L.A. Authority Study Shows Rampant Yield Burning Abuse," by Michael Stanton, *The Bond Buyer*, April 22, 1997.

"Dispute Over Yield Burning Dominates GFOA Session," by Michael Stanton, *The Bond Buyer*, January 29, 1997.

"Men Behaving Badly (Yield Burning)," *Grants Municipal Bond Observer*, January 24, 1997.

"Municipal Bond Dealers Face Scrutiny," by Peter Truell, *The New York Times*, December 17, 1996.

"Iowa Market Takes Stock of Presidential Candidates," by Stanley W. Angrist, *The Wall Street Journal*, August 28, 1995.

"Looking for Clues in Options Prices," by Sylvia Nasar, *The New York Times*, July 18, 1991.

"For Fed, A New Set of Tea Leaves," by Sylvia Nasar, *The New York Times*, July 5, 1991.

126

Exhibit-2

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

**MEMBERSHIP IN PROFESSIONAL SOCIETIES**

    American Finance Association
    Boston Security Analysts Society
    Chartered Financial Analyst Institute (formerly the Association for Investment
        Management and Research)
    Financial Management Association
    Foundation for Advancement of Research in Financial Economics (founding member)
    North American Case Research Association

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony in the Last 4 Years**

In Re: Motorola Securities Litigation
United States District Court
For The Northeastern District of Illinois
Eastern Division
No. 03 C 00287
Deposition Testimony
March 2007

In Re Apollo Group, Inc. Securities Litigation
United States District Court
District of Arizona
Lead Case No. CV 04-2147-PHX-JAT
Deposition Testimony
February 2007
Trial Testimony
December 2007

In Re Veeco Instruments, Inc. Securities Litigation
United States District Court
Southern District of New York
Case No.: 7:05-md-1695 (CM)
Deposition Testimony
June 2007

Ellington Overseas Partners. LTD. and Ellington Long Term Fund. LTD. vs.
HSBC Securities (USA) Inc.
United States District Court
Southern District of New York
06-CV-02353
July 2007

Carpenters Health & Welfare Fund, *et al.* vs. The Coca-Cola Company
United States District Court
Northern District of Georgia
Atlanta Division
File No. 1:00-CV-2838-WBH
Deposition Testimony
August 2007

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony in the Last 4 Years**

In Re Schering-Plough Corporation Securities Litigation
United States District Court
For The District of New Jersey
Master File No. 01-CV-0829 (KSH/MF)
Deposition Testimony
September 2007

In Re ProQuest Company Securities Litigation
United States District Court
Eastern District Of Michigan
Master File No. 2:06-cv-10619
Deposition Testimony
May 2008

Marvin Overby, *et al.* vs. Tyco International, Ltd., *et al.*
United States District Court
District of New Hampshire
Case No. 02-CV-1357-B
Deposition Testimony
May 2008

Franz Schleicher, *et al.* vs. Gary C. Wendt, *et al.*
(Conseco, Inc.)
United States District Court
Southern District of Indiana
Indianapolis Division
No. 02 CV 1332 DFH-TAB
Deposition Testimony
July 2008

In Re The Mills Corporation Securities Litigation
United States District Court
For The Eastern District of Virginia
Alexandria Division
Civil Action No. 1:06-cv-00077 (LO/TJR)
Deposition Testimony
September 2008

In Re Cooper Companies, Inc. Securities Litigation
United States District Court
Central District of California, Southern Division
No. SACV-06-00169-CJC(RNBx)
Deposition Testimony
October 2008 and December 2009

129

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony in the Last 4 Years**

Debra Hall, *et al.* vs. The Children's Place Retail Stores, Inc., *et al.*
United States District Court
Southern District of New York
Civil Action No. 1:07-cv-08252-SAS
Deposition Testimony
December 2008

Robert Ross, *et al.* vs. Abercrombie & Fitch Company, *et al.*
United States District Court
Southern District of Ohio
Eastern Division
No. 2:05-cv-00819-EAS-TPK
Deposition Testimony
February 2009

In Re Comcast Corporation ERISA Litagation
United States District Court
Eastern District of Pennsylvania
Master File No. 2:08-cv-00773-HB
Deposition Testimony
July 2009

John Richard Beach, *et al.* vs. Healthways Inc., *et al.*
United States District Court
Middle District of Tennessee
Nashville Division
Civil Action No. 3:08-cv-00569
Deposition Testimony
July 2009

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 2/5/2007 | $33.46 | $33.42 | $33.46 | | 616,200 | - |
| 2/6/2007 | $33.09 | $33.10 | $33.12 | | 810,100 | -1.11% |
| 2/7/2007 | $33.67 | $33.76 | $33.80 | | 1,587,800 | 1.74% |
| 2/8/2007 | $33.01 | $33.00 | $33.01 | | 1,478,900 | -1.98% |
| 2/9/2007 | $33.15 | $33.13 | $33.19 | | 839,300 | 0.42% |
| 2/12/2007 | $33.56 | $33.55 | $33.56 | | 2,330,889 | 1.23% |
| 2/13/2007 | $34.90 | $34.82 | $34.86 | | 823,369 | 3.92% |
| 2/14/2007 | $35.53 | $35.50 | $35.53 | | 1,788,190 | 1.79% |
| 2/15/2007 | $34.75 | $34.74 | $34.75 | | 3,212,600 | -2.22% |
| 2/16/2007 | $35.24 | $35.24 | $35.27 | $0.34 | 1,580,200 | 2.37% |
| 2/20/2007 | $35.35 | $35.35 | $35.41 | | 804,200 | 0.31% |
| 2/21/2007 | $35.38 | $35.33 | $35.35 | | 790,300 | 0.08% |
| 2/22/2007 | $35.43 | $35.38 | $35.43 | | 1,340,600 | 0.14% |
| 2/23/2007 | $35.17 | $35.15 | $35.20 | | 698,400 | -0.74% |
| 2/26/2007 | $35.00 | $34.99 | $35.02 | | 1,607,681 | -0.48% |
| 2/27/2007 | $34.16 | $34.15 | $34.31 | | 1,756,600 | -2.43% |
| 2/28/2007 | $33.99 | $33.94 | $33.97 | | 1,805,600 | -0.50% |
| 3/1/2007 | $34.08 | $34.04 | $34.05 | | 871,505 | 0.26% |
| 3/2/2007 | $34.10 | $34.10 | $34.11 | | 568,700 | 0.06% |
| 3/5/2007 | $34.05 | $34.05 | $34.07 | | 555,300 | -0.15% |
| 3/6/2007 | $33.98 | $33.98 | $33.99 | | 645,500 | -0.21% |
| 3/7/2007 | $34.04 | $34.07 | $34.08 | | 645,800 | 0.18% |
| 3/8/2007 | $34.57 | $34.47 | $34.52 | | 1,204,200 | 1.54% |
| 3/9/2007 | $34.28 | $34.28 | $34.29 | | 729,700 | -0.84% |
| 3/12/2007 | $34.02 | $34.00 | $34.02 | | 1,275,400 | -0.76% |
| 3/13/2007 | $33.86 | $33.86 | $33.86 | | 583,800 | -0.47% |
| 3/14/2007 | $32.69 | $32.62 | $32.67 | | 1,123,700 | -3.52% |
| 3/15/2007 | $33.50 | $33.50 | $33.52 | | 809,800 | 2.45% |
| 3/16/2007 | $33.60 | $33.55 | $33.56 | | 1,447,500 | 0.30% |
| 3/19/2007 | $34.00 | $33.94 | $33.95 | | 1,215,700 | 1.18% |
| 3/20/2007 | $33.65 | $33.67 | $33.68 | | 415,100 | -1.03% |
| 3/21/2007 | $34.18 | $34.12 | $34.15 | | 1,607,122 | 1.56% |
| 3/22/2007 | $34.23 | $34.26 | $34.30 | | 927,300 | 0.15% |
| 3/23/2007 | $34.66 | $34.66 | $34.70 | | 714,000 | 1.25% |
| 3/26/2007 | $34.35 | $34.35 | $34.38 | | 821,300 | -0.90% |
| 3/27/2007 | $34.32 | $34.26 | $34.29 | | 780,700 | -0.09% |
| 3/28/2007 | $34.16 | $34.09 | $34.10 | | 907,300 | -0.47% |
| 3/29/2007 | $34.73 | $34.71 | $34.73 | | 515,800 | 1.65% |
| 3/30/2007 | $35.10 | $35.03 | $35.06 | | 519,042 | 1.06% |
| 4/2/2007 | $35.77 | $35.71 | $35.73 | | 686,300 | 1.89% |
| 4/3/2007 | $35.84 | $35.84 | $35.88 | | 565,400 | 0.20% |
| 4/4/2007 | $35.18 | $35.18 | $35.19 | | 702,900 | -1.86% |
| 4/5/2007 | $35.44 | $35.39 | $35.40 | | 502,800 | 0.74% |
| 4/9/2007 | $35.32 | $35.32 | $35.32 | | 284,100 | -0.34% |
| 4/10/2007 | $34.77 | $34.74 | $34.77 | | 540,400 | -1.57% |

131

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|------|------|------|------|------|------|------|
| 4/11/2007 | $34.50 | $34.51 | $34.52 | | 467,900 | -0.78% |
| 4/12/2007 | $34.70 | $34.62 | $34.73 | | 480,900 | 0.58% |
| 4/13/2007 | $34.74 | $34.69 | $34.73 | | 243,400 | 0.12% |
| 4/16/2007 | $34.52 | $34.50 | $34.53 | | 251,900 | -0.64% |
| 4/17/2007 | $34.38 | $34.38 | $34.39 | | 534,600 | -0.41% |
| 4/18/2007 | $34.62 | $34.64 | $34.66 | | 348,300 | 0.70% |
| 4/19/2007 | $34.53 | $34.48 | $34.49 | | 801,900 | -0.26% |
| 4/20/2007 | $35.24 | $35.25 | $35.25 | | 434,200 | 2.04% |
| 4/23/2007 | $35.30 | $35.26 | $35.27 | | 263,400 | 0.17% |
| 4/24/2007 | $34.50 | $34.51 | $34.53 | | 463,400 | -2.29% |
| 4/25/2007 | $34.70 | $34.75 | $34.79 | | 792,400 | 0.58% |
| 4/26/2007 | $34.82 | $34.83 | $34.87 | | 382,700 | 0.35% |
| 4/27/2007 | $34.78 | $34.81 | $34.84 | | 433,200 | -0.11% |
| 4/30/2007 | $34.75 | $34.75 | $34.76 | | 425,100 | -0.09% |
| 5/1/2007 | $34.78 | $34.81 | $34.82 | | 375,400 | 0.09% |
| 5/2/2007 | $36.11 | $36.17 | $36.18 | | 937,000 | 3.75% |
| 5/3/2007 | $37.02 | $37.01 | $37.02 | | 1,144,200 | 2.49% |
| 5/4/2007 | $37.39 | $37.39 | $37.40 | | 824,900 | 0.99% |
| 5/7/2007 | $36.68 | $36.68 | $36.69 | | 537,332 | -1.92% |
| 5/8/2007 | $36.16 | $36.19 | $36.22 | | 496,600 | -1.43% |
| 5/9/2007 | $35.98 | $35.95 | $35.99 | | 569,800 | -0.50% |
| 5/10/2007 | $35.29 | $35.35 | $35.36 | | 952,500 | -1.94% |
| 5/11/2007 | $35.94 | $35.92 | $35.95 | | 447,700 | 1.83% |
| 5/14/2007 | $36.08 | $36.03 | $36.06 | $0.34 | 623,900 | 1.33% |
| 5/15/2007 | $36.35 | $36.34 | $36.39 | | 573,900 | 0.75% |
| 5/16/2007 | $36.90 | $36.87 | $36.90 | | 680,000 | 1.50% |
| 5/17/2007 | $36.85 | $36.86 | $36.89 | | 448,500 | -0.14% |
| 5/18/2007 | $36.83 | $36.83 | $36.84 | | 775,600 | -0.05% |
| 5/21/2007 | $36.84 | $36.80 | $36.85 | | 599,900 | 0.03% |
| 5/22/2007 | $37.05 | $37.06 | $37.10 | | 362,300 | 0.57% |
| 5/23/2007 | $37.66 | $37.71 | $37.73 | | 300,100 | 1.63% |
| 5/24/2007 | $37.18 | $37.17 | $37.18 | | 405,700 | -1.28% |
| 5/25/2007 | $36.88 | $36.89 | $36.92 | | 343,100 | -0.81% |
| 5/29/2007 | $36.81 | $36.88 | $36.90 | | 417,100 | -0.19% |
| 5/30/2007 | $35.83 | $35.80 | $35.81 | | 695,900 | -2.70% |
| 5/31/2007 | $35.25 | $35.14 | $35.19 | | 714,000 | -1.63% |
| 6/1/2007 | $36.68 | $36.63 | $36.67 | | 614,100 | 3.98% |
| 6/4/2007 | $37.39 | $37.35 | $37.39 | | 679,700 | 1.92% |
| 6/5/2007 | $36.62 | $36.66 | $36.67 | | 271,300 | -2.08% |
| 6/6/2007 | $36.25 | $36.19 | $36.20 | | 524,600 | -1.02% |
| 6/7/2007 | $35.70 | $35.65 | $35.70 | | 462,200 | -1.53% |
| 6/8/2007 | $35.94 | $35.96 | $36.00 | | 421,500 | 0.67% |
| 6/11/2007 | $36.45 | $36.40 | $36.43 | | 621,000 | 1.41% |
| 6/12/2007 | $36.44 | $36.44 | $36.47 | | 305,300 | -0.03% |
| 6/13/2007 | $35.80 | $35.74 | $35.75 | | 360,800 | -1.77% |

132

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 6/14/2007 | $35.69 | $35.65 | $35.68 | | 863,300 | -0.31% |
| 6/15/2007 | $36.07 | $36.07 | $36.11 | | 413,800 | 1.06% |
| 6/18/2007 | $36.01 | $36.00 | $36.01 | | 293,700 | -0.17% |
| 6/19/2007 | $35.74 | $35.74 | $35.75 | | 481,000 | -0.75% |
| 6/20/2007 | $35.42 | $35.27 | $35.50 | | 404,400 | -0.90% |
| 6/21/2007 | $35.46 | $35.45 | $35.50 | | 700,200 | 0.11% |
| 6/22/2007 | $35.60 | $35.43 | $35.47 | | 950,900 | 0.39% |
| 6/25/2007 | $35.57 | $35.50 | $35.56 | | 450,700 | -0.08% |
| 6/26/2007 | $35.84 | $35.81 | $35.82 | | 324,500 | 0.76% |
| 6/27/2007 | $35.77 | $35.76 | $35.78 | | 429,800 | -0.20% |
| 6/28/2007 | $35.29 | $35.27 | $35.29 | | 393,200 | -1.35% |
| 6/29/2007 | $35.33 | $35.33 | $35.36 | | 458,600 | 0.11% |
| 7/2/2007 | $35.57 | $35.50 | $35.55 | | 379,800 | 0.68% |
| 7/3/2007 | $35.51 | $35.51 | $35.56 | | 237,400 | -0.17% |
| 7/5/2007 | $36.01 | $36.00 | $36.01 | | 527,000 | 1.40% |
| 7/6/2007 | $36.31 | $36.24 | $36.27 | | 229,600 | 0.83% |
| 7/9/2007 | $36.12 | $36.07 | $36.11 | | 330,100 | -0.52% |
| 7/10/2007 | $36.01 | $35.93 | $35.99 | | 1,378,600 | -0.31% |
| 7/11/2007 | $36.50 | $36.46 | $36.51 | | 445,800 | 1.35% |
| 7/12/2007 | $36.24 | $36.11 | $36.13 | | 468,800 | -0.71% |
| 7/13/2007 | $36.03 | $35.99 | $36.02 | | 799,000 | -0.58% |
| 7/16/2007 | $35.97 | $35.97 | $36.02 | | 406,000 | -0.17% |
| 7/17/2007 | $36.25 | $36.26 | $36.28 | | 336,500 | 0.78% |
| 7/18/2007 | $35.91 | $35.84 | $35.91 | | 1,087,200 | -0.94% |
| 7/19/2007 | $36.08 | $36.12 | $36.18 | | 348,300 | 0.47% |
| 7/20/2007 | $36.94 | $36.85 | $36.89 | | 717,200 | 2.36% |
| 7/23/2007 | $37.00 | $36.94 | $36.96 | | 531,700 | 0.16% |
| 7/24/2007 | $36.12 | $36.07 | $36.08 | | 431,400 | -2.41% |
| 7/25/2007 | $35.73 | $35.74 | $35.77 | | 728,900 | -1.09% |
| 7/26/2007 | $34.51 | $34.11 | $34.60 | | 2,640,584 | -3.47% |
| 7/27/2007 | $33.11 | $33.18 | $33.66 | | 1,663,800 | -4.14% |
| 7/30/2007 | $34.01 | $33.95 | $33.99 | | 680,000 | 2.68% |
| 7/31/2007 | $34.71 | $34.79 | $34.83 | | 2,641,500 | 2.04% |
| 8/1/2007 | $34.92 | $34.92 | $34.94 | | 1,037,400 | 0.60% |
| 8/2/2007 | $34.74 | $34.67 | $34.73 | | 1,625,200 | -0.52% |
| 8/3/2007 | $33.76 | $33.76 | $33.78 | | 1,572,887 | -2.86% |
| 8/6/2007 | $33.14 | $33.08 | $33.10 | | 1,631,424 | -1.85% |
| 8/7/2007 | $32.90 | $32.91 | $32.96 | | 1,694,300 | -0.73% |
| 8/8/2007 | $32.03 | $31.60 | $32.26 | | 1,966,300 | -2.68% |
| 8/9/2007 | $32.10 | $31.95 | $32.10 | | 1,898,200 | 0.22% |
| 8/10/2007 | $32.24 | $32.16 | $32.23 | | 1,956,700 | 0.44% |
| 8/13/2007 | $33.22 | $33.22 | $33.24 | | 1,417,900 | 2.99% |
| 8/14/2007 | $32.19 | $32.13 | $32.16 | | 1,400,600 | -3.15% |
| 8/15/2007 | $30.46 | $30.44 | $30.47 | | 991,700 | -5.52% |
| 8/16/2007 | $31.31 | $31.01 | $31.05 | $0.34 | 881,925 | 3.84% |

133

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 8/17/2007 | $32.15 | $32.08 | $32.15 | | 789,200 | 2.65% |
| 8/20/2007 | $32.01 | $32.05 | $32.07 | | 414,300 | -0.44% |
| 8/21/2007 | $32.72 | $32.72 | $32.75 | | 753,900 | 2.19% |
| 8/22/2007 | $32.70 | $32.76 | $32.78 | | 644,700 | -0.06% |
| 8/23/2007 | $34.00 | $34.00 | $34.03 | | 1,084,100 | 3.90% |
| 8/24/2007 | $34.85 | $34.85 | $34.99 | | 1,237,400 | 2.47% |
| 8/27/2007 | $34.78 | $34.79 | $34.80 | | 797,500 | -0.20% |
| 8/28/2007 | $34.12 | $34.01 | $34.10 | | 952,591 | -1.92% |
| 8/29/2007 | $33.62 | $33.62 | $33.65 | | 475,500 | -1.48% |
| 8/30/2007 | $33.50 | $33.49 | $33.50 | | 598,700 | -0.36% |
| 8/31/2007 | $34.13 | $34.11 | $34.13 | | 753,800 | 1.86% |
| 9/4/2007 | $35.13 | $35.11 | $35.13 | | 547,300 | 2.89% |
| 9/5/2007 | $34.82 | $34.74 | $34.78 | | 438,100 | -0.89% |
| 9/6/2007 | $34.42 | $34.40 | $34.42 | | 419,300 | -1.16% |
| 9/7/2007 | $33.21 | $33.24 | $33.25 | | 883,200 | -3.58% |
| 9/10/2007 | $32.67 | $32.74 | $32.77 | | 584,600 | -1.64% |
| 9/11/2007 | $33.00 | $32.99 | $33.00 | | 571,800 | 1.01% |
| 9/12/2007 | $33.08 | $33.10 | $33.13 | | 442,800 | 0.24% |
| 9/13/2007 | $33.47 | $33.48 | $33.52 | | 757,300 | 1.17% |
| 9/14/2007 | $33.35 | $33.24 | $33.28 | | 514,700 | -0.36% |
| 9/17/2007 | $32.85 | $32.77 | $32.82 | | 675,900 | -1.51% |
| 9/18/2007 | $32.90 | $32.99 | $33.00 | | 995,100 | 0.15% |
| 9/19/2007 | $32.95 | $32.90 | $32.95 | | 637,500 | 0.15% |
| 9/20/2007 | $32.90 | $32.90 | $32.94 | | 587,000 | -0.15% |
| 9/21/2007 | $32.28 | $32.25 | $32.33 | | 1,011,300 | -1.90% |
| 9/24/2007 | $31.54 | $31.50 | $31.55 | | 1,854,855 | -2.32% |
| 9/25/2007 | $31.12 | $31.14 | $31.15 | | 983,000 | -1.34% |
| 9/26/2007 | $31.03 | $31.01 | $31.04 | | 1,097,300 | -0.29% |
| 9/27/2007 | $31.63 | $31.55 | $31.59 | | 953,400 | 1.92% |
| 9/28/2007 | $31.47 | $31.41 | $31.43 | | 1,667,400 | -0.51% |
| 10/1/2007 | $31.10 | $31.13 | $31.18 | | 939,600 | -1.18% |
| 10/2/2007 | $31.99 | $31.95 | $32.00 | | 982,500 | 2.82% |
| 10/3/2007 | $31.59 | $31.63 | $31.67 | | 476,400 | -1.26% |
| 10/4/2007 | $31.90 | $31.91 | $31.96 | | 846,800 | 0.98% |
| 10/5/2007 | $32.17 | $32.00 | $32.21 | | 661,200 | 0.84% |
| 10/8/2007 | $32.18 | $32.18 | $32.23 | | 351,900 | 0.03% |
| 10/9/2007 | $32.25 | $32.28 | $32.31 | | 613,100 | 0.22% |
| 10/10/2007 | $32.02 | $32.03 | $32.04 | | 923,600 | -0.72% |
| 10/11/2007 | $32.05 | $32.05 | $32.06 | | 785,400 | 0.09% |
| 10/12/2007 | $32.16 | $32.10 | $32.13 | | 415,800 | 0.34% |
| 10/15/2007 | $31.35 | $31.34 | $31.35 | | 1,115,200 | -2.55% |
| 10/16/2007 | $31.20 | $31.25 | $31.26 | | 652,500 | -0.48% |
| 10/17/2007 | $31.06 | $31.06 | $31.07 | | 936,600 | -0.45% |
| 10/18/2007 | $30.62 | $30.66 | $30.68 | | 932,500 | -1.43% |
| 10/19/2007 | $30.05 | $30.00 | $30.02 | | 930,000 | -1.88% |

134

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 10/22/2007 | $29.74 | $29.70 | $29.74 | | 793,325 | -1.04% |
| 10/23/2007 | $29.49 | $29.49 | $29.52 | | 1,691,900 | -0.84% |
| 10/24/2007 | $28.85 | $28.81 | $28.84 | | 2,018,300 | -2.19% |
| 10/25/2007 | $28.41 | $28.36 | $28.40 | | 2,509,500 | -1.54% |
| 10/26/2007 | $27.70 | $27.71 | $27.73 | | 1,475,600 | -2.53% |
| 10/29/2007 | $27.40 | $27.36 | $27.39 | | 1,212,100 | -1.09% |
| 10/30/2007 | $26.85 | $26.83 | $26.90 | | 1,072,500 | -2.03% |
| 10/31/2007 | $26.98 | $27.00 | $27.02 | | 1,829,000 | 0.48% |
| 11/1/2007 | $25.22 | $25.13 | $25.44 | | 4,221,364 | -6.75% |
| 11/2/2007 | $24.32 | $24.29 | $24.31 | | 3,210,200 | -3.63% |
| 11/5/2007 | $23.74 | $23.74 | $23.75 | | 3,057,943 | -2.41% |
| 11/6/2007 | $23.79 | $23.79 | $23.80 | | 2,100,922 | 0.21% |
| 11/7/2007 | $22.75 | $22.80 | $22.83 | | 1,929,077 | -4.47% |
| 11/8/2007 | $22.00 | $22.01 | $22.04 | | 3,354,598 | -3.35% |
| 11/9/2007 | $22.39 | $22.41 | $22.48 | | 1,320,035 | 1.76% |
| 11/12/2007 | $22.50 | $22.49 | $22.50 | | 919,038 | 0.49% |
| 11/13/2007 | $22.75 | $22.65 | $22.68 | | 1,106,821 | 1.10% |
| 11/14/2007 | $22.16 | $22.17 | $22.20 | | 950,004 | -2.63% |
| 11/15/2007 | $21.79 | $21.73 | $21.74 | | 2,575,400 | -1.68% |
| 11/16/2007 | $21.02 | $20.94 | $21.22 | | 2,021,665 | -3.60% |
| 11/19/2007 | $20.28 | $20.29 | $20.30 | $0.34 | 1,323,291 | -1.91% |
| 11/20/2007 | $19.67 | $19.66 | $19.69 | | 1,424,051 | -3.05% |
| 11/21/2007 | $20.26 | $20.23 | $20.24 | | 1,780,518 | 2.96% |
| 11/23/2007 | $20.33 | $20.27 | $20.32 | | 402,120 | 0.34% |
| 11/26/2007 | $20.26 | $20.18 | $20.21 | | 1,427,562 | -0.34% |
| 11/27/2007 | $19.30 | $19.29 | $19.30 | | 2,472,570 | -4.85% |
| 11/28/2007 | $18.54 | $18.59 | $18.62 | | 3,543,217 | -4.02% |
| 11/29/2007 | $18.75 | $18.75 | $18.80 | | 2,910,706 | 1.13% |
| 11/30/2007 | $18.92 | $18.83 | $19.03 | | 1,391,496 | 0.90% |
| 12/3/2007 | $18.65 | $18.66 | $18.68 | | 1,524,000 | -1.44% |
| 12/4/2007 | $17.72 | $17.70 | $17.75 | | 2,210,200 | -5.12% |
| 12/5/2007 | $16.99 | $16.85 | $16.90 | | 3,907,400 | -4.21% |
| 12/6/2007 | $17.12 | $17.06 | $17.16 | | 1,689,700 | 0.76% |
| 12/7/2007 | $18.77 | $18.73 | $18.76 | | 2,597,500 | 9.20% |
| 12/10/2007 | $18.57 | $18.59 | $18.62 | | 1,557,000 | -1.07% |
| 12/11/2007 | $17.87 | $17.80 | $17.85 | | 1,205,800 | -3.84% |
| 12/12/2007 | $17.51 | $17.48 | $17.50 | | 1,581,600 | -2.04% |
| 12/13/2007 | $17.36 | $17.31 | $17.34 | | 765,500 | -0.86% |
| 12/14/2007 | $17.02 | $16.98 | $17.00 | | 1,032,100 | -1.98% |
| 12/17/2007 | $16.85 | $16.85 | $16.87 | | 1,340,700 | -1.00% |
| 12/18/2007 | $17.21 | $17.21 | $17.24 | | 947,500 | 2.11% |
| 12/19/2007 | $17.07 | $17.08 | $17.12 | | 1,117,600 | -0.82% |
| 12/20/2007 | $17.63 | $17.61 | $17.62 | | 1,573,100 | 3.23% |
| 12/21/2007 | $17.87 | $17.84 | $17.85 | | 937,200 | 1.35% |
| 12/24/2007 | $17.68 | $17.70 | $17.72 | | 217,000 | -1.07% |

135

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 12/26/2007 | $17.80 | $17.82 | $17.83 | | 622,500 | 0.68% |
| 12/27/2007 | $17.33 | $17.30 | $17.31 | | 521,100 | -2.68% |
| 12/28/2007 | $17.39 | $17.36 | $17.38 | | 773,300 | 0.35% |
| 12/31/2007 | $17.56 | $17.58 | $17.60 | | 805,100 | 0.97% |
| 1/2/2008 | $16.65 | $16.60 | $16.63 | | 1,165,300 | -5.32% |
| 1/3/2008 | $16.40 | $16.42 | $16.44 | | 1,598,500 | -1.51% |
| 1/4/2008 | $14.94 | $14.93 | $14.94 | | 1,605,300 | -9.32% |
| 1/7/2008 | $15.17 | $15.17 | $15.20 | | 1,220,100 | 1.53% |
| 1/8/2008 | $15.36 | $15.37 | $15.39 | | 1,213,300 | 1.24% |
| 1/9/2008 | $14.96 | $14.98 | $15.00 | | 2,678,400 | -2.64% |
| 1/10/2008 | $14.59 | $14.60 | $14.62 | | 2,566,200 | -2.50% |
| 1/11/2008 | $15.30 | $15.29 | $15.30 | | 1,449,600 | 4.75% |
| 1/14/2008 | $15.24 | $15.22 | $15.23 | | 1,647,600 | -0.39% |
| 1/15/2008 | $15.34 | $15.29 | $15.38 | | 1,232,600 | 0.65% |
| 1/16/2008 | $16.58 | $16.53 | $16.55 | | 2,106,200 | 7.77% |
| 1/17/2008 | $15.28 | $15.32 | $15.35 | | 1,289,900 | -8.17% |
| 1/18/2008 | $15.73 | $15.70 | $15.72 | | 2,488,600 | 2.90% |
| 1/22/2008 | $14.90 | $14.92 | $14.95 | | 1,731,400 | -5.42% |
| 1/23/2008 | $15.18 | $15.13 | $15.14 | | 1,430,300 | 1.86% |
| 1/24/2008 | $15.34 | $15.34 | $15.37 | | 1,597,600 | 1.05% |
| 1/25/2008 | $15.35 | $15.30 | $15.33 | | 1,043,500 | 0.07% |
| 1/28/2008 | $16.45 | $16.42 | $16.43 | | 1,585,900 | 6.92% |
| 1/29/2008 | $16.98 | $16.94 | $16.96 | | 1,507,900 | 3.17% |
| 1/30/2008 | $16.29 | $16.30 | $16.31 | | 1,971,200 | -4.15% |
| 1/31/2008 | $16.24 | $16.20 | $16.24 | | 1,099,200 | -0.31% |
| 2/1/2008 | $16.06 | $16.02 | $16.06 | | 1,553,900 | -1.11% |
| 2/4/2008 | $15.69 | $15.63 | $15.64 | | 1,745,100 | -2.33% |
| 2/5/2008 | $15.40 | $15.34 | $15.36 | | 1,705,700 | -1.87% |
| 2/6/2008 | $15.22 | $15.09 | $15.10 | | 1,730,900 | -1.18% |
| 2/7/2008 | $11.56 | $11.55 | $11.57 | | 9,433,200 | -27.51% |
| 2/8/2008 | $9.70 | $9.72 | $9.84 | | 11,911,100 | -17.54% |
| 2/11/2008 | $9.31 | $9.30 | $9.33 | | 7,365,000 | -4.10% |
| 2/12/2008 | $9.70 | $9.68 | $9.70 | | 3,578,000 | 4.10% |
| 2/13/2008 | $9.44 | $9.44 | $9.47 | | 3,488,500 | -2.72% |
| 2/14/2008 | $9.19 | $9.15 | $9.19 | | 2,798,300 | -2.68% |
| 2/15/2008 | $9.08 | $9.08 | $9.09 | | 2,622,300 | -1.20% |
| 2/19/2008 | $7.87 | $7.86 | $7.87 | $0.34 | 5,699,500 | -10.04% |
| 2/20/2008 | $7.51 | $7.51 | $7.53 | | 5,945,400 | -4.68% |
| 2/21/2008 | $7.05 | $6.93 | $7.05 | | 4,599,200 | -6.32% |
| 2/22/2008 | $6.91 | $6.88 | $6.89 | | 5,500,800 | -2.01% |
| 2/25/2008 | $7.28 | $7.26 | $7.28 | | 2,640,500 | 5.22% |
| 2/26/2008 | $6.92 | $6.88 | $6.89 | | 3,436,400 | -5.07% |
| 2/27/2008 | $7.00 | $6.97 | $6.98 | | 4,790,200 | 1.15% |
| 2/28/2008 | $5.76 | $5.78 | $5.79 | | 6,270,100 | -19.50% |
| 2/29/2008 | $4.82 | $4.77 | $4.81 | | 13,323,900 | -17.82% |

136

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 3/3/2008 | $5.33 | $5.28 | $5.30 | | 6,840,100 | 10.06% |
| 3/4/2008 | $5.37 | $5.39 | $5.42 | | 4,574,500 | 0.75% |
| 3/5/2008 | $5.50 | $5.49 | $5.50 | | 3,653,600 | 2.39% |
| 3/6/2008 | $5.25 | $5.25 | $5.26 | | 4,115,000 | -4.65% |
| 3/7/2008 | $4.93 | $4.93 | $4.95 | | 4,070,600 | -6.29% |
| 3/10/2008 | $5.06 | $5.02 | $5.03 | | 2,190,100 | 2.60% |
| 3/11/2008 | $4.40 | $4.39 | $4.40 | | 4,370,400 | -13.98% |
| 3/12/2008 | $4.23 | $4.24 | $4.28 | | 6,959,800 | -3.94% |
| 3/13/2008 | $4.55 | $4.51 | $4.53 | | 2,165,600 | 7.29% |
| 3/14/2008 | $4.53 | $4.44 | $4.47 | | 2,670,700 | -0.44% |
| 3/17/2008 | $3.90 | $3.91 | $3.92 | | 1,500,000 | -14.97% |
| 3/18/2008 | $4.63 | $4.57 | $4.59 | | 3,140,200 | 17.16% |
| 3/19/2008 | $4.26 | $4.32 | $4.36 | | 2,867,100 | -8.33% |
| 3/20/2008 | $4.59 | $4.51 | $4.56 | | 2,335,800 | 7.46% |
| 3/24/2008 | $5.29 | $5.25 | $5.27 | | 3,145,900 | 14.19% |
| 3/25/2008 | $5.22 | $5.24 | $5.26 | | 3,085,700 | -1.33% |
| 3/26/2008 | $5.03 | $4.99 | $5.02 | | 2,137,000 | -3.71% |
| 3/27/2008 | $4.56 | $4.58 | $4.61 | | 4,267,800 | -9.81% |
| 3/28/2008 | $3.86 | $3.79 | $3.80 | | 5,766,600 | -16.67% |
| 3/31/2008 | $3.64 | $3.65 | $3.66 | | 3,258,200 | -5.87% |
| 4/1/2008 | $3.99 | $3.96 | $3.97 | | 2,728,100 | 9.18% |
| 4/2/2008 | $3.83 | $3.81 | $3.82 | | 1,895,500 | -4.09% |
| 4/3/2008 | $3.88 | $3.82 | $3.85 | | 1,810,800 | 1.30% |
| 4/4/2008 | $3.93 | $3.92 | $3.93 | | 1,451,400 | 1.28% |
| 4/7/2008 | $3.90 | $3.95 | $3.96 | | 1,789,600 | -0.77% |
| 4/8/2008 | $3.90 | $3.94 | $3.96 | | 1,617,900 | 0.00% |
| 4/9/2008 | $3.87 | $3.83 | $3.85 | | 2,302,900 | -0.77% |
| 4/10/2008 | $3.98 | $3.96 | $3.97 | | 2,439,700 | 2.80% |
| 4/11/2008 | $3.81 | $3.83 | $3.83 | | 2,631,900 | -4.37% |
| 4/14/2008 | $3.77 | $3.73 | $3.74 | | 1,249,200 | -1.06% |
| 4/15/2008 | $3.72 | $3.68 | $3.72 | | 2,417,800 | -1.34% |
| 4/16/2008 | $3.78 | $3.76 | $3.77 | | 992,700 | 1.60% |
| 4/17/2008 | $3.81 | $3.83 | $3.87 | | 1,254,600 | 0.79% |
| 4/18/2008 | $3.89 | $3.94 | $3.95 | | 2,040,000 | 2.08% |
| 4/21/2008 | $3.82 | $3.79 | $3.80 | | 1,025,100 | -1.82% |
| 4/22/2008 | $3.66 | $3.71 | $3.72 | | 1,121,200 | -4.28% |
| 4/23/2008 | $3.64 | $3.61 | $3.62 | | 858,900 | -0.55% |
| 4/24/2008 | $3.62 | $3.59 | $3.62 | | 1,006,500 | -0.55% |
| 4/25/2008 | $3.59 | $3.49 | $3.50 | | 985,500 | -0.83% |
| 4/28/2008 | $3.40 | $3.45 | $3.46 | | 1,516,900 | -5.44% |
| 4/29/2008 | $3.36 | $3.35 | $3.36 | | 1,849,500 | -1.18% |
| 4/30/2008 | $3.30 | $3.25 | $3.27 | | 2,600,600 | -1.80% |
| 5/1/2008 | $3.40 | $3.35 | $3.36 | | 2,319,100 | 2.99% |
| 5/2/2008 | $3.36 | $3.33 | $3.34 | | 2,533,800 | -1.18% |
| 5/5/2008 | $3.33 | $3.31 | $3.32 | | 1,433,500 | -0.90% |

137

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 5/6/2008 | $4.85 | $4.77 | $4.80 | | 16,476,500 | 37.60% |
| 5/7/2008 | $5.05 | $5.08 | $5.09 | | 10,872,200 | 4.04% |
| 5/8/2008 | $4.71 | $4.68 | $4.69 | | 11,941,700 | -6.97% |
| 5/9/2008 | $4.94 | $4.90 | $4.92 | | 4,702,800 | 4.77% |
| 5/12/2008 | $4.91 | $4.94 | $4.95 | | 3,952,500 | -0.61% |
| 5/13/2008 | $4.70 | $4.73 | $4.74 | | 2,300,300 | -4.37% |
| 5/14/2008 | $4.62 | $4.60 | $4.62 | | 2,468,100 | -1.72% |
| 5/15/2008 | $4.66 | $4.64 | $4.65 | | 2,190,400 | 0.86% |
| 5/16/2008 | $4.61 | $4.60 | $4.61 | | 2,193,400 | -1.08% |
| 5/19/2008 | $4.64 | $4.60 | $4.62 | | 2,150,400 | 0.65% |
| 5/20/2008 | $4.37 | $4.40 | $4.41 | | 3,757,900 | -6.00% |
| 5/21/2008 | $4.01 | $4.07 | $4.08 | | 2,289,100 | -8.60% |
| 5/22/2008 | $4.15 | $4.10 | $4.11 | | 1,494,500 | 3.43% |
| 5/23/2008 | $3.84 | $3.81 | $3.82 | | 1,813,300 | -7.76% |
| 5/27/2008 | $3.81 | $3.84 | $3.85 | | 2,371,100 | -0.78% |
| 5/28/2008 | $3.74 | $3.78 | $3.80 | | 2,486,400 | -1.85% |
| 5/29/2008 | $3.90 | $3.94 | $3.96 | | 2,710,000 | 4.19% |
| 5/30/2008 | $4.02 | $4.05 | $4.08 | | 5,182,900 | 3.03% |
| 6/2/2008 | $3.93 | $3.96 | $3.97 | | 1,828,900 | -2.26% |
| 6/3/2008 | $3.80 | $3.85 | $3.86 | | 1,832,200 | -3.36% |
| 6/4/2008 | $3.90 | $3.92 | $3.93 | | 2,780,500 | 2.60% |
| 6/5/2008 | $4.00 | $4.04 | $4.06 | | 1,568,000 | 2.53% |
| 6/6/2008 | $3.85 | $3.88 | $3.89 | | 2,390,500 | -3.82% |
| 6/9/2008 | $3.71 | $3.67 | $3.68 | | 1,808,400 | -3.70% |
| 6/10/2008 | $3.64 | $3.62 | $3.63 | | 2,589,900 | -1.90% |
| 6/11/2008 | $3.62 | $3.58 | $3.59 | | 1,830,700 | -0.55% |
| 6/12/2008 | $3.39 | $3.41 | $3.42 | | 2,180,900 | -6.56% |
| 6/13/2008 | $3.67 | $3.62 | $3.64 | | 2,584,200 | 7.94% |
| 6/16/2008 | $3.52 | $3.56 | $3.57 | | 1,548,300 | -4.17% |
| 6/17/2008 | $3.46 | $3.42 | $3.45 | | 1,303,200 | -1.72% |
| 6/18/2008 | $3.31 | $3.35 | $3.37 | | 2,093,400 | -4.43% |
| 6/19/2008 | $3.27 | $3.25 | $3.26 | | 2,782,500 | -1.22% |
| 6/20/2008 | $3.14 | $3.13 | $3.14 | | 2,151,400 | -4.06% |
| 6/23/2008 | $2.93 | $2.97 | $2.98 | | 2,587,700 | -6.92% |
| 6/24/2008 | $2.76 | $2.81 | $2.82 | | 1,864,800 | -5.98% |
| 6/25/2008 | $2.90 | $2.94 | $2.95 | | 1,569,400 | 4.95% |
| 6/26/2008 | $2.65 | $2.65 | $2.66 | | 4,208,000 | -9.02% |
| 6/27/2008 | $2.35 | $2.35 | $2.38 | | 12,452,300 | -12.01% |
| 6/30/2008 | $2.35 | $2.31 | $2.34 | | 3,649,400 | 0.00% |
| 7/1/2008 | $2.07 | $2.08 | $2.09 | | 4,738,100 | -12.69% |
| 7/2/2008 | $1.94 | $1.93 | $1.94 | | 5,304,800 | -6.49% |
| 7/3/2008 | $1.73 | $1.73 | $1.74 | | 3,868,700 | -11.46% |
| 7/7/2008 | $1.76 | $1.76 | $1.77 | | 3,543,800 | 1.72% |
| 7/8/2008 | $1.82 | $1.81 | $1.82 | | 4,026,400 | 3.35% |
| 7/9/2008 | $1.69 | $1.68 | $1.69 | | 4,922,100 | -7.41% |

138

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 7/10/2008 | $1.63 | $1.63 | $1.64 | | 2,917,900 | -3.61% |
| 7/11/2008 | $1.65 | $1.64 | $1.65 | | 1,589,600 | 1.22% |
| 7/14/2008 | $1.59 | $1.58 | $1.61 | | 8,450,600 | -3.70% |
| 7/15/2008 | $1.53 | $1.53 | $1.54 | | 3,442,100 | -3.85% |
| 7/16/2008 | $1.74 | $1.73 | $1.74 | | 4,074,300 | 12.86% |
| 7/17/2008 | $1.82 | $1.82 | $1.83 | | 2,277,700 | 4.50% |
| 7/18/2008 | $1.74 | $1.75 | $1.76 | | 5,365,400 | -4.50% |
| 7/21/2008 | $1.70 | $1.70 | $1.71 | | 1,226,800 | -2.33% |
| 7/22/2008 | $1.86 | $1.86 | $1.87 | | 2,769,200 | 8.99% |
| 7/23/2008 | $1.93 | $1.93 | $1.94 | | 8,164,200 | 3.69% |
| 7/24/2008 | $2.23 | $2.21 | $2.23 | | 9,558,800 | 14.45% |
| 7/25/2008 | $2.26 | $2.24 | $2.25 | | 3,492,000 | 1.34% |
| 7/28/2008 | $2.20 | $2.18 | $2.20 | | 4,897,100 | -2.69% |
| 7/29/2008 | $1.32 | $1.32 | $1.33 | | 23,659,000 | -51.08% |
| 7/30/2008 | $1.31 | $1.29 | $1.30 | | 5,906,300 | -0.76% |
| 7/31/2008 | $1.31 | $1.30 | $1.31 | | 9,730,600 | 0.00% |
| 8/1/2008 | $1.27 | $1.26 | $1.27 | | 6,877,500 | -3.10% |
| 8/4/2008 | $1.24 | $1.24 | $1.25 | | 6,024,600 | -2.39% |
| 8/5/2008 | $1.27 | $1.26 | $1.27 | | 4,489,100 | 2.39% |
| 8/6/2008 | $1.31 | $1.31 | $1.32 | | 4,022,200 | 3.10% |
| 8/7/2008 | $1.26 | $1.26 | $1.27 | | 4,346,700 | -3.89% |
| 8/8/2008 | $1.35 | $1.34 | $1.35 | | 5,337,000 | 6.90% |
| 8/11/2008 | $1.54 | $1.53 | $1.54 | | 11,458,500 | 13.17% |
| 8/12/2008 | $1.42 | $1.40 | $1.41 | | 8,171,800 | -8.11% |
| 8/13/2008 | $1.32 | $1.32 | $1.33 | | 4,888,300 | -7.30% |
| 8/14/2008 | $1.29 | $1.28 | $1.29 | | 4,077,000 | -2.30% |
| 8/15/2008 | $1.28 | $1.27 | $1.28 | | 1,686,500 | -0.78% |
| 8/18/2008 | $1.35 | $1.32 | $1.32 | | 6,329,000 | 5.32% |
| 8/19/2008 | $1.29 | $1.29 | $1.30 | | 2,723,000 | -4.55% |
| 8/20/2008 | $1.27 | $1.27 | $1.28 | | 2,251,900 | -1.56% |
| 8/21/2008 | $1.25 | $1.24 | $1.25 | | 2,971,300 | -1.59% |
| 8/22/2008 | $1.27 | $1.26 | $1.27 | | 3,425,700 | 1.59% |
| 8/25/2008 | $1.27 | $1.27 | $1.28 | | 3,096,700 | 0.00% |
| 8/26/2008 | $1.28 | $1.27 | $1.28 | | 1,989,600 | 0.78% |
| 8/27/2008 | $1.36 | $1.35 | $1.36 | | 9,795,100 | 6.06% |
| 8/28/2008 | $1.56 | $1.55 | $1.56 | | 14,855,700 | 13.72% |
| 8/29/2008 | $1.65 | $1.61 | $1.62 | | 5,129,700 | 5.61% |
| 9/2/2008 | $1.70 | $1.70 | $1.71 | | 6,175,400 | 2.99% |
| 9/3/2008 | $1.81 | $1.80 | $1.81 | | 5,445,100 | 6.27% |
| 9/4/2008 | $1.74 | $1.70 | $1.71 | | 6,937,700 | -3.94% |
| 9/5/2008 | $1.78 | $1.76 | $1.77 | | 3,296,600 | 2.27% |
| 9/8/2008 | $1.70 | $1.69 | $1.70 | | 3,512,600 | -4.60% |
| 9/9/2008 | $1.44 | $1.45 | $1.46 | | 5,212,000 | -16.60% |
| 9/10/2008 | $1.41 | $1.39 | $1.40 | | 3,220,600 | -2.11% |
| 9/11/2008 | $1.30 | $1.29 | $1.30 | | 6,586,700 | -8.12% |

139

**Exhibit-4**

**Idearc Inc. (IAR) Stock Prices, Dividends, Volume, and Returns**

5 February 2007 to 30 October 2008

| Date | Idearc Closing Price | Idearc Closing Bid | Idearc Closing Ask | Idearc Dividend | Idearc Volume | Idearc Logarithmic Return |
|---|---|---|---|---|---|---|
| 9/12/2008 | $1.27 | $1.28 | $1.29 | | 2,898,500 | -2.33% |
| 9/15/2008 | $1.02 | $1.00 | $1.02 | | 9,267,300 | -21.92% |
| 9/16/2008 | $0.95 | $0.90 | $0.91 | | 4,403,700 | -7.11% |
| 9/17/2008 | $0.90 | $0.90 | $0.93 | | 3,186,800 | -5.30% |
| 9/18/2008 | $1.08 | $1.13 | $1.20 | | 5,185,600 | 18.12% |
| 9/19/2008 | $1.30 | $1.28 | $1.29 | | 7,891,100 | 18.54% |
| 9/22/2008 | $1.23 | $1.22 | $1.24 | | 1,876,500 | -5.54% |
| 9/23/2008 | $1.24 | $1.24 | $1.25 | | 1,843,900 | 0.81% |
| 9/24/2008 | $1.21 | $1.22 | $1.23 | | 3,858,900 | -2.45% |
| 9/25/2008 | $1.24 | $1.24 | $1.25 | | 3,023,200 | 2.45% |
| 9/26/2008 | $1.23 | $1.23 | $1.24 | | 1,727,400 | -0.81% |
| 9/29/2008 | $1.21 | $1.20 | $1.21 | | 2,241,000 | -1.64% |
| 9/30/2008 | $1.25 | $1.17 | $1.20 | | 2,822,500 | 3.25% |
| 10/1/2008 | $1.05 | $1.05 | $1.06 | | 2,445,700 | -17.44% |
| 10/2/2008 | $1.00 | $0.99 | $1.00 | | 3,227,900 | -4.88% |
| 10/3/2008 | $0.75 | $0.85 | $0.86 | | 6,959,200 | -28.77% |
| 10/6/2008 | $0.85 | $0.84 | $0.85 | | 3,047,900 | 12.52% |
| 10/7/2008 | $0.74 | $0.71 | $0.73 | | 3,575,700 | -13.86% |
| 10/8/2008 | $0.70 | $0.75 | $0.76 | | 2,880,500 | -5.56% |
| 10/9/2008 | $0.78 | $0.71 | $0.76 | | 3,433,400 | 10.82% |
| 10/10/2008 | $0.76 | $0.77 | $0.81 | | 2,476,100 | -2.60% |
| 10/13/2008 | $0.71 | $0.85 | $0.86 | | 3,252,600 | -6.81% |
| 10/14/2008 | $0.95 | $0.94 | $0.95 | | 3,047,100 | 29.12% |
| 10/15/2008 | $0.87 | $0.79 | $0.87 | | 2,183,200 | -8.80% |
| 10/16/2008 | $0.74 | $0.79 | $0.80 | | 1,240,700 | -16.18% |
| 10/17/2008 | $0.88 | $0.82 | $0.83 | | 1,514,700 | 17.33% |
| 10/20/2008 | $0.83 | $0.83 | $0.85 | | 905,300 | -5.45% |
| 10/21/2008 | $0.78 | $0.80 | $0.81 | | 853,200 | -6.60% |
| 10/22/2008 | $0.70 | $0.67 | $0.70 | | 1,834,200 | -10.83% |
| 10/23/2008 | $0.74 | $0.70 | $0.74 | | 2,273,800 | 5.56% |
| 10/24/2008 | $0.64 | $0.64 | $0.65 | | 1,314,500 | -14.52% |
| 10/27/2008 | $0.56 | $0.53 | $0.56 | | 3,123,900 | -13.35% |
| 10/28/2008 | $0.50 | $0.49 | $0.50 | | 2,382,700 | -11.33% |
| 10/29/2008 | $0.50 | $0.48 | $0.50 | | 2,298,900 | 0.00% |
| 10/30/2008 | $0.32 | $0.32 | $0.33 | | 7,926,500 | -44.01% |

**Source:**
    CRSP

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and**
**Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 2/5/2007 | 3,643.63 | 587.21 | - | - |
| 2/6/2007 | 3,649.26 | 589.96 | 0.15% | 0.47% |
| 2/7/2007 | 3,657.42 | 595.32 | 0.22% | 0.91% |
| 2/8/2007 | 3,655.76 | 598.42 | -0.05% | 0.52% |
| 2/9/2007 | 3,630.62 | 591.00 | -0.69% | -1.25% |
| 2/12/2007 | 3,616.43 | 587.73 | -0.39% | -0.55% |
| 2/13/2007 | 3,645.53 | 589.50 | 0.80% | 0.30% |
| 2/14/2007 | 3,672.00 | 594.79 | 0.72% | 0.89% |
| 2/15/2007 | 3,678.33 | 596.47 | 0.17% | 0.28% |
| 2/16/2007 | 3,680.09 | 602.79 | 0.05% | 1.05% |
| 2/20/2007 | 3,693.32 | 605.01 | 0.36% | 0.37% |
| 2/21/2007 | 3,692.26 | 604.61 | -0.03% | -0.07% |
| 2/22/2007 | 3,690.89 | 603.28 | -0.04% | -0.22% |
| 2/23/2007 | 3,681.40 | 599.17 | -0.26% | -0.68% |
| 2/26/2007 | 3,676.52 | 593.39 | -0.13% | -0.97% |
| 2/27/2007 | 3,551.21 | 576.73 | -3.47% | -2.85% |
| 2/28/2007 | 3,567.82 | 580.65 | 0.47% | 0.68% |
| 3/1/2007 | 3,557.68 | 581.82 | -0.28% | 0.20% |
| 3/2/2007 | 3,513.34 | 578.41 | -1.25% | -0.59% |
| 3/5/2007 | 3,471.21 | 572.90 | -1.21% | -0.96% |
| 3/6/2007 | 3,529.25 | 578.81 | 1.66% | 1.03% |
| 3/7/2007 | 3,524.52 | 576.71 | -0.13% | -0.36% |
| 3/8/2007 | 3,550.01 | 578.20 | 0.72% | 0.26% |
| 3/9/2007 | 3,555.75 | 581.90 | 0.16% | 0.64% |
| 3/12/2007 | 3,566.92 | 579.57 | 0.31% | -0.40% |
| 3/13/2007 | 3,495.04 | 568.62 | -2.04% | -1.91% |
| 3/14/2007 | 3,513.99 | 570.57 | 0.54% | 0.34% |
| 3/15/2007 | 3,530.79 | 573.00 | 0.48% | 0.43% |
| 3/16/2007 | 3,518.07 | 569.51 | -0.36% | -0.61% |
| 3/19/2007 | 3,556.95 | 573.81 | 1.10% | 0.75% |
| 3/20/2007 | 3,581.12 | 576.59 | 0.68% | 0.48% |
| 3/21/2007 | 3,641.15 | 582.61 | 1.66% | 1.04% |
| 3/22/2007 | 3,640.62 | 581.94 | -0.01% | -0.12% |
| 3/23/2007 | 3,646.87 | 587.60 | 0.17% | 0.97% |
| 3/26/2007 | 3,648.89 | 577.40 | 0.06% | -1.75% |
| 3/27/2007 | 3,628.10 | 577.19 | -0.57% | -0.04% |
| 3/28/2007 | 3,602.70 | 575.20 | -0.70% | -0.34% |
| 3/29/2007 | 3,615.40 | 574.15 | 0.35% | -0.18% |
| 3/30/2007 | 3,614.01 | 577.11 | -0.04% | 0.51% |
| 4/2/2007 | 3,624.98 | 577.79 | 0.30% | 0.12% |
| 4/3/2007 | 3,657.28 | 579.23 | 0.89% | 0.25% |
| 4/4/2007 | 3,662.75 | 576.99 | 0.15% | -0.39% |

141

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and**
**Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 4/5/2007 | 3,676.05 | 576.78 | 0.36% | -0.04% |
| 4/9/2007 | 3,678.18 | 578.45 | 0.06% | 0.29% |
| 4/10/2007 | 3,688.13 | 576.32 | 0.27% | -0.37% |
| 4/11/2007 | 3,666.48 | 573.51 | -0.59% | -0.49% |
| 4/12/2007 | 3,689.87 | 575.41 | 0.64% | 0.33% |
| 4/13/2007 | 3,703.66 | 578.11 | 0.37% | 0.47% |
| 4/16/2007 | 3,742.51 | 583.34 | 1.04% | 0.90% |
| 4/17/2007 | 3,746.37 | 591.15 | 0.10% | 1.33% |
| 4/18/2007 | 3,747.60 | 592.49 | 0.03% | 0.23% |
| 4/19/2007 | 3,737.14 | 589.75 | -0.28% | -0.46% |
| 4/20/2007 | 3,772.05 | 593.84 | 0.93% | 0.69% |
| 4/23/2007 | 3,765.52 | 591.28 | -0.17% | -0.43% |
| 4/24/2007 | 3,762.75 | 600.86 | -0.07% | 1.61% |
| 4/25/2007 | 3,798.44 | 601.40 | 0.94% | 0.09% |
| 4/26/2007 | 3,796.26 | 603.63 | -0.06% | 0.37% |
| 4/27/2007 | 3,793.26 | 601.09 | -0.08% | -0.42% |
| 4/30/2007 | 3,758.11 | 596.34 | -0.93% | -0.79% |
| 5/1/2007 | 3,764.68 | 617.05 | 0.17% | 3.41% |
| 5/2/2007 | 3,795.83 | 622.27 | 0.82% | 0.84% |
| 5/3/2007 | 3,810.53 | 624.63 | 0.39% | 0.38% |
| 5/4/2007 | 3,821.49 | 633.91 | 0.29% | 1.47% |
| 5/7/2007 | 3,831.47 | 633.49 | 0.26% | -0.07% |
| 5/8/2007 | 3,826.08 | 635.44 | -0.14% | 0.31% |
| 5/9/2007 | 3,840.18 | 636.03 | 0.37% | 0.09% |
| 5/10/2007 | 3,787.38 | 630.27 | -1.38% | -0.91% |
| 5/11/2007 | 3,826.64 | 637.19 | 1.03% | 1.09% |
| 5/14/2007 | 3,816.32 | 636.33 | -0.27% | -0.13% |
| 5/15/2007 | 3,809.25 | 633.54 | -0.19% | -0.44% |
| 5/16/2007 | 3,837.23 | 638.30 | 0.73% | 0.75% |
| 5/17/2007 | 3,835.32 | 636.05 | -0.05% | -0.35% |
| 5/18/2007 | 3,861.32 | 636.85 | 0.68% | 0.13% |
| 5/21/2007 | 3,873.82 | 633.74 | 0.32% | -0.49% |
| 5/22/2007 | 3,877.40 | 635.43 | 0.09% | 0.27% |
| 5/23/2007 | 3,873.76 | 639.43 | -0.09% | 0.63% |
| 5/24/2007 | 3,829.92 | 637.15 | -1.14% | -0.36% |
| 5/25/2007 | 3,854.36 | 635.17 | 0.64% | -0.31% |
| 5/29/2007 | 3,866.12 | 639.29 | 0.30% | 0.65% |
| 5/30/2007 | 3,897.96 | 644.21 | 0.82% | 0.77% |
| 5/31/2007 | 3,904.21 | 642.58 | 0.16% | -0.25% |
| 6/1/2007 | 3,924.23 | 652.12 | 0.51% | 1.47% |
| 6/4/2007 | 3,932.49 | 660.71 | 0.21% | 1.31% |
| 6/5/2007 | 3,911.57 | 658.12 | -0.53% | -0.39% |

142

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and
Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 6/6/2007 | 3,874.99 | 653.73 | -0.94% | -0.67% |
| 6/7/2007 | 3,804.84 | 646.78 | -1.83% | -1.07% |
| 6/8/2007 | 3,845.81 | 647.26 | 1.07% | 0.08% |
| 6/11/2007 | 3,850.13 | 649.56 | 0.11% | 0.35% |
| 6/12/2007 | 3,808.45 | 635.40 | -1.09% | -2.21% |
| 6/13/2007 | 3,862.40 | 638.02 | 1.41% | 0.41% |
| 6/14/2007 | 3,883.10 | 639.65 | 0.53% | 0.26% |
| 6/15/2007 | 3,911.88 | 644.92 | 0.74% | 0.82% |
| 6/18/2007 | 3,908.39 | 645.88 | -0.09% | 0.15% |
| 6/19/2007 | 3,915.34 | 646.73 | 0.18% | 0.13% |
| 6/20/2007 | 3,865.59 | 635.19 | -1.28% | -1.80% |
| 6/21/2007 | 3,886.40 | 637.27 | 0.54% | 0.33% |
| 6/22/2007 | 3,844.64 | 629.30 | -1.08% | -1.26% |
| 6/25/2007 | 3,826.11 | 621.45 | -0.48% | -1.26% |
| 6/26/2007 | 3,810.77 | 626.81 | -0.40% | 0.86% |
| 6/27/2007 | 3,846.32 | 631.54 | 0.93% | 0.75% |
| 6/28/2007 | 3,849.14 | 632.44 | 0.07% | 0.14% |
| 6/29/2007 | 3,846.37 | 629.53 | -0.07% | -0.46% |
| 7/2/2007 | 3,890.27 | 629.77 | 1.13% | 0.04% |
| 7/3/2007 | 3,903.66 | 628.11 | 0.34% | -0.27% |
| 7/5/2007 | 3,908.36 | 632.20 | 0.12% | 0.65% |
| 7/6/2007 | 3,925.79 | 632.78 | 0.44% | 0.09% |
| 7/9/2007 | 3,931.88 | 629.71 | 0.16% | -0.49% |
| 7/10/2007 | 3,878.49 | 611.65 | -1.37% | -2.91% |
| 7/11/2007 | 3,898.12 | 604.05 | 0.50% | -1.25% |
| 7/12/2007 | 3,966.36 | 604.97 | 1.74% | 0.15% |
| 7/13/2007 | 3,978.94 | 614.27 | 0.32% | 1.52% |
| 7/16/2007 | 3,966.82 | 615.19 | -0.31% | 0.15% |
| 7/17/2007 | 3,966.46 | 612.19 | -0.01% | -0.49% |
| 7/18/2007 | 3,960.34 | 606.28 | -0.15% | -0.97% |
| 7/19/2007 | 3,979.61 | 611.25 | 0.49% | 0.82% |
| 7/20/2007 | 3,933.13 | 600.46 | -1.17% | -1.78% |
| 7/23/2007 | 3,945.09 | 600.34 | 0.30% | -0.02% |
| 7/24/2007 | 3,865.75 | 577.41 | -2.03% | -3.89% |
| 7/25/2007 | 3,876.14 | 588.22 | 0.27% | 1.85% |
| 7/26/2007 | 3,783.66 | 571.35 | -2.41% | -2.91% |
| 7/27/2007 | 3,728.08 | 562.80 | -1.48% | -1.51% |
| 7/30/2007 | 3,762.68 | 564.59 | 0.92% | 0.32% |
| 7/31/2007 | 3,724.49 | 567.62 | -1.02% | 0.54% |
| 8/1/2007 | 3,739.82 | 567.36 | 0.41% | -0.04% |
| 8/2/2007 | 3,762.12 | 601.24 | 0.59% | 5.80% |
| 8/3/2007 | 3,664.65 | 582.27 | -2.63% | -3.21% |

143

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and**
**Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 8/6/2007 | 3,730.79 | 589.18 | 1.79% | 1.18% |
| 8/7/2007 | 3,755.32 | 594.34 | 0.66% | 0.87% |
| 8/8/2007 | 3,813.98 | 595.20 | 1.55% | 0.14% |
| 8/9/2007 | 3,711.41 | 573.93 | -2.73% | -3.64% |
| 8/10/2007 | 3,709.61 | 570.67 | -0.05% | -0.57% |
| 8/13/2007 | 3,707.45 | 568.47 | -0.06% | -0.39% |
| 8/14/2007 | 3,636.70 | 556.97 | -1.93% | -2.04% |
| 8/15/2007 | 3,579.72 | 547.44 | -1.58% | -1.73% |
| 8/16/2007 | 3,586.31 | 538.60 | 0.18% | -1.63% |
| 8/17/2007 | 3,673.89 | 541.75 | 2.41% | 0.58% |
| 8/20/2007 | 3,679.73 | 537.22 | 0.16% | -0.84% |
| 8/21/2007 | 3,687.73 | 542.07 | 0.22% | 0.90% |
| 8/22/2007 | 3,735.70 | 556.34 | 1.29% | 2.60% |
| 8/23/2007 | 3,729.74 | 557.22 | -0.16% | 0.16% |
| 8/24/2007 | 3,775.77 | 560.30 | 1.23% | 0.55% |
| 8/27/2007 | 3,744.45 | 564.66 | -0.83% | 0.78% |
| 8/28/2007 | 3,656.73 | 548.81 | -2.37% | -2.85% |
| 8/29/2007 | 3,736.50 | 553.66 | 2.16% | 0.88% |
| 8/30/2007 | 3,722.29 | 555.13 | -0.38% | 0.27% |
| 8/31/2007 | 3,768.06 | 558.71 | 1.22% | 0.64% |
| 9/4/2007 | 3,809.95 | 563.99 | 1.11% | 0.94% |
| 9/5/2007 | 3,771.54 | 557.80 | -1.01% | -1.10% |
| 9/6/2007 | 3,788.25 | 554.25 | 0.44% | -0.64% |
| 9/7/2007 | 3,726.68 | 549.50 | -1.64% | -0.86% |
| 9/10/2007 | 3,715.93 | 545.67 | -0.29% | -0.70% |
| 9/11/2007 | 3,766.17 | 550.99 | 1.34% | 0.97% |
| 9/12/2007 | 3,767.02 | 553.95 | 0.02% | 0.54% |
| 9/13/2007 | 3,794.94 | 552.85 | 0.74% | -0.20% |
| 9/14/2007 | 3,799.73 | 549.62 | 0.13% | -0.59% |
| 9/17/2007 | 3,777.63 | 541.53 | -0.58% | -1.48% |
| 9/18/2007 | 3,888.36 | 567.90 | 2.89% | 4.75% |
| 9/19/2007 | 3,910.82 | 561.60 | 0.58% | -1.12% |
| 9/20/2007 | 3,890.49 | 555.60 | -0.52% | -1.07% |
| 9/21/2007 | 3,909.60 | 558.98 | 0.49% | 0.61% |
| 9/24/2007 | 3,892.07 | 549.79 | -0.45% | -1.66% |
| 9/25/2007 | 3,890.40 | 542.46 | -0.04% | -1.34% |
| 9/26/2007 | 3,911.78 | 549.78 | 0.55% | 1.34% |
| 9/27/2007 | 3,932.71 | 559.67 | 0.53% | 1.78% |
| 9/28/2007 | 3,922.16 | 555.10 | -0.27% | -0.82% |
| 10/1/2007 | 3,976.04 | 566.08 | 1.36% | 1.96% |
| 10/2/2007 | 3,978.08 | 566.55 | 0.05% | 0.08% |
| 10/3/2007 | 3,957.57 | 572.77 | -0.52% | 1.09% |

144

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and
Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|------|------|------|------|------|
| 10/4/2007 | 3,968.34 | 571.77 | 0.27% | -0.18% |
| 10/5/2007 | 4,015.25 | 581.25 | 1.18% | 1.64% |
| 10/8/2007 | 4,003.15 | 583.20 | -0.30% | 0.33% |
| 10/9/2007 | 4,035.43 | 583.68 | 0.80% | 0.08% |
| 10/10/2007 | 4,034.48 | 582.85 | -0.02% | -0.14% |
| 10/11/2007 | 4,013.53 | 577.88 | -0.52% | -0.86% |
| 10/12/2007 | 4,034.95 | 573.64 | 0.53% | -0.74% |
| 10/15/2007 | 4,000.27 | 566.29 | -0.86% | -1.29% |
| 10/16/2007 | 3,972.15 | 561.98 | -0.71% | -0.76% |
| 10/17/2007 | 3,983.48 | 557.70 | 0.28% | -0.76% |
| 10/18/2007 | 3,984.95 | 558.99 | 0.04% | 0.23% |
| 10/19/2007 | 3,886.92 | 545.16 | -2.49% | -2.50% |
| 10/22/2007 | 3,899.58 | 550.35 | 0.33% | 0.95% |
| 10/23/2007 | 3,939.61 | 554.75 | 1.02% | 0.80% |
| 10/24/2007 | 3,926.81 | 554.85 | -0.33% | 0.02% |
| 10/25/2007 | 3,922.80 | 546.05 | -0.10% | -1.60% |
| 10/26/2007 | 3,977.05 | 551.40 | 1.37% | 0.98% |
| 10/29/2007 | 3,998.48 | 550.72 | 0.54% | -0.12% |
| 10/30/2007 | 3,970.83 | 552.61 | -0.69% | 0.34% |
| 10/31/2007 | 4,023.26 | 554.46 | 1.31% | 0.33% |
| 11/1/2007 | 3,918.95 | 534.21 | -2.63% | -3.72% |
| 11/2/2007 | 3,926.95 | 526.76 | 0.20% | -1.40% |
| 11/5/2007 | 3,900.94 | 527.01 | -0.66% | 0.05% |
| 11/6/2007 | 3,951.06 | 525.56 | 1.28% | -0.28% |
| 11/7/2007 | 3,844.73 | 510.79 | -2.73% | -2.85% |
| 11/8/2007 | 3,842.48 | 514.69 | -0.06% | 0.76% |
| 11/9/2007 | 3,784.56 | 513.19 | -1.52% | -0.29% |
| 11/12/2007 | 3,731.53 | 514.99 | -1.41% | 0.35% |
| 11/13/2007 | 3,835.79 | 525.60 | 2.76% | 2.04% |
| 11/14/2007 | 3,813.52 | 519.89 | -0.58% | -1.09% |
| 11/15/2007 | 3,759.65 | 513.63 | -1.42% | -1.21% |
| 11/16/2007 | 3,776.97 | 517.29 | 0.46% | 0.71% |
| 11/19/2007 | 3,706.23 | 506.53 | -1.89% | -2.10% |
| 11/20/2007 | 3,721.03 | 506.80 | 0.40% | 0.05% |
| 11/21/2007 | 3,664.10 | 499.92 | -1.54% | -1.37% |
| 11/23/2007 | 3,724.04 | 507.36 | 1.62% | 1.48% |
| 11/26/2007 | 3,647.79 | 498.84 | -2.07% | -1.69% |
| 11/27/2007 | 3,692.84 | 498.79 | 1.23% | -0.01% |
| 11/28/2007 | 3,801.62 | 516.82 | 2.90% | 3.55% |
| 11/29/2007 | 3,800.31 | 518.02 | -0.03% | 0.23% |
| 11/30/2007 | 3,827.36 | 525.62 | 0.71% | 1.46% |
| 12/3/2007 | 3,806.16 | 511.52 | -0.56% | -2.72% |

145

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and
Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 12/4/2007 | 3,778.56 | 502.78 | -0.73% | -1.72% |
| 12/5/2007 | 3,833.23 | 503.58 | 1.44% | 0.16% |
| 12/6/2007 | 3,893.67 | 508.31 | 1.56% | 0.93% |
| 12/7/2007 | 3,893.06 | 511.85 | -0.02% | 0.69% |
| 12/10/2007 | 3,923.44 | 515.66 | 0.78% | 0.74% |
| 12/11/2007 | 3,823.46 | 506.23 | -2.58% | -1.85% |
| 12/12/2007 | 3,845.06 | 506.51 | 0.56% | 0.06% |
| 12/13/2007 | 3,841.93 | 508.41 | -0.08% | 0.37% |
| 12/14/2007 | 3,790.53 | 504.71 | -1.35% | -0.73% |
| 12/17/2007 | 3,730.05 | 497.70 | -1.61% | -1.40% |
| 12/18/2007 | 3,753.65 | 507.24 | 0.63% | 1.90% |
| 12/19/2007 | 3,752.33 | 501.23 | -0.04% | -1.19% |
| 12/20/2007 | 3,775.91 | 502.56 | 0.63% | 0.26% |
| 12/21/2007 | 3,840.42 | 508.87 | 1.69% | 1.25% |
| 12/24/2007 | 3,875.57 | 511.36 | 0.91% | 0.49% |
| 12/26/2007 | 3,881.37 | 516.30 | 0.15% | 0.96% |
| 12/27/2007 | 3,828.70 | 503.74 | -1.37% | -2.46% |
| 12/28/2007 | 3,836.49 | 500.56 | 0.20% | -0.63% |
| 12/31/2007 | 3,811.46 | 499.80 | -0.65% | -0.15% |
| 1/2/2008 | 3,766.08 | 484.32 | -1.20% | -3.15% |
| 1/3/2008 | 3,762.43 | 478.01 | -0.10% | -1.31% |
| 1/4/2008 | 3,665.67 | 462.55 | -2.61% | -3.29% |
| 1/7/2008 | 3,666.31 | 471.62 | 0.02% | 1.94% |
| 1/8/2008 | 3,603.46 | 454.56 | -1.73% | -3.69% |
| 1/9/2008 | 3,639.39 | 462.36 | 0.99% | 1.70% |
| 1/10/2008 | 3,670.12 | 467.86 | 0.84% | 1.18% |
| 1/11/2008 | 3,619.18 | 469.92 | -1.40% | 0.44% |
| 1/14/2008 | 3,657.05 | 470.39 | 1.04% | 0.10% |
| 1/15/2008 | 3,566.76 | 458.22 | -2.50% | -2.62% |
| 1/16/2008 | 3,543.46 | 456.01 | -0.66% | -0.48% |
| 1/17/2008 | 3,444.77 | 445.63 | -2.82% | -2.30% |
| 1/18/2008 | 3,425.01 | 435.80 | -0.58% | -2.23% |
| 1/22/2008 | 3,393.18 | 436.08 | -0.93% | 0.06% |
| 1/23/2008 | 3,460.89 | 448.13 | 1.98% | 2.73% |
| 1/24/2008 | 3,504.17 | 470.35 | 1.24% | 4.84% |
| 1/25/2008 | 3,458.21 | 465.36 | -1.32% | -1.07% |
| 1/28/2008 | 3,517.78 | 470.91 | 1.71% | 1.19% |
| 1/29/2008 | 3,540.43 | 472.89 | 0.64% | 0.42% |
| 1/30/2008 | 3,521.52 | 474.62 | -0.54% | 0.37% |
| 1/31/2008 | 3,574.24 | 484.63 | 1.49% | 2.09% |
| 2/1/2008 | 3,631.47 | 496.90 | 1.59% | 2.50% |
| 2/4/2008 | 3,598.61 | 490.25 | -0.91% | -1.35% |

146

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and
Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 2/5/2008 | 3,487.74 | 480.69 | -3.13% | -1.97% |
| 2/6/2008 | 3,459.77 | 467.60 | -0.81% | -2.76% |
| 2/7/2008 | 3,486.62 | 471.00 | 0.77% | 0.73% |
| 2/8/2008 | 3,479.47 | 453.71 | -0.21% | -3.74% |
| 2/11/2008 | 3,499.64 | 457.38 | 0.58% | 0.81% |
| 2/12/2008 | 3,521.44 | 463.70 | 0.62% | 1.37% |
| 2/13/2008 | 3,572.30 | 470.88 | 1.43% | 1.54% |
| 2/14/2008 | 3,524.75 | 469.72 | -1.34% | -0.25% |
| 2/15/2008 | 3,522.97 | 463.25 | -0.05% | -1.39% |
| 2/19/2008 | 3,524.73 | 466.20 | 0.05% | 0.64% |
| 2/20/2008 | 3,556.30 | 475.86 | 0.89% | 2.05% |
| 2/21/2008 | 3,513.91 | 469.02 | -1.20% | -1.45% |
| 2/22/2008 | 3,537.72 | 463.04 | 0.68% | -1.28% |
| 2/25/2008 | 3,591.24 | 469.99 | 1.50% | 1.49% |
| 2/26/2008 | 3,620.66 | 481.47 | 0.82% | 2.41% |
| 2/27/2008 | 3,617.72 | 479.10 | -0.08% | -0.49% |
| 2/28/2008 | 3,589.71 | 457.92 | -0.78% | -4.52% |
| 2/29/2008 | 3,495.62 | 444.03 | -2.66% | -3.08% |
| 3/3/2008 | 3,493.96 | 439.43 | -0.05% | -1.04% |
| 3/4/2008 | 3,477.60 | 436.53 | -0.47% | -0.66% |
| 3/5/2008 | 3,501.51 | 438.00 | 0.69% | 0.34% |
| 3/6/2008 | 3,424.27 | 422.01 | -2.23% | -3.72% |
| 3/7/2008 | 3,394.31 | 421.00 | -0.88% | -0.24% |
| 3/10/2008 | 3,332.13 | 411.07 | -1.85% | -2.39% |
| 3/11/2008 | 3,451.53 | 412.82 | 3.52% | 0.42% |
| 3/12/2008 | 3,427.24 | 412.30 | -0.71% | -0.13% |
| 3/13/2008 | 3,452.49 | 410.45 | 0.73% | -0.45% |
| 3/14/2008 | 3,383.37 | 399.95 | -2.02% | -2.59% |
| 3/17/2008 | 3,332.57 | 394.70 | -1.51% | -1.32% |
| 3/18/2008 | 3,465.22 | 410.97 | 3.90% | 4.04% |
| 3/19/2008 | 3,375.05 | 403.78 | -2.64% | -1.76% |
| 3/20/2008 | 3,447.14 | 416.77 | 2.11% | 3.17% |
| 3/24/2008 | 3,507.81 | 430.14 | 1.74% | 3.16% |
| 3/25/2008 | 3,527.61 | 430.83 | 0.56% | 0.16% |
| 3/26/2008 | 3,504.79 | 426.55 | -0.65% | -1.00% |
| 3/27/2008 | 3,468.94 | 415.84 | -1.03% | -2.54% |
| 3/28/2008 | 3,441.05 | 409.42 | -0.81% | -1.56% |
| 3/31/2008 | 3,459.33 | 407.26 | 0.53% | -0.53% |
| 4/1/2008 | 3,571.02 | 420.43 | 3.18% | 3.18% |
| 4/2/2008 | 3,572.18 | 424.30 | 0.03% | 0.92% |
| 4/3/2008 | 3,581.59 | 420.81 | 0.26% | -0.83% |
| 4/4/2008 | 3,588.62 | 422.09 | 0.20% | 0.30% |

147

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and**
**Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 4/7/2008 | 3,594.69 | 424.63 | 0.17% | 0.60% |
| 4/8/2008 | 3,583.40 | 419.80 | -0.31% | -1.15% |
| 4/9/2008 | 3,551.10 | 412.89 | -0.91% | -1.66% |
| 4/10/2008 | 3,571.14 | 411.55 | 0.56% | -0.33% |
| 4/11/2008 | 3,500.97 | 401.46 | -1.98% | -2.48% |
| 4/14/2008 | 3,491.98 | 404.43 | -0.26% | 0.74% |
| 4/15/2008 | 3,509.65 | 406.89 | 0.50% | 0.61% |
| 4/16/2008 | 3,594.45 | 417.08 | 2.39% | 2.47% |
| 4/17/2008 | 3,590.37 | 416.91 | -0.11% | -0.04% |
| 4/18/2008 | 3,650.27 | 423.31 | 1.65% | 1.52% |
| 4/21/2008 | 3,648.09 | 424.89 | -0.06% | 0.37% |
| 4/22/2008 | 3,614.20 | 416.01 | -0.93% | -2.11% |
| 4/23/2008 | 3,618.04 | 425.31 | 0.11% | 2.21% |
| 4/24/2008 | 3,636.82 | 428.95 | 0.52% | 0.85% |
| 4/25/2008 | 3,662.09 | 433.52 | 0.69% | 1.06% |
| 4/28/2008 | 3,662.91 | 434.39 | 0.02% | 0.20% |
| 4/29/2008 | 3,642.35 | 436.56 | -0.56% | 0.50% |
| 4/30/2008 | 3,636.30 | 433.12 | -0.17% | -0.79% |
| 5/1/2008 | 3,689.56 | 442.85 | 1.45% | 2.22% |
| 5/2/2008 | 3,701.56 | 439.47 | 0.32% | -0.77% |
| 5/5/2008 | 3,691.60 | 434.09 | -0.27% | -1.23% |
| 5/6/2008 | 3,722.81 | 436.64 | 0.84% | 0.59% |
| 5/7/2008 | 3,663.70 | 431.43 | -1.60% | -1.20% |
| 5/8/2008 | 3,680.44 | 438.56 | 0.46% | 1.64% |
| 5/9/2008 | 3,663.59 | 438.31 | -0.46% | -0.06% |
| 5/12/2008 | 3,703.98 | 444.67 | 1.10% | 1.44% |
| 5/13/2008 | 3,706.89 | 457.44 | 0.08% | 2.83% |
| 5/14/2008 | 3,718.29 | 455.74 | 0.31% | -0.37% |
| 5/15/2008 | 3,759.58 | 465.77 | 1.10% | 2.18% |
| 5/16/2008 | 3,768.42 | 461.72 | 0.23% | -0.87% |
| 5/19/2008 | 3,767.67 | 464.22 | -0.02% | 0.54% |
| 5/20/2008 | 3,745.21 | 454.46 | -0.60% | -2.13% |
| 5/21/2008 | 3,687.39 | 435.09 | -1.56% | -4.36% |
| 5/22/2008 | 3,698.16 | 437.21 | 0.29% | 0.49% |
| 5/23/2008 | 3,655.30 | 429.74 | -1.17% | -1.72% |
| 5/27/2008 | 3,673.43 | 430.98 | 0.49% | 0.29% |
| 5/28/2008 | 3,694.53 | 427.01 | 0.57% | -0.93% |
| 5/29/2008 | 3,710.97 | 442.09 | 0.44% | 3.47% |
| 5/30/2008 | 3,722.94 | 442.02 | 0.32% | -0.01% |
| 6/2/2008 | 3,689.25 | 434.78 | -0.91% | -1.65% |
| 6/3/2008 | 3,671.51 | 438.75 | -0.48% | 0.91% |
| 6/4/2008 | 3,668.40 | 456.74 | -0.08% | 4.02% |

148

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and**
**Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|------|------------------------|------------------|----------------------------------|-------------------------------|
| 6/5/2008 | 3,742.85 | 466.39 | 2.01% | 2.09% |
| 6/6/2008 | 3,642.63 | 454.32 | -2.71% | -2.62% |
| 6/9/2008 | 3,640.64 | 448.67 | -0.05% | -1.25% |
| 6/10/2008 | 3,623.04 | 449.97 | -0.48% | 0.29% |
| 6/11/2008 | 3,567.75 | 442.74 | -1.54% | -1.62% |
| 6/12/2008 | 3,573.05 | 442.05 | 0.15% | -0.16% |
| 6/13/2008 | 3,625.94 | 449.98 | 1.47% | 1.78% |
| 6/16/2008 | 3,637.68 | 450.68 | 0.32% | 0.16% |
| 6/17/2008 | 3,623.06 | 449.75 | -0.40% | -0.21% |
| 6/18/2008 | 3,592.87 | 442.15 | -0.84% | -1.70% |
| 6/19/2008 | 3,601.61 | 445.84 | 0.24% | 0.83% |
| 6/20/2008 | 3,538.63 | 439.03 | -1.76% | -1.54% |
| 6/23/2008 | 3,535.64 | 433.00 | -0.08% | -1.38% |
| 6/24/2008 | 3,513.56 | 422.01 | -0.63% | -2.57% |
| 6/25/2008 | 3,535.38 | 436.59 | 0.62% | 3.40% |
| 6/26/2008 | 3,442.39 | 422.43 | -2.67% | -3.30% |
| 6/27/2008 | 3,433.57 | 418.55 | -0.26% | -0.92% |
| 6/30/2008 | 3,429.92 | 414.31 | -0.11% | -1.02% |
| 7/1/2008 | 3,436.55 | 415.61 | 0.19% | 0.31% |
| 7/2/2008 | 3,364.31 | 404.69 | -2.12% | -2.66% |
| 7/3/2008 | 3,356.14 | 404.14 | -0.24% | -0.14% |
| 7/7/2008 | 3,327.37 | 394.74 | -0.86% | -2.35% |
| 7/8/2008 | 3,384.22 | 404.72 | 1.69% | 2.50% |
| 7/9/2008 | 3,318.46 | 389.82 | -1.96% | -3.75% |
| 7/10/2008 | 3,343.63 | 387.79 | 0.76% | -0.52% |
| 7/11/2008 | 3,315.80 | 384.37 | -0.84% | -0.89% |
| 7/14/2008 | 3,288.42 | 382.17 | -0.83% | -0.57% |
| 7/15/2008 | 3,250.66 | 381.66 | -1.15% | -0.13% |
| 7/16/2008 | 3,328.93 | 405.20 | 2.38% | 5.98% |
| 7/17/2008 | 3,361.12 | 414.66 | 0.96% | 2.31% |
| 7/18/2008 | 3,362.23 | 416.09 | 0.03% | 0.35% |
| 7/21/2008 | 3,375.42 | 414.21 | 0.39% | -0.45% |
| 7/22/2008 | 3,413.22 | 421.62 | 1.11% | 1.77% |
| 7/23/2008 | 3,419.53 | 428.67 | 0.18% | 1.66% |
| 7/24/2008 | 3,336.22 | 417.04 | -2.47% | -2.75% |
| 7/25/2008 | 3,354.98 | 412.25 | 0.56% | -1.16% |
| 7/28/2008 | 3,299.41 | 403.75 | -1.67% | -2.08% |
| 7/29/2008 | 3,369.88 | 423.10 | 2.11% | 4.68% |
| 7/30/2008 | 3,425.83 | 428.69 | 1.65% | 1.31% |
| 7/31/2008 | 3,385.60 | 428.20 | -1.18% | -0.11% |
| 8/1/2008 | 3,368.13 | 435.35 | -0.52% | 1.66% |
| 8/4/2008 | 3,323.20 | 432.95 | -1.34% | -0.55% |

149

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and
Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 8/5/2008 | 3,405.04 | 451.11 | 2.43% | 4.11% |
| 8/6/2008 | 3,424.51 | 453.12 | 0.57% | 0.44% |
| 8/7/2008 | 3,366.81 | 437.57 | -1.70% | -3.49% |
| 8/8/2008 | 3,431.97 | 456.02 | 1.92% | 4.13% |
| 8/11/2008 | 3,455.23 | 456.84 | 0.68% | 0.18% |
| 8/12/2008 | 3,422.02 | 454.25 | -0.97% | -0.57% |
| 8/13/2008 | 3,421.86 | 447.45 | 0.00% | -1.51% |
| 8/14/2008 | 3,439.35 | 456.63 | 0.51% | 2.03% |
| 8/15/2008 | 3,444.32 | 462.52 | 0.14% | 1.28% |
| 8/18/2008 | 3,397.90 | 449.88 | -1.36% | -2.77% |
| 8/19/2008 | 3,367.71 | 438.56 | -0.89% | -2.55% |
| 8/20/2008 | 3,390.68 | 435.33 | 0.68% | -0.74% |
| 8/21/2008 | 3,401.50 | 434.39 | 0.32% | -0.22% |
| 8/22/2008 | 3,434.12 | 447.41 | 0.95% | 2.95% |
| 8/25/2008 | 3,370.22 | 434.42 | -1.88% | -2.95% |
| 8/26/2008 | 3,382.18 | 436.00 | 0.35% | 0.36% |
| 8/27/2008 | 3,414.57 | 440.13 | 0.95% | 0.94% |
| 8/28/2008 | 3,463.58 | 455.10 | 1.43% | 3.34% |
| 8/29/2008 | 3,422.89 | 443.59 | -1.18% | -2.56% |
| 9/2/2008 | 3,399.29 | 452.94 | -0.69% | 2.08% |
| 9/3/2008 | 3,389.16 | 458.99 | -0.30% | 1.33% |
| 9/4/2008 | 3,291.30 | 444.89 | -2.93% | -3.12% |
| 9/5/2008 | 3,304.03 | 447.40 | 0.39% | 0.56% |
| 9/8/2008 | 3,353.09 | 469.13 | 1.47% | 4.74% |
| 9/9/2008 | 3,235.88 | 457.35 | -3.56% | -2.54% |
| 9/10/2008 | 3,263.64 | 453.84 | 0.85% | -0.77% |
| 9/11/2008 | 3,299.98 | 459.42 | 1.11% | 1.22% |
| 9/12/2008 | 3,317.26 | 457.24 | 0.52% | -0.48% |
| 9/15/2008 | 3,165.61 | 433.16 | -4.68% | -5.41% |
| 9/16/2008 | 3,214.49 | 435.84 | 1.53% | 0.62% |
| 9/17/2008 | 3,067.79 | 412.71 | -4.67% | -5.45% |
| 9/18/2008 | 3,203.25 | 435.16 | 4.32% | 5.30% |
| 9/19/2008 | 3,349.80 | 425.36 | 4.47% | -2.28% |
| 9/22/2008 | 3,226.20 | 415.37 | -3.76% | -2.38% |
| 9/23/2008 | 3,175.86 | 403.44 | -1.57% | -2.91% |
| 9/24/2008 | 3,165.35 | 409.39 | -0.33% | 1.46% |
| 9/25/2008 | 3,217.71 | 394.03 | 1.64% | -3.83% |
| 9/26/2008 | 3,211.55 | 391.51 | -0.19% | -0.64% |
| 9/29/2008 | 2,946.01 | 360.86 | -8.63% | -8.15% |
| 9/30/2008 | 3,083.92 | 374.67 | 4.57% | 3.76% |
| 10/1/2008 | 3,066.12 | 371.59 | -0.58% | -0.83% |
| 10/2/2008 | 2,925.79 | 355.55 | -4.68% | -4.41% |

150

**Exhibit-5**

**CRSP Market Total Return Index (Market Index) and
Peer Index Levels and Returns**

5 February 2007 through 30 October 2008

| Date | Market Index Level [1] | Peer Index Level | Market Index Logarithmic Return | Peer Index Logarithmic Return |
|---|---|---|---|---|
| 10/3/2008 | 2,883.86 | 343.00 | -1.44% | -3.59% |
| 10/6/2008 | 2,761.32 | 323.75 | -4.34% | -5.78% |
| 10/7/2008 | 2,600.75 | 308.98 | -5.99% | -4.67% |
| 10/8/2008 | 2,570.68 | 307.37 | -1.16% | -0.52% |
| 10/9/2008 | 2,382.38 | 285.97 | -7.61% | -7.22% |
| 10/10/2008 | 2,353.76 | 285.34 | -1.21% | -0.22% |
| 10/13/2008 | 2,624.87 | 323.73 | 10.90% | 12.62% |
| 10/14/2008 | 2,601.23 | 323.83 | -0.90% | 0.03% |
| 10/15/2008 | 2,367.29 | 289.71 | -9.42% | -11.13% |
| 10/16/2008 | 2,461.51 | 302.80 | 3.90% | 4.42% |
| 10/17/2008 | 2,456.19 | 292.44 | -0.22% | -3.48% |
| 10/20/2008 | 2,570.64 | 309.31 | 4.55% | 5.61% |
| 10/21/2008 | 2,489.93 | 290.26 | -3.19% | -6.36% |
| 10/22/2008 | 2,342.63 | 272.40 | -6.10% | -6.35% |
| 10/23/2008 | 2,344.72 | 271.05 | 0.09% | -0.50% |
| 10/24/2008 | 2,266.68 | 254.09 | -3.38% | -6.46% |
| 10/27/2008 | 2,182.76 | 242.85 | -3.77% | -4.53% |
| 10/28/2008 | 2,391.01 | 264.09 | 9.11% | 8.39% |
| 10/29/2008 | 2,394.50 | 265.34 | 0.15% | 0.47% |
| 10/30/2008 | 2,470.64 | 282.83 | 3.13% | 6.38% |

**Source:**
[1] CRSP

151

**Exhibit-6**

**Regression Results**

Estimation Period:  6 February 2007 to 5 February 2008

| Regression Statistics | |
|---|---|
| Multiple R | 0.342 |
| R Square | 0.117 |
| Adjusted R Square | 0.110 |
| Standard Error | 2.09% |
| Observations | 252 |
| F-Statistic | 16.54 |
| F-Statistic Significance Level | ~0.00% |

| | Coefficients | Standard Error | $t$-statistic |
|---|---|---|---|
| Intercept | -0.26% | 0.13% | -1.965 |
| Market Index | 0.376 | 0.181 | 2.077 |
| Peer Index | 0.289 | 0.144 | 2.009 |

152

**Exhibit-7**

**Event Study Results**

| Date | Idearc Closing Price | Idearc Closing Price on Previous Trading Day | Idearc Volume | Idearc Logarithmic Return | CRSP Market Total Return Index Logarithmic Return | Peer Index Logarithmic Return | Idearc Explained Return | Idearc Residual Return | *t*-statistic | Statistically Significant | Dollar Residual Return |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 February 2008 | $11.56 | $15.22 | 9,433,200 | -27.51% | 0.77% | 0.73% | 0.24% | -27.75% | -13.25 | Yes | ($3.69) |
| 29 July 2008 | $1.32 | $2.20 | 23,659,000 | -51.08% | 2.11% | 4.68% | 1.89% | -52.97% | -25.29 | Yes | ($0.90) |
| 30 October 2008 | $0.32 | $0.50 | 7,926,500 | -44.01% | 3.13% | 6.38% | 2.76% | -46.77% | -22.33 | Yes | ($0.19) |

153

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| JAN BUETTGEN, on Behalf of Himself and All Others Similarly Situated, | § § § | Civil Action No. 3:09-cv-00791-K (Consolidated with Nos. 3:09-cv-00938-K; 3:09-cv-1049-K and 3:09-cv-1552-K) |
| Plaintiff, | § § | CLASS ACTION |
| vs. | § § | |
| KATHERINE J. HARLESS, et al., | § § | |
| Defendants. | § § § | |
| | § | |

**DECLARATION OF DAVID C. THARP IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

583604_1

I, David C. Tharp, provide this declaration in support of the Motion for Class Certification. The motion seeks to certify a class of Idearc stockholders and name Lead Plaintiff Kentucky State District Council of Carpenters Pension Trust Fund ("KYCARP") as a class representative. The following facts are true and correct of my own knowledge, and if called upon to testify, I could and would testify competently thereto.

1.      I am currently the Chair of KYCARP's Board of Trustees. KYCARP is a multi-employer Taft-Hartley Act pension fund with over 6,200 active participants. KYCARP was established to provide pension benefits to carpenters and millwrights within the State of Kentucky. KYCARP currently has nearly $250 million in assets under management. KYCARP is administered by a Board of Trustees consisting of an equal number of labor and management trustees. I am one of the labor trustees and am employed by the Indiana-Kentucky Regional Council of Carpenters.

2.      KYCARP lost over $154,000 on its transactions in Idearc Stock. See Exhibit A (KYCARP Cert.). In July 2009, KYCARP moved for appointment as Lead Plaintiff in this litigation. After careful consideration of its choice of Lead Counsel, KYCARP selected Lead Counsel, then Coughlin Stoia Geller Rudman & Robbins LLP, now Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), on the basis of its attorneys' extensive experience representing plaintiffs in securities litigation, the resources the firm had available to prosecute the case, the aggressiveness it had already demonstrated in litigating securities cases, and KYCARP's belief that they would work cooperatively with this office. The Court appointed KYCARP Lead Plaintiff on November 9, 2009.

3.      KYCARP has developed an extremely effective working relationship with Robbins Geller, which has welcomed our involvement in the litigation. As set out in the Motion for Class Certification, KYCARP has been kept informed of and participated in the major developments of the

583604_1

- 1 -

Idearc litigation.  Moreover, a KYCARP representative will attend all significant court hearings and is prepared to participate in settlement negotiations.  KYCARP will also attend the trial.

4.    KYCARP is currently in the process of responding to defendants' discovery requests, including requests for production of documents, interrogatories and giving a deposition.  KYCARP is reviewing and responding to defendants' extensive document requests, and anticipates producing substantial documents in response to the requests.  With the assistance of Lead Counsel Robbins Geller, on November 4, 2010, KYCARP will respond to interrogatories propounded on it by defendants.  I am also working with Lead Counsel to schedule my deposition, which I anticipate will occur in December 2010.  I will also testify at trial, if called.

5.    KYCARP will continue to take an active role in and oversee and monitor the litigation for the best interest of the entire class.  Moreover, KYCARP will vigorously pursue the claims against the defendants to obtain the maximum possible recovery on behalf of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _28_ day of October, 2010, at Greenwood, Indiana.

_____
DAVID C. THARP

# EXHIBIT A

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

KENTUCKY STATE DISTRICT COUNCIL OF CARPENTERS PENSION TRUST FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
| --- | --- | --- | --- |

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

IDEARC

App. 162

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _9_ day of _June_ , 2009.

KENTUCKY STATE DISTRICT
COUNCIL OF CARPENTERS PENSION
TRUST FUND

By: _____

Its: _____

- 2 -

IDEARC

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 11/02/2007 | 7,600 | $24.14 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 04/10/2008 | 3,000 | $3.87 |
| 04/11/2008 | 4,600 | $3.81 |

OCT-30-2010 03:18 AM                                                              P.05

## GLANCY BINKOW & GOLDBERG LLP
## SWORN CERTIFICATION OF PLAINTIFF
## IDEARC, INC. SECURITIES LITIGATION

I, Kenneth F. Werring, certify that;

1.     I have reviewed the Complaint and authorized its filing.

2.     I did not purchase Idearc, Inc., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.     My transactions in Idearc, Inc. during the Class Period set forth in the Complaint are as follows:

I ~~bought~~ rec'd   __70__ shares on __11 / 24 / 06__ at $ __29.38__ per share (spin of )

I bought __130__ shares on __11 / 16 / 07__ at $ __20.61__ per share

I bought __1000__ shares on __5 / 1 / 08__ at $ __3.41__ per share

I bought _____ shares on ___/___/___ at $ _____ per share

I sold _____ shares on ___/___/___ at $ _____ per share

I sold _____ shares on ___/___/___ at $ _____ per share

I sold _____ shares on ___/___/___ at $ _____ per share

(List Additional Transactions On Separate Page If Necessary)

5.     I have not served as a representative party on behalf of a class under this title during the last three years.

6.     I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: __10/29/2010__                       _Kenneth F. Werring_
                                            (Please Sign Your Name Above)
                                            KENNETH F. WERRING

34 Beveridge Road
Mahwah, NJ 07430
201-529-4445
ken34@earthlink.net

RETURN THIS FORM TO:
Glancy Binkow & Goldberg LLP, 1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067
FAX: 310-201-9160; Tel: 310-201-9150; Email: shareholders@glancylaw.com

App. 165

# ROBBINS GELLER RUDMAN & DOWD LLP

**ROBBINS GELLER RUDMAN & DOWD LLP** (the "Firm") is a 180-lawyer firm with offices in San Diego, San Francisco, New York, Boca Raton, Washington, D.C., Philadelphia and Atlanta (*www.rgrdlaw.com*). The Firm is actively engaged in complex litigation, emphasizing securities, consumer, insurance, healthcare, human rights, employment discrimination and antitrust class actions. The Firm's unparalleled experience and capabilities in these fields are based upon the talents of its attorneys who have successfully prosecuted thousands of class-action lawsuits.

This successful track record stems from our experienced attorneys, including many who left partnerships at other firms or came to the Firm from federal, state and local law enforcement and regulatory agencies, including dozens of former prosecutors and SEC attorneys. The Firm also includes more than 25 former federal and state judicial clerks.

The Firm currently represents more institutional investors, including public and multi-employer pension funds – domestic and international financial institutions – in securities and corporate litigation than any other firm in the United States.

The Firm is committed to practicing law with the highest level of integrity and in an ethical and professional manner. We are a diverse firm with lawyers and staff from all walks of life. Our lawyers and other employees are hired and promoted based on the quality of their work and their ability to enhance our team and treat others with respect and dignity. Evaluations are never influenced by one's background, gender, race, religion or ethnicity.

We also strive to be good corporate citizens and to work with a sense of global responsibility. Contributing to our communities and our environment is important to us. We raised hundreds of thousands of dollars in aid for the victims of Hurricane Katrina and we often take cases on a *pro bono* basis. We are committed to the rights of workers and to the extent possible, we contract with union vendors. We care about civil rights, workers' rights and treatment, workplace safety and environmental protection. Indeed, while we have built a reputation as the finest securities and consumer class action law firm in the nation, our lawyers have also worked tirelessly in less high-profile, but no less important, cases involving human rights.

## PRACTICE AREAS

Securities Fraud

As recent corporate scandals demonstrate clearly, it has become all too common for companies and their executives – and often with the help of their advisors, such as bankers, lawyers and accountants – to manipulate the market price of their securities by misleading the public about the company's financial condition or prospects for the future. This misleading information has the effect of artificially inflating the price of the company's securities above their true value. When the underlying truth is eventually revealed, the prices of these securities plummet, harming those innocent investors who relied upon the company's misrepresentations.

Robbins Geller Rudman & Dowd LLP is the leader in the fight to provide investors with relief from corporate securities fraud. We utilize a wide range of federal and state laws to provide investors with

App. 166

remedies, either by bringing a class action on behalf of all affected investors or, where appropriate, by bringing individual cases.

The Firm's reputation for excellence has been repeatedly noted by courts and has resulted in the appointment of Firm attorneys to lead roles in hundreds of complex class-action securities and other cases. In the securities area alone, the Firm's attorneys have been responsible for a number of outstanding recoveries on behalf of investors.  Currently, Robbins Geller Rudman & Dowd LLP attorneys are lead or named counsel in approximately 500 securities class action or large institutional-investor cases.  Some current and past cases include:

- *In re Enron Corp. Sec. Litig.*, Case No. H-01-3624 (S.D. Tex.).  Investors lost billions of dollars as a result of the massive fraud at Enron. In appointing Robbins Geller Rudman & Dowd LLP lawyers as sole lead counsel to represent the interests of Enron investors, the court found that the Firm's zealous prosecution and level of "insight" set it apart from its peers. Robbins Geller Rudman & Dowd LLP attorneys and lead plaintiff The Regents of the University of California aggressively pursued numerous defendants, including many of Wall Street's biggest banks, and successfully obtained settlements in excess of *$7.3 billion* for the benefit of investors.  *This is the largest aggregate class action settlement not only in a securities class action, but in class action history.*

- *In re UnitedHealth Group Inc. PSLRA Litig.*, Case No. 06-CV-1691 (D. Minn.).  In the *UnitedHealth* case, Robbins Geller Rudman & Dowd LLP represented the California Public Employees' Retirement System ("CalPERS") and demonstrated its willingness to vigorously advocate for its institutional clients, even under the most difficult circumstances.  For example, in 2006, the issue of high-level executives backdating stock options made national headlines.  During that time, many law firms, including Robbins Geller Rudman & Dowd LLP, brought shareholder derivative lawsuits against the companies' boards of directors for breaches of their fiduciary duties or for improperly granting backdated options.  Rather than pursuing a shareholder derivative case, the Firm filed a securities fraud class action against the company on behalf of CalPERS.  In doing so, Robbins Geller Rudman & Dowd LLP faced significant and unprecedented legal obstacles with respect to loss causation, *i.e.*, that defendants' actions were responsible for causing the stock losses.  Despite these legal hurdles, Robbins Geller Rudman & Dowd LLP obtained an $895 million recovery on behalf of the UnitedHealth shareholders.  Shortly after reaching the $895 million settlement with UnitedHealth, the remaining corporate defendants, including former CEO William A. McGuire, also settled.   Mr. McGuire paid $30 million and returned stock options representing more than three million shares to the shareholders.  The total recovery for the class was over $925 million, the largest stock option backdating recovery ever, and *a recovery which is more than four times larger than the next largest options backdating recovery*.  Moreover, Robbins Geller Rudman & Dowd LLP obtained unprecedented corporate governance reforms, including election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercise, and executive compensation reforms which tie pay to performance.

- *Jaffe v. Household Int'l, Inc.*, Case No. 02-C-05893 (N.D. Ill.).  Sole lead counsel Robbins Geller Rudman & Dowd LLP obtained a jury verdict on May 7, 2009, following a six-week trial in the Northern District of Illinois, on behalf of a class of investors led by plaintiffs

PACE Industry Union-Management Pension Fund, the International Union of Operating Engineers, Local No. 132 Pension Plan, and Glickenhaus & Company. The jury determined that Household and the individual defendants made fraudulent misrepresentations concerning the Company's predatory lending practices, the quality of its loan portfolio and the company's financial results between March 23, 2001 and October 11, 2002. Although certain post-trial proceedings are ongoing, plaintiffs' counsel anticipate that the verdict will ultimately allow class members to recover in excess of $1 billion in damages. Since the enactment of the PSLRA in 1995, trials in securities fraud cases have been rare. According to published reports, only nine such cases have gone to verdict since the passage of the PSLRA.

- ***Alaska Elec. Pension Fund v. CitiGroup, Inc. (In re WorldCom Sec. Litig.)***, Case No. 03 Civ. 8269 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys represented more than 50 private and public institutions that opted out of the class action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998 to 2001. The Firm's clients included major public institutions from across the country such as CalPERS, CalSTRS, the state pension funds of Maine, Illinois, New Mexico and West Virginia, union pension funds, and private entities such as AIG and Northwestern Mutual. Robbins Geller Rudman & Dowd LLP attorneys recovered more than $650 million for their clients on the May 2000 and May 2001 bond offerings (the primary offerings at issue), substantially more than they would have recovered as part of the class.

- ***In re Cardinal Health, Inc. Sec. Litig.***, Case No. C2-04-575 (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Robbins Geller Rudman & Dowd LLP obtained a recovery of $600 million for investors. On behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, and the California Ironworkers Field Trust Fund, the Firm aggressively pursued class claims and won notable courtroom victories, including a favorable decision on defendants' motion to dismiss. *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006). At the time, the $600 million settlement was the tenth largest settlement in the history of securities fraud litigation and is the largest-ever recovery in a securities fraud action in the Sixth Circuit.

- ***AOL Time Warner Cases I & II***, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles County). Robbins Geller Rudman & Dowd LLP represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, several Australian public and private funds, insurance companies, and numerous additional institutional investors, both domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger with Internet high flier America Online. Robbins Geller Rudman & Dowd LLP attorneys exposed a massive and sophisticated accounting fraud involving America Online's e-commerce and advertising revenue. After almost four years of litigation involving extensive discovery, the Firm secured combined settlements for its opt-out clients totaling over $629 million just weeks before The Regents' case pending in California state court was scheduled to go to trial. The Regents' gross recovery of $246 million is the largest individual opt-out securities recovery in history.

- ***In re HealthSouth Corp. Secs. Litig.***, Case No. CV-03-BE-1500-S (N.D. Ala.). As court-appointed co-lead counsel, Robbins Geller Rudman & Dowd LLP attorneys obtained a combined recovery of $680 million from HealthSouth, its auditor Ernst & Young, and its investment banker, UBS, for the benefit of stockholder plaintiffs. The settlement against HealthSouth represents one of the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the PSLRA. Likewise, the settlement against Ernst & Young is one of the largest securities class action settlements entered into by an accounting firm since the passage of the PSLRA. HealthSouth and its financial advisors perpetrated one of the largest and most pervasive frauds in the history of United States healthcare, prompting Congressional and law enforcement inquiry and resulting in guilty pleas of 16 former HealthSouth executives in related federal criminal prosecutions.

- ***In re Dynegy Inc. Secs. Litig.***, Case No. H-02-1571 (S.D. Tex.). As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Robbins Geller Rudman & Dowd LLP attorneys obtained a combined settlement of $474 million from Dynegy, Citigroup, Inc. and Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha. Given Dynegy's limited ability to pay, Robbins Geller Rudman & Dowd LLP attorneys structured a settlement (reached shortly before the commencement of trial) that maximized plaintiffs' recovery without bankrupting the company. Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Robbins Geller Rudman & Dowd LLP and The Regents believe will benefit all of Dynegy's stockholders.

- ***In re Qwest Commc'ns Int'l, Inc. Sec. Litig.***, Case No. 01-cv-1451 (D. Colo.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased Qwest securities. In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice. After five years of litigation, lead plaintiffs entered into a settlement with Qwest and certain individual defendants that provided a $400 million recovery for the class and created a mechanism that allowed the vast majority of class members to share in an additional $250 million recovered by the SEC. In 2008, Robbins Geller Rudman & Dowd LLP attorneys recovered an additional $45 million for the class in a settlement with defendants Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO, respectively, of Qwest during large portions of the class period.

- ***In re AT&T Corp. Sec. Litig.***, MDL No. 1399 (D.N.J.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased AT&T common stock. The case charged defendants AT&T and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, the largest IPO in American history. After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million. In granting approval of the settlement, the court stated the following about the Robbins Geller Rudman & Dowd LLP attorneys handling the case:

Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

*In re AT&T Corp. Sec. Litig.*, MDL No. 1399, 2005 U.S. Dist. LEXIS 46144, \*28-\*29 (D.N.J. Apr. 22, 2005).

- *In re Dollar General Corp. Sec. Litig.*, Case No. 01-CV-00388 (M.D. Tenn.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel in this case in which the Firm recovered $172.5 million for investors. The *Dollar General* settlement was the largest shareholder class action recovery ever in Tennessee.

- *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, Case No. 00-CV-2838 (N.D. Ga.). As co-lead counsel representing Coca-Cola shareholders, Robbins Geller Rudman & Dowd LLP attorneys obtained a recovery of $137.5 million after nearly eight years of litigation. Robbins Geller Rudman & Dowd LLP attorneys traveled to three continents to uncover the evidence that ultimately resulted in the settlement of this hard-fought litigation. The case concerned Coca-Cola's shipping of excess concentrate at the end of financial reporting periods for the sole purpose of meeting analyst earnings expectations, as well as the company's failure to properly account for certain impaired foreign bottling assets.

- *Schwartz v. TXU Corp.*, Case No. 02-CV-2243 (N.D. Tex). As co-lead counsel, Robbins Geller Rudman & Dowd LLP attorneys obtained a recovery of over $149 million for a class of purchasers of TXU securities. The recovery compensated class members for damages they incurred as a result of their purchases of TXU securities at inflated prices. Defendants had inflated the price of these securities by concealing the fact that TXU's operating earnings were declining due to a deteriorating gas pipeline and the failure of the company's European operations.

- *Thurber v. Mattel, Inc.*, Case No. 99-CV-10368 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys served as co-lead counsel for a class of investors who purchased Mattel common stock. When the shareholders approved Mattel's acquisition of The Learning Company, they were misled by defendants' false statements regarding the financial condition of the acquired company. Within months of the close of the transaction, Mattel disclosed that The Learning Company had incurred millions in losses, and that instead of adding to Mattel's earnings, earnings would be far less than previously stated. After thorough discovery, Robbins Geller Rudman & Dowd attorneys negotiated a settlement of $122 million plus corporate governance changes.

- *Brody vs. Hellman (U.S. West Dividend Litigation)*, Case No. 00-CV-4142 (Dist. Ct. for the City & Cty. of Denver, Colo.). Robbins Geller Rudman & Dowd LLP attorneys were court-

appointed counsel for the class of former stockholders of U.S. West, Inc. who sought to recover a dividend declared by U.S. West before its merger with Qwest. The merger closed before the record and payment dates for the dividend, which Qwest did not pay following the merger. The case was aggressively litigated and the plaintiffs survived a motion to dismiss, two motions for summary judgment and successfully certified the class over vigorous opposition from defendants. In certifying the class, the court commented, "Defendants do not contest that Plaintiffs' attorneys are extremely well qualified to represent the putative class. This litigation has been ongoing for years; in that time Plaintiffs' counsel has proven that they are more than adequate in ability, determination, and resources to represent the putative class." The case settled for $50 million on the day before trial was scheduled to commence. At the August 30, 2005 final approval hearing relating to the settlement, the court noted that the case "was litigated by extremely talented lawyers on both sides" and that the settlement was "a great result." In describing the risk taken by the Firm and its co-counsel, the court noted, "There wasn't any other lawyer[] in the United States that took the gamble that these people did. Not one other firm anywhere said I'm willing to take that on. I'll go five years. I'll pay out the expenses. I'll put my time and effort on the line." In discussing the difficulties facing the Firm in this case, the court said, "There wasn't any issue that wasn't fought. It took a great deal of skill to get to the point of trial." In concluding, the court remarked that the class was "fortunate they had some lawyers that had the guts to come forward and do it."

Robbins Geller Rudman & Dowd LLP's Securities Department includes dozens of former federal and state prosecutors and trial attorneys. The Firm's securities practice is also strengthened by the existence of a strong Appellate Department, whose collective work has established numerous legal precedents. The Securities Department also utilizes an extensive group of in-house economic and damage analysts, investigators and forensic accountants to aid in the prosecution of complex securities issues.

Corporate Governance

While obtaining monetary recoveries for our clients is our primary focus, Robbins Geller Rudman & Dowd LLP attorneys have also been at the forefront of securities fraud *prevention*. The Firm's prevention efforts are focused on creating important changes in corporate governance, either as part of the global settlements of derivative and class cases or through court orders. Recent cases in which such changes were made include:

- ***In re UnitedHealth Group Inc. PSLRA Litig.***, Case No. 06-CV-1691 (D. Minn.). In the UnitedHealth case, our client, CalPERS, obtained sweeping corporate governance improvements, including the election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercises, as well as executive compensation reforms which tie pay to performance. These corporate governance reforms were obtained in addition to a $925 million cash recovery for UnitedHealth shareholders, the largest stock option backdating recovery ever. The recovery included $30 million paid to the class by the CEO out of his own pocket.

- ***Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Hanover Compressor Co.***, Case No. H-02-0410 (S.D. Tex.). Groundbreaking corporate governance changes obtained include: direct shareholder nomination of two directors; mandatory rotation of the outside audit firm; two-thirds of the board required to be independent; audit and other key

committees to be filled only by independent directors;  and creation and appointment of lead independent director with authority to set up board meetings.

- ***In re Sprint Corp. S'holder Litig.***, Case No. 00-CV-230077 (Cir. Ct. Jackson County, Mo.). In connection with the settlement of a derivative action involving Sprint Corporation, the company adopted over 60 new corporate governance provisions which, among other things, established a truly independent board of directors and narrowly defines "independence" to eliminate cronyism between the board and top executives; required outside board directors to meet at least twice a year without management present; created an independent director who will hold the authority to set the agenda, a power previously reserved for the CEO; and imposed new rules to prevent directors and officers from vesting their stock on an accelerated basis.

- ***Teachers' Ret. Sys. of La. v. Occidental Petroleum Corp.***, Case No. BC185009 (Cal. Super. Ct., Los Angeles County).  As part of the settlement, corporate governance changes were made to the composition of the company's board of directors, the company's nominating committee, compensation committee and audit committee.

- ***Barry v. E*Trade Group, Inc.***, Case No. CIV419804 (Cal. Super. Ct., San Mateo County). In connection with settlement of derivative suit, excessive compensation of the company's CEO was eliminated (reduced salary from $800,000 to zero; bonuses reduced and to be repaid if company restates earnings; reduction of stock option grant; and elimination of future stock option grants) and important governance enhancements were obtained, including the appointment of a new unaffiliated outside director as chair of board's compensation committee.

Through these efforts, Robbins Geller Rudman & Dowd LLP has been able to create substantial shareholder guarantees to prevent future securities fraud.  The Firm works closely with noted corporate governance consultant Robert Monks and his firm, LENS Governance Advisors, to shape corporate governance remedies for the benefit of investors.

Shareholder Derivative Litigation

The Firm's shareholder derivative practice is focused on ***preserving*** corporate assets, ***restoring*** accountability, ***improving*** transparency, ***strengthening*** the shareholder franchise and ***protecting*** long-term investor value.  Often brought by large institutional investors, these actions typically address executive malfeasance that resulted in violations of the nation's securities, environmental, labor, health & safety and wage & hour laws, coupled with self-dealing.  Corporate governance therapeutics recently obtained in the following actions was valued by the market in the billions of dollars:

- ***BP plc Shareholder Litigation***, No. 3AN-06-11929CI (Sup. Ct. Alaska).  Successfully prosecuted a shareholder derivative action on behalf of the London-based BP plc.  The action, filed in late 2006, arose out of the misconduct of certain of BP's officers and directors who's gross dereliction of duty and failure to oversee BP's U.S. operations exposed the Company to significant criminal and civil liability in connection with the 2005 Texas City refinery explosion (where 15 workers were killed and 170 more were injured), the 2006 Prudhoe Bay oil spill (where 200,000 gallons of crude were spilled on the Alaska tundra) and

the Federal Commodities Trade Commission energy trading manipulation charges (where BP and its traders were charged with intentionally inflating the price of propane, the primary heating source in the northeastern U.S.). BP ultimately pled guilty to several felony and misdemeanor criminal charges, paid over $373 million in criminal fines and penalties and agreed to serve five years felony corporate probation, and paid over $2 billion in civil damages for its failure to properly fund or oversee maintenance and operations at its U.S. facilities. As part of the settlement of the shareholder derivative action, BP agreed to:

- Improved Operational Safety Oversight in the U.S.: BP adopted a six-point plan to enhance the operational integrity and safety oversight function; formed two new board-level operations committees to facilitate the flow of important safety and operations information; put in place a new management team in Alaska; and oversight responsibility over compliance, safety and operational integrity at BP's U.S. operations.

- Increased Shareholder Input: BP agreed to hold annual meetings with the Company's top 20 shareholders – including ADR holders – to engage in discussions concerning BP's ongoing commitment to good corporate governance.

- Site Inspections: BP agreed to facilitate regular visits for BP board members to the Company's operational sites around the globe.

- Safety as an Executive Compensation Metric: BP agreed to include operational health, safety and environmental performance in the principles used to calculate performance pay for executives.

- Strengthened the Shareholder Voting Franchise: BP agreed to take measures to improve shareholder access to the proxy, web cast the annual shareholder meeting and remove impediments that prevent ADR holders from putting up resolutions at the annual meeting.

- ***Royal Dutch Shell Shareholder Litigation***, No. 04-CV-3603 (D.N.J.). Successfully prosecuted and settled a shareholder derivative action on behalf of the London-based Royal Dutch Shell plc., achieving very unique and quite valuable transatlantic corporate governance reforms. The suit, filed June 25, 2004, charged that misconduct by executives and board members that resulted in four separate misstatements of Shell's oil and gas reserves – which collectively erased billions of gallons of previously improperly reported "proven reserves" – was due in large part to inadequate internal controls. To settle the derivative litigation, the complicit executives agreed to:

- Improved Governance Standards: The Dutch and English Company committed to changes that extend well beyond the corporate governance requirements of the New York Stock Exchange listing requirements, while preserving the important characteristics of Dutch and English corporate law.

- Shareholder Participation in the Nomination of Board Members: Important governance changes were made regarding solicitation of shareholder input on

Supervisory Board nominees going forward, making Shell corporate directors more accountable to shareholders in the governing process and producing highly qualified candidates for election to the Shell Board.

- Board Independence Standards: Shell agreed to a significant strengthening of the Companies' board independence standards and a requirement that a majority of its board members qualify as independent under those rigorous standards.

- Stock Ownership Requirements: The Company implemented enhanced director stock ownership standards and adopted a requirement that Shell's officers or directors hold stock options for two years before exercising them.

- Improved Compensation Practices: Cash incentive compensation plans for Shell's senior management must now be designed to link pay to performance and prohibit the payment of bonuses based on reported levels of hydrocarbon reserves.

- Full Compliance with U.S. GAAP: In addition to international accounting standards, Shell agreed to comply in all respects with the Generally Accepted Accounting Principles of the United States.

- *EDS Shareholder Derivative Litigation*, No. 6:04-CV-77 (E.D. Tex.). Prosecuted shareholder derivative action on behalf of Electronic Data Systems alleging EDS's senior executives breached their fiduciary duties by improperly using percentage-of-completion accounting to inflate EDS's financial results, by improperly recognizing hundreds of millions of dollars in revenue and concealing millions of dollars in losses on its contract with the U.S. Navy Marine Corps, by failing in their oversight responsibilities, and by making and/or permitting material, false and misleading statements to be made concerning EDS's business prospects, financial condition and expected financial results in connection with EDS's contracts with the United States Navy Marine Corps and WorldCom.  In settlement of the action, EDS agreed, among other provisions, to:

  - limits on the number of current EDS employees that may serve as board members and limits on the number of non-independent directors;

  - limits on the number of other boards on which independent directors may serve;

  - requirements for the Compensation and Benefits Committee to retain an independent expert consultant to review executive officer compensation;

  - formalizing certain responsibilities of the Audit Committee in connection with its role of assisting the Board of Directors in its oversight of the integrity of the Company's financial statements;

  - a requirement for new directors to complete an orientation program, which shall include information about principles of corporate governance;

- a prohibition on repricing stock options at a lower exercise price without shareholder approval;

- change of director election standards from a plurality standard to a majority vote standard;

- change from classified board to annual election of directors;

- elimination of all supermajority voting requirements;

- termination of rights plan; and

- adopting corporate governance guidelines, including: requirement that a substantial majority of directors be outside, independent directors with no significant financial or personal tie to EDS; that all Board committees be composed entirely of independent directors; and other significant additional practices and policies to assist the Board in the performance of its duties and the exercise of its responsibilities to shareholders.

Robbins Geller Rudman & Dowd LLP lawyers are also currently prosecuting shareholder derivative actions against executives at several companies charged with violating the Foreign Corrupt Practices Act and have obtained an injunction preventing the recipient of the illegally-paid bribe payments at one prominent international arms manufacturer from removing those funds from the U.S. while the action is pending.  In another ongoing action, Robbins Geller Rudman & Dowd LLP lawyers are prosecuting Audit Committee members who knowingly authorized the payment of illegal "security payments" to a terrorist group though expressly prohibited by U.S. law.  As artificial beings, corporations only behave – or misbehave – as their directors and senior executives let them. So they are only as valuable as their corporate governance. Shareholder derivative litigation enhances value by allowing shareholder-owners to replace chaos and self-dealing with accountability.

Corporate Takeover Litigation

Robbins Geller Rudman & Dowd LLP has earned a reputation as the leading law firm in representing shareholders in corporate takeover litigation.  Through its aggressive efforts in prosecuting corporate takeovers, the Firm has secured for shareholders billions of dollars of additional consideration as well as beneficial changes for shareholders in the context of mergers and acquisitions.

The Firm regularly prosecutes merger and acquisition cases post-merger, often through trial, to maximize the benefit for its shareholder class. Some of these cases include:

- ***In re Chaparral Resources, Inc. S'holders Litig.*** (Del. Ch.).  After a full trial and a subsequent mediation before the Delaware Chancellor, the Firm obtained a common fund settlement of $41 million (or 45% increase above merger price) for both class and appraisal claims.  The Delaware Vice Chancellor who presided over the trial noted that "the performance was outstanding, and frankly, without the efforts of counsel, nothing would have been achieved.  The class would have gotten zero.  I don't think that can be more clear."

- ***In re TD Banknorth S'holders Litig.*** (Del. Ch.).  After objecting to a modest recovery of just a few cents per share, the Firm took over the litigation and obtained a common fund settlement of $50 million.  The Delaware Vice Chancellor who presided over the case expressly noted that "through the sheer diligence and effort of plaintiffs' counsel," the Firm's efforts "resulted in substantial awards for plaintiffs, after overcoming serious procedural and other barriers."

- ***In re eMachines, Inc. Merger Litig.*** (Cal. Super. Ct., Orange County).  After four years of litigation, the Firm secured a common fund settlement of $24 million on the brink of trial.

- ***In re Prime Hospitality, Inc. S'holders Litig.*** (Del. Ch.).  The Firm objected to a settlement that was unfair to the class and proceeded to litigate breach of fiduciary duty issues involving a sale of hotels to a private equity firm.  The litigation yielded a common fund of $25 million for shareholders.  The Delaware Chancellor presiding over the case noted that "had it not been for the intervention of [Robbins Geller Rudman & Dowd LLP] . . . there would not have been a settlement that would have generated actual cash for the shareholders. . . . That's quite an achievement."

- ***In re Dollar General Corp. S'holder Litig.*** (Circuit Ct., Davidson County, Tn.).  As lead counsel, the Firm secured a recovery of up to $57 million in cash for former Dollar General shareholders on the eve of trial.

- ***In re UnitedGlobalCom, Inc. S'holder Litig.*** (Del. Ch.).  The Firm secured a common fund settlement of $25 million just weeks before trial.

Robbins Geller Rudman & Dowd LLP has also obtained significant benefits for shareholders, including increases in consideration and significant improvements to merger terms.  Some of these cases include:

- ***Harrah's Entertainment*** (District Court, Clark County, Nev.).  The Firm's active prosecution of the case on several fronts, both in federal and state court, assisted Harrah's shareholders in securing an additional $1.65 billion in merger consideration.

- ***In re Chiron S'holder Deal Litig.*** (Cal. Super. Ct., Alameda County).  The Firm's efforts helped to obtain an additional $800 million in increased merger consideration for Chiron shareholders.

- ***In re PeopleSoft, Inc. S'holder Litig.*** (Cal. Super. Ct., Alameda County).  The Firm successfully objected to a proposed compromise of class claims arising from takeover defenses by PeopleSoft, Inc. to thwart an acquisition by Oracle Corp., resulting in shareholders receiving an increase of over $900 million in merger consideration.

- ***ACS S'holder Litig.*** (County Court, Dallas, Tex).  The Firm forced ACS's acquirer, Xerox, to make significant concessions by which shareholders would not be locked out of receiving more money from another buyer.  The *New York Times* Deal Professor deemed this result both "far reaching" and "unprecedented."

Options Backdating Litigation

As has been widely reported in the media, the stock options backdating scandal suddenly engulfed hundreds of publicly traded companies throughout the country. Robbins Geller Rudman & Dowd LLP is at the forefront of investigating and prosecuting options backdating derivative and securities cases. Robbins Geller Rudman & Dowd LLP's lawyers have recovered over $1 billion in damages on behalf of injured companies and shareholders. Robbins Geller Rudman & Dowd LLP have served as lead counsel in several large stock option backdating actions, including actions involving Affiliated Computer Services, Extreme Networks, Inc., KLA-Tencor Corp., KB Home, Inc., Marvell Technology Group, Inc., McAfee, Inc. and UnitedHealth Group, Inc.

- *In re PMC-Sierra, Inc. Derivative Litig.*, Case No. C-06-05330 (N.D. Cal.). As lead counsel for lead plaintiff, Robbins Geller Rudman & Dowd LLP obtained substantial relief for nominal party PMC-Sierra in the form of extensive corporate governance measures, including improved stock option granting practices and procedures and an executive compensation "claw-back" in the event of a future restatement.

- *In re KLA-Tencor Corp. S'holder Derivative Litig.*, Case No. C-06-03445 (N.D. Cal.). After successfully opposing the Special Litigation Committee of the Board of Directors' motion to terminate the derivative claims, Robbins Geller Rudman & Dowd LLP recovered $43.6 million in direct financial benefits for KLA-Tencor, including $33.2 million in cash payments by certain former executives and their directors' and officers' insurance carriers.

- *In re Marvell Technology Group Ltd. Derivative Litig.*, Case No. C-06-03894 (N.D. Cal.). In this stock option backdating derivative action, Robbins Geller Rudman & Dowd LLP recovered $54.9 million in financial benefits, including $14.6 million in cash, for Marvell, in addition to extensive corporate governance reforms related to Marvell's stock option granting practices, board of directors' procedures and executive compensation. At the time, the recovery in *Marvell* represented one of the largest of its kind in shareholder derivative action.

- *In re KB Home S'holder Derivative Litig.*, Case No. 06-CV-05148 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP served as co-lead counsel for the plaintiffs and recovered more than $31 million in financial benefits, including $21.5 million in cash, for KB Home, plus substantial corporate governance enhancements relating to KB Home's stock option granting practices, director elections and executive compensation practices.

- *In re Affiliated Computer Services Derivative Litig.*, Case No. 06-CV-1110 (N.D. Tex.). Robbins Geller Rudman & Dowd LLP served a counsel for the federal plaintiffs. After defeating the defendants' dismissal motions and opposing the Special Litigation Committee of the Board of Directors' motion to terminate the federal derivative claims, Robbins Geller Rudman & Dowd LLP recovered $30 million in cash for Affiliated Computer Services. This amount exceeded the cash recovery anticipated for the company in the settlement negotiated by the Special Litigation Committee in a parallel state court stock option backdating proceeding.

- ***In re Ditech Networks, Inc. Derivative Litig.***, Case No. C-06-05157 (N.D. Cal.).  Robbins Geller Rudman & Dowd LLP served as co-lead counsel for plaintiffs in this stock option backdating derivative action.  The prosecution and settlement of the action resulted in the adoption of substantial corporate governance measures designed to enhance Ditech Network's stock option granting practices and improve the overall responsiveness of the Ditech Networks Board to shareholder concerns.

- ***In re F5 Networks, Inc. Derivative Litig.***, Case No. 81817-7 (Wash. Sup. Ct.).  Robbins Geller Rudman & Dowd LLP represented the plaintiffs in this precedent setting stock option backdating derivative action.  Adopting the plaintiffs' arguments, the Washington Supreme Court unanimously held that shareholders of Washington corporations need not make a pre-suit litigation demand upon the board of directors where such a demand would be a futile act. The Washington Supreme Court also adopted Delaware's less-stringent pleading standard for establishing backdating and futility of demand in a shareholder derivative action, as urged by the plaintiffs.

## Insurance

Fraud and collusion in the insurance industry by executives, agents, brokers, lenders and others is one of the most costly crimes in the United States.  Some experts have estimated the annual cost of white collar crime in the insurance industry to be over $120 billion nationally. Recent legislative proposals seek to curtail anti-competitive behavior within the industry. However, in the absence of comprehensive regulation, Robbins Geller Rudman & Dowd LLP has played a critical role as private attorney general in protecting the rights of consumers against insurance fraud and other unfair business practices within the insurance industry.

Robbins Geller Rudman & Dowd LLP attorneys were among the first to expose illegal and improper bid-rigging and kickbacks between insurance companies and brokers.  The Firm is a leader in representing businesses, individuals, school districts, counties and the State of California in numerous actions in state and federal courts nationwide to stop these practices.  To date, the Firm has helped recover over $200 million on behalf of insureds.

Robbins Geller Rudman & Dowd LLP attorneys have long been at the forefront of litigating race discrimination issues within the life insurance industry.  For example, the Firm has fought the practice by certain insurers of charging African-Americans and other people of color more for life insurance than similarly situated Caucasians.  The Firm recovered over $400 million for African-Americans and other minorities as redress for civil rights abuses, including landmark recoveries in *McNeil v. American General Life & Accident Insurance Company*; *Thompson v. Metropolitan Life Insurance Company*; and *Williams v. United Insurance Company of America*.

The Firm's attorneys fight on behalf of elderly victims targeted for the sale of deferred annuity products with hidden sales loads and illusory bonus features.  Sales agents for life insurance companies such as Allianz Life Insurance Company of North America, Midland National Life Insurance Company, and National Western Life Insurance Company have targeted senior citizens for these annuities with lengthy investment horizons and high sales commissions. The Firm has recovered millions of dollars for elderly victims and seeks to ensure that senior citizens are afforded full and accurate information regarding deferred annuities.

Robbins Geller Rudman & Dowd LLP attorneys also stopped the fraudulent sale of life insurance policies based on misrepresentations about how the life insurance policy would perform, the costs of the policy, and whether premiums would "vanish." Purchasers were also misled about the financing of a new life insurance policy, falling victim to a "replacement" or "churning" sales scheme where they were convinced to use loans, partial surrenders or withdrawals of cash values from an existing permanent life insurance policy to purchase a new policy.

- **Brokerage "Pay to Play" Cases**.  On behalf of individuals, governmental entities, businesses, and non-profits, Robbins Geller Rudman & Dowd LLP has sued the largest commercial and employee benefit insurance brokers and insurers for unfair and deceptive business practices. While purporting to provide independent, unbiased advice as to the best policy, the brokers failed to adequately disclose that they had entered into separate "pay to play" agreements with certain third-party insurance companies. These agreements provide additional compensation to the brokers based on such factors as profitability, growth and the volume of insurance that they place with a particular insurer, and are akin to a profit-sharing arrangement between the brokers and the insurance companies. These agreements create a conflict of interest since the brokers have a direct financial interest in selling their customers only the insurance products offered by those insurance companies with which the brokers have such agreements.

  Robbins Geller Rudman & Dowd LLP attorneys were among the first to uncover and pursue the allegations of these practices in the insurance industry in both state and federal courts. On behalf of the California Insurance Commissioner, the Firm brought an injunctive case against the biggest employee benefit insurers and local San Diego brokerage, ULR, which resulted in major changes to the way they did business. The Firm also sued on behalf of the City and County of San Francisco to recover losses due to these practices. Finally, Robbins Geller Rudman & Dowd LLP represents a putative nationwide class of individuals, businesses, employers, and governmental entities against the largest brokerage houses and insurers in the nation. To date, the Firm has obtained over $200 million on behalf of policyholders and enacted landmark business reforms.

- **Discriminatory Credit Scoring and Redlining Cases**.  Robbins Geller Rudman & Dowd LLP attorneys have prosecuted cases concerning countrywide schemes of alleged discrimination carried out by Nationwide, Allstate and other insurance companies against African-American and other persons of color who are purchasers of homeowner and automobile insurance policies. Such discrimination includes alleged redlining and the improper use of "credit scores," which disparately impact minority communities. Plaintiffs in these actions have alleged that the insurance companies' corporate driven scheme of intentional racial discrimination includes refusing coverage and/or charging them higher premiums for homeowners and automobile insurance. On behalf of the class of aggrieved policyholders, the Firm has recovered over $400 million for these predatory and racist policies.

- **Senior Annuities**.  Insurance companies and their agents target senior citizens for the sale of long-term deferred annuity products and misrepresent or otherwise fail to disclose the extremely high costs, including sales commissions.  These annuities and their high costs are particularly harmful to seniors because they do not mature for 15 or 20 years, often beyond

the elderly person's life expectancy. Also, they carry exorbitant surrender charges if cashed in before they mature. As a result, the annuitant's money is locked up for years, and the victims or their loved ones are forced to pay high surrender charges if they need to get it out early. Nevertheless, many companies and their sales agents intentionally target the elderly for their deferred annuity products, holding seminars in retirement centers and nursing homes, and through pretexts such as wills and estate planning or financial advice. The Firm has filed lawsuits against a number of life insurance companies, including Allianz Life Insurance Company of North America, Midland National Life Insurance Company, and Jackson National Insurance Company, in connection with the marketing and sales of deferred annuities to senior citizens. We are investigating similar practices by other companies. Information that you have may be valuable so please contact us by filling out the form below.

- **State Farm**.  State Farm and other automobile insurance companies in California have illegally charged monthly policyholders more premiums than they are required to pay.  Because automobile insurance is required under law, it is closely regulated.  State Farm and others bring in millions of dollars each year by concealing up front that policyholders must pay an extra charge if they opt for a monthly plan, and they later tack on the extra charge without revealing it as a premium as they must do under state law.  Robbins Geller Rudman & Dowd LLP's attorneys have fought this practice, recovering millions of dollars on behalf of policyholders.

Antitrust

Robbins Geller Rudman & Dowd LLP's antitrust practice focuses on representing businesses and individuals who have been the victims of price-fixing, unlawful monopolization, market allocation, tying and other anti-competitive conduct.  The Firm has taken a leading role in many of the largest federal and state price-fixing, monopolization, market allocation and tying cases throughout the United States.

- ***In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.***, 05 MDL No. 1720 (E.D.N.Y.).  Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel in one of the country's largest antitrust actions, in which merchants allege Visa, MasterCard and their member banks, including Bank of America, Citibank, JPMorgan Chase, Capital One, Wells Fargo and HSBC, among others, have collectively imposed and set the level of interchange fees paid by merchants on each Visa and MasterCard credit and debit transaction, in violation of federal and state antitrust laws.  Fact discovery has closed, and plaintiffs' motion for class certification and the defendants' motions to dismiss are under submission.

- ***In re Currency Conversion Fee Antitrust Litig.***, 01 MDL No. 1409 (S.D.N.Y.).  Robbins Geller Rudman & Dowd LLP attorneys recovered $336 million for credit and debit cardholders in this multi-district litigation in which the Firm served as co-lead counsel. Plaintiffs alleged that Visa and MasterCard, and certain leading member banks of Visa and MasterCard, conspired to fix and maintain the foreign currency conversion fee charged to United States cardholders, and failed to disclose adequately the fee in violation of federal law.  In October 2009, the trial court granted final approval of the $336 million settlement and described the Firm as a "highly competent and experienced" law firm.  The court

specifically commented: "Class Counsel provided extraordinarily high-quality representation. This case raised a number of unique and complex legal issues including the effect of arbitration clauses on consumer antitrust class actions, and collusive activity in the context of joint ventures." The court further praised the Firm as "indefatigable" and noted that the Firm lawyers "represented the Class with a high degree of professionalism, and vigorously litigated every issue against some of the ablest lawyers in the antitrust defense bar." The trial court's final approval decision is currently on appeal.

- **_The Apple iPod iTunes Antitrust Litig._**, Case No. C-05-00037-JW (N.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel for a proposed class of iPod purchasers. Plaintiffs assert that Apple illegally maintained its monopolies in the digital music and portable player markets by designing and revising its products to render any competing player or digital music incompatible. This conduct locked Apple's competitors out of the market and allowed Apple to inflate the price at which iPods were sold. Discovery is ongoing.

- **_In re Aftermarket Automotive Lighting Products Antitrust Litig._**, MDL No. 2007 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel in this multi-district litigation in which plaintiffs allege that defendants conspired to fix prices and allocate markets for automotive lighting products. Discovery is ongoing.

- **_Dahl v. Bain Capital Partners, LLC_**, Case No. 07-cv-12388-EFH (D. Mass). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel on behalf of shareholders in this action against the nation's largest private equity firms who have colluded to restrain competition to suppress prices paid to shareholders of public companies in connection with leveraged buyouts. The trial court denied the defendants' motion to dismiss and discovery is ongoing.

- **_In re Digital Music Antitrust Litig._**, 06 MDL No. 1780 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel in an action against the major music labels (Sony-BMG, EMI, Universal and Warner Music Group) in a case involving music that can be downloaded digitally from the Internet. Plaintiffs allege that defendants restrained the development of digital downloads and agreed to fix the distribution price of digital downloads at supracompetitive prices. Plaintiffs also allege that as a result of defendants' restraint of the development of digital downloads, and the market and price for downloads, defendants were able to maintain the prices of their CDs at supracompetitive levels. The Second Circuit Court of Appeals recently upheld plaintiffs' complaint, reversing the trial court's dismissal.

- **_In re NASDAQ Market-Makers Antitrust Litig._**, MDL No. 1023 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys served as co-lead counsel in this case in which investors alleged that NASDAQ market-makers set and maintained artificially wide spreads pursuant to an industry-wide conspiracy. After three and one half years of intense litigation, the case settled for a total of $1.027 billion, at the time the largest ever antitrust settlement. The court commended counsel for its work, saying:

> Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for the Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

See *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998).

- ***Hall v. NCAA (Restricted Earnings Coach Antitrust Litigation)***, Case No. 94-2392-KHV (D. Kan.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel and lead trial counsel for one of three classes of coaches who alleged that the National Collegiate Athletic Association illegally fixed their compensation by instituting the "restricted earnings coach" rule. On May 4, 1998, the jury returned verdicts in favor of the three classes for more than $70 million.

- ***Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc. (Carbon Fiber Antitrust Litigation)***, Case No. CV-99-7796 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys were co-lead counsel (with one other firm) in this consolidated class action in which a class of purchasers alleged that the major producers of carbon fiber fixed its price from 1993 to 1999. The case settled for $67.5 million.

- ***In re Carbon Black Antitrust Litig.***, MDL No. 1543 (D. Mass.). Robbins Geller Rudman & Dowd LLP attorneys recovered $20 million for the class in this multi-district litigation in which the Firm served as co-lead counsel. Plaintiffs purchased carbon black from major producers that unlawfully conspired to fix the price of carbon black, which is used in the manufacture of tires, rubber and plastic products, inks and other products, from 1999 to 2005.

- ***In re Dynamic Random Access Memory (DRAM) Antitrust Litig.***, 02 MDL No. 1486 (N.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys served on the executive committee in this multi-district class action in which a class of purchasers of dynamic random access memory (or DRAM) chips alleged that the leading manufacturers of semiconductor products fixed the price of DRAM chips from the fall of 2001 through at least the end of June 2002. The case settled for more than $300 million.

- ***Microsoft I-V Cases***, J.C.C.P. No. 4106 (Cal. Super. Ct., San Francisco County). Robbins Geller Rudman & Dowd LLP attorneys served on the executive committee in these consolidated cases in which California indirect purchasers challenged Microsoft's illegal exercise of monopoly power in the operating system, word processing and spreadsheet markets. In a settlement approved by the court, class counsel obtained an unprecedented $1.1 billion worth of relief for the business and consumer class members who purchased the Microsoft products.

## Consumer Fraud

In our consumer-based economy, working families who purchase products and services must receive truthful information so they can make meaningful choices about how to spend their hard-earned money. When financial institutions and other corporations deceive consumers or take advantage of unequal bargaining

power, class action suits provide, in many instances, the only realistic means for an individual to right a corporate wrong.

Robbins Geller Rudman & Dowd LLP's attorneys represent consumers around the country in a variety of important, complex class actions. Our attorneys have taken a leading role in many of the largest federal and state consumer fraud, environmental, human rights and public health cases throughout the U.S. The Firm is also actively involved in many cases relating to banks and the financial services industry, pursuing claims on behalf of individuals victimized by abusive telemarketing practices, abusive mortgage lending practices, market timing violations in the sale of variable annuities, and deceptive consumer credit lending practices in violation of the Truth-In-Lending Act. Below are a few representative samples of our robust, nationwide consumer practice.

- **Bank Overdraft Fees**.  The banking industry charges consumers exorbitant amounts for "overdraft" of their checking accounts, even if the customer did not authorize a charge beyond the available balance and even if they would not have overdrawn the account if the transactions were ordered chronologically as they occurred–that is, banks reorder transactions to maximize such fees. In fact, it is reported that Americans spent more money on bank overdraft fees than on vegetables last year.  The Firm has brought lawsuits against major banks to stop this practice and recover the hundreds of millions, if not billions, of dollars in overdraft fees.  We are investigating other banks that engage in this practice.

- **In re Vertrue Sales and Marketing Practices Litigation**.  Telemarketing companies use a deceptive telemarketing practice they call "upselling."  In the *Vertrue Sales Practices Litigation*, after purchasing products (including Nad's, vitamins, knives, Q-Ray bracelets, Edgemaster paint roller, Simoniz car washer, flowers, dance videos, AB Slider, ultrasonic toothbrushes and OxiClean) via an infomercial, consumers were told they were being sent a free 30-day trial membership in an unrelated buying club.  Those consumers who did not refuse the 30-day membership were charged between $60 and $150 annually for this so-called "gift."  We have filed suit in 21 states.

- **CHASE Bank Home Equity Line of Credit Litigation**.  In October 2008, after receiving $25 billion in TARP funding to encourage lending institutions to provide businesses and consumers with access to credit, Chase Bank began unilaterally suspending its customers' Home Equity Lines of Credit.  Plaintiffs charge that Chase Bank did so using an unreliable computer model that did not reliably estimate the actual value of its customers' homes in breach of the borrowers' contracts.  The Firm has brought a lawsuit to secure damages on behalf of borrowers whose credit lines were improperly suspended.

- **Pacific Gas & Electric Trespass Litigation**.  Robbins Geller Rudman & Dowd LLP's attorneys have filed suit on behalf of property owners alleging that PG&E has trespassed on their land.  In short, PG&E's has electricity easements giving them access for the purposes of building towers and stringing lines related to the transmission of electricity.  PG&E has recently installed a fiber-optic telecommunications network which it has leased to telephone and Internet services, despite the fact that the electricity easements do not allow PG&E to use plaintiffs' property to engage in general telecommunications business.  Through their lawsuit, plaintiffs seek damages to compensate them for PG&E's trespass.

Settlements

- **Visa and MasterCard Fees**.  After years of litigation and a six-month trial, Robbins Geller Rudman & Dowd LLP attorneys won one of the largest consumer-protection verdicts ever awarded in the United States.  The Firm's attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from cardholders.  The court ordered Visa and MasterCard to return $800,000,000 in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest. In addition, the court ordered full disclosure of the hidden fee.

- **Drivers' Privacy Case**.  In a cutting edge consumer case, Robbins Geller Rudman & Dowd LLP attorneys brought a case on behalf of a half-million Florida drivers against a national bank for purchasing their private information from the state department of motor vehicles for marketing purposes.  After years of litigation that included appeals to the United States Supreme Court, the Firm's attorneys successfully negotiated a $50 million all cash settlement in this cutting-edge case involving consumer privacy rights.  The published decision in *Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209 (S.D. Fla. 2005), *cert denied*, 547 U.S. 1051 (2006), one of the first opinions construing the Federal Drivers Privacy Protection Act, was a victory for the Firm's clients and has been cited over 50 times by other courts since its publication in 2005.

- **Lifescan Diabetic Systems**.  Robbins Geller Rudman & Dowd LLP attorneys were responsible for achieving a $45 million all cash settlement with Johnson & Johnson and its wholly owned subsidiary, Lifescan, Inc., over claims that Lifescan deceptively marketed and sold a defective blood-glucose monitoring system for diabetics.  The Lifescan settlement was noted by the court as providing "exceptional results" for members of the class.

- **West Telemarketing Case**.  Robbins Geller Rudman & Dowd LLP attorneys secured a $39 million settlement for class members caught up in a telemarketing scheme where consumers were charged for an unwanted membership program after purchasing Tae-Bo exercise videos.  Under the settlement, consumers were entitled to claim between one and one-half to three times the amount of all fees they unknowingly paid.

- **Dannon Activia®**.  Robbins Geller Rudman & Dowd LLP attorneys secured the largest ever settlement for a false advertising case involving a food product.  The case alleged that Dannon's advertising for its Activia® and DanActive® branded products and their benefits from "probiotic" bacteria were overstated.  As part of the nationwide settlement, Dannon agreed to modify its advertising and establish a fund of up to $45 million to compensate consumers for their purchases of Activia® and DanActive®.

- **Out-of-Network Emergency Room Doctors**.  In a case that changed the way out-of-network emergency room physicians are paid by insurance carriers in Florida, Robbins Geller Rudman & Dowd LLP successfully represented a class of physicians who claimed their reimbursements for emergency services were unfair.  As a result of the case, these physicians were guaranteed approximately double the rate of reimbursement they received prior to the case being pursued, resulting in a recovery of nearly $20 million and important business reforms.

- ***Mattel Lead Paint Toys***.  In 2006-2007, toy manufacturing giant, Mattel and its subsidiary Fisher-Price, announced the recall of over 14 million toys made in China due to hazardous lead and dangerous magnets.  Robbins Geller Rudman & Dowd LLP attorneys filed lawsuits on behalf of millions of parents and other consumers who purchased or received toys for children that were marketed as safe but were later recalled because they were dangerous. The Firm's attorneys reached a landmark settlement for millions of dollars in refunds and lead testing reimbursements, as well as important testing requirements to ensure that Mattel's toys are safe for consumers in the future.

- ***Tenet Healthcare Cases***.  Robbins Geller Rudman & Dowd LLP attorneys were co-lead counsel in a class action alleging a fraudulent scheme of corporate misconduct, resulting in the overcharging of uninsured patients by the Tenet chain of hospitals.  The Firm's attorneys represented uninsured patients of Tenet hospitals nationwide who were overcharged by Tenet's admittedly "aggressive pricing strategy," which resulted in price gouging of the uninsured.  The case was settled with Tenet changing its practices and making refunds to patients.

Human Rights, Labor Practices and Public Policy

Robbins Geller Rudman & Dowd LLP attorneys have a long tradition of representing the victims of unfair labor practices and violations of human rights.  These include:

- ***Does I v. The Gap, Inc.***, Case No. 01 0031 (D. N. Mariana Islands).  In this groundbreaking case, Robbins Geller Rudman & Dowd LLP attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top United States retailers such as The Gap, Target and J.C. Penney.  In the first action of its kind, Robbins Geller Rudman & Dowd LLP attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan.  This case was a companion to two other actions: ***Does I v. Advance Textile Corp.***, Case No. 99 0002 (D. N. Mariana Islands), which alleged overtime violations by the garment factories under the Fair Labor Standards Act and local labor law, and ***UNITE v. The Gap, Inc.***, Case No. 300474 (Cal. Super. Ct., San Francisco County), which alleged violations of California's Unfair Practices Law by the United States retailers. These actions resulted in a settlement of approximately $20 million that included a comprehensive monitoring program to address past violations by the factories and prevent future ones.  The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts at bringing about the precedent-setting settlement of the actions.

- ***Kasky v. Nike, Inc.***, 27 Cal. 4th 939 (2002).  The California Supreme Court upheld claims that an apparel manufacturer misled the public regarding its exploitative labor practices, thereby violating California statutes prohibiting unfair competition and false advertising. The Court rejected defense contentions that any misconduct was protected by the First Amendment, finding the heightened constitutional protection afforded to noncommercial speech inappropriate in such a circumstance.

- ***World War II-Era Slave Labor***.  Against steep odds, the Firm's lawyers took up the claims of people forced to work as slave labor for Japanese corporations during the Second World War.  Their human rights case ran into trouble when the Ninth Circuit agreed with the Bush administration that any claims against Japanese corporations and their subsidiaries were preempted by the federal government's foreign-affairs power. *See Deutsch v. Turner,* 324 F.3d 692 (9th Cir. 2003).  The case nonetheless demonstrates the lawyers' dedication to prosecuting human-rights violations against the challenge of formidable political opposition.

- ***The Cintas Litigation***.  Brought against one of the nation's largest commercial laundries for violations of the Fair Labor Standards Act for misclassifying truck drivers as salesmen to avoid payment of overtime.

- ***Taco Bell workers***.  Robbins Geller Rudman & Dowd LLP attorneys represented over 2,300 Taco Bell workers who were denied thousands of hours of overtime pay because, among other reasons, they were improperly classified as overtime-exempt employees.

Shareholder derivative litigation brought by Robbins Geller Rudman & Dowd LLP attorneys at times also involves stopping anti-union activities, including:

- ***Southern Pacific/Overnite***.  A shareholder action stemming from several hundred million dollars in loss of value in the company due to systematic violations by Overnite of United States labor laws.

- ***Massey Energy***.  A shareholder action against an anti-union employer for flagrant violations of environmental laws resulting in multi-million dollar penalties.

- ***Crown Petroleum***.  A shareholder action against a Texas-based oil company for self-dealing and breach of fiduciary duty while also involved in a union lockout.

Environment and Public Health

Robbins Geller Rudman & Dowd LLP attorneys have also represented plaintiffs in class actions related to environmental law.  The Firm's attorneys represented, on a *pro bono* basis, the Sierra Club and the National Economic Development and Law Center as *amici curiae* in a federal suit designed to uphold the federal and state use of project labor agreements ("PLAs").  The suit represented a legal challenge to President Bush's Executive Order 13202, which prohibits the use of project labor agreements on construction projects receiving federal funds.  Our *amici* brief in the matter outlined and stressed the significant environmental and socio-economic benefits associated with the use of PLAs on large-scale construction projects.

Attorneys with Robbins Geller Rudman & Dowd LLP have been involved in several other significant environmental cases, including:

- ***Public Citizen v. U.S. D.O.T.***  Robbins Geller Rudman & Dowd LLP attorneys represented a coalition of labor, environmental, industry and public health organizations including Public Citizen, The International Brotherhood of Teamsters, California AFL-CIO and California Trucking Industry in a challenge to a decision by the Bush Administration to lift a congressionally-imposed "moratorium" on cross-border trucking from Mexico on the basis

App. 186

that such trucks do not conform to emission controls under the Clean Air Act, and further, that the Administration did not first complete a comprehensive environmental impact analysis as required by the National Environmental Policy Act. The suit was dismissed by the Supreme Court, the Court holding that because the D.O.T. lacked discretion to prevent cross-border trucking, an environmental assessment was not required.

- ***Sierra Club v. AK Steel***. Brought on behalf of the Sierra Club for massive emissions of air and water pollution by a steel mill, including homes of workers living in the adjacent communities, in violation of the Federal Clean Air Act, Resource Conservation Recovery Act and the Clean Water Act.

- ***MTBE Litigation***. Brought on behalf of various water districts for befouling public drinking water with MTBE, a gasoline additive linked to cancer.

- ***Exxon Valdez***. Brought on behalf of fisherman and Alaska residents for billions of dollars in damages resulting from the greatest oil spill in United States history.

- ***Avilla Beach***. A citizens' suit against UNOCAL for leakage from the oil company pipeline so severe it literally destroyed the town of Avilla Beach, California.

Federal laws such as the Clean Water Act, the Clean Air Act, the Resource Conservation and Recovery Act and state laws such as California Proposition 65 exist to protect the environment and the public from abuses by corporate and government organizations. Companies can be found liable for negligence, trespass or intentional environmental damage, be forced to pay for reparations and to come into compliance with existing laws. Prominent cases litigated by Robbins Geller Rudman & Dowd LLP attorneys include representing more than 4,000 individuals suing for personal injury and property damage related to the Stringfellow Dump Site in Southern California, participation in the Exxon Valdez oil spill litigation and the toxic spill arising from a Southern Pacific train derailment near Dunsmuir, California.

Robbins Geller Rudman & Dowd LLP attorneys have led the fight against Big Tobacco since 1991. As an example, Robbins Geller Rudman & Dowd LLP attorneys filed the case that helped get rid of Joe Camel representing various public and private plaintiffs, including the State of Arkansas, the general public in California, the cities of San Francisco, Los Angeles and Birmingham, 14 counties in California and the working men and women of this country in the Union Pension and Welfare Fund cases that have been filed in 40 states. In 1992, Robbins Geller Rudman & Dowd LLP attorneys filed the first case in the country that alleged a conspiracy by the Big Tobacco companies.

Intellectual Property

Individual inventors, universities and research organizations provide the fundamental research behind many existing and emerging technologies. Every year, the majority of U.S. patents are issued to this group of inventors. Through this fundamental research, these inventors provide a significant competitive advantage to this country. Unfortunately, while responsible for most of the inventions that issue into U.S. patents every year, individual inventors, universities and research organizations receive very little of the licensing revenues for U.S. patents. Large companies reap 99% of all patent licensing revenues.

Robbins Geller Rudman & Dowd LLP enforces the rights of these inventors by filing and litigating patent infringement cases against infringing entities.  Our attorneys have decades of patent litigation experience in a variety of technical applications.  This experience, combined with the Firm's extensive resources, gives individual inventors the ability to enforce their patent rights against even the largest infringing companies.

Our attorneys have experience handling cases involving a broad range of technologies, including:

- biochemistry

- telecommunications

- medical devices

- medical diagnostics

- networking systems

- computer hardware devices and software

- mechanical devices

- video gaming technologies

- audio and video recording devices

Current intellectual property cases include:

- ***vTRAX Technologies Licensing, Inc. v. Siemens Communications, Inc., et al.***, Case No. 9:10-CV-80369-KLR (S.D. Fl.). Counsel for plaintiff vTRAX Technologies in a patent infringement action involving U.S. Patent No. 6,865,268 for "Dynamic, Real-Time Call Tracking for Web-Based Customer Relationship Management."

- ***U.S. Ethernet Innovations***. Counsel for plaintiff U.S. Ethernet Innovations, owner of the 3Com Ethernet Patent Portfolio, in multiple patent infringement actions involving U.S. Patent Nos. 5,307,459 for "Network Adapter with Host Indication Optimization," 5,434,872 for "Apparatus for Automatic Initiation of Data Transmission," 5,732,094 for "Method for Automatic Initiation of Data Transmission," and 5,299,313 for "Network Interface with Host Independent Buffer Management."

- ***SIPCO, LLC v. Johnson Controls, Inc., et al.***, Case No. 6:09-CV-532 (E.D. Tex.). Counsel for plaintiff SIPCO in a patent infringement action involving U.S. Patent Nos. 7,103,511 for "Wireless Communications Networks for Providing Remote Monitoring of Devices" and 6,437,692 and 7,468,661 for "System and Method for Monitoring and Controlling Remote Devices."

- ***SIPCO, LLC v. Florida Power & Light Company, et al.***, Case No. 1:09-CV-22209-FAM (S.D. Fla.).  Counsel for plaintiff SIPCO, LLC in a patent infringement action involving U.S.

Patent Nos. 6,437,692, 7,053,767 and 7,468,661, entitled "System and Method for Monitoring and Controlling Remote Devices."

- *IPCO, LLC v. Cellnet Technology, Inc.*, Case No. 1:05-CV-2658 (N.D. Ga.). Counsel for plaintiff IPCO, LLC in a patent infringement action involving U.S. Patent No. 6,044,062 for a "Wireless Network System and Method for Providing Same" and U.S. Patent No. 6,249,516 for a "Wireless Network Gateway and Method for Providing Same."

- *IPCO, LLC v. Tropos Networks, Inc.*, Case No. 1:06-CV-585 (N.D. Ga.). Counsel for plaintiff IPCO, LLC in a patent infringement action involving U.S. Patent No. 6,044,062 for a "Wireless Network System and Method for Providing Same" and U.S. Patent No. 6,249,516 for a "Wireless Network Gateway and Method for Providing Same."

- *Cary Jardin v. Datallegro, Inc. and Stuart Frost*, Case No. 08-CV-01462-IEG-RBB (S.D. Cal.). Counsel for plaintiff Cary Jardin in a patent infringement action involving U.S. Patent No. 7,177,874 for a "System and Method for Generating and Processing Results Data in a Distributed System."

- *FlashPoint Technology, Inc. v. AT&T, et al.*, Case No. 1:08-CV-00140 (D. Del.). Five separate actions pending in the United States District Court for the District of Delaware involving 10 patents covering aspects of digital camera technology.

- *NorthPeak Wireless, LLC v. 3Com Corporation, et al.*, Case No. CV-08-J-1813-NE (N.D. Ala.). Counsel for plaintiff NorthPeak Wireless, LLC in a multi-defendant patent infringement action involving U.S. Patent Nos. 4,977,577 and 5,987,058 related to spread spectrum devices.

- *PageMelding, Inc. v. Feeva Technology, Inc., Hitwise USA, Inc., Kindsight, Inc., Microsoft Corporation and NebuAd, Inc.*, Case No. 08-CV-03484 CRB (N.D. Cal.). Counsel for plaintiff PageMelding, Inc. in a patent infringement action involving U.S. Patent No. 6,442,577 for a "Method and Apparatus for Dynamically Forming Customized Web Pages for Web Sites."

- *SIPCO, LLC v. Amazon.com, Inc., et al.*, Case No. 2:08-CV-359 (E.D. Tex.). Counsel for plaintiff SIPCO in a multi-defendant patent infringement action involving U.S. Patent No. 6,891,838 for a "System and Method for Monitoring and Controlling Residential Devices" and U.S. Patent No. 7,103,511 for "Wireless Communication Networks for Providing Remote Monitoring Devices."

- *IPCO, LLC d/b/a Intus IQ v. Oncor Electric Delivery Co. LLC, Reliant Energy Inc., et al.*, Case No. 2:09-CV-00037 (E.D. Tex.). Counsel for plaintiff Intus IQ in a patent infringement action involving U.S. Patent Nos. 6,249,516 and 7,054,271 for a "Wireless Network System and Method for Providing Same."

Pro Bono

Robbins Geller Rudman & Dowd LLP attorneys have a distinguished record of *pro bono* work. In 1999, the Firm's lawyers were finalists for the San Diego Volunteer Lawyer Program's 1999 Pro Bono Law Firm of the Year Award, for their work on a disability-rights case. In 2003, when the Firm's lawyers were nominated for the California State Bar President's *Pro Bono* Law Firm of the Year award, the State Bar President praised them for "dedication to the provision of *pro bono* legal services to the poor" and "extending legal services to underserved communities."

More recently, one of the Firm's lawyers obtained political asylum, after an initial application for political asylum had been denied, for an impoverished Somali family whose ethnic minority faced systematic persecution and genocidal violence in Somalia. The family's female children also faced forced genital mutilation if returned to Somalia.

The Firm's lawyers worked as cooperating attorneys with the ACLU in a class action filed on behalf of welfare applicants subject to San Diego County's "Project 100%" program, which sent investigators from the D.A.'s office (Public Assistance Fraud Division) to enter and search the home of every person applying for welfare benefits, and to interrogate neighbors and employers – never explaining they had no reason to suspect wrongdoing. Real relief was had when the County admitted that food-stamp eligibility could not hinge upon the Project 100% "home visits," and again when the district court ruled that unconsented "collateral contacts" violated state regulations. The district court's ruling that CalWORKS aid to needy families could be made contingent upon consent to the D.A.'s "home visits" and "walk throughs," was affirmed by the Ninth Circuit with eight judges vigorously dissenting from denial of *en banc* rehearing. *Sanchez v. County of San Diego*, 464 F.3d 916, (9th Cir. 2006), *reh'g denied* 483 F.3d 965, 966 (9th Cir. 2007). The decision was noted by the *Harvard Law Review*, *The New York Times*, and even *The Colbert Report*.

The Firm's lawyers also have represented groups such as the Sierra Club and the National Economic Development and Law Center as *amici curiae* before the United States Supreme Court.

Senior appellate partner Eric Alan Isaacson has in a variety of cases filed *amicus curiae* briefs on behalf of religious organizations and clergy supporting civil rights, opposing government-backed religious-viewpoint discrimination, and generally upholding the American traditions of religious freedom and church-state separation. Organizations represented as *amici curiae* in such matters have included the California Council of Churches, Union for Reform Judaism, Jewish Reconstructionist Federation, United Church of Christ, Unitarian Universalist Association of Congregations, Unitarian Universalist Legislative Ministry – California, and California Faith for Equality.

## JUDICIAL COMMENDATIONS

Robbins Geller Rudman & Dowd LLP attorneys have been commended by countless judges all over the country for the quality of their representation in class-action lawsuits.

- In March 2009, Judge Karon Bowdre commented in the *HealthSouth* class certification opinion that "[t]he court has had many opportunities since November 2001 to examine the work of class counsel and the supervision by the Class Representatives. The court find both to be far more than adequate."

App. 190

*In re HealthSouth Corp. Sec. Litig.*, Case No. CV-03-BE-1500-S, Memorandum Opinion (S.D. Ala. Mar. 31, 2009).

- In October 2007, a $600 million settlement for shareholders in the securities fraud class action against Ohio's biggest drug distributor, Cardinal Health, Inc., was approved – the largest settlement in the Sixth Circuit.  Judge Marbley commented:

> The quality of representation in this case was superb. Lead Counsel, [Robbins Geller Rudman & Dowd LLP], are nationally recognized leaders in complex securities litigation class actions.  The quality of the representation is demonstrated by the substantial benefit achieved for the Class and the efficient, effective prosecution and resolution of this action.  Lead Counsel defeated a volley of motions to dismiss, thwarting well-formed challenges from prominent and capable attorneys from six different law firms.

In Re: Cardinal Health Inc. Sec. Litig., 528 F. Supp. 2d 752 (2007).

- In the *Enron* securities class action, Robbins Geller Rudman & Dowd LLP attorneys and lead plaintiff The Regents of the University of California successfully recovered over *$7.3 billion* on behalf of Enron investors.  The Court overseeing this action had utmost praise for Robbins Geller Rudman & Dowd LLP's efforts and stated that "[t]he experience, ability, and reputation of the attorneys of [Robbins Geller Rudman & Dowd LLP] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, MDL No. 1446, Order at 130 (S.D. Tex. Sept. 8, 2008).

  The Court further commented, "In the face of extraordinary obstacles, the skills, expertise, commitment, and tenacity of [Robbins Geller Rudman & Dowd LLP] in this litigation cannot be overstated.  Not to be overlooked are the unparalleled results, … which demonstrate counsel's clearly superlative litigating and negotiating skills." *Id.* at 112-13.

  In addition, the Court noted, "This Court considers [Robbins Geller Rudman & Dowd LLP] 'a lion' at the securities bar on the national level," noting that the Lead Plaintiff selected Robbins Geller Rudman & Dowd LLP because of the Firm's "outstanding reputation, experience, and success in securities litigation nationwide." *Id.* at 115.

- In *Stanley v. Safeskin Corp.*, Case No. 99 CV 454-BTM (S.D. Cal. May 25, 2004), where Robbins Geller Rudman & Dowd LLP attorneys obtained $55 million for the class of investors, Judge Moskowitz stated:

> I said this once before, and I'll say it again.  I thought the way that your firm handled this case was outstanding.  This was not an easy case.  It was a complicated case, and every step of the way, I thought they did a very professional job.

- In April 2005, in granting final approval of a $100 million settlement obtained after two weeks of trial in *In re AT&T Corp. Sec. Litig.*, MDL No. 1399 (D.N.J.), Judge Garret E. Brown, Jr. stated the following about the Robbins Geller Rudman & Dowd LLP attorneys prosecuting the case:

Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

- In a December 2006 hearing on the $50 million consumer privacy class action settlement in *Kehoe v. Fidelity Fed.*, Case No. 03-80593-CIV (S.D. Fla.), United States District Court Judge Daniel T.K. Hurley said the following:

  First, I thank counsel. As I said repeatedly on both sides we have been very, very fortunate. We have had fine lawyers on both sides. The issues in the case are significant issues. We are talking about issues dealing with consumer protection and privacy -- something that is increasingly important today in our society. [I] want you to know I thought long and hard about this. I am absolutely satisfied that the settlement is a fair and reasonable settlement. [I] thank the lawyers on both sides for the extraordinary effort that has been brought to bear here.

- In July 2007, the Honorable Richard Owen of the Southern District of New York approved the $129 million settlement of the *In re Doral Fin. Corp. Sec. Litig.*, MDL No. 1706 (S.D.N.Y.) finding in his Order that:

  The services provided by Lead Counsel [Robbins Geller Rudman & Dowd LLP] were efficient and highly successful, resulting in an outstanding recovery for the Class without the substantial expense, risk and delay of continued litigation. Such efficiency and effectiveness supports the requested fee percentage.

  []Cases brought under the federal securities laws are notably difficult and notoriously uncertain. . . . Despite the novelty and difficulty of the issues raised, Lead Plaintiffs' counsel secured an excellent result for the Class.

  . . . Based upon Lead Plaintiff's counsel's diligent efforts on behalf of the Class, as well as their skill and reputations, Lead Plaintiff's counsel were able to negotiate a very favorable result for the Class. . . . The ability of [Robbins Geller Rudman & Dowd LLP] to obtain such a favorable partial settlement for the Class in the face of such formidable opposition confirms the superior quality of their representation.

## NOTABLE CLIENTS

### Public Fund Clients

- Alaska State Pension Investment Board.

- California Public Employees' Retirement System.

- California State Teachers' Retirement System.

- Teachers' Retirement System of the State of Illinois.

- Illinois Municipal Retirement Fund.

- Illinois State Board of Investment.

- Los Angeles County Employees Retirement Association.

- Maine State Retirement System.

- The Maryland-National Capital Park & Planning Commission Employees' Retirement System.

- Milwaukee Employees' Retirement System.

- Minnesota State Board of Investment.

- New Hampshire Retirement System.

- New Mexico Public Funds (New Mexico Educational Retirement Board, New Mexico Public Employees Retirement Association, and New Mexico State Investment Council).

- Ohio Public Funds (Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, School Employees Retirement System of Ohio, Ohio Police and Fire Pension Fund, Ohio State Highway Patrol Retirement System, and Ohio Bureau of Workers' Compensation).

- The Regents of the University of California.

- State Universities Retirement System of Illinois.

- State of Wisconsin Investment Board.

- Tennessee Consolidated Retirement System.

- Washington State Investment Board.

- Wayne County Employees' Retirement System.

- West Virginia Investment Management Board.

### Multi-Employer Clients

- Alaska Electrical Pension Fund.

- Alaska Hotel & Restaurant Employees Pension Trust Fund.

- Alaska Ironworkers Pension Trust.

- Carpenters Pension Fund of West Virginia.

- Carpenters Health & Welfare Fund of Philadelphia & Vicinity.

- Carpenters Pension Fund of Baltimore, Maryland.

- Carpenters Pension Fund of Illinois.

- Southwest Carpenters Pension Trust.

- Central States, Southeast and Southwest Areas Pension Fund.

- Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund.

- Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds.

- 1199 SEIU Greater New York Pension Fund.

- Massachusetts State Carpenters Pension and Annuity Funds.

- Massachusetts State Guaranteed Fund.

- New England Health Care Employees Pension Fund.

- SEIU Staff Fund.

- Southern California Lathing Industry Pension Fund.

- United Brotherhood of Carpenters Pension Fund.

**Additional Institutional Investors**

- Bank of Ireland Asset Management.

- Northwestern Mutual Life Insurance Company.

- Standard Life Investments.

## PROMINENT CASES AND PRECEDENT-SETTING DECISIONS

### Prominent Cases

- ***In re Enron Corp. Sec. Litig.***, Case No. H-01-3624 (S.D. Tex.). Investors lost billions of dollars as a result of the massive fraud at Enron. In appointing Robbins Geller Rudman & Dowd LLP lawyers as sole lead counsel to represent the interests of Enron investors, the court found that the Firm's zealous prosecution and level of "insight" set it apart from its peers. Robbins Geller Rudman & Dowd LLP attorneys and lead plaintiff The Regents of the University of California aggressively pursued numerous defendants, including many of Wall Street's biggest banks, and successfully obtained settlements in excess of ***$7.3 billion*** for the benefit of investors. ***This is the largest aggregate class action settlement not only in a securities class action, but in class action history.***

- ***In re UnitedHealth Group Inc. PSLRA Litig.***, Case No. 06-CV-1691 (D. Minn.).   In the *UnitedHealth* case, Robbins Geller Rudman & Dowd LLP represented the California Public Employees' Retirement System ("CalPERS") and demonstrated its willingness to vigorously advocate for its institutional clients, even under the most difficult circumstances.  For example, in 2006, the issue of high-level executives backdating stock options made national headlines.  During that time, many law firms, including Robbins Geller Rudman & Dowd LLP, brought shareholder derivative lawsuits against the companies' boards of directors for breaches of their fiduciary duties or for improperly granting backdated options. Rather than pursuing a shareholder derivative case, the Firm filed a securities fraud class action against the company on behalf of CalPERS.  In doing so, Robbins Geller Rudman & Dowd LLP faced significant and unprecedented legal obstacles with respect to loss causation, *i.e.*, that defendants' actions were responsible for causing the stock losses.  Despite these legal hurdles, Robbins Geller Rudman & Dowd LLP obtained an $895 million recovery on behalf of the UnitedHealth shareholders.  Shortly after reaching the $895 million settlement with UnitedHealth, the remaining corporate defendants, including former CEO William A. McGuire, also settled.  Mr. McGuire paid $30 million and returned stock options representing more than three million shares to the shareholders.  The total recovery for the class was over $925 million, the largest stock option backdating recovery ever, and ***a recovery which is more than four times larger than the next largest options backdating recovery***.   Moreover, Robbins Geller Rudman & Dowd LLP obtained unprecedented corporate governance reforms, including election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercise, and executive compensation reforms which tie pay to performance.

- ***Jaffe v. Household Int'l, Inc.***, Case No. 02-C-05893 (N.D. Ill.). Sole lead counsel Robbins Geller Rudman & Dowd LLP obtained a jury verdict on May 7, 2009, following a six-week trial in the Northern District of Illinois, on behalf of a class of investors led by plaintiffs PACE Industry Union-Management Pension Fund, the International Union of Operating Engineers, Local No. 132 Pension Plan, and Glickenhaus & Company. The jury determined that Household and the individual defendants made fraudulent misrepresentations concerning the Company's predatory lending practices, the quality of its loan portfolio and the company's financial results between March 23, 2001 and October 11, 2002. Although certain post-trial proceedings are ongoing, plaintiffs' counsel anticipate that the verdict will ultimately allow class members to recover in excess of $1 billion in damages. Since the enactment of the PSLRA in 1995, trials in securities fraud cases have been rare. According to published reports, only nine such cases have gone to verdict since the passage of the PSLRA.

- *Alaska Elec. Pension Fund v. CitiGroup, Inc. (In re WorldCom Sec. Litig.)*, Case No. 03 Civ. 8269 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys represented more than 50 private and public institutions that opted out of the class action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998 to 2001. The Firm's clients included major public institutions from across the country such as CalPERS, CalSTRS, the state pension funds of Maine, Illinois, New Mexico and West Virginia, union pension funds, and private entities such as AIG and Northwestern Mutual. Robbins Geller Rudman & Dowd LLP attorneys recovered more than $650 million for their clients on the May 2000 and May 2001 bond offerings (the primary offerings at issue), substantially more than they would have recovered as part of the class.

- *In re Cardinal Health, Inc. Sec. Litig.*, Case No. C2-04-575 (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Robbins Geller Rudman & Dowd LLP obtained a recovery of $600 million for investors.  On behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, and the California Ironworkers Field Trust Fund, the Firm aggressively pursued class claims and won notable courtroom victories, including a favorable decision on defendants' motion to dismiss. *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006). At the time, the $600 million settlement was the tenth largest settlement in the history of securities fraud litigation and is the largest-ever recovery in a securities fraud action in the Sixth Circuit.

- *AOL Time Warner Cases I & II*, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles County). Robbins Geller Rudman & Dowd LLP represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, several Australian public and private funds, insurance companies, and numerous additional institutional investors, both domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger with Internet high flier America Online. Robbins Geller Rudman & Dowd LLP attorneys exposed a massive and sophisticated accounting fraud involving America Online's e-commerce and advertising revenue. After almost four years of litigation involving extensive discovery, the Firm secured combined settlements for its opt-out clients totaling over $629 million just weeks before The Regents' case pending in California state court was scheduled to go to trial. The Regents' gross recovery of $246 million is the largest individual opt-out securities recovery in history.

- *In re HealthSouth Corp. Secs. Litig.*, Case No. CV-03-BE-1500-S (N.D. Ala.). As court-appointed co-lead counsel, Robbins Geller Rudman & Dowd LLP attorneys have obtained a combined recovery of $554 million from HealthSouth and its auditor Ernst & Young for the benefit of stockholder plaintiffs. The settlement against HealthSouth ($445 million) represents one of the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the PSLRA. Likewise, the settlement against Ernst & Young ($109 million) is the eighth largest securities class action settlement entered into by an accounting firm since the passage of the PSLRA. HealthSouth, Ernst & Young and HealthSouth's investment banker, UBS, perpetrated one of the largest and most pervasive frauds in the history of United States healthcare, prompting Congressional and law enforcement inquiry and resulting in guilty pleas of 16 former HealthSouth executives in related federal criminal prosecutions. Robbins Geller Rudman & Dowd LLP attorneys continue to prosecute the case against former HealthSouth CEO Richard Scrushy, as well as UBS, to win further large recoveries for the victims of this immense fraud.

- *In re Dynegy Inc. Secs. Litig.*, Case No. H-02-1571 (S.D. Tex.). As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Robbins Geller Rudman & Dowd LLP attorneys obtained a combined settlement of $474 million from Dynegy, Citigroup, Inc. and

Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha. Given Dynegy's limited ability to pay, Robbins Geller Rudman & Dowd LLP attorneys structured a settlement (reached shortly before the commencement of trial) that maximized plaintiffs' recovery without bankrupting the company. Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Robbins Geller Rudman & Dowd LLP and The Regents believe will benefit all of Dynegy's stockholders.

- **In re Qwest Commc'ns Int'l, Inc. Sec. Litig.**, Case No. 01-cv-1451 (D. Colo.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased Qwest securities. In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice. After five years of litigation, lead plaintiffs entered into a settlement with Qwest and certain individual defendants that provided a $400 million recovery for the class and created a mechanism that allowed the vast majority of class members to share in an additional $250 million recovered by the SEC.  In 2008, Robbins Geller Rudman & Dowd LLP attorneys recovered an additional $45 million for the class in a settlement with defendants Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO, respectively, of Qwest during large portions of the class period.

- **In re AT&T Corp. Sec. Litig.**, MDL No. 1399 (D.N.J.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased AT&T common stock. The case charged defendants AT&T and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, the largest IPO in American history. After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million. In granting approval of the settlement, the court stated the following about the Robbins Geller Rudman & Dowd LLP attorneys handling the case:

> Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

*In re AT&T Corp. Sec. Litig.*, MDL No. 1399, 2005 U.S. Dist. LEXIS 46144, *28-*29 (D.N.J. Apr. 22, 2005).

- **In re Dollar General Corp. Sec. Litig.**, Case No. 01-CV-00388 (M.D. Tenn.).  Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel in this case in which the Firm recovered $172.5 million for investors.  The *Dollar General* settlement was the largest shareholder class action recovery ever in Tennessee.

- **Carpenters Health & Welfare Fund v. Coca-Cola Co.**, Case No. 00-CV-2838 (N.D. Ga.).  As co-lead counsel representing Coca-Cola  shareholders, Robbins Geller Rudman & Dowd LLP attorneys obtained a recovery of $137.5 million after nearly eight years of litigation.  Robbins Geller Rudman & Dowd LLP attorneys traveled to three continents to uncover the evidence that ultimately resulted in the

settlement of this hard-fought litigation.  The case concerned Coca-Cola's shipping of excess concentrate at the end of financial reporting periods for the sole purpose of meeting analyst earnings expectations, as well as the company's failure to properly account for certain impaired foreign bottling assets.

- ***Schwartz v. TXU Corp.***, Case No. 02-CV-2243 (N.D. Tex).  As co-lead counsel, Robbins Geller Rudman & Dowd LLP attorneys obtained a recovery of over $149 million for a class of purchasers of TXU securities.  The recovery compensated class members for damages they incurred as a result of their purchases of TXU securities at inflated prices.  Defendants had inflated the price of these securities by concealing the fact that TXU's operating earnings were declining due to a deteriorating gas pipeline and the failure of the company's European operations.

- ***Thurber v. Mattel, Inc.***, Case No. 99-CV-10368 (C.D. Cal.).  Robbins Geller Rudman & Dowd LLP attorneys served as co-lead counsel for a class of investors who purchased Mattel common stock.  When the shareholders approved Mattel's acquisition of The Learning Company, they were misled by defendants' false statements regarding the financial condition of the acquired company.  Within months of the close of the transaction, Mattel disclosed that The Learning Company had incurred millions in losses, and that instead of adding to Mattel's earnings, earnings would be far less than previously stated.  After thorough discovery, Robbins Geller Rudman & Dowd attorneys negotiated a settlement of $122 million plus corporate governance changes.

- ***Brody vs. Hellman (U.S. West Dividend Litigation)***, Case No. 00-CV-4142 (Dist. Ct. for the City & Cty. of Denver, Colo.). Robbins Geller Rudman & Dowd LLP attorneys were court-appointed counsel for the class of former stockholders of U.S. West, Inc. who sought to recover a dividend declared by U.S. West before its merger with Qwest. The merger closed before the record and payment dates for the dividend, which Qwest did not pay following the merger. The case was aggressively litigated and the plaintiffs survived a motion to dismiss, two motions for summary judgment and successfully certified the class over vigorous opposition from defendants. In certifying the class, the court commented, "Defendants do not contest that Plaintiffs' attorneys are extremely well qualified to represent the putative class. This litigation has been ongoing for years; in that time Plaintiffs' counsel has proven that they are more than adequate in ability, determination, and resources to represent the putative class." The case settled for $50 million on the day before trial was scheduled to commence. At the August 30, 2005 final approval hearing relating to the settlement, the court noted that the case "was litigated by extremely talented lawyers on both sides" and that the settlement was "a great result." In describing the risk taken by the Firm and its co-counsel, the court noted, "There wasn't any other lawyer[] in the United States that took the gamble that these people did. Not one other firm anywhere said I'm willing to take that on. I'll go five years. I'll pay out the expenses. I'll put my time and effort on the line." In discussing the difficulties facing the Firm in this case, the court said, "There wasn't any issue that wasn't fought. It took a great deal of skill to get to the point of trial." In concluding, the court remarked that the class was "fortunate they had some lawyers that had the guts to come forward and do it."

- ***In re NASDAQ Market-Makers Antitrust Litig.***, MDL No. 1023 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys served as court-appointed co-lead counsel for a class of investors. The class alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry wide conspiracy in one of the largest and most important antitrust cases in recent history. After three and one half years of intense litigation, the case was settled for a total of $1.027 billion, the largest antitrust settlement ever. An excerpt from the court's opinion reads:

Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for the Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998).

- **In re Exxon Valdez**, Case No. A89 095 Civ. (D. Alaska), and **In re Exxon Valdez Oil Spill Litig.**, Case No. 3 AN 89 2533 (Alaska Super. Ct., 3d Jud. Dist.). Robbins Geller Rudman & Dowd LLP attorneys served on the Plaintiffs' Coordinating Committee and Plaintiffs' Law Committee in this massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. The jury awarded hundreds of millions in compensatory damages, as well as $5 billion in punitive damages (the latter were later reduced by the U.S. Supreme Court to $507 million).

- **In re 3Com, Inc. Sec. Litig.**, Case No. C-97-21083-JW (N.D. Cal.). A hard-fought class action alleging violations of the federal securities laws in which Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for the class and obtained a recovery totaling $259 million.

- **Mangini v. R.J. Reynolds Tobacco Co.**, Case No. 939359 (Cal. Super. Ct., San Francisco County). In this case, R.J. Reynolds admitted, "the *Mangini* action, and the way that it was vigorously litigated, was an early, significant and unique driver of the overall legal and social controversy regarding underage smoking that led to the decision to phase out the Joe Camel Campaign."

- **Cordova v. Liggett Group, Inc.**, Case No. 651824 (Cal. Super. Ct., San Diego County), and **People v. Philip Morris, Inc.**, Case No. 980864 (Cal. Super. Ct., San Francisco County). Robbins Geller Rudman & Dowd LLP attorneys, as lead counsel in both these actions, played a key role in these cases which were settled with the Attorneys General global agreement with the tobacco industry, bringing $26 billion to the State of California as a whole and $12.5 billion to the cities and counties within California.

- **Does I v. The Gap, Inc.**, Case No. 01 0031 (D. N. Mariana Islands). In this ground-breaking case, Robbins Geller Rudman & Dowd LLP attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top United States retailers such as The Gap, Target and J.C. Penney. In the first action of its kind, Robbins Geller Rudman & Dowd LLP attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan. This case was a companion to two other actions: **Does I v. Advance Textile Corp.**, Case No. 99 0002 (D. N. Mariana Islands), which alleged overtime violations by the garment factories under the Fair Labor Standards Act, and **UNITE v. The Gap, Inc.**, Case No. 300474 (Cal. Super. Ct., San Francisco County), which alleged violations of California's Unfair Practices Law by the United States retailers. These actions resulted in a settlement of approximately $20 million that included a comprehensive monitoring program to address past violations by the factories and prevent future ones. The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts in bringing about the precedent-setting settlement of the actions.

- **Hall v. NCAA (Restricted Earnings Coach Antitrust Litigation)**, Case No. 94-2392-KHV (D. Kan.). Robbins Geller Rudman & Dowd LLP attorneys were lead counsel and lead trial counsel for one of three classes of coaches in these consolidated price fixing actions against the National Collegiate Athletic

Association. On May 4, 1998, the jury returned verdicts in favor of the three classes for more than $70 million.

- ***In re Prison Realty Sec. Litig.***, Case No. 3:99-0452 (M.D. Tenn.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for the class, obtaining a $105 million recovery.

- ***In re Honeywell Int'l, Inc. Sec. Litig.***, Case No. 00-cv-03605 (DRD) (D.N.J.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased Honeywell common stock. The case charged Honeywell and its top officers with violations of the federal securities laws, alleging the defendants made false public statements concerning Honeywell's merger with Allied Signal, Inc. and that defendants falsified Honeywell's financial statements. After extensive discovery, Robbins Geller Rudman & Dowd LLP attorneys obtained a $100 million settlement for the class.

- ***In re Reliance Acceptance Group, Inc. Sec. Litig.***, MDL No. 1304 (D. Del.). Robbins Geller Rudman & Dowd LLP attorneys served as co-lead counsel and obtained a recovery of $39 million.

- ***Schwartz v. Visa Int'l***, Case No. 822404-4 (Cal. Super. Ct., Alameda County). After years of litigation and a six-month trial, Robbins Geller Rudman & Dowd LLP attorneys won one of the largest consumer protection verdicts ever awarded in the United States. Robbins Geller Rudman & Dowd LLP attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from their cardholders. The court ordered Visa and MasterCard to return $800,000,000 in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest. In addition, the court ordered full disclosure of the hidden fee.

- ***Thompson v. Metro. Life Ins. Co.***, Case No. 00-cv-5071 (HB) (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel and obtained $145 million for the class in a settlement involving racial discrimination claims in the sale of life insurance.

- ***In re Prudential Ins. Co. of Am. Sales Practices Litig.***, MDL No. 1061(D.N.J.). In one of the first cases of its kind, Robbins Geller Rudman & Dowd LLP attorneys obtained a settlement of $4 billion for deceptive sales practices in connection with the sale of life insurance involving the "vanishing premium" sales scheme.

### Precedent-Setting Decisions

Investor and Shareholder Rights

- ***In re Constar Int'l Inc. Sec Litig.***, 585 F.3d 774 (3d Cir. 2009). The Third Circuit flatly rejected defense contentions that where relief is sought under §11 of the Securities Act of 1933, which imposes liability when securities are issued pursuant to an incomplete or misleading registration statement, class certification should depend upon findings concerning market efficiency and loss causation.

- ***Siracusano v. Matrixx Initiatives, Inc.***, 585 F.3d 1167 (9th Cir. 2009). In a securities fraud action, the Ninth Circuit rejected reliance upon a bright-line "statistical significance" materiality standard, agreeing with plaintiffs that defendants had omitted a material fact by failing to disclose a possible link between the company's popular cold remedy and the loss of sense of smell in some users.

- *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009). Aided by former Supreme Court Justice O'Connor's presence on the panel, the Fifth Circuit reversed a district court order denying class certification and also reversed an order granting summary judgment to defendants. The court held that the district court applied an incorrect fact-for-fact standard of loss causation, and that genuine issues of fact on loss causation precluded summary judgment.

- *In re F5 Networks, Inc. Derivative Litig.*, 207 P.3d 433 (Wash. 2009). In a derivative action alleging unlawful stock option backdating, the Supreme Court of Washington ruled that shareholders need not make a presuit demand on the board of directors where this step would be futile, agreeing with plaintiffs that favorable Delaware case law should be followed as persuasive authority.

- *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009). In a rare win for investors in the Fifth Circuit, the court reversed an order of dismissal, holding that safe harbor warnings were not meaningful when the facts alleged established a strong inference that defendants knew their forecasts were false. The court also held that plaintiffs sufficiently alleged loss causation.

- *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009). In a victory for investors in the Third Circuit, the court reversed an order of dismissal, holding that shareholders pled with particularity why the company's repeated denials of price discounts on products were false and misleading when the totality of facts alleged established a strong inference that defendants knew their denials were false.

- *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342 (3d Cir. 2009). The Third Circuit held that claims filed for violation of §10(b) of the Securities Exchange Act of 1934 were timely, adopting investors' argument that because scienter is a critical element of the claims, the time for filing them cannot begin to run until the defendants' fraudulent state of mind should be apparent.

- *Rael v. Page*, 222 P.3d 678 (N.M. Ct. App. 2009). In this shareholder class and derivative action, Robbins Geller Rudman & Dowd LLP attorneys obtained an appellate decision reversing the trial court's dismissal of the complaint alleging serious director misconduct in connection with the merger of SunCal Companies and Westland Development Co., Inc., a New Mexico company with large and historic landholdings and other assets in the Albuquerque area. The appellate court held that plaintiff's claims for breach of fiduciary duty were direct, not derivative, because they constituted an attack on the validity or fairness of the merger and the conduct of the directors. Although New Mexico law had not addressed this question directly, at the urging of the Firm's attorneys, the court relied on Delaware law for guidance, rejecting the "special injury" test for determining the direct versus derivative inquiry and instead applying more recent Delaware case law.

- *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008). In a case of first impression, the Ninth Circuit held that the Securities Act of 1933's specific non-removal features had not been trumped by the general removal provisions of the Class Action Fairness Act of 2005.

- *St. Clare v. Gilead Sciences, Inc. (In re Gilead Sciences Sec. Litig.)*, 536 F.3d 1049 (9th Cir. 2008). The Ninth Circuit upheld defrauded investors' loss causation theory as plausible, ruling that a limited temporal gap between the time defendants' misrepresentation was publicly revealed and the subsequent decline in stock value was reasonable where the public had not immediately understood the impact of defendants' fraud.

- ***Fidel v. Farley***, 534 F.3d 508 (6th Cir. 2008). The Sixth Circuit upheld class-notice procedures, rejecting an objector's contentions that class action settlements should be set aside because his own stockbroker had failed to forward timely notice of the settlement to him.

- ***Cal. Pub. Employees' Ret. Sys. v. Caboto-Gruppo Intesa, BCI (In re WorldCom Sec. Litig.)***, 496 F.3d 245 (2d Cir. 2007). The Second Circuit held that the filing of a class action complaint tolls the limitations period for all members of the class, including those who choose to opt out of the class action and file their own individual actions without waiting to see whether the district court certifies a class – reversing the decision below and effectively overruling multiple district court rulings that *American Pipe* tolling did not apply under these circumstances.

- ***In re Merck & Co., Inc., Sec., Derivative & ERISA Litig.***, 493 F.3d 393 (3d Cir. 2007). In a shareholder derivative suit appeal, the Third Circuit held that the general rule that discovery may not be used to supplement ***demand***-futility allegations does not apply where the defendants enter a voluntary stipulation to produce materials relevant to demand futility without providing for any limitation as to their use.

- ***Crandon Capital Partners v. Shelk***, 157 P.3d 176 (Or. 2007). Oregon's Supreme Court ruled that a shareholder plaintiff in a derivative action may still seek attorney fees even if the defendants took actions to moot the underlying claims. The Firm's attorneys convinced Oregon's highest court to take the case, and reverse, despite the contrary position articulated by both the trial court and the Oregon Court of Appeals.

- ***In re Qwest Commc'ns Int'l***, 450 F.3d 1179 (10th Cir. 2006). In a case of first impression, the Tenth Circuit held that a corporation's deliberate release of purportedly privileged materials to governmental agencies was not a "selective waiver" of the privileges such that the corporation could refuse to produce the same materials to non-governmental plaintiffs in private securities fraud litigation.

- ***Ritter v. Dollens (In re Guidant S'holders Derivative Litig.)***, 841 N.E.2d 571 (Ind. 2006). Answering a certified question from a federal court, the Supreme Court of Indiana unanimously held that a pre-suit demand in a derivative action is excused if the demand would be a futile gesture. The court adopted a "demand futility" standard and rejected the defendants' call for a "universal demand" standard that might have immediately ended the case.

- ***Denver Area Meat Cutters and Employers Pension Plan v. Clayton***, 209 S.W.3d 584 (Tenn. Ct. App. 2006). The Tennessee Court of Appeals rejected an objector's challenge to a class action settlement arising out of Warren Buffet's 2003 acquisition of Tennessee-based Clayton Homes. In their effort to secure relief for Clayton Homes stockholders, the firm's attorneys obtained a temporary injunction of the Buffet acquisition for six weeks in 2003 while the matter was litigated in the courts. The temporary halt to Buffet's acquisition received national press attention.

- ***DeJulius v. New England Health Care Employees Pension Fund***, 429 F.3d 935 (10th Cir. 2005). The Tenth Circuit held that the multi-faceted notice of a $50 million settlement in a securities fraud class action had been the best notice practicable under the circumstances, and thus satisfied both constitutional due process and Rule 23 of the Federal Rules of Civil Procedure.

- ***Alaska Elec. Pension Fund v. Brown***, 941 A.2d 1011 (Del. 2007). The Supreme Court of Delaware held that the Alaska Electrical Pension Fund, for purposes of the "corporate benefit" attorney-fee doctrine, was presumed to have caused a substantial increase in the tender offer price paid in a "going private" buyout

transaction. The Court of Chancery originally ruled that Alaska's counsel, Robbins Geller Rudman & Dowd LLP, was not entitled to an award of attorney fees, but Delaware's high court, in its published opinion, reversed and remanded for further proceedings.

- **Sparling v. Daou (In re Daou Sys.)**, 411 F.3d 1006 (9th Cir. 2005).  The Ninth Circuit sustained investors' allegations of accounting fraud and ruled that loss causation was adequately alleged by pleading that the value of the stock they purchased declined when the issuer's true financial condition was revealed.

- **Barrie v. Intervoice-Brite, Inc.**, 397 F.3d 249 (5th Cir. 2005), *reh'g denied and opinion modified*, 409 F.3d 653 (5th Cir. 2005).  The Fifth Circuit upheld investors' accounting-fraud claims, holding that fraud is pled as to both defendants when one knowingly utters a false statement and the other knowingly fails to correct it, even if the complaint does not specify who spoke and who listened.

- **Illinois Municipal Ret. Fund v. Citigroup, Inc.**, 391 F.3d 844 (7th Cir. 2004).  The Seventh Circuit upheld a district court's decision that the Illinois Municipal Retirement Fund was entitled to litigate its claims under the Securities Act of 1933 against WorldCom's underwriters before a state court rather than before the federal forum sought by the defendants.

- **Nursing Home Pension Fund, Local 144 v. Oracle Corp.**, 380 F.3d 1226 (9th Cir. 2004).  The Ninth Circuit ruled that defendants' fraudulent intent could be inferred from allegations concerning their false representations, insider stock sales and improper accounting methods.

- **Pirraglia v. Novell, Inc.**, 339 F.3d 1182 (10th Cir. 2003).  The Tenth Circuit upheld investors' accounting-fraud claims, holding that plaintiffs could not be expected to plead details of documents from defendants' files, that the materiality of defendants' false statements is usually not resolvable at the pleading stage, and that the absence of insider trading by individual defendants did not mean they lacked a motive to commit fraud.

- **No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.**, 320 F.3d 920 (9th Cir. 2003).  The Ninth Circuit upheld investors' fraud claims, ruling that the materiality of defendants' fraud was not reflected in the stock's market price until the full economic effects of defendants' fraud were finally revealed, and that a lack of stock sales by defendants is not dispositive as to scienter.

- **Herrgott v. U.S. Dist. Court for the N. Dist. of Cal. (In re Cavanaugh)**, 306 F.3d 726 (9th Cir. 2002).  The Ninth Circuit disallowed judicial auctions to select lead plaintiffs in securities class actions and protected lead plaintiffs' right to select the lead counsel they desire to represent them.

- **Lone Star Ladies Inv. Club v. Schlotzsky's Inc.**, 238 F.3d 363 (5th Cir. 2001).  The Fifth Circuit upheld investors' claims that securities offering documents were incomplete and misleading, reversing a district court order that had applied inappropriate pleading standards to dismiss the case.

- **City of Monroe Employees Ret. Sys. v. Bridgestone Corp.**, 387 F.3d 468 (6th Cir. 2004). The Sixth Circuit held that a statement regarding objective data supposedly supporting a corporation's belief that its tires were safe was actionable where jurors could have found a reasonable basis to believe the corporation was aware of undisclosed facts seriously undermining the statement's accuracy.

- ***Southland Sec. Corp. v. INSpire Ins. Solutions Inc.***, 365 F.3d 353 (5th Cir. 2004). The Fifth Circuit sustained allegations that an issuer's CEO made fraudulent statements in connection with a contract announcement.

- ***Fox v. JAMDAT Mobile, Inc.***, 185 Cal. App. 4th 1068 (2010). Concluding that Delaware's shareholder ratification doctrine did not bar the claims, the California Court of Appeal reversed dismissal of a shareholder class action alleging breach of fiduciary duty in a corporate merger.

Insurance

- ***Lebrilla v. Farmers Group, Inc.***, 119 Cal. App. 4th 1070 (2004). Reversing the trial court, the California Court of Appeal ordered class certification of a suit against Farmers, one of the largest automobile insurers in California and ruled that Farmers' standard automobile policy requires it to provide parts that are as good as those made by vehicle's manufacturer. The case involved Farmers' practice of using inferior imitation parts when repairing insureds' vehicles.

- ***Dehoyos v. Allstate Corp.***, 345 F.3d 290 (5th Cir. 2003). The Fifth Circuit Court of Appeals held that claims under federal civil rights statutes involving the sale of racially discriminatory insurance policies based upon the use of credit scoring did not interfere with state insurance statutes or regulatory goals and were not preempted under the McCarran-Ferguson Act. Specifically, the Appellate Court affirmed the district court's ruling that the McCarran-Ferguson Act does not preempt civil-rights claims under the Civil Rights Act of 1866 and the Fair Housing Act for racially discriminatory business practices in the sale of automobile and homeowners insurance. The United States Supreme Court denied defendants' petition for certiorari and plaintiffs can now proceed with their challenge of defendants' allegedly discriminatory credit scoring system used in pricing of automobile and homeowners insurance policies.

- ***In re Monumental Life Ins. Co.***, 365 F.3d 408 (5th Cir. 2004). The Fifth Circuit Court of Appeals reversed a district court's denial of class certification in a case filed by African-Americans seeking to remedy racially discriminatory insurance practices. The Fifth Circuit held that a monetary relief claim is viable in a Rule 23(b)(2) class if it flows directly from liability to the class as a whole and is capable of classwide "computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances."

- ***Moore v. Liberty Nat'l Life Ins. Co.***, 267 F.3d 1209 (11th Cir. 2001). The Eleventh Circuit affirmed the district court's denial of the defendant's motion for judgment on the pleadings, rejecting contentions that insurance policyholders' claims of racial discrimination were barred by Alabama's common law doctrine of repose. The Eleventh Circuit also rejected the insurer's argument that the McCarran-Ferguson Act mandated preemption of plaintiffs' federal civil rights claims under 42 U.S.C. §§1981 and 1982.

- ***Mass. Mut. Life Ins. Co. v. Super. Ct.***, 97 Cal. App. 4th 1282 (2002). The California Court of Appeal affirmed a trial court's Order certifying a class in an action by purchasers of so-called "vanishing premium" life-insurance policies who claimed violations of California's consumer-protection statutes. The Court held that common issues predominate where plaintiffs allege a uniform failure to disclose material information about policy dividend rates.

- ***Smith v. Am. Family Mut. Ins. Co.***, 289 S.W.3d 675 (W.D. Mo. 2009). Capping nearly a decade of hotly contested litigation, the Missouri Court of Appeals reversed the trial court's judgment

notwithstanding the verdict for auto insurer American Family and reinstated a unanimous jury verdict for the plaintiff class.

- ***Troyk v. Farmers Group, Inc.***, 171 Cal. App. 4th 1305 (2009). The California Court of Appeal held that Farmers Insurance's practice of levying a "service charge" on one-month auto insurance policies, without specifying the charge in the policy, violated California's Insurance Code.

Consumer Protection

- ***Sanford v. MemberWorks, Inc.***, 483 F.3d 956 (9th Cir. 2007). In a telemarketing-fraud case, where the plaintiff consumer insisted she had never entered the contractual arrangement that defendants said bound her to arbitrate individual claims to the exclusion of pursuing class claims, the Ninth Circuit reversed an order compelling arbitration – allowing the plaintiff to litigate on behalf of a class.

- ***Benson v. Kwikset Corp.***, 152 Cal. App. 4th 1254 (2007). In the first published decision to apply California's "Made in the USA" statute, the California Court of Appeal ruled that the statute had been violated and that judgment should be re-entered against Kwikset provided the plaintiff can satisfy Proposition 64's amendments to the Unfair Competition Law.  The case is now pending now before the California Supreme Court on the issue of whether the initiative's new standing requirements were met.

- ***Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n***, 148 P.3d 1179 (Haw. 2006). The Supreme Court of Hawaii ruled that claims of unfair competition were not subject to arbitration and that claims of tortious interference with prospective economic advantage were adequately alleged.

- ***Branick v. Downey Sav. & Loan Ass'n***, 39 Cal. 4th 235 (2006). Robbins Geller Rudman & Dowd LLP attorneys were part of a team of lawyers that briefed this case at the Supreme Court of California. The Court issued a unanimous decision holding that new plaintiffs may be substituted, if necessary, to preserve actions pending when Proposition 64 was passed by California voters in 2004. Proposition 64 amended California's Unfair Competition Law and was aggressively cited by defense lawyers in an effort to dismiss cases after the initiative was adopted.

- ***McKell v. Washington Mut. Inc.***, 142 Cal. App. 4th 1457 (2006). The California Court of Appeal reversed the trial court, holding that plaintiff's theories attacking a variety of allegedly inflated mortgage related fees were actionable.

- ***West Corp. v. Super. Ct.***, 116 Cal. App. 4th 1167 (2004). The California Court of Appeal upheld the trial court's finding that jurisdiction in California was appropriate over the out-of-state corporate defendant whose telemarketing was aimed at California residents. Exercise of jurisdiction was found to be in keeping with considerations of fair play and substantial justice.

- ***Ritt v. Billy Blanks Enters.***, 870 N.E.2d 212 (Ohio Ct. App. 2007). In the Ohio analog to the West case, the Ohio Court of Appeals approved certification of a class of Ohio residents seeking relief under Ohio's consumer protection laws for the same telemarketing fraud.

- ***Kruse v. Wells Fargo Home Mortgage, Inc.***, 383 F.3d 49 (2d Cir. 2004) and ***Santiago v. GMAC Mortgage Group, Inc.***, 417 F.3d 384 (3d Cir. 2005). In two groundbreaking federal appellate decisions, the

Second and Third Circuits each ruled that the Real Estate Settlement Practices Act prohibits marking up home loan-related fees and charges.

- ***Lavie v. Procter & Gamble Co.***, 105 Cal. App. 4th 496 (2003). The California Court of Appeal issued an extensive opinion elaborating, for the first time in California law, the meaning of the "reasonable consumer" standard. The Court announced a balanced approach that has enabled actions under California's leading consumer protection statutes when necessary to protect the public from acts of unfair business competition.

- ***Kasky v. Nike, Inc.***, 27 Cal. 4th 939 (2002). The California Supreme Court upheld claims that an apparel manufacturer misled the public regarding its exploitative labor practices, thereby violating California statutes prohibiting unfair competition and false advertising. The Court rejected defense contentions that such misconduct was protected by the First Amendment.

- ***Spielholz v. Superior Court***, 86 Cal. App. 4th 1366 (2001). The California Court of Appeal held that false advertising claims against a wireless communications provider are not preempted by the Federal Communications Act of 1934.

- ***Safeco Ins. Co. of Am. v. Super. Ct.***, 173 Cal. App. 4th 814 (2009). In a class action against auto insurer Safeco, the California Court of Appeal agreed that the plaintiff should have access to discovery to identify a new class representative after her standing to sue was challenged.

- ***Koponen v. Pacific Gas & Electric***, 165 Cal. App. 4th 345 (2008). The firm's attorneys obtained a published decision reversing the trial court's dismissal of the action, and holding that the plaintiff's claims for damages arising from the utility's unauthorized use of rights-of-way or easements obtained from the plaintiff and other landowners were not barred by a statute limiting the authority of California courts to review or correct decisions of the California Public Utilities Commission.

- ***Consumer Privacy Cases***, 175 Cal. App. 4th 545 (2009). The California Court of Appeal rejected objections to a nationwide class action settlement benefiting Bank of America customers.

## THE FIRM'S PARTNERS

**X. JAY ALVAREZ** graduated from the University of California, Berkeley, with a Bachelor of Arts degree in Political Science in 1984. He earned his Juris Doctor degree from the University of California, Berkeley, Boalt Hall, in 1987 and entered private practice in San Diego, California that same year.

Mr. Alvarez served as an Assistant United States Attorney for the Southern District of California from 1991-2003. As an Assistant United States Attorney, Mr. Alvarez obtained extensive trial experience, including the prosecution of bank fraud, money laundering, and complex narcotics conspiracy cases. During his tenure as an Assistant United States Attorney, Mr. Alvarez also briefed and argued numerous appeals before the Ninth Circuit Court of Appeals.

At Robbins Geller Rudman & Dowd LLP, Mr. Alvarez's practice areas include securities fraud litigation and other complex litigation.

**STEPHEN R. ASTLEY** earned his Bachelor of Science degree in Communication from Florida State University and his Masters degree in Accounting from the University of Hawaii at Manoa. He also attended the University of Miami School of Law where he earned his Juris Doctor degree, *cum laude*. From 2002-2003, Mr. Astley clerked for the Honorable Peter T. Fay, U.S. Court of Appeals for the Eleventh Circuit.

Prior to joining Robbins Geller Rudman & Dowd LLP, Mr. Astley was a senior associate with the Miami office of Hunton & Williams, where he concentrated his practice on class action defense, including securities class actions, and white collar criminal defense. Mr. Astley also represented numerous corporate clients accused of engaging in unfair and deceptive practices.

Prior to joining Hunton & Williams, Mr. Astley was an active duty member of the United States Navy's Judge Advocate General's Corps. In that capacity, Mr. Astley was the Senior Defense Counsel for the Naval Legal Service Office Pearl Harbor Detachment where he was the lead trial defense counsel in numerous court-martials and oversaw the operations of a large Navy legal department, including its attorneys and support staff. Mr. Astley currently holds the rank of Lieutenant.

A substantial portion of Mr. Astley's current practice is devoted to representing shareholders in actions brought under the federal securities laws.

Mr. Astley is admitted to practice law in Florida, California, and Washington, D.C.. He has been admitted to practice before the United States Court of Appeals for the First and Eleventh Circuits, the Southern and Middle Districts of Florida, the United States Court of Appeals for the Armed Forces, and the United States Tax Court. Mr. Astley is a licensed CPA in Florida.

**A. RICK ATWOOD, JR.** has successfully represented shareholders in securities class actions, merger-related class actions, and shareholder derivative suits in federal and state courts in numerous jurisdictions, including Alabama, Arizona, California, Colorado, Delaware, Georgia, Hawaii, Illinois, Iowa, Idaho, Kentucky, Maryland, Missouri, Nevada, New York, New Jersey, North Carolina, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Washington, D.C. Through his litigation efforts at both the trial and appellate levels, Mr. Atwood has helped recover billions of dollars for public shareholders.

Significant reported opinions include: *Crandon Capital Partners v. Shelk*, 342 Ore. 555 (2007) (reversing dismissal of action); *Ind. State Dist. Council of Laborers and HOD Carriers Pension Fund v. Renal Care Group, Inc.*, No. 3:05-0451, 2005 U.S. Dist. LEXIS 24210 (M.D. Tenn. Aug. 18, 2005) (successfully obtaining remand of case improperly removed to federal court under the

Class Action Fairness Act); *Pipefitters Locals 522 & 633 Pension Trust Fund v. Salem Commc'ns Corp.*, No. CV 05-2730-RGK (MCx), 2005 U.S. Dist. LEXIS 14202 (C.D. Cal. June 28, 2005) (successfully obtaining remand of case improperly removed to federal court under the Securities Litigation Uniform Standards Act of 1998); *In re Prime Hospitality, Inc. S'holders Litig.*, No. 652-N, 2005 Del. Ch. LEXIS 61 (Del. Ch. May 4, 2005) (successfully objecting to unfair settlement and thereafter obtaining $25 million recovery for shareholders); *Ind. State Dist. Council of Laborers v. Brukardt*, No. M2007-02271-COA-R3-CV, 2009 Tenn. App. LEXIS 269 (Tenn. Ct. App. Feb. 19, 2009) (reversing dismissal of action); *Pate v. Elloway*, No. 01-03-00187-CV, 2003 Tex. App. LEXIS 9681 (Tex. App. Houston 1st Dist. Nov. 13, 2003) (upholding grant of class certification and denial of motion to dismiss).

Mr. Atwood was born in Nashville, Tennessee in 1965. In 1987, he earned a Bachelor of Arts degree, with honors, in Political Science from the University of Tennessee at Knoxville. In 1988, he earned a Bachelor of Arts degree, with great distinction, in Philosophy from the Katholieke Universiteit Leuven in Leuven, Belgium. Mr. Atwood earned his Juris Doctor degree in 1991 from Vanderbilt University Law School, where he served as Authorities Editor on the *Vanderbilt Journal of Transnational Law*. Mr. Atwood was admitted to the California Bar in 1991, and is licensed to practice before the United States District Courts for the Southern, Central, and Northern Districts of California.

**RANDI D. BANDMAN** is a partner in the Firm's New York office whose responsibilities include coordination of the Firm's Institutional Investor Department and implementation of the Firm's Portfolio Monitoring Program[SM] on behalf of hundreds of clients. Ms. Bandman is also responsible for directing the prosecution of numerous complex securities cases, such as *In re Societe Generale*. Ms. Bandman received her Juris Doctor degree from the University of Southern California and her Bachelor of Arts

degree in English from the University of California at Los Angeles.

Using her extensive experience, Ms. Bandman lectures and advises public and multi-employer pension funds, fund managers, banks, hedge funds and insurance companies, both domestically and internationally, on their options for seeking redress for losses due to fraud sustained in their portfolios. These clients include various States and Municipalities, as well as trades such as Teamsters, the Entertainment Industry, Sheet Metal, Construction, Air Conditioning, Food and Hospitality, Nursing and Plumbers.

Ms. Bandman has represented hundreds of institutional investors, including domestic and non-U.S. investors in some of the largest and most successful shareholder actions ever prosecuted, resulting in billions of dollars of recoveries, both as private opt-out and class actions, and involving such companies as Enron, WorldCom, AOL Time Warner, Unocal and Boeing. Ms. Bandman initiated the class action against Vivendi, which resulted in one of the first and most successful decisions recognizing a worldwide class of investors. Ms. Bandman was also instrumental in the landmark 1998 state settlement with the tobacco companies for $12.5 billion.

**RANDALL J. BARON** specializes in securities litigation, corporate takeover litigation and breach of fiduciary duty actions. For more than a decade, Mr. Baron has headed up a team of lawyers who have been instrumental in shaping merger and acquisition, and breach of fiduciary duty litigation throughout the country. By focusing on an in depth understanding of merger and acquisition and breach of fiduciary duty law, an ability to work under extreme time pressures and the experience and willingness to take a case through trial, Mr. Baron has been responsible for obtaining hundreds of millions of dollars in additional consideration for shareholders.

A few recent notable achievements include: *In re Chaparral Res., Inc. S'holder Litig.*, (Del. Ch.),

where Mr. Baron was one of the lead trial counsel, resulted in a common fund settlement of $41 million (or 45% increase above merger price) after a full trial and a subsequent mediation before the Delaware Chancellor. The Delaware Vice Chancellor who presided over the trial noted that "the performance [of the attorneys on the case] was outstanding, and frankly, without the efforts of counsel, nothing would have been achieved." *In re Prime Hospitality, Inc. S'holder Litig.*, (Del. Ch.), where Mr. Baron led a team of lawyers who objected to a settlement that was unfair to the class and proceeded to litigate breach of fiduciary duty issues involving a sale of hotels to a private equity firm. The litigation resulted in a common fund settlement of $25 million for shareholders. As the Delaware Chancellor presiding over the case noted: "[H]ad it not been for the intervention of [Robbins Geller Rudman & Dowd LLP] . . . there would not have been a settlement that would have generated actual cash for the shareholders." *Dollar Gen. S'holder Litig.* (Cir. Ct., Davidson County, Tenn.), where Mr. Baron was lead trial counsel and helped to secure a settlement of up to a $57 million in a common fund shortly before trial. *ACS S'holder Litig.* (Dallas County Ct, Dallas, Tex), where Mr. Baron led the negotiations and obtained significant concessions from ACS's acquirer, Xerox, by which shareholders would not be locked out of receiving more money from another buyer. *The New York Times* Deal Professor deemed this result both "far reaching" and "unprecedented." *WorldCom Sec. Litig.* (S.D.N.Y.), where Mr. Baron was one of the lead attorneys representing over 60 public and private institutional investors that filed and settled individual actions.

Formerly, Mr. Baron served as a Deputy District Attorney in Los Angeles County. From 1990-1994, he was a trial deputy in numerous offices throughout Los Angeles County, where he tried over 70 felony cases. From 1990-1994, Mr. Baron was part of the Special Investigation Division of the Los Angeles District Attorneys office, where he investigated and prosecuted

public corruption cases. Mr. Baron received his Bachelor of Arts degree from University of Colorado at Boulder in 1987 and his Juris Doctor degree, *cum laude*, from the University of San Diego School of Law in 1990.

**DOUGLAS R. BRITTON** was born in Los Angeles, California, in 1968. Mr. Britton received his Bachelor of Business Administration degree from Washburn University in Topeka, Kansas in 1991 and his Juris Doctor degree, *cum laude*, from Pepperdine University Law School in 1996.

Mr. Britton was admitted to the Nevada Bar in 1996 and to the California Bar in 1997. He is admitted to practice in all of the state courts in California, as well as the United States District Courts for the Northern, Southern, Eastern and Central Districts of California.

Mr. Britton has been litigating securities class action lawsuits since his admission to the Bar in 1996. Mr. Britton has been involved in settlements exceeding $1 billion and has secured significant corporate governance enhancements to improve corporate functioning.

**LUKE O. BROOKS** is a partner in the Firm's securities litigation practice group. Mr. Brooks earned his Bachelor of Arts degree from the University of Massachusetts at Amherst in 1997 and his Juris Doctor degree from the University of San Francisco in 2000, where he was a member of the *University of San Francisco Law Review*. In 1999, Mr. Brooks externed for the Honorable Vaughn R. Walker, United States District Court, Northern District of California.

Mr. Brooks focuses primarily on securities fraud litigation on behalf of individual and institutional investors, including state and municipal pension funds, Taft-Hartley funds, and private retirement and investment funds. Mr. Brooks was on the trial team that won a jury verdict in *Jaffe v. Household Int'l*, No. 02-C-5893 (N.D. Ill.), a securities fraud class action against one of the world's largest subprime lenders. Although the

litigation is ongoing, the *Household* verdict is expected to yield in excess of $1 billion for the plaintiff class.

Mr. Brooks is admitted to all California courts, the United States District Court for the Northern, Central and Southern Districts of California and the Northern District of Illinois.

**ANDREW J. BROWN** received his Bachelor of Arts degree from the University of Chicago in 1988 and received his Juris Doctor degree from the University of California, Hastings College of Law in 1992. Upon passing the Bar, Mr. Brown worked as a trial lawyer for the San Diego County Public Defender's Office. In 1997, he opened his own firm in San Diego, representing consumers and insureds in lawsuits against major insurance companies. He joined Robbins Geller Rudman & Dowd LLP's predecessor firm in 2000.

As a partner of the Firm, Mr. Brown prosecutes complex securities fraud and shareholder derivative actions against executives and corporations. His efforts have resulted in numerous multi-million dollar recoveries to shareholders and precedent-setting changes in corporate practices. Recent examples include: *Batwin v. Occam Networks, Inc.,* No. CV 07-2750, 2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008); *In re Constar Int'l, Inc. Sec. Litig.,* 585 F. 3d 774 (3rd Cir. 2009); *In re Unumprovident Corp. Sec. Litig.,* 396 F. Supp. 2d 858 (E.D. Tenn. 2005); and *In re UnitedHealth Group Inc. PSLRA Litig.,* No. 06-CV-1691, 2007 U.S. Dist. LEXIS 94616 (D. Minn. Dec. 26, 2007). Mr. Brown has been responsible for recovering more than a billion dollars for defrauded investors.

Mr. Brown is admitted to the Bars of California and the United States District Courts for all Districts in California.

**JOY ANN BULL** received her Juris Doctor degree, *magna cum laude,* from the University of San Diego in 1988. She was a member of the University of San Diego National Trial Competition Team and the *San Diego Law Review*. Ms. Bull focuses on the litigation of complex securities and consumer class actions.

For nine years, Ms. Bull has concentrated her practice in negotiating and documenting complex settlement agreements and obtaining the required court approval of the settlements and payment of attorneys' fees. These settlements include: *In re Dole S'holders Litig.,* Case No. BC281949 (Cal. Super. Ct., Los Angeles County) ($172 million recovery plus injunctive relief); *Lindmark v. Am. Express,* Case No. 00-8658-JFW(CWx) (C.D. Cal.) ($38 million cash payment plus injunctive relief); *In re Disposable Contact Lens Antitrust Litig.,* MDL No. 1030 (M.D. Fla.) ($89 million); *In re LifeScan, Inc. Consumer Litig.,* Case No. C-98-20321-JF(EAI) (N.D. Cal.) ($45 million cash recovery); *In re Bergen Brunswig Corp. Sec. Litig.,* Case No. SACV-99-1305-AHS(ANx) (C.D. Cal.) ($27.9 million cash recovery); *Hall v. NCAA,* Case No. 94-2392-KHV (D. Kan.) (more than $70 million cash recovery); *In re Glen Ivy Resorts, Inc.,* Case No. SD92-16083MG (Banker. Ct. C.D. Cal.) ($31 million cash recovery); and *In re Advanced Micro Devices Sec. Litig.,* Case No. C-93-20662-RPA(PVT) (N.D. Cal.) ($34 million cash recovery).

**SPENCER A. BURKHOLZ** received his Bachelor of Arts degree in Economics, *cum laude,* from Clark University in 1985, where he was elected to Phi Beta Kappa, and received his Juris Doctor degree from the University of Virginia School of Law in 1989. Mr. Burkholz specializes in securities class actions and has been involved in some of the most high-profile cases in the nation in the past decade.

Mr. Burkholz was one of the lead trial attorneys in the high-profile *Household* securities class action case that resulted in a jury verdict on liability and per share damages in favor of investors in May 2009. *Jaffe et al. v. HSBC*. Mr. Burkholz has also represented public and private institutional investors in the *Enron*, *WorldCom*, *Qwest*, and

*Cisco* securities class actions, which have recovered billions of dollars for investors.

Mr. Burkholz is a member of the California Bar and has been admitted to practice in numerous federal courts throughout the country.

**CHRIS COLLINS** earned his Bachelor of Arts degree in History from Sonoma State University in 1988 and his Juris Doctor degree from Thomas Jefferson School of Law. His practice areas include antitrust and consumer protection. Mr. Collins first joined the firm in 1994 and was a part of the trial teams that successfully prosecuted the tobacco industry. Mr. Collins left the firm and served as a Deputy District Attorney for the Imperial County where he was in charge of the Domestic Violence Unit. Mr. Collins is currently counsel on the California Energy Manipulation antitrust litigation, the Memberworks upsell litigation, as well as a number of consumer actions alleging false and misleading advertising and unfair business practices against major corporations.

Mr. Collins is a member of the American Bar Association, the Federal Bar Association, the California Bar Association, and the Consumer Attorneys of California and San Diego.

**JOSEPH D. DALEY** received his Juris Doctor degree from the University of San Diego School of Law. Mr. Daley is a member of the Firm's Appellate Practice Group, where his practice concentrates on federal appeals. Precedents include: *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009); *In re HealthSouth Corp. Secs. Litig.*, 2009 U.S. App. LEXIS 13035 (11th Cir. June 17, 2009); *Frank v. Dana Corp.*, 547 F.3d 564, (6th Cir. 2008); *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008); *In re Merck & Co., Inc.*, 493 F.3d 393 (3d Cir. 2007); *In re Qwest Commc'ns Int'l*, 450 F.3d 1179 (10th Cir. 2006); *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935 (10th Cir. 2005); *Southland*

*Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353 (5th Cir. 2004).

Mr. Daley is a past editor of the award-winning *Federal Bar Association Newsletter* (San Diego chapter) and has served as the Chair of San Diego's Co-operative Federal Appellate Committees ("COFACS"). Mr. Daley co-authored *What's Brewing in Dura v. Broudo? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and Its Import for Securities-Fraud Litigation*, 37 Loy. U. Chi. L.J. 1 (2005), and *The Nonretroactivity of the Private Securities Litigation Reform Act of 1995*, 25 Sec. Regulation L.J. 60 (1997), reprinted in 3 Sec. Reform Act Litig. Rep. 258 (1997) and 25 RICO L. Rep. 819 (1997).

While attending law school, Mr. Daley was a member of the USD Appellate Moot Court Board and received several awards for written and oral advocacy, including: Order of the Barristers, Roger J. Traynor Constitutional Law Moot Court Competition (Best Advocate Award); Philip C. Jessup International Law Moot Court Competition (United States National Champions); USD Alumni Torts Moot Court Competition (First Place Overall and Best Brief); the USD Jessup International Law Moot Court Competition (First Place Overall and Best Brief); and the American Jurisprudence Award in Professional Responsibility.

Mr. Daley was admitted to the California Bar in 1996. He is admitted to practice before the Supreme Court of the United States, and the United States Courts of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and District of Columbia Circuits.

**PATRICK W. DANIELS** is a founding partner of the Firm and the global director of business development. He received his Bachelor of Arts degree from the University of California, Berkeley, *cum laude*, and his Juris Doctor degree from the University of San Diego School of Law.

Mr. Daniels is widely recognized as a leading corporate governance and investor advocate. The Editorial Board of the preeminent legal publisher in California named Mr. Daniels one of the 20 most influential lawyers in the state under 40 years of age. And Yale School of Management's Millstein Center for Corporate Governance & Performance awarded Mr. Daniels its "Rising Star of Corporate Governance" for his outstanding leadership in shareholder advocacy and activism.

Mr. Daniels is an advisor to political and financial leaders throughout the world. He counsels state government pension funds, central banks and fund managers in the United States, Australia, United Arab Emirates, United Kingdom, the Netherlands and other countries within the European Union on issues related to corporate fraud in the United States securities markets and "best practices" in the corporate governance of publicly traded companies. Mr. Daniels has represented dozens of institutional investors in some of the largest and most significant shareholder actions in the United States, including, UBS, Enron, WorldCom, AOL Time Warner and BP, to name just a few.

In advancing international standards on human rights, Mr. Daniels was a lead counsel in an international coalition of attorneys and human rights groups that won a historic settlement with major United States clothing retailers and manufacturers, including The Gap, Ralph Lauren, Donna Karan and Calvin Klein, on behalf of a class of over 50,000 predominantly female Chinese garment workers on the island of Saipan in an action seeking to hold the Saipan garment industry responsible for creating a system of indentured servitude and forced labor in the island's garment factories. The coalition obtained an unprecedented agreement for supervision of working conditions in the Saipan factories by an independent NGO, as well as a substantial multi-million dollar compensation award for the workers.

Mr. Daniels is based at the Firm's headquarters in San Diego and is also a managing partner of the Firm's Manhattan office.

**STUART A. DAVIDSON** is admitted to practice law in the state courts of Florida, as well as the United States District Courts for the Southern, Middle, and Northern Districts of Florida, the Northern District of Texas, the Northern District of Indiana, the Third, Eighth, Tenth and Eleventh Circuit Courts of Appeals, and the United States Supreme Court.

Mr. Davidson earned his Bachelor of Arts degree in Political Science from the State University of New York at Geneseo. He then earned his Juris Doctor degree, *summa cum laude*, from Nova Southeastern University Shepard Broad Law Center, where he graduated in the top 3% of his class. At Nova Law, he was an Associate Editor of the Nova Law Review, and was the recipient of Book Awards (highest grade) in Trial Advocacy, Criminal Pretrial Practice, and International Law.

Before joining the Firm in 2004, Mr. Davidson was an associate with the law firm of Geller Rudman, PLLC in Boca Raton, Florida, where he also concentrated his practice on the prosecution of class actions. At Geller Rudman, Mr. Davidson handled numerous cases on behalf of shareholders of public corporations whose shares were to be acquired through leveraged buyouts, mergers, tender offers, and other "change of control" transactions, as well as derivative lawsuits filed against corporate boards, seeking to impose corporate governance reforms aimed at protecting shareholders and eliminating corporate waste and abuse. Mr. Davidson also represented consumers in numerous cases in which allegations of consumer fraud and deceptive trade practices were alleged.

Prior to joining Geller Rudman, Mr. Davidson was an associate at a private law firm in Boca Raton, Florida, where he gained substantial experience in all aspects of securities litigation, including, among other things, SEC and NASD

enforcement proceedings, securities regulatory proceedings by state and self-regulatory organizations, federal criminal securities fraud prosecutions, federal securities appellate litigation, and NASD customer arbitration proceedings, as well as acting as counsel for court-appointed receivers in complex federal securities and franchise litigation proceedings. In addition, Mr. Davidson is an experienced trial lawyer, having been a former lead assistant public defender in the Felony Division of the Broward County, Florida Public Defender's Office. During his tenure at the Public Defender's Office, Mr. Davidson tried over 30 jury trials, conducted hundreds of depositions, handled numerous evidentiary hearings, engaged in extensive motion practice, and defended individuals charged with major crimes ranging from third-degree felonies to life and capital felonies.

A substantial portion of Mr. Davidson's time is currently devoted to the representation of investors in class actions involving mergers and acquisitions and in prosecuting derivative lawsuits on behalf of public corporations. Mr. Davidson is also actively involved in prosecuting a number of consumer fraud cases throughout the nation. Mr. Davidson recently served as class counsel in *Kehoe v. Fidelity Federal Bank & Trust*, a consumer class action alleging privacy violations filed in the Southern District of Florida, which was settled for $50 million. In addition, Mr. Davidson currently serves as court-appointed co-lead counsel in *In re Pet Food Products Liability Litigation*, a multidistrict consumer class action pending in the District of New Jersey, where Mr. Davidson represents thousands of aggrieved pet owners nationwide against some of the nation's largest pet food manufacturers, distributors and retailers.

**MICHAEL J. DOWD** graduated from Fordham University, *magna cum laude*, with a Bachelor of Arts degree in History and Latin in 1981. While at Fordham, he was elected to Phi Beta Kappa. He earned his Juris Doctor degree from the University of Michigan School of Law in 1984

and entered private practice in New York that same year. He was admitted to practice in New York in 1985 and in California in 1988.

Mr. Dowd served as an Assistant United States Attorney in the Southern District of California from 1987-1991 and again from 1994-1998. As an Assistant United States Attorney, Mr. Dowd obtained extensive trial experience, including the prosecution of bank fraud, bribery, money laundering and narcotics cases. He is a recipient of the Director's Award for Superior Performance as an Assistant United States Attorney. Mr. Dowd has been responsible for prosecuting complex securities cases and obtaining recoveries for investors, including cases involving AOL Time Warner, UnitedHealth Group, WorldCom, Qwest, Vesta, U.S. West and Safeskin. Mr. Dowd was the lead lawyer for the Robbins Geller Rudman & Dowd LLP trial team in *In re AT&T Corp. Sec. Litig.*, which was tried in the District of New Jersey and settled after two weeks of trial for $100 million. In 2009, Mr. Dowd, with his partners Spencer Burkholz and Daniel Drosman, tried *Jaffe v. Household International* in the Northern District of Illinois, in which the jury returned a verdict for plaintiffs on liability and an award of per share damages. Although the litigation is ongoing, the *Household* verdict is expected to yield in excess of $1 billion for the plaintiff class. Mr. Dowd also participated in the prosecution of the Firm's tobacco cases.

**TRAVIS E. DOWNS III** areas of expertise include prosecution of shareholder and securities litigation, including shareholder derivative litigation on behalf of corporations and shareholders injured by wayward corporate fiduciaries. Recently, Mr. Downs lead a team of lawyers who successfully prosecuted over sixty-five stock option backdating derivative actions in federal and state courts across the country, resulting in hundreds of millions in financial givebacks for the plaintiffs and extensive corporate governance enhancements, including annual directors elections, majority voting for directors and shareholder nomination of directors.

Mr. Downs specializes in shareholder derivative and class action litigation, and has helped recover hundreds of millions of dollars for corporations and shareholders injured by faithless corporate fiduciaries. Mr. Downs has extensive experience in federal and state shareholder litigation. Recently, he lead a team of lawyers who successfully prosecuted over sixty-five stock option backdating derivative actions pending in state and federal courts across the country, including: *In re Marvell Tech. Group, Inc. Deriv. Litig.* ($54 million in financial relief and extensive corporate governance enhancements); *In re McAfee, Inc. Deriv. Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re Affiliated Computer Servs., Inc. Deriv. Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re KB Home Deriv. Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re Juniper Network Deriv. Litig.* ($22.7 million in financial relief and extensive corporate governance enhancements); and *In re Nvidia Corp. Deriv. Litig.* ($15 million in financial relief and extensive corporate governance enhancements).

Mr. Downs was born in Quonset Point, Rhode Island in 1963. In 1985, he earned a Bachelors of Arts, with honors, in History from Whitworth University in Spokane, Washington. After college, Mr. Downs worked at Procter & Gamble. In 1990, Mr. Downs earned a Juris Doctor from the University of Washington School of Law in Seattle, Washington. Mr. Downs was admitted to the California Bar in 1990, and is admitted to practice before the United States District Courts for the Central, Eastern, Northern and Southern Districts of California. Mr. Downs is a frequent speaker at conferences and seminars and has lectured on a variety of topics related to shareholder derivative and class action litigation.

**DANIEL DROSMAN** is a partner with Robbins Geller Rudman & Dowd LLP. He is a former federal prosecutor with extensive litigation experience before trial and appellate courts. His practice focuses on securities fraud litigation and other complex civil litigation. Mr. Drosman is admitted to practice in New York and California and before federal courts throughout those states.

Mr. Drosman is a native San Diegan who received his Bachelor of Arts degree in Political Science from Reed College in 1990, with honors, and was a member of Phi Beta Kappa. He received his Juris Doctor degree from Harvard Law School in 1993. Following graduation from law school, Mr. Drosman served for three years as an Assistant District Attorney for the Manhattan District Attorney's Office. While there, Mr. Drosman served in both the appellate section, where he briefed and argued over 25 cases to the New York appellate courts, and in the trial section, where he prosecuted a wide variety of street crime.

From 1996-1997, Mr. Drosman was an associate in the New York office of Weil Gotshal & Manges, where he concentrated his practice in civil litigation and white-collar criminal defense.

In 1997, Mr. Drosman returned to San Diego and became an Assistant United States Attorney in the Southern District of California. In the Southern District, Mr. Drosman tried cases before the United States District Court and briefed and argued numerous appeals before the Ninth Circuit Court of Appeals. He was a member of the border crimes unit, where he was assigned to investigate and prosecute violations of the federal narcotics and immigration laws and official corruption cases. During his tenure as an Assistant United States Attorney, Mr. Drosman received the Department of Justice Special Achievement Award in recognition of sustained superior performance of duty.

Mr. Drosman's practice involves representing defrauded investors in securities class actions, an area in which he has co-authored a law journal article.

**THOMAS E. EGLER** was born in Pittsburgh, Pennsylvania in 1967. Mr. Egler received his

Bachelor of Arts degree from Northwestern University in 1989. Mr. Egler received his Juris Doctor degree in 1995 from Catholic University of America, Columbus School of Law, where he served as Associate Editor for *Catholic University Law Review* from 1994-1995. From 1995-1997, Mr. Egler was a law clerk to the Honorable Donald E. Ziegler, Chief Judge, United States District Court, Western District of Pennsylvania.

Mr. Egler was admitted to the California Bar in 1995 and the Pennsylvania Bar in 1996. He is admitted to practice before the United States District Courts for the Western District of Pennsylvania, the Northern, Southern and Central Districts of California and the United States Court of Appeals for the Third and Eleventh Circuits.

PAUL J. GELLER received his Bachelor of Science degree in Psychology from the University of Florida, where he was a member of the University Honors Program. Mr. Geller earned his Juris Doctor degree, with Highest Honors, from Emory University School of Law. At Emory, Mr. Geller was an Editor of the *Law Review*, was inducted into the Order of the Coif legal honor society, and was awarded multiple American Jurisprudence Book Awards for earning the highest grade in the school in a dozen courses.

After spending several years representing blue chip companies in class action lawsuits at one of the largest corporate defense firms in the world, Mr. Geller became a founding partner and head of the Boca Raton office of a national class action boutique firm, Geller Rudman, PLLC. In July 2004, through a merger of the firms, Mr. Geller opened the Boca Raton, Florida office of Robbins Geller Rudman & Dowd LLP.

In May 2005, Mr. Geller was selected by *The National Law Journal* ("*NLJ*") as one of the nation's top "40 Under 40" – an honor bestowed upon 40 of the country's top lawyers under the age of 40. The *NLJ* previously compiled its "40 Under 40" list in July 2002, and Mr. Geller is the only lawyer in the country selected for inclusion

both in 2002 and again in 2005. In July 2006, as well as July 2003, Mr. Geller was featured in *Florida Trend* magazine as one of Florida's "Legal Elite." Mr. Geller was featured in the *South Florida Business Journal* as one of Florida's top lawyers, and named one of the nation's top 500 lawyers by *Lawdragon* in August 2006 and again in May 2010. In June 2007, Mr. Geller was selected by *Law & Politics* as one of Florida's top lawyers.

Mr. Geller is rated AV by Martindale-Hubbell (the highest rating available) and has served as lead or co-lead counsel in a majority of the securities class actions that have been filed in the southeastern United States in the past several years, including cases against Hamilton Bancorp ($8.5 million settlement); Prison Realty Trust (co-lead derivative counsel, total combined settlement of over $120 million); and Intermedia Corp. ($38 million settlement). Mr. Geller recently served as one of the court-appointed lead counsel in cases involving the alleged manipulation of the asset value of some of the nation's largest mutual funds, including *Hicks v. Morgan Stanley & Co.*; *Abrams v. Van Kampen Funds, Inc.*; and *In Re Eaton Vance Sec. Litig.* ($51.5 million aggregate settlements).

Mr. Geller is also heavily involved in corporate governance litigation. For example, Mr. Geller recently represented a shareholder of Applica, Inc. who was concerned with allegedly reckless acquisitions made by the company. Mr. Geller and his partners secured a settlement that required Applica, Inc. to establish a new independent Acquisitions Committee charged with conducting due diligence and approving future acquisitions, even though such a committee is not required by SEC regulations. In another corporate governance lawsuit, Mr. Geller and his co-counsel challenged the independence of certain members of a Special Committee empaneled by Oracle Corp. to look into certain stock sales made by its Chairman and CEO, Larry Ellison. After Delaware Chancery Court Vice Chancellor Leo E. Strine issued an Order agreeing that the Special Committee was

"fraught with conflicts," *The Wall Street Journal* called the decision "one of the most far-reaching ever on corporate governance."

Mr. Geller has also successfully represented consumers in class action litigation. He recently settled *Kehoe v. Fidelity Fed.*, a consumer class action alleging privacy violations filed in the Southern District of Florida, for $50 million. He was personal counsel to the lead plaintiff in *Stoddard v. Advanta*, a case that challenged the adequacies of interest rate disclosures by one of the nation's largest credit card companies ($11 million settlement), and was personal counsel to one of the lead plaintiffs in the American Family Publishers sweepstakes litigation, which alleged that the defendant misled consumers into thinking they would win a lottery if they purchased magazine subscriptions ($38 million settlement).

Mr. Geller is currently representing Emergency Room physicians in Florida who are suing four of the nation's largest HMOs for improper payment calculations. The four related cases have been through numerous appeals. After Mr. Geller's most recent appellate victory in the case, he was presented an award by the America Law Media's *Daily Business Review* and named one of "Florida's Most Effective Lawyers" in 2006.

During the past few years, several of Mr. Geller's cases have received regional and national press coverage. Mr. Geller has appeared on CNN Headline News, CNN Moneyline with Lou Dobbs, ABC, NBC and FOX network news programs. Mr. Geller is regularly quoted in the financial press, including *The New York Times*, *The Wall Street Journal*, *The Washington Post* and *BusinessWeek*.

Mr. Geller has been or is a member of the Association of Trial Lawyers of America, the Practicing Law Institute, the American Bar Association, the Palm Beach County Bar Association (former Member of Bar Grievance Committee) and the South Palm Beach County Bar Association (former Co-Chair of Pro Bono Committee).

**DAVID J. GEORGE** earned his Bachelor of Arts degree in Political Science from the University of Rhode Island, *summa cum laude*. Mr. George then graduated at the top of his class at the University of Richmond School of Law. At the University of Richmond, Mr. George was a member of the Law Review, was the President of the McNeill Law Society/Order of the Coif, and earned numerous academic awards, including outstanding academic performance in each of his three years there and outstanding graduate.

Before joining the Firm, Mr. George, who is AV rated by Martindale-Hubbell (the highest rating available), was a partner in the Boca Raton office of Geller Rudman, PLLC. Mr. George, a zealous advocate of shareholder rights, has been lead and/or co-lead counsel with respect to various securities class action matters, including: *In Re Cryo Cell Int'l, Inc. Sec. Litig.* ($7 million settlement); *In Re TECO Energy, Inc. Sec. Litig.* ($17.35 million settlement); *In Re Newpark Res., Inc. Sec. Litig.* ($9.24 million settlement); *In Re Mannatech, Inc. Sec. Litig.* ($11.5 million settlement); *Reese v. The McGraw Hill Companies, Inc.* (S.D.N.Y.); and *Kuriakose v. Fed. Home Loan Mtg. Co.* (S.D.N.Y.). Mr. George has also acted as lead counsel in numerous consumer class actions, including: *Lewis v. Labor Ready, Inc.* ($11 million settlement); *In Re Webloyalty, Inc. Mktg. and Sales Practices Litig.* ($10 million settlement); *In Re Navisite Migration Litigation* ($1.7 million settlement); and various cases regarding the Pinecastle Bombing Range (Mo. and Fla. District Courts, and Fla. State Court). Mr. George was also a member of the litigation team in *In Re UnitedHealth Group, Inc.* ($925.5 million settlement). Before joining Geller Rudman, Mr. George spent more than a decade as a commercial litigator with two of the largest corporate law firms in the United States. During that time, Mr. George aggressively prosecuted and defended a wide array of complex commercial litigation

matters, including securities class action matters, non-compete litigation, fraud claims, and real estate-based litigation matters.

In 2007, Mr. George was named one of Florida's Most Effective Corporate/Securities Lawyers, and was the only plaintiffs' securities class action counsel recognized.

Mr. George is licensed to practice law in the state courts of Florida, as well as the United States District Courts for the Southern, Middle, and Northern Districts of Florida, and the First and Fifth Circuit Courts of Appeal. Mr. George is currently, or has been, a member of the American Bar Association, the Federal Bar Association, the Academy of Florida Trial Lawyers, the Palm Beach County Bar Association, and the Southern Palm Beach County Bar Association.

JONAH H. GOLDSTEIN is a partner with Robbins Geller Rudman & Dowd LLP. Formerly, Mr. Goldstein was an Assistant United States Attorney in the United States Attorney's Office for the Southern District of California, where he obtained extensive trial experience (including a seven-defendant 11-week trial), and briefed and argued appeals before the Ninth Circuit Court of Appeals. Mr. Goldstein has been responsible for prosecuting complex securities cases and obtaining recoveries for investors. Mr. Goldstein was a member of the Firm's trial team in *In re AT&T Corp. Sec. Litig.*, No. 3:00-CV-5364, which was tried in the United States District Court for the District of New Jersey and settled after two weeks of trial for $100 million.

Mr. Goldstein graduated from Duke University with a Bachelor of Arts degree in Political Science in 1991. He received his Juris Doctor degree from the University of Denver College of Law in 1995, where he was the Notes & Comments Editor of the *University of Denver Law Review*. Following graduation from law school, Mr. Goldstein served as a law clerk for the Honorable William H. Erickson on the Colorado Supreme Court.

Mr. Goldstein is admitted to practice in Colorado (1995) and California (1997).

BENNY C. GOODMAN III'S concentrates his practice in shareholder derivative actions and securities class actions.

Most recently, Mr. Goodman achieved groundbreaking settlements as lead counsel in a number of shareholder derivative actions related to stock option backdating by corporate insiders. Notable among Mr. Goodman's recent backdating settlements are: *In re KB Home S'holder Deriv. Litig.*, No. CV-06-05148-FMC (C.D. Cal.) (extensive corporate governance changes, over $80 million cash back to the company); *In re Affiliated Computer Servs. Deriv. Litig.*, No. 06-CV-1110-M (N.D. Tex.) ($30 million); *Gunther v. Tomasetta, et al.*, No. 06-CV-02529-R (C.D. Cal.) (corporate governance overhaul, including shareholder nominated directors, and cash payment to Vitesse from corporate insiders).

Mr. Goodman also recently earned a landmark ruling from the Washington State Supreme Court. *In In re F5 Networks, Inc. Deriv. Litig.*, 166 Wn.2d 229 (Wash. 2009), the Washington Supreme Court held that Washington applies Delaware's demand futility standard rather than requiring universal demand as advocated by defendants. Additionally, the Court held that the reasoning found in *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) regarding demand futility in a stock option backdating case "follows naturally from Delaware's demand futility standard" and should be applied in Washington courts.

Mr. Goodman also represented over 60 public and private institutional investors that filed and settled individual actions in the *WorldCom* securities litigation. Additionally, Mr. Goodman successfully litigated several other notable securities class actions against companies such as Infonet Services Corporation, Global Crossing, and Fleming Companies, Inc., each of which resulted in significant recoveries for shareholders.

On the human rights front, Mr. Goodman was counsel for a class of over 50,000 Chinese garment workers from the island of Saipan in the Commonwealth of the Northern Mariana Islands who were being forced to work as indentured servants. The lawsuit resulted in a historic settlement with major United States clothing retailers and manufacturers, including The Gap, Ralph Lauren, Donna Karan and Calvin Klein that included an agreement providing independent supervision of working conditions in Saipan garment factories and multi-million dollar compensation for unpaid overtime work performed by class members.

Mr. Goodman earned his Bachelor of Science in Management Systems from Arizona State University in 1994, and his Juris Doctor degree from the University of San Diego in 2000. Mr. Goodman is admitted to practice in the all California and the District of Columbia courts as well as the United States Courts of Appeal for the Sixth and Seventh Circuits.

**ELISE J. GRACE** is a partner in the Firm's San Diego office and is responsible for advising the Firm's state and government pension fund clients on issues related to securities fraud and corporate governance. Ms. Grace currently serves as the Editor-in-Chief of the Firm's Corporate Governance Bulletin and is a frequent lecturer on securities fraud, shareholder litigation and options for institutional investors seeking to recover losses caused by securities and accounting fraud. Ms. Grace has significant experience prosecuting securities fraud class actions and was a member of the litigation team that secured a combined $629 million for defrauded shareholders in the *AOL Time Warner* state and federal securities opt-out litigations. Prior to joining the Firm, Ms. Grace was an associate at Brobeck Phleger & Harrison LLP and Clifford Chance LLP, where she defended various Fortune 500 companies in securities class actions and complex business litigation.

**JOHN K. GRANT** was born in Provo, Utah in 1961. Mr. Grant received his Bachelor of Arts degree from Brigham Young University in 1988 and his Juris Doctor degree from the University of Texas at Austin in 1990. Mr. Grant was admitted to the California Bar in 1994.

**KEVIN K. GREEN** represents defrauded investors and consumers in the appellate courts. Mr. Green is a partner in the Appellate Practice Group and a Certified Appellate Specialist, State Bar of California Board of Legal Specialization. Mr. Green also assists the Firm's trial litigators with briefing and strategy.

Mr. Green received his Bachelor of Arts degree, with honors and distinction, from the University of California at Berkeley in 1989. He took his Juris Doctor degree from Notre Dame Law School, and was admitted to the California Bar, in 1995. Before entering practice, Mr. Green served as law clerk to the Honorable Theodore R. Boehm (Supreme Court of Indiana) and the Honorable Barry T. Moskowitz (United States District Court, Southern District of California).

After briefing and arguing appeals and writs in jurisdictions across the country, Mr. Green was named a San Diego Super Lawyer (2008-present). Published decisions in which he played a substantial role include: *Fox v. JAMDAT Mobile, Inc.*, 185 Cal. App. 4th 1068 (2010); *In re F5 Networks, Inc.*, 207 P.3d 433 (Wash. 2009); *Safeco Ins. Co. of Am. v. Super. Ct.*, 173 Cal. App. 4th 814 (2009); *Smith v. Am. Family Mut. Ins. Co.*, 289 S.W.3d 675 (W.D. Mo. 2009); *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305 (2009); *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011 (Del. 2007); *Ritt v. Billy Blanks Enter.*, 870 N.E.2d 212 (Ohio Ct. App. 2007); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457 (2006); *In re Guidant S'holders Deriv. Litig.*, 841 N.E.2d 571 (Ind. 2006); *Denver Area Meat Cutters & Employers Pension Plan v. Clayton*, 209 S.W.3d 584 (Tenn. Ct. App. 2006); *Lebrilla v. Farmers Group, Inc.*, 119 Cal. App. 4th 1070 (2004); *West Corp. v. Super. Ct.*, 116 Cal. App. 4th 1167

(2004); and *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496 (2003).

Beyond his appellate practice, Mr. Green is active in professional activities. Mr. Green has served in the leadership of the Appellate Court Committee of the San Diego County Bar Association (Chair, 2010; Vice Chair, 2009; and Chair, Civil Rules Subcommittee, 2007-2008). Mr. Green also sat on the State Bar of California Committee on Appellate Courts (2006-2009). In addition, Mr. Green is a member of Consumer Attorneys of California (Amicus Curiae Committee), State Bar of California Antitrust and Unfair Competition Law Section, California Supreme Court Historical Society, American Constitution Society, Federal Bar Association and Bench-Bar Coalition. Past speaking engagements include: State Bar of California 82nd Annual Meeting (September 2009, Moderator for "Preparing an Appellate Record: As Important as the Brief?"); and Consumer Attorneys of California 47th Annual Convention (November 2008, Employment Litigation Panel).

In the publication area, Mr. Green has authored three articles: *A Tool for Mischief: Preemptive Defense Motions Under BCBG Overtime Cases to Reject Class Certification*, Forum (Vol. 38, No. 7, Jan./Feb. 2009) (with Kimberly A. Kralowec); *The Unfair Competition Law After Proposition 64: The California Supreme Court Speaks*, Journal of Competition (Vol. 15, No. 2, Fall/Winter 2006); and *A Vote Properly Cast? The Constitutionality of the National Voter Registration Act of 1993*, 22 Journal of Legislation 45 (1996).

**ELI GREENSTEIN** is a partner in the Firm's securities litigation practice group. Mr. Greenstein received his Bachelor of Arts degree in Business Administration in 1997 from the University of San Diego, where he was a Presidential Scholar. In 2001, Mr. Greenstein received his Juris Doctor degree from Santa Clara University School of Law. He also received a Master of Business Administration degree from Santa Clara University Leavey School of Business in 2002.

Prior to joining the Firm, Mr. Greenstein was a judicial extern for the Honorable James Ware, United States District Court, Northern District of California. He also worked for PricewaterhouseCoopers LLP in its International Tax and Legal Services division, and clerked on the trading floor of the Chicago Mercantile Exchange in the S&P 500 index futures and options division. Mr. Greenstein co-authored *Post-Enron: Auditor Independence, Regulation and Disclosure*, published in the Practising Law Institute's Hot Securities Litigation Issues in a Down Economy (2002).

Mr. Greenstein's primary practice area is securities fraud litigation on behalf of individual and institutional investors. His clients include state, county and municipal pension funds, Taft-Hartley funds, and private retirement and investment funds. He has been a member of the California Bar since 2001 and is admitted to practice in all California state courts, as well as federal courts in the Northern, Central and Eastern Districts of California and the Northern District of Illinois.

**TOR GRONBORG** was born in Portland, Oregon in 1969. Mr. Gronborg received his Bachelor of Arts degree in 1991 from the University of California at Santa Barbara and was a recipient of an AFL-CIO history scholarship. In 1992, Mr. Gronborg did graduate work in international relations and strategic studies at the University of Lancaster, United Kingdom on a Rotary International Fellowship. Mr. Gronborg received his Juris Doctor degree in 1995 from Boalt Hall at the University of California at Berkeley where he was a member of the Moot Court Board.

Since 1997, Mr. Gronborg has worked on securities fraud actions and has been lead or co-lead litigation counsel in cases that have recovered more than $1 billion, including: *In re Cardinal Health, Inc. Sec. Litig.* ($600 million);

*In re Prison Realty Sec. Litig.* ($104 million); *In re Accredo Health, Inc. Sec. Litig.* ($33 million); and *Roth v. Aon Corp.* ($30 million). On three separate occasions, Mr. Gronborg's pleadings have been upheld by the federal Courts of Appeals (*Broudo v. Dura Pharms., Inc.*, 339 F.3d 933 (9th Cir. 2003); *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005); *Staehr v. The Hartford Financial Services Group*, 2008 U.S. App. LEXIS 23551 (2d Cir. 2008)), and he has been responsible for a number of significant rulings, including: *Roth v. Aon Corp.*, 2008 U.S. Dist. LEXIS 18471 (N.D. Ill. 2008); *In re Cardinal Health Inc., Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006); *In re Direct Gen. Corp. Sec. Litig.*, Case No. 3:05-0077, 2006 U.S. Dist. LEXIS 56128 (M.D. Tenn. 2006); and *In re Dura Pharms., Inc. Sec. Litig.*, 452 F.Supp. 2d 1005 (S.D. Cal. 2006).

In addition to his securities litigation practice, Mr. Gronborg has lectured on the Federal Rules of Civil Procedure and electronic discovery.

**ELLEN A. GUSIKOFF STEWART** received her Bachelor of Arts degree in Economics from Muhlenberg College in 1986 and her Juris Doctor degree from Case Western Reserve University in 1989. Ms. Stewart was admitted to the California Bar in 1989 and is admitted to practice before all federal courts in California, the Sixth and Ninth Circuit Courts of Appeals, the Western District of Michigan, and the District of Colorado. Ms. Stewart is Peer-Rated by Martindale-Hubbell.

Ms. Stewart currently practices in the Firm's settlement department, negotiating and documenting the Firm's complex securities, merger, ERISA and stock options backdating derivative actions. Notably, recent settlements include: *In re Forest Labs., Inc. Sec. Litig.* (S.D.N.Y. 2009) ($65 million); *In re Activision, Inc. S'holder Deriv. Litig.* (C.D. Cal. 2008) ($24.3 million in financial benefits to Activision in options backdating litigation); *In re Affiliated Computer Servs. Deriv. Litig.* (N.D. Tex. 2009) ($30 million cash benefit to ACS in options

backdating litigation); and *In re TD Banknorth S'holders Litig.* (Del. Ct. of Chancery 2009) ($50 million).

**DENNIS J. HERMAN** received his Bachelor of Science degree from Syracuse University in 1982. He is a 1992 graduate of Stanford Law School, where he received the Order of the Coif and the Urban A. Sontheimer Award for graduating second in his class. Mr. Herman concentrates his practice in securities class action litigation.

Mr. Herman has lead or been significantly involved in the prosecution of numerous securities fraud claims that have resulted in substantial recoveries for investors, including settled actions against the Coca-Cola Company ($137 million), VeriSign Corp. ($78 million), NorthWestern Corp. ($40 million), Specialty Laboratories, Inc. ($12 million), Stellent, Inc. ($12 million) and Threshold Pharmaceuticals, Inc. ($10 million) (approval pending). Mr. Herman led the prosecution of the securities action against Lattice Semiconductor, Inc., which resulted in a significant, precedent-setting decision regarding the liability of officers who falsely certify the adequacy of internal accounting controls under the Sarbanes-Oxley Act. Mr. Herman has also successfully represented the estate of a bankrupt company in lawsuits against its former officers and outside auditor seeking recovery for actions that deepened the company's insolvency before it went bankrupt.

Previously, Mr. Herman practiced for 10 years in Denver, Colorado, where he had a general commercial litigation practice and litigated many fraud and other tort claims cases, as well as a wide variety of cases involving contract claims, land use disputes, environmental issues, inter-governmental disputes, voting rights, and intellectual property disputes. Mr. Herman is admitted to practice in both California and Colorado (inactive), and is a member of the bar of the United States Courts of Appeals for the Fifth, Eighth, Ninth and Tenth Circuits, as well as the bars of the United States District Courts for

Colorado, and the Northern, Central and Southern Districts of California.  Prior to attending law school, Mr. Herman was an award-winning investigative newspaper reporter and editor in California and Connecticut.

**JOHN HERMAN** has spent his career handling complex litigation, with a particular emphasis on patent litigation.  His practice focuses on vindicating the rights of famous innovators. Noteworthy cases of his include representing renowned inventor Ed Phillips in the landmark case of *Phillips v. AWH Corp.*; representing pioneers of mesh technology – David Petite, Edwin Brownrigg and IPCo – in a series of patent infringement cases on multiple patents; as well as acting as plaintiffs' counsel in the *In Re Home Depot* shareholder derivative actions pending in Fulton County Superior Court.

Mr. Herman is recognized by his peers as being among the leading intellectual property litigators in the Southeast.  He is regularly named as a Georgia Super Lawyer by Atlanta Magazine, and in 2007 he was named to the "Top 100" Georgia Super Lawyers list.  Mr. Herman also has been named one of "Georgia's Most Effective Lawyers" by Legal Trend.  He is a graduate of Vanderbilt University Law School (where he was Editor-in-Chief of the *Vanderbilt Journal* and a John Wade Scholar), and of Marquette University (B.S., Biochemistry, *summa cum laude*).

**ERIC ALAN ISAACSON** received his Bachelor of Arts degree *summa cum laude* from Ohio University in 1982.  He earned his Juris Doctor degree with high honors from Duke University School of Law in 1985 and was elected to the Order of the Coif.  Mr. Isaacson served as a Note and Comment Editor for the *Duke Law Journal* and in his third year of law school became a member of the Moot Court Board.  After graduation, Mr. Isaacson clerked for the Honorable J. Clifford Wallace of the United States Court of Appeals for the Ninth Circuit.

In 1986, Mr. Isaacson joined the litigation department of O'Melveny & Myers, where his practice included cases involving allegations of trademark infringement, unfair business practices and securities fraud.  He served as a member of the trial team that successfully prosecuted a major trademark infringement action.

Mr. Isaacson joined the plaintiffs' bar in 1989, and has taken part in prosecuting many securities fraud class actions.  He was a member of the plaintiffs' trial team in *In re Apple Computer Sec. Litig.*, No. C 84-20148(A)-JW (N.D. Cal.).  Since the early 1990s, his practice has focused primarily on appellate matters in cases that have produced dozens of published precedents.  *See, e.g.*, *In re Constar Int'l, Inc. Sec. Litig.*, 585 F.3d 774 (3d Cir. 2009); *Hatfield v. Halifax PLC*, 564 F.3d 1177 (9th Cir. 2009); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342 (3d Cir. 2009); *In re NYSE Specialists Sec. Litig. (Cal. Pub. Employees' Ret. Sys. v. N.Y. Stock Exch., Inc.)*, 503 F.3d 89 (2d Cir. 2007); *In re WorldCom Sec. Litig. (Cal. Pub. Employees' Ret. Sys. v. Caboto-Gruppo Intesa, BCI)*, 496 F. 3d 245 (2d Cir. 2007); *Sanford v. MemberWorks, Inc.*, 483 F.3d 956 (9th Cir. 2007); *Sanchez v. County of San Diego*, 464 F.3d 916 (9th Cir. 2006), *rehearing denied*, 483 F.3d 965 (2007); *In re Daou Sys., Inc., Sec. Litig. (Sparling v. Daou)*, 411 F.3d 1006 (9th Cir. 2005); *Ill. Mun. Ret. Fund v. CitiGroup, Inc.*, 391 F.3d 844 (7th Cir. 2004); *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003); *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363 (5th Cir. 2001); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999); *Warshaw v. Xoma Corp.*, 74 F.3d 955 (9th Cir. 1996); *Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995); and *Mangini v. R.J. Reynolds Tobacco Co.*, 7 Cal. 4th 1057 (1994).

Mr. Isaacson's publications include: *Assaulting America's Mainstream Values: Hans Zeiger's*, Get Off My Honor: The Assault on the Boy Scouts of America, 5 Pierce Law Review 433 (2007); *Traditional Values, or a New Tradition of Prejudice? The Boy Scouts of America vs. The*

*Unitarian Universalist Association of Congregations*, 17 George Mason Civil Rights Law Journal 1 (2006); *What's Brewing in Dura v. Broudo? A Review of the Supreme Court's Opinion and Its Import for Securities-Fraud Litigation* (co-authored with Patrick J. Coughlin and Joseph D. Daley), 37 Loyola University Chicago Law Journal 1 (2005); *Pleading Scienter Under Section 21D(b)(2) of the Securities Exchange Act of 1934: Motive, Opportunity, Recklessness and the Private Securities Litigation Reform Act of 1995* (co-authored with William S. Lerach), 33 San Diego Law Review 893 (1996); *Securities Class Actions in the United States* (co-authored with Patrick J. Coughlin), Litigation Issues in the Distribution of Securities: An International Perspective 399 (Kluwer International/International Bar Association, 1997); *Pleading Standards Under the Private Securities Litigation Reform Act of 1995: The Central District of California's* Chantal *Decision* (co-authored with Alan Schulman & Jennifer Wells), *Class Action & Derivative Suits*, Summer 1996, at 14; *Commencing Litigation Under the Private Securities Litigation Reform Act of 1995* (co-authored with Patrick J. Coughlin), Securities Litigation 1996 9-22 (Practising Law Institute 1996); *The Flag Burning Issue: A Legal Analysis and Comment,* 23 Loyola of Los Angeles Law Review 535 (1990).

Mr. Isaacson has done extensive *pro bono* work. He has served as a cooperating attorney with the American Civil Liberties Union of San Diego and Imperial Counties representing indigent San Diegans. He also has filed *amicus curiae* briefs on behalf of a variety of organizations, including the Social Justice Ministry and Board of Trustees of the First Unitarian Universalist Church of San Diego where he teaches Sunday school. In California's *Marriage Cases*, Mr. Isaacson was on the team of attorneys representing the California Council of Churches, the Union for Reform Judaism, the United Church of Christ, the Unitarian Universalist Association of Congregations, and the hundreds of other religious organizations and faith leaders, as *amici curiae*, insisting civil marriage is a civil right that California cannot withhold from same-sex couples. *See In re Marriage Cases*, 43 Cal. 4th 757, 773 (2008). Mr. Isaacson then represented the California Council of Churches, the General Synod of the United Church of Christ, the Episcopal Bishops of California and Los Angeles, the Unitarian Universalist Association of Congregations and Unitarian Universalist Legislative Ministry California, and the Progressive Jewish Alliance as petitioners and *amici* in related proceedings challenging Proposition 8's withdrawal of that fundamental right. *See Strauss v. Horton*, 46 Cal. 4th 364, 377-78 (2009); C*al. Council of Churches v. Horton*, No. S168332 (Cal. July 8, 2009) (order denying writ of mandate or prohibition).

Mr. Isaacson has received awards for his *pro bono* work from the California State Bar and the San Diego Volunteer Lawyer Program, and in 2009 he received the Unitarian Universalist Association President's Annual Award for Volunteer Service, which was awarded by the Rev. William G. Sinkford at the Association's 48th General Assembly in Salt Lake City.

From January 2004 to June 2010, Mr. Isaacson served on the Board of Directors – and from March 2005 through June 2008 he was Board President – of San Diego's Foundation for Change, an organization dedicated to funding and supporting community-led efforts to promote social equality, economic justice and environmental sustainability. Its grantees have included groups as diverse as Activist San Diego, the Interfaith Committee for Worker Justice, and the Employee Rights Center.

Mr. Isaacson has been a member of the California Bar since 1985. He is also admitted to practice before the United States Supreme Court, the United States Courts of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and District of

Columbia Circuits, and before all federal district courts in the State of California.

**JAMES I. JACONETTE** is one of the founding partners of Robbins Geller Rudman & Dowd LLP and manages cases in the Firm's securities class action and shareholder derivative litigation practices. Mr. Jaconette has extensive experience in federal and state securities class action litigation. He has served in a primary litigating role as one of lead counsel in a variety of securities cases resulting in recoveries of over $8 billion for individual and institutional investors. For example, Mr. Jaconette was one of three partners responsible for the day-to-day prosecution of *In re Enron Corp. Sec. Litig.* (S.D. Tex.) and *In re Dynegy Inc. Sec. Litig.* (S.D. Tex.), on behalf of lead plaintiff The Regents of the University of California and the large classes of public investors represented in those actions.

Mr. Jaconette is currently serving as lead counsel in securities class actions and shareholder derivative cases, including numerous derivative actions arising out of alleged stock option backdating. He also advises institutional investors, including pension funds, hedge funds, and financial institutions on portfolio monitoring and case evaluation.

Favorable reported decisions include: *In re Informix Corp. Secs. Litig.*, No. C-97-1289-SBA, 1997 U.S. Dist. LEXIS 23687 (N.D. Cal. Oct. 17, 1997); *Schlagal v. Learning Tree Int'l*, No. CV 98-6384 ABC, 1998 U.S. Dist. LEXIS 20306 (C.D. Cal. Dec. 23, 1998); *In re Enron Corp. Sec. Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804 (S.D. Tex. 2004); *Belova v. Sharp*, No. CV 07-299-MO, 2008 U.S. Dist. LEXIS 19880 (D. Or. Mar. 13, 2008); *Bacas v. Way*, No. 07-cv-456, 2008 U.S. Dist. LEXIS 23025 (S.D. Tex. Mar. 20, 2008); *In re Cirrus Logic, Inc.*, No. A-07-CA-212-SS, 2008 U.S. Dist. LEXIS 71195 (W.D. Tex. Aug. 28, 2008); and *Alaska Electrical Pension Fund v. Olofson*, No. 08-2344-CM, 2009 U.S. Dist. LEXIS 46564 (D. Kan. June 3, 2009).

Mr. Jaconette attended San Diego State University, receiving his Bachelor of Arts degree with honors and distinction in 1989 and his M.B.A. in 1992. In 1995, Mr. Jaconette received his Juris Doctor degree, *cum laude*, from Hastings College of the Law, University of California, San Francisco. Mr. Jaconette was the Mortar Board Vice President from 1988-1989, a member of the *Hastings Law Journal* from 1993-1994, and Associate Articles Editor from 1994-1995. Mr. Jaconette authored *The Fraud-on-the-Market Theory in State Law Securities Fraud Suits*, Hastings Law Journal, Volume 46, August 1995. In 1993, Mr. Jaconette served as law clerk to the Honorable Barbara J. Gamer, and in 1994, as extern to the Honorable William H. Orrick, Jr., District Judge.

Mr. Jaconette has been licensed to practice in the California Bar since 1995 and has been admitted to practice in California state courts, the United States District Courts in all districts in California, the United States Court of Appeals for the Ninth Judicial Circuit, and the United States Supreme Court.

**FRANK J. JANECEK, JR.** received his Bachelor of Science degree in Psychology from the University of California at Davis in 1987 and his Juris Doctor degree from Loyola Law School in 1991. He is admitted to the Bar of the State of California, the district courts for all districts of California and to the United States Court of Appeals for the Sixth, Ninth and Eleventh Circuits. For 11 years, Mr. Janecek has practiced in the areas of consumer/antitrust, Proposition 65, taxpayer and tobacco litigation. He has participated as a panelist and a speaker in continuing legal education programs relating to California's Unfair Competition laws, public enforcement, tobacco litigation and challenging unconstitutional taxation schemes.

Mr. Janecek was co-lead counsel, as well as the Court-appointed Liaison Counsel, in *Wholesale Elec. Antitrust Cases I & II*, Judicial Counsel Coordination Proceedings 4204 & 4205, charging

an antitrust conspiracy by wholesale electricity suppliers and traders of electricity in California's newly deregulated wholesale electricity market. In conjunction with the Governor of the State of California, the California State Attorney General, the California Public Utilities Commission, the California Electricity Oversight Board, a number of other state and local governmental entities and agencies, and California's large, investor-owned electric utilities, plaintiffs secured a global settlement for California consumers, businesses and local governments valued at more than $1.1 Billion.

Mr. Janecek has also litigated several Proposition 65 actions, including *People ex rel. Lungren v. Super. Ct.*, 14 Cal. 4th 294 (1996), which was jointly prosecuted with the Attorney General's office. These actions resulted in the recovery of more than $10 million in disgorgement and/or civil penalties and warnings to consumers of their exposure to cancer causing agents and reproductive toxins. Mr. Janecek chaired several of the litigation committees in California's tobacco litigation, which resulted in the $25.5 billion recovery for California and its local entities. Mr. Janecek also handled a constitutional challenge to the State of California's Smog Impact Fee, in the case *Ramos v. Dep't of Motor Vehicles*, No. 95AS00532 (Cal. Super. Ct., Sacramento County). As a result of the *Ramos* litigation, more than a million California residents received full refunds, plus interest, totaling $665 million.

Mr. Janecek and Patrick J. Coughlin co-authored A Review of R.J. Reynolds' Internal Documents Produced in Mangini v. R.J. Reynolds Tobacco Co., No. 939359 – The Case that Rid California and the American Landscape of 'Joe Camel' (January 1998), which, along with more than 60,000 internal industry documents, was released to the public through Congressman Henry Waxman. He is also the author of California's Unfair Competition Act and Its Role in the Tobacco Wars (Fall 1997). Mr. Janecek is a member of the American Bar Association, the California Bar Association, the San Diego County Bar Association, the Consumer Attorneys of California and San Diego and Trial Lawyers for Public Justice.

RACHEL L. JENSEN grew up in St. Petersburg, Florida. She received her Bachelor of Arts degree in International Affairs from Florida State University's honors program in 1997, graduating *cum laude*. She received her Juris Doctor degree from Georgetown University Law School in 2000. During law school, she served as Editor-in-Chief of the *First Annual Review of Gender and Sexuality Law*, a publication of the nascent *Georgetown Journal of Gender and the Law*. She also taught Street Law at a public high school in Washington, D.C.

Upon graduation, Ms. Jensen joined the law firm of Morrison & Foerster in San Francisco for one year before clerking for the Honorable Warren J. Ferguson on the Ninth Circuit Court of Appeals. Thereafter, she worked abroad as a law clerk in the Office of the Prosecutor at the International Criminal Tribunal for Rwanda (ICTR) and at the International Criminal Tribunal for the Former Yugoslavia (ICTY), respectively.

Ms. Jensen's practice focuses on class action securities and consumer fraud. She is licensed to practice law in the State of California and is admitted to practice before all the federal district courts in the state.

EVAN KAUFMAN focuses his practice in the area of complex litigation in federal and state courts including securities, corporate mergers and acquisitions, derivative, and consumer fraud class actions.

Mr. Kaufman has served as lead counsel or played a significant role in numerous actions, including: *In re TD Banknorth S'holders Litig.* ($50 million recovery); *In re Gen. Elec. Co. ERISA Litig.* ($40 million cost to GE, including significant improvements to GE's employee retirement plan, and benefits to GE plan participants valued in

excess of $100 million); *In re Warner Chilcott Ltd. Sec. Litig.* ($16.5 million recovery); *In re Royal Group Tech. Sec. Litig.* ($9 million recovery); *In re Audiovox Deriv. Litig.* ($6.75 million recovery and corporate governance reforms); *Candela Corp.* ($3.85 million); *In re Hibernia Foods, PLC Sec. Litig.* ($2.8 million recovery from auditor of liquidated company); *In re MONY Group, Inc. S'holder Litig.* (obtained preliminary injunction requiring disclosures in proxy statement); *N.J. v. Gemstar TV-Guide* (recovered approximately 50% of New Jersey's losses); *Hudson Soft & Autobacs, Seven Co. v. CSFB* (resolved for an undisclosed sum); and *In re Merrill Lynch & Co., Inc., Internet Strategies Sec. Litig.* (resolved as part of a $39 million global settlement).

In the *TD Banknorth* litigation, the court appointed Mr. Kaufman and the Firm to be lead counsel for plaintiffs after rejecting as "wholly inadequate" a $3 million settlement objected to by Mr. Kaufman and the Firm on behalf of their clients and the class. When the Firm later achieved a $50 million recovery for the class, the court stated: "This is one of the cases – there's probably been a half a dozen since I've been a judge that I handled which have – really through the sheer diligence and effort of plaintiffs' counsel – resulted in substantial awards for plaintiffs, after overcoming serious procedural and other barriers. . . . it appears plainly from the papers that you and your co-counsel have diligently, and at great personal expense and through the devotion of many thousands of hours of your time, prosecuted this case to a successful conclusion."

Mr. Kaufman earned his Bachelor of Arts degree from the University of Michigan in 1992. Mr. Kaufman earned his Juris Doctor degree from Fordham University School of Law in 1995, where he was a member of the *Fordham International Law Journal*. Prior to joining the Firm, between 2001 and early 2005, Mr. Kaufman was associated with a prominent Manhattan plaintiffs' class action firm, where his practice focused on securities and consumer fraud class actions.

Mr. Kaufman is admitted to practice before the courts of the State of New York, the United States District Courts for the Southern, Eastern, and Northern Districts of New York, and the United States Court of Appeals for the Second Circuit. Mr. Kaufman is a member of the Nassau County Bar Association.

CATHERINE J. KOWALEWSKI was born in Cleveland, Ohio. Ms. Kowalewski earned her Bachelor of Business Administration degree in Accounting from Ohio University in 1994 and her Masters degree in Business Administration from Limburgs Universitair Centrum (currently known as Hasselt University) in Diepenbeek, Belgium in 1995. Ms. Kowalewski earned her Juris Doctor degree from the University of San Diego in 2001, where she served as Lead Articles Editor of the *San Diego Law Review*. While in law school, Ms. Kowalewski served as judicial extern to the Honorable Richard D. Huffman of the California Court of Appeal, 4th District, Division 1.

Ms. Kowalewski's practice focuses on class actions on behalf of defrauded investors, primarily in the area of accounting fraud. She has investigated and participated in the investigation and litigation of many large accounting scandals, including Cardinal Health and Krispy Kreme, and numerous companies implicated in stock option backdating.

Ms. Kowalewski is admitted to the California Bar (2001) and is licensed to practice before the United States District Courts for the Northern, Central and Southern Districts of California. Ms. Kowalewski is a member of the San Diego County Bar, the State Bar of California, American Association for Justice, Consumer Attorneys of San Diego and Consumer Attorneys of California. Ms. Kowalewski is the President of Lawyers Club of San Diego (2009-2010). Ms. Kowalewski is also a Certified Public Accountant (Ohio, 1998).

**ARTHUR C. LEAHY** graduated with a Bachelor of Arts degree in Business from Point Loma College in 1987. In 1990, Mr. Leahy graduated *cum laude* and received a Juris Doctor degree from the University of San Diego School of Law, where he served as Managing Editor of the Law Review. While in law school, Mr. Leahy authored an article published in the *San Diego Law Review* and other articles published in another law journal. In addition, he served as a judicial extern for the Honorable J. Clifford Wallace of the United States Court of Appeals for the Ninth Circuit. After law school, Mr. Leahy served as a judicial law clerk for the Honorable Alan C. Kay of the United States District Court for the District of Hawaii.

Mr. Leahy works on securities actions in which his clients have recovered hundreds of millions of dollars. Mr. Leahy is a member of the California Bar and has been admitted in numerous federal courts throughout the country.

**JEFFREY D. LIGHT** was born in Los Angeles, California in 1964. He earned his Bachelor of Arts degree from San Diego State University in 1987 and his Juris Doctor degree from the University of San Diego in 1991, *cum laude*. Mr. Light was the recipient of the American Jurisprudence Award in Constitutional Law. He served as law clerk to the Honorable Louise DeCarl Adler, U.S. Bankruptcy Court, and the Honorable James Meyers, Chief Judge, Southern District of California, United States Bankruptcy Court. Mr. Light was admitted to the California Bar in 1992 and is admitted to practice before all federal courts in California.

Mr. Light is a member of the San Diego County Bar Association and is on the Attorney Fee Arbitration Panel. Mr. Light also currently serves as a Judge Pro Tem for the San Diego County Superior Court. Mr. Light practices in the Firm's settlement department, negotiating, documenting and obtaining court approval of the Firm's complex securities, merger, consumer and derivative actions. These settlements include: *In re AT&T Corp. Sec. Litig.* (D.N.J. 2005) ($100

million recovery); *In re Infonet Corp. Sec. Litig.* (C.D. Cal. 2004) ($18 million recovery); and *In re Ashworth, Inc. Sec. Litig.* (S.D. Cal. 2004) ($15.25 million recovery).

**DAVID W. MITCHELL** was born in Wilmington, Delaware in 1973. He graduated from the University of Richmond in 1995 with a Bachelor of Arts degree in both Economics and History and thereafter received his Juris Doctor degree from the University of San Diego School of Law in 1998.

Prior to joining the Firm, Mr. Mitchell served as an Assistant United States Attorney in the Southern District of California. While at the United States Attorney's Office, he worked on cases involving narcotics trafficking, bank robbery, murder-for-hire, alien smuggling, and terrorism. He tried nearly 20 cases to verdict before federal criminal juries and made numerous appellate arguments before the Ninth Circuit Court of Appeals.

Mr. Mitchell's practice focuses on securities fraud and antitrust litigation. He is a member of the State Bar of California and is admitted to practice before the Southern and Central Districts of California and the Ninth Circuit Court of Appeals.

**KEITH F. PARK** graduated from the University of California at Santa Barbara in 1968 and from Hastings College of Law of the University of California in 1972.

Mr. Park has overseen the Court-approval process in more than 1,000 securities class action and shareholder derivative settlements, including actions involving: Enron ($7.3 billion recovery); UnitedHealth ($925.5 million recovery and corporate governance reforms); Dynegy ($474 million recovery and corporate governance reforms); Dollar General ($162 million recovery); Mattel ($122 million recovery); Prison Realty ($105 million recovery); Honeywell (in addition to the $100 million recovery, Honeywell's agreed to adopt significant corporate governance changes

relating to compensation of senior executives and directors, stock trading by directors, executive officers and key employees, internal and external audit functions, and financial reporting and board independence); Sprint (in addition to $50 million recovery, obtained important governance enhancements, including creation of Lead Independent Director and expensing of stock options); Hanover Compressor (on top of $85 million recovery, obtained the following governance enhancements, among others: direct shareholder nomination of Board and mandatory rotation of audit firm); 3COM ($259 million recovery); Chiron ($43 million recovery); National Health Labs ($64 million recovery); and NME ($60.75 million recovery).

He is admitted to practice in California and New York.

**STEVEN W. PEPICH** earned his Bachelor of Science degree in Economics from Utah State University in 1980 and his Juris Doctor degree from De Paul University in 1983.

Mr. Pepich's practice has focused primarily on securities class action litigation, but has also included a wide variety of complex civil cases, including representing plaintiffs in mass tort, royalty, civil rights, human rights, ERISA and employment law actions.

Mr. Pepich has participated in the successful prosecution of numerous securities class actions, including: *Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, No. 1-04-CV-021465 ($43 million recovery); *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-CV-2838 ($137.5 million recovery); *In re Fleming Cos. Inc. Sec. and Deriv. Litig.*, No. 5-03-MD-1530 ($95 million recovered); *In re Advanced Micro Devices Sec. Litig.*, No. C-93-20662 ($34 million recovery); *In re Louisiana-Pacific Corp. Sec. Litig.*, No. C-95-707 ($65 million recovery); *Gohler v. Wood*, No. 92-C-181 ($17.2 million recovery); and *In re Boeing Sec. Litig.*, No. C-97-1715Z ($92 million recovery).

Mr. Pepich was also a member of the plaintiffs' trial team in *Mynaf v. Taco Bell Corp.*, which settled after two months of trial on terms favorable to two plaintiff classes of restaurant workers for recovery of unpaid wages, and a member of the plaintiffs' trial team in *Newman v. Stringfellow* where, after a nine-month trial in Riverside, California, all claims for exposure to toxic chemicals were ultimately resolved for $109 million.

**THEODORE J. PINTAR** received his Bachelor of Arts degree from the University of California at Berkeley in 1984 where he studied Political Economies of Industrial Societies. Mr. Pintar received his Juris Doctor degree from the University of Utah College of Law in 1987 where he was Note and Comment Editor of the *Journal of Contemporary Law* and the *Journal of Energy Law and Policy*. Formerly, Mr. Pintar was associated with the firm of McKenna Conner & Cuneo in Los Angeles, California, where he focused in commercial and government contracts defense litigation. Mr. Pintar is co-author of *Assuring Corporate Compliance with Federal Contract Laws and Regulations*, Corporate Criminal Liability Reporter, Vol. 2 (Spring 1988).

Mr. Pintar has participated in the successful prosecution of numerous securities fraud class actions and derivative actions. Mr. Pintar was part of the litigation team in the AOL Time Warner state and federal court securities opt-out actions, which arose from the 2001 merger of American Online and Time Warner. These cases resulted in a global settlement of $618 million. Mr. Pintar participated on the trial team in *Knapp v. Gomez*, No. 87-0067-H(M) (S.D. Cal.), which resulted in a plaintiff's verdict.

Mr. Pintar has also participated in the successful prosecution of numerous insurance and consumer class actions, including: (i) actions against major life insurance companies such as Manufacturer's Life ($555 million initial estimated settlement value) and Principal Mutual Life Insurance Company ($380+ million settlement value); (ii)

actions against major homeowners insurance companies such as Allstate ($50 million settlement) and Prudential Property and Casualty Co. ($7 million settlement); (iii) actions against automobile insurance companies such as the Auto Club and GEICO; and (iv) actions against Columbia House ($55 million settlement value) and BMG Direct, direct marketers of CDs and cassettes.

Mr. Pintar has served as a panelist for numerous Continuing Legal Education seminars on federal and state court practice and procedure. Mr. Pintar is a member of the State Bar of California and the San Diego County Bar Association.

**WILLOW E. RADCLIFFE** earned her Bachelor of Arts degree from the University of California at Los Angeles and graduated *cum laude* from the Seton Hall University School of Law. While in law school, Ms. Radcliffe interned at the National Labor Relations Board in Newark, New Jersey. Ms. Radcliff is a member of the State Bar of California, and is admitted to practice before the United States District Courts for the Northern, Central and Eastern Districts of California. Prior to joining the Firm, Ms. Radcliffe clerked for the Honorable Maria-Elena James, Magistrate Judge for the United States District Court for the Northern District of California.

Ms. Radcliffe concentrates her practice in securities class action litigation in federal court. Ms. Radcliffe has been significantly involved in the prosecution of numerous securities fraud claims, including actions filed against Flowserve Corp., NorthWestern Corp. and Ashworth, Inc. Ms. Radcliffe has also represented plaintiffs in other complex actions, including a class action against a major bank regarding the adequacy of disclosures made to consumers in California related to Access Checks.

**JACK REISE** earned his Bachelor of Arts degree in History from Binghamton University. He graduated cum laude from University of Miami School of Law where he was an Associate Editor on the *University of Miami Inter-American Law Review*, and was the recipient of the American Jurisprudence Book Award in Contracts.

Mr. Reise is devoted to protecting the rights of those who have been harmed by corporate misconduct. Mr. Reise started his legal career representing individuals suffering the debilitating affects of asbestos exposure back in the 1950s and 1960s. Mr. Reise currently concentrates his practice on class action litigation, including: securities fraud, shareholder derivative actions, consumer protection, antitrust, and unfair and deceptive insurance practices.

Mr. Reise devotes a substantial portion of his practice to representing shareholders in actions brought under the federal securities laws. Mr. Reise is currently serving as lead counsel in more than a dozen cases nationwide. Some recent notable actions include *Abrams v. Van Kampen Funds*, No. 01-cv-07538 (N.D. Ill. 2001) (involved a mutual fund charged with improperly valuating its net assets) and *In re NewPower Holdings Sec. Litig.*, No. 02-cv-01550 (CLB) (S.D.N.Y. 2005) (settlement with several of the defendants for $26 million).

Mr. Reise was admitted to the Florida Bar in 1995. He is admitted to practice before the United States Court of Appeals for the First, Fourth and Eleventh Circuits, as well as the Southern and Middle District Courts of Florida.

**JOHN J. RICE** graduated *cum laude* from Harvard University with a Bachelor of Arts degree in History and received his Juris Doctor degree from the University of Virginia. After law school, he was a judicial law clerk to the late United States District Court Judge Judith N. Keep of the Southern District of California.

Mr. Rice brings significant trial experience to Robbins Geller Rudman & Dowd LLP, where he is a member of the Firm's litigation team. In his time at the Firm, he has prosecuted complex securities cases and helped obtained recoveries for

investors in numerous cases, including *AOL Time Warner*, *HealthSouth*, *Forest Labs*, and *Healthways*.

Prior to joining the Firm, Mr. Rice prosecuted a wide array of cases, ranging from complex white-collar criminal to murder to Russian organized-crime cases. Most recently, he worked as an Assistant United States Attorney in the Southern District of California, specializing in public corruption cases. He has also served stints prosecuting organized crime for the United States Attorney's Office in the Southern District of New York and was nominated to serve as Branch Chief in the Northern Mariana Islands, prosecuting public corruption and white-collar criminal cases. Mr. Rice has been praised for his diligent efforts to combat graft, corruption and collusion among public and private officials in San Diego and has received numerous awards from law enforcement agencies.

Mr. Rice has taught for many years and currently serves as an adjunct professor at the University of San Diego School of Law.

**DARREN J. ROBBINS** is a founding partner of Robbins Geller Rudman & Dowd LLP and a member of its Executive and Management Committees. Mr. Robbins oversees various aspects of the Firm's practice, including the Firm's institutional client outreach efforts and its Mergers and Acquisitions practice. Mr. Robbins has served as lead counsel in more than one hundred cases, which have yielded recoveries of over $2 billion for injured shareholders.

One of the hallmarks of Mr. Robbins' practice has been his focus on corporate governance reform. Prime examples are the settlements Mr. Robbins negotiated in the *UnitedHealth Group* and *Hanover Compressor* securities fraud class actions. In *UnitedHealth Group*, a securities fraud class action arising out of the options backdating scandal, where the Firm's client, CalPERS, was able to successfully obtain unprecedented corporate governance changes, the cancellation of more than 3.6 million options granted to UnitedHealth's former CEO, and a record $925-million cash recovery for shareholders. The *Hanover Compressor* action similarly resulted in landmark corporate governance reforms in addition to a substantial recovery for shareholders. In 2004, Mr. Robbins was recognized as Attorney of the Year by *California Lawyer* for his particular expertise in formulating corporate governance reforms.

In 2008, the *Daily Journal* named Mr. Robbins as one of the Top 100 Lawyers shaping the future. And, in 2007, *The American Lawyer* recognized Mr. Robbins as one of the "Young Litigators 45 and Under" for making significant strides in securities litigation.

Mr. Robbins received his Juris Doctor degree from Vanderbilt Law School, where he served as the Managing Editor of the *Vanderbilt Journal of Transnational Law* and received his Bachelor of Science and Master of Arts degrees in Economics from the University of Southern California.

**HENRY ROSEN** obtained his Bachelor of Arts degree in 1984 from the University of California, after attending American College in Paris. In 1988, Mr. Rosen received his Juris Doctor degree from the University of Denver, where he was Editor-in-Chief for the *University of Denver Law Review*. Mr. Rosen served as Judicial Law Clerk to the Honorable Jim R. Carrigan, United States District Court, District of Colorado, from 1989 to 1990. He is a member of the Firm's Hiring Committee and is also a member of the Firm's Technology Committee, which focuses on applications to digitally manage documents produced during litigation and internally generate research files.

Major clients include Minebea Co., Ltd., a Japanese manufacturing company, represented in securities fraud arbitration against a United States investment bank. Mr. Rosen has significant experience prosecuting every aspect of securities fraud class actions and has obtained hundreds of

millions of dollars on behalf of defrauded investors. Prominent cases include: *In re Storagetek Sec. Litig.*, Case No. 92-B-750 (D. Colo.); *In re Access HealthNet Sec. Litig.*, Case No. SACV-96-1250-GLT(EEx) and Case No. SACV-97-191-GLT(EEx) (C.D. Cal.); *In re Valence Sec. Litig.*, Case No. C-95-20459-JW(EAI) (N.D. Cal.); *In re J.D. Edwards Sec. Litig.*, Case No. 99-N-1744 (D. Colo.); *In re Bergen Brunswig Sec. Litig.* and *Bergen Brunswig Capital Litig.*, Case No. SACV-99-1462-AHS(ANx) (C.D. Cal.); *In re Advanced Lighting Sec. Litig.*, No. 1:99CV8936 (N.D. Ohio); and *In re Safeskin Sec. Litig.*, Case No. 99cv454-BTM(LSP) (S.D. Cal.).

Mr. Rosen is admitted to the California Bar (1991) and the Colorado Bar (1988). He is a member of the State Bar of California, the American Bar Association (Litigation Section), the Association of Trial Lawyers of America, the California Trial Lawyers of America, California Trial Lawyers Association and the San Diego Trial Lawyers Association.

**DAVID A. ROSENFELD,** a partner of the firm resident in the Melville, NY and Manhattan offices, has focused his practice of law for more than a decade in the areas of securities litigation and corporate takeover litigation. He has been appointed as lead counsel in dozens of securities fraud cases and successfully recovered hundreds of millions of dollars for defrauded shareholders.

For example, Mr. Rosenfeld was appointed as lead counsel in the securities fraud lawsuit against First BanCorp, which provided shareholders with a $74.25 million recovery. He also served as lead counsel in *In re Aramark Corporation Shareholders Litigation*, which resulted in a $222 million increase in consideration paid to shareholders of Aramark and a dramatic reduction to management's voting power in connection with shareholder approval of the going-private transaction (reduced from 37% to 3.5%).

Mr. Rosenfeld is actively prosecuting many cases involving widespread financial fraud, ranging from options backdating to Bernie Madoff, as well as litigation concerning collateralized debt obligations and credit default swaps.

Mr. Rosenfeld often advises and lectures the firm's institutional investor clients on securities litigation and has been responsible for numerous significant rulings in their appointment as lead plaintiffs.

Mr. Rosenfeld regularly practices in federal and state courts throughout the United States and is admitted to practice in the states of New York and New Jersey, the Southern, Eastern and Western Districts of New York, the District of New Jersey, the District of Colorado, the Eastern and Western Districts of Arkansas, the Eastern District of Wisconsin and the First, Second and Fourth Circuit Courts of Appeal.

Mr. Rosenfeld earned his Bachelor of Science degree in Accounting from Yeshiva University's Sy Syms School of Business and his Juris Doctor degree from the Benjamin N. Cardozo School of Law.

Mr. Rosenfeld is a member of the Federal Bar Council and J-LINK (a provider of pro bono legal services) and serves on the Advisory Board of Strafford's Securities Class Action Reporter.

**ROBERT M. ROTHMAN** has extensive experience litigating cases involving investment fraud, consumer fraud and antitrust violations. Mr. Rothman also lectures to institutional investors throughout the world.

Mr. Rothman has served as lead counsel in numerous class actions alleging violations of securities laws, including cases against *First Bancorp* ($74.25 million recovery), *Spiegel* ($17.5 million recovery), *NBTY* ($16 million recovery), and *The Children's Place* ($12 million recovery). Mr. Rothman actively represents shareholders in connection with going private

transactions and tender offers. For example, in connection with a tender offer made by Citigroup, Mr. Rothman secured an increase of more than $38 million in upfront cash benefits over what was originally offered to shareholders.

Mr. Rothman actively litigates consumer fraud cases. In a case alleging false advertising claims where Mr. Rothman was the lead counsel, the defendant agreed to a settlement valued in excess of $67 million. Mr. Rothman also tries, arbitrates and mediates cases. For example, he obtained a multi-million dollar verdict after the trial of a shareholders' derivative case.

In one ongoing securities matter that Mr. Rothman is litigating, the court took the time, in upholding plaintiffs' complaint, to compliment the quality of the legal representation: "I've thought about the arguments and the briefs. Let me commend the lawyers. It was well argued on both sides, and well written briefs, and it's a pleasure to have lawyering of this caliber in the courthouse." *In re Orion Sec. Litig.*, No. 08-cv-1328 (RJS), Transcript at 32 (S.D.N.Y. Aug. 19, 2009). In another, now settled matter that Mr. Rothman and the Firm litigated as lead counsel, the court stated that the appointment of lead counsel went a "long way" to resolving "a very difficult matter and a very complicated situation." *Phillips v. Reckson Assoc. Realty Corp.*, No. 12871/2006, Transcript at 3 (N.Y. Sup. Ct. Nassau County Jan. 20, 2009).

Mr. Rothman is admitted to practice before the courts of the State of New York, as well as the United States District Courts for the Southern and Eastern Districts of New York. Mr. Rothman is a member of the American Bar Association's Sections of Litigation and Antitrust Law.

Mr. Rothman earned his Bachelor of Arts degree in Economics from the State University of New York at Binghamton. He then earned his Juris Doctor degree, with Distinction, from Hofstra University School of Law. During law school, Mr. Rothman was a member of the law review

and was awarded the Dean's Academic Scholarship for completing his first year in the top one percent of his class. Prior to the Firm, Mr. Rothman practiced commercial litigation with an international law firm.

SAMUEL H. RUDMAN's practice focuses on recognizing and investigating securities fraud, and initiating securities and shareholder class actions to vindicate shareholder rights and recover shareholder losses. A former attorney with the United States Securities and Exchange Commission, Mr. Rudman has recovered hundreds of millions of dollars for shareholders, including: $129 million recovery in *In re Doral Fin. Corp. Sec. Litig.*, No. 05 MD 1706 (S.D.N.Y.); $74 million recovery in *In re First BanCorp Sec. Litig.*, No. 05-CV-2148 (D.P.R.); $65 million recovery in *In re Forest Labs., Inc. Sec. Litig.*, No. 05-CV-2827 (S.D.N.Y.); and $50 million recovery in *In re TD Banknorth S'holders Litig.*, No. 2557-VCL (Del. Ch.).

In the *TD Banknorth* litigation, the court appointed Mr. Rudman and the Firm to be lead counsel for the plaintiff class only after rejecting as "wholly inadequate" the settlement negotiated for the class by another law firm. When the Firm later achieved a $50 million recovery for the class, the court stated: "This is one of the cases – there's probably been a half a dozen since I've been a judge that I handled which have – really through the sheer diligence and effort of plaintiffs' counsel – resulted in substantial awards for plaintiffs, after overcoming serious procedural and other barriers. . . . [I]t appears plainly from the papers that you and your co-counsel have diligently, and at great personal expense and through the devotion of many thousands of hours of your time, prosecuted this case to a successful conclusion." The court also credited the Firm with raising the inadequacy of the initial settlement.

Mr. Rudman is an active speaker and writer on securities law matters. Mr. Rudman has spoken at programs sponsored by the Practising Law Institute, including: *Securities Litigation &*

*Enforcement Institute 2009* and *Response to Ponzi and Other Schemes: Alternative Investment Funds under Scrutiny 2009*. In 2008 and 2009, Mr. Rudman spoke at the *D&O Symposium* organized by the Professional Liability Underwriting Society.

Mr. Rudman's recent articles include: *Meaning of Second Circuit's "W.R. Huff" for Investment Advisors*, New York Law Journal, Jan. 30, 2009, which was quoted by Judge Juan R. Sánchez in his decision granting class certification in *In re Herley Indus., Inc. Sec. Litig.*, No. 06-CV-2596 (E.D. Pa.); *Back to "Novak": Confidential Witnesses in Fraud Actions*, New York Law Journal, Oct. 20, 2008; and *"Oscar": Misinterpretation of Fraud-on-the-Market Theory*, New York Law Journal, July 17, 2008.

Mr. Rudman received his Bachelor of Arts degree in Political Science from Binghamton University and earned his Juris Doctor degree from Brooklyn Law School. While attending law school, Mr. Rudman was a Dean's Merit Scholar and a member of the *Brooklyn Journal of International Law* and the Moot Court Honor Society. Upon graduation from law school, Mr. Rudman joined the Enforcement Division of the United States Securities and Exchange Commission in its New York Regional Office as a staff attorney, where he was responsible for numerous investigations and prosecutions of violations of the federal securities laws. Thereafter, Mr. Rudman joined one of the largest corporate law firms in the country, where he represented public companies in the defense of securities class actions and also handled white-collar criminal defense matters.

**SCOTT SAHAM** was born in Detroit, Michigan in 1970. Mr. Saham received a Bachelor of Arts degree in 1992 from the University of Michigan. Mr. Saham received a Juris Doctor degree from the University of Michigan Law School in 1995. Mr. Saham is licensed to practice law in both California and Michigan. Mr. Saham's practice areas include securities and other complex litigation. Mr. Saham recently served as lead counsel prosecuting the *In re Coca-Cola Securities Litigation* in the Northern District of Georgia, which resulted in a $137.5 million settlement after nearly 8 years of litigation. Prior to joining the Firm, Mr. Saham served as an Assistant United States Attorney in the Southern District of California, where he tried over 20 felony jury trials.

**STEPHANIE M. SCHRODER** is a partner in the San Diego office. Ms. Schroder earned her Bachelor of Arts degree from the University of Kentucky in 1997 and her Juris Doctor degree from the University of Kentucky, College of Law in 2000. During law school, Ms. Schroder served as an intern for the Honorable Sara Walter Combs, Kentucky Court of Appeals, 7th Appellate District. In 2006, Ms. Schroder helped campaign for her father, Justice Wil Schroder, who was elected to the Kentucky Supreme Court.

Ms. Schroder has significant experience prosecuting every aspect of securities fraud class actions and has obtained millions of dollars on behalf of defrauded investors. Prominent cases include: *In re AT&T Corp. Sec. Litig.* ($100 million recovery at trial); *In re FirstEnergy Corp. Sec. Litig.* ($89.5 million recovery); *Rasner v. Sturm* (*FirstWorld Commc'ns*); and *In re Advanced Lighting Sec. Litig.* Ms. Schroder also specializes in derivative litigation for breaches of fiduciary duties by corporate officers and directors. Significant litigation includes *In re OM Group S'holder Litig.* and *In re Chiquita S'holder Litig.* Currently, Ms. Schroder is representing clients that have suffered losses from the Madoff fraud in the *Austin Capital* and *Meridian Capital* litigations.

Ms. Schroder's practice also focuses on advising institutional investors, including public and multi-employer pension funds, on issues related to corporate fraud in the United States securities markets. Ms. Schroder is a frequent lecturer on securities fraud, shareholder litigation, and options for institutional investors seeking to

recover losses caused by securities and/or accounting fraud.

Ms. Schroder is a member of the California and Kentucky Bars and is admitted to practice before the United States Supreme Court and before the United States District Courts for the Southern, Central, and Northern Districts of California, the District of Colorado, and the Eastern District of Kentucky.

**CHRISTOPHER P. SEEFER** received his Bachelor of Arts degree from the University of California, Berkeley in 1984 and his Master of Business Administration degree from the University of California, Berkeley in 1990. He received his Juris Doctor degree from the Golden Gate University School of Law in 1998. Mr. Seefer concentrates his practice in securities class action litigation. Mr. Seefer was a Fraud Investigator with the Office of Thrift Supervision, Department of the Treasury (1990-1999) and a field examiner with the Office of Thrift Supervision (1986-1990).

Mr. Seefer is a member of the Bar of California, the United States District Courts for the Northern, Central, and Southern Districts of California, and the United States Court of Appeals for the Ninth Circuit.

**TRIG SMITH** received his Bachelor of Science degree and Master of Science degree from the University of Colorado, Denver, in 1995 and 1997, respectively. Mr. Smith received a Juris Doctor degree from Brooklyn Law School in 2000. While at Brooklyn Law Mr. Smith was a member of the *Brooklyn Journal of International Law*, which published his note entitled: *The S.E.C. and Foreign Private Issuers*, 26 Brook. J. Int'l L. 765 (2000). Mr. Smith is licensed to practice in both California and Colorado. Mr. Smith's practice areas include securities and other complex litigation.

**MARK SOLOMON** earned his law degrees at Trinity College, Cambridge University, England (1985), Harvard Law School (1986), and the Inns of Court School of Law, England (1987). He is admitted to the Bar of England and Wales (Barrister), Ohio and California, as well as to various United States Federal District and Appellate Courts. Mr. Solomon regularly represents both United States - and United Kingdom - based pension funds and asset managers in class and non-class securities litigation. Mr. Solomon is a founding partner of Robbins Geller Rudman & Dowd LLP.

Before studying law in England, Mr. Solomon served as a British police officer. After qualifying as a barrister, he first practiced at the international firm Jones Day in Cleveland, Ohio (1987-1990), followed by practice at the Los Angeles office of New York's Stroock & Stroock & Lavan (1990-1993). At those firms, Mr. Solomon's representations included the defense of securities fraud and other white-collar crimes, antitrust, copyright, commercial and real estate litigation and reinsurance arbitration. While practicing in Los Angeles, acting for plaintiffs, Mr. Solomon took to trial and won complex commercial contract and real estate actions in the Orange County and Los Angeles Superior Courts, respectively.

Since 1993, Mr. Solomon has spearheaded the prosecution of many significant cases. He has obtained substantial recoveries and judgments for plaintiffs through settlement, summary adjudications and trial. He litigated, through trial, *In re Helionetics*, where he won a unanimous $15.4 million jury verdict in November 2000. He has successfully led many other cases, among them: *Schwartz v. TXU* ($150 million recovery plus significant corporate governance reforms); *In re Informix Corp. Sec. Litig.* ($142 million recovery); *Rosen v. Macromedia, Inc.* ($48 million recovery); *In re Comty. Psychiatric Ctrs. Sec. Litig.* ($42.5 million recovery); *In re Advanced Micro Devices Sec. Litig.* ($34 million recovery); *In re Tele-Commc'ns, Inc. Sec. Litig.* ($33 million recovery); *In re Home Theater Sec. Litig.* ($22.5 million judgment); *In re Diamond Multimedia Sec. Litig.* ($18 million recovery);

*Hayley v. Parker* ($16.4 million recovery); *In re Gupta Corp. Sec. Litig.* ($15 million recovery); *In re Radius Sec. Litig.*; *In re SuperMac Tech., Inc. Sec. Litig.* (combined recovery of $14 million); *Markus v. The North Face* ($12.5 million recovery); *In re Brothers Gourmet Coffees, Inc. Sec. Litig.* ($9 million recovery); *Anderson v. EFTC* ($9 million recovery); *In re Flir Sys. Inc. Sec. Litig.* ($6 million recovery); *In re Nike, Inc. Sec. Litig.* ($8.9 million recovery); *Sharma v. Insignia* ($8 million recovery); and *In re Medeva Sec. Litig.* ($6.75 million recovery).

Mr. Solomon chaired the American Bar Association Directors and Officers Liability Sub-Committee and the Accountants Liability Sub-Committee between 1996 and 2001.

**SANFORD SVETCOV** has been a partner in the Appellate Practice Group at Robbins Geller Rudman & Dowd LLP's San Francisco office since joining the Firm in July 2000. Mr. Svetcov has briefed and argued more than 300 appeals in state and federal court, including *Braxton v. Mun. Court*, 10 Cal.3d 138 (1973) (First Amendment); *Procunier v. Navarette*, 434 U.S. 555 (1977) (Civil Rights); *Parker Plaza v. UNUM Ins.*, 941 F.2d 349 (5th Cir. 1991) (Real Estate); *Catellus v. United States*, 34 F.3d 748 (9th Cir. 1994) (CERCLA); *United States v. Hove*, 52 F.3d 233 (9th Cir. 1995) (Criminal Law); *Kelly v. City of Oakland*, 198 F.3d 779 (9th Cir. 1999) (Employment Law); *United States v. Henke*, 222 F.3d 633 (9th Cir. 2000) (Securities Fraud); *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001) (Civil Rights); *In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) (Securities Fraud); *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) (Civil Rights); *In re Monumental Life Ins. Co.*, 343 F.3d 331 (5th Cir. 2003) (Class Certification); *Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) (Securities Fraud); *Inst. Investors v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) (Securities Fraud); *Lormand v. United States Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) (Securities Fraud); and *Alaska Elec. Pension Fund*

*v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009) (Securities Fraud).

Mr. Svetcov was a partner with the firm of Landels Ripley & Diamond, LLP, in San Francisco, from 1989 to 2000. His extensive legal experience includes service as: Chief, Appellate Section, United States Attorney's Office, San Francisco, 1984-1989; Attorney-in-Charge, Organized Crime Strike Force, San Francisco, 1981-1984; Chief Assistant United States Attorney, San Francisco, 1978-1981; Deputy Attorney General, State of California, 1969-1977; Legal Officer, United Stats Navy, VT-25, Chase Field, Beeville, Texas, 1966-1969; and Deputy Legislative Counsel, Legislature of California, Sacramento, 1965-1966.

Mr. Svetcov is certified as a Specialist in Appellate practice by the State Bar of California Board of Legal Specialization. He was selected by the Attorney General for the Department of Justice's John Marshall Award for Excellence in Appellate Advocacy in 1986 and is a member and past President of the American Academy of Appellate Lawyers (1998), and a member of the California Academy of Appellate Lawyers.

In 1999 and 2002, Chief Justice Rehnquist appointed Mr. Svetcov to three-year terms on the Federal Appellate Rules Advisory Committee. He is also an ex officio member of the Ninth Circuit Rules Advisory Committee on Rules and Internal Operating Procedures. His other memberships and service commitments to the legal profession include: American Academy of Appellate Lawyers; Ninth Circuit Advisory Committee on Rules and Internal Operating Procedures; Federal Appellate Rules Advisory Committee; the California Academy of Appellate Lawyers; the Bar Association of San Francisco (Appellate Courts section); the American Bar Association (Appellate Judges Conference) Committee on Appellate Practice; and the Northern California Federal Bar Association, Board of Directors.

Mr. Svetcov earned his Bachelor of Arts degree, *cum laude*, from Brooklyn College in 1961 and his Juris Doctor degree from the University of California, Berkeley, in 1964. He is a member of the Bars of the State of California, the United States Supreme Court, the United States Court of Appeals for the First through Eleventh Circuits and the United States District Court for the Northern District of California.

For two decades, he as been active as a teacher and lecturer at continuing legal education programs, including those of the ABA Appellate Practice Institutes (1990-2000), Fifth Circuit Bar Association Appellate Practice Seminars (1991-2003), the Ninth Circuit Federal Bar Association Appellate Practice Seminar, and the N.I.T.A. Appellate Advocacy Seminar and Fifth Circuit Bar Association Appellate Practice Seminars (1991-1999). He has served as an adjunct professor at Hastings College of Law and an instructor in Appellate Advocacy at the United States Attorney General's Advocacy Institute (1980-1989).

Mr. Svetcov is also active in community affairs. He has been a member of the San Francisco Jewish Community Relations Council from 1982-2000, its President from 1991-1992, and during the years 1993-1995, he also served on the Northern California Hillel Council.

**BONNY E. SWEENEY** is a partner in the San Diego office of Robbins Geller Rudman & Dowd LLP, where she specializes in antitrust and unfair competition class action litigation. She is a former Chair of the Antitrust and Unfair Competition Law Section of the State Bar of California and has been an Advisory Board Member of the American Antitrust Institute since 2004. In 2007, Ms. Sweeney was honored by *Competition Law 360* in its "Outstanding Women in Antitrust" series.

Ms. Sweeney is co-lead counsel in several multi-district antitrust class actions pending in federal courts around the country, including *In re*

*Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.* (E.D.N.Y.), and *In re Currency Conversion Fee Antitrust Litig.* (S.D.N.Y.). In *Currency Conversion*, Ms. Sweeney helped recover $336 million for class members through a proposed settlement that is awaiting approval from the federal court.

Ms. Sweeney was one of the trial lawyers in *Law v. NCAA/Hall v. NCAA/Schreiber v. NCAA* (D. Kan.), in which the jury awarded $67 million to three classes of college coaches. She has participated in the successful prosecution and settlement of numerous other antitrust and unfair competition cases, including *In re LifeScan, Inc. Consumer Litig.* (N.D. Cal.), which settled for $45 million; the Bank Privacy Cases (S.F. Sup. Ct.), which resulted in better bank privacy policies, funding to non-profit groups advocating for privacy rights, and benefits to credit cardholders; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (N.D. Cal.), which settled for more than $300 million; *In re NASDAQ Market-Makers Antitrust Litig.* (S.D.N.Y.), which settled for $1.027 billion, and *In re Airline Ticket Comm'n Antitrust Litig.* (D. Minn.), which settled for more than $85 million.

A frequent lecturer on antitrust law, California's unfair competition law, and complex litigation matters, Ms. Sweeney has published several articles, contributed to books and treatises, and testified before the California Judiciary Committee on these topics. Recent publications include *THE NEXT ANTITRUST AGENDA: THE AMERICAN ANTITRUST INSTITUTE'S TRANSITION REPORT ON COMPETITION POLICY TO THE 44TH PRESIDENT OF THE UNITED STATES* (Albert A. Foer, ed. 2008) (co-author); *The 'Federalization' of the Cartwright Act, 17 COMPETITION 139* (Fall 2008); *State Common Law Torts, Business Torts and Unfair Competition Law, ANTITRUST And UNFAIR COMPETITION LAW TREATISE* (4th ed., forthcoming 2008) (co-author); and *An Overview of Section 2 Enforcement and Developments*, 2008 WIS. L. REV. 231 (2008).

In 2003, Ms. Sweeney was honored with the Wiley M. Manuel Pro Bono Services Award and the San Diego Volunteer Lawyer Program Distinguished Service Award for her work on behalf of welfare applicants in *Sanchez v. County of San Diego*.

Ms. Sweeney graduated *summa cum laude* from Case Western Reserve University School of Law in 1988, where she served as editor of the *Law Review* and was elected to the Order of the Coif. She earned a Master of Arts degree from Cornell University in 1985, a Chinese Language Certificate from the Beijing Language Institute in 1982, and a Bachelor of Arts degree from Whittier College in 1981.

A litigator since 1988, Ms. Sweeney is admitted to practice before all courts in California and Massachusetts, and before the United States Supreme Court. She is a member of the Antitrust Section of the American Bar Association and the Antitrust and Unfair Competition Law Section of the California Bar Association.

**SUSAN GOSS TAYLOR** graduated from Pennsylvania State University in 1994 with a double major in International Politics and Russian. Ms. Taylor earned her Juris Doctor degree from The Catholic University of America, Columbus School of Law in 1997. While in law school, Ms. Taylor was a member of the Moot Court team and was a student attorney in the D.C. Law Students in Court Program, where she was responsible for defending juveniles and indigent adults in criminal proceedings. Ms. Taylor was admitted to the Bar in California in 1997.

Ms. Taylor has served as a Special Assistant United States Attorney for the Southern District of California, where she obtained considerable trial experience prosecuting drug smuggling and alien smuggling cases.

Ms. Taylor entered private practice in 1999, initially focusing on antitrust and consumer fraud class actions. Ms. Taylor has served as counsel on the Microsoft, DRAM and Private Equity antitrust litigation teams, as well as on a number of consumer actions alleging false and misleading advertising and unfair business practices against major corporations such as General Motors, Saturn, Mercedes-Benz USA, LLC, BMG Direct Marketing, Inc., and Ameriquest Mortgage Company. As a partner with Robbins Geller Rudman & Dowd LLP, Ms. Taylor has also been responsible for prosecuting securities fraud class actions and has obtained recoveries for investors in litigation involving WorldCom, Qwest and AOL Time Warner.

Ms. Taylor is a member of the California Bar Association, San Diego County Bar Association, Consumer Attorneys of California, Consumer Attorneys of San Diego, Lawyer's Club, and is on the Board of Directors for the San Diego Volunteer Lawyer Program. Ms. Taylor is also an active member of the Junior League of San Diego, and a founding member of the Girls Think Tank, currently serving on its Advisory Board.

**RYAN K. WALSH** is an experienced intellectual property litigator whose practice is primarily focused in the area of patent litigation. Mr. Walsh's experience has included disputes involving a variety of technologies, from basic mechanical applications to more sophisticated technologies in the medical device and wireless telecommunications fields. Mr. Walsh has appeared as lead counsel in complex cases before federal appellate and district courts, state trial courts, and in arbitration proceedings. Recent notable cases include multi-defendant patent litigation involving wireless mesh technology and wireless LAN technology.

Mr. Walsh has been recognized often by his peers in *Atlanta Magazine's* "Super Lawyers" survey as a "Rising Star" in the field of Intellectual Property Litigation, and he writes and speaks on topics related to patent litigation. Mr. Walsh is a *magna cum laude* graduate of the University of Georgia School of Law, where he was a Bryant T. Castellow Scholar and a member of the Order of

the Coif. He received his undergraduate degree from Brown University.

Throughout his career, Mr. Walsh has been active in the Atlanta legal community. He is currently the First Vice President of the Atlanta Legal Aid Society, where he sits on the ALAS Board and Executive Committee.

**DAVID C. WALTON** earned his Bachelor of Arts degree in Accounting from the University of Utah and his Juris Doctor degree from the University of Southern California Law Center in 1993. He was a staff member of the *Southern California Law Review* and a member of the Hale Moot Court Honors Program.

Mr. Walton is a member of the Bar of California, a Certified Public Accountant (California 1992), a Certified Fraud Examiner, and is fluent in Spanish. Mr. Walton focuses on class actions and private actions on behalf of defrauded investors, particularly in the area of accounting fraud. He has investigated and participated in the litigation of many large accounting scandals, including Enron, WorldCom, AOL Time Warner, Krispy Kreme, Informix, HealthSouth, Dynegy, Dollar General and numerous companies implicated in stock option backdating. In 2003-2004, Mr. Walton served as a member of the California Board of Accountancy, which is responsible for regulating the accounting profession in California.

**DOUGLAS WILENS** is a partner in the Firm's Boca Raton, Florida office. Mr. Wilens is involved in all aspects of securities class action litigation, focusing on lead plaintiff issues arising under the Private Securities Litigation Reform Act. Mr. Wilens is also involved in the Firm's appellate practice, participating in the successful appeal of a motion to dismiss before the Fifth Circuit Court of Appeals in *Lormand v. US Unwired, Inc.*, No 07-30106 (5th Cir. 2009) (reversal of order granting motion to dismiss).

Mr. Wilens earned his Bachelor of Science degree in Accounting from the University of Florida. He

graduated with honors from the University of Florida College of Law where he received a "Book Award" for the highest grade in his legal drafting class. Mr. Wilens is licensed to practice law in the state courts of Florida and New York, as well as the Eleventh Circuit Court of Appeals, and the United States District Courts for the Southern and Eastern Districts of New York, and the Southern, Middle and Northern Districts of Florida.

Prior to joining the Firm, Mr. Wilens learned the basics of class action practice at various boutique firms located in Boca Raton, Florida. Prior to that, Mr. Wilens was an associate in the New York office of Proskauer Rose LLP, a nationally recognized firm, where he litigated complex actions on behalf of numerous professional sports leagues, including: the National Basketball Association, the National Hockey League and Major League Soccer. Mr. Wilens has served as an adjunct professor at Florida Atlantic University and Nova Southeastern University, where he taught undergraduate and graduate level business law classes.

**SHAWN A. WILLIAMS** is a partner in the Firm's San Francisco, California office. Mr. Williams' practice focuses on securities class actions and shareholder derivative actions. Mr. Williams was among the lead class counsel for the Firm in notable cases, including: *In re Harmonic Inc. Sec. Litig.*, No. 00-2287 (N.D. Cal.); *In re Krispy Kreme Doughnuts, Inc. Sec. Litig.*, No. 04-0416 (M.D.N.C.); and *In re Veritas Software Corp. Sec. Litig.*, No. 03-0283-MMC (N.D. Cal.).

Mr. Williams is also among the Firm's lead attorneys prosecuting shareholder derivative actions, in particular, numerous stock option backdating actions, securing tens of millions of dollars in cash recoveries, and negotiating the implementation of comprehensive corporate governance enhancements for companies victimized by fraudulent stock option practices. *See, e.g., In re McAfee, Inc. Deriv. Litig.*, No. 06-3484-JF (N.D. Cal.); *In re Marvell Tech. Group*

*Ltd. Deriv. Litig.*, No. 06-3894-RMW (N.D. Cal.); and *The Home Depot, Inc. Deriv. Litig.*, No. 2006-cv-122302 (Ga. Super. Ct. Fulton County).

Prior to joining the Firm in 2000, Mr. Williams served for five years as an Assistant District Attorney in the Manhattan District Attorney's Office where he tried over 20 cases to New York City juries, and led white collar fraud grand jury investigations.

Mr. Williams received his Bachelor of Arts degree in English from The State University of New York at Albany in 1991. He earned his Juris Doctor degree from the University of Illinois in 1995.

Mr. Williams is admitted to the New York State Bar and the State Bar of California.

**DAVID T. WISSBROECKER** focuses his practice on securities class action litigation in the context of mergers and acquisitions, representing both individual shareholders and institutional investors. Mr. Wissbroecker combines aggressive advocacy with a detailed knowledge of the law to achieve effective results for his clients in both state and federal courts nationwide.

Mr. Wissbroecker has successfully litigated matters resulting in monetary settlements in excess of $150 million dollars over the last two years, including: *In re PETCO Animal Supplies*; *In re Dollar Gen.l Corp. S'holders Litig.*; *Hattan v. Restoration Hardware Inc.*; and *In re Elec. Data Sys. Class Action Litig*. Most recently, Mr. Wissbroecker was appointed as lead counsel for the Affiliated Computer Services, Inc. shareholder litigation in Texas where he secured substantial modifications to the merger agreement between Affiliated and Xerox, as reported in *The New York Times* in an article by Steven M. Davidoff entitled "A Look at Xerox's Big Concessions in Its ACS Deal."

Mr. Wissbroecker graduated, *cum laude*, from Arizona State University in 1998 with Bachelor of Arts degrees in History and Art History. In 2003, Mr. Wissbroecker earned his Juris Doctor degree from the University of Illinois College of Law, *magna cum laude*. Following law school, Mr. Wissbroecker served as a staff attorney for the United States Court of Appeals for the Seventh Circuit, and then as a law clerk for the Honorable John L. Coffey, Circuit Judge for the Seventh Circuit. Mr. Wissbroecker is the author of Six Klimts, a Picasso and a Schiele: Recent Litigation Attempts to Recover Nazi Stolen Art, 14 DEPAUL-LCA J. ART & ENT. L. 39 (2004).

**DEBRA J. WYMAN** was born in La Mesa, California in 1967. Ms. Wyman specializes in securities litigation and has litigated numerous cases against public companies in the state and federal courts which resulted in hundreds of millions of dollars in recoveries to investors. In late 2004, Ms. Wyman was a member of the trial team in *In re AT&T Corp. Sec. Litig.*, which was tried in the District Court in New Jersey, and which settled after two weeks of trial for $100 million. Currently, Ms. Wyman is litigating the complicated accounting fraud matter against HealthSouth Corporation, one of the largest and long-running corporate frauds in history.

Ms. Wyman received her Bachelor of Arts degree from the University of California, Irvine in 1990 and her Juris Doctor degree from the University of San Diego School of Law in 1997. Ms. Wyman was admitted to the California Bar in 1997 and is licensed to practice before all the California State Courts, as well as all the United States District Courts in California and the Eleventh Circuit Court of Appeals. She is a member of the California Bar Association and the San Diego County Bar Association.

## OF COUNSEL

**AELISH MARIE BAIG** earned her Bachelor of Arts degree in International Relations from Brown University in 1992. Ms. Baig obtained her Juris Doctor degree, *cum laude*, in 1998 from the Washington College of Law at American

University, where she was a senior editor of the *Administrative Law Review*. Upon graduating, Ms. Baig clerked for one year for the Honorable Judge Alfred Lindeman at the United States Department of Labor, Office of Administrative Law Judges.

Ms. Baig joined the firm of Lawless & Lawless in 1999, where she litigated primarily employment discrimination cases on behalf of plaintiffs. Ms. Baig has successfully briefed and argued numerous dispositive motions in state and federal trial courts, as well as in the Court of Appeals. Notably, Ms. Baig prepared all briefing in the trial, appellate and California Supreme Court for a sexual harassment/retaliation case entitled *Miller v. The California Department of Corrections*, ultimately obtaining a unanimous decision from the California Supreme Court in the plaintiffs' favor. Ms. Baig has second chaired a number of jury trials which resulted in awards or favorable settlements for her clients.

Ms. Baig joined the Firm in July 2004. She presently litigates consumer and securities fraud class actions. She is a member of the California Bar and is admitted to practice before the United States District Court for the Northern District of California and the Ninth Circuit Court of Appeals.

**ELISABETH A. BOWMAN** practice areas include class action consumer protection and antitrust. In addition, Ms. Bowman oversees and assists in the preparation of Robbins Geller Rudman & Dowd LLP's litigation graphics.

Ms. Bowman assisted in the successful prosecution of the following trials: *Long v. Wells Fargo Co.; Yourish v. Ca. Amplifier; In re Helionetics, Inc. Sec. Litig.; Schwartz v. Visa; Douglas Shooker v. Gary Winnick*; and *In re AT&T Corp. Sec. Litig.*

Ms. Bowman received her Bachelor of Fine Arts degree from the University of Alaska at Anchorage in 1986. She majored in Fine Arts and Psychology. While a student at the U of A, she received a grant from the Ford Foundation to participate in the artists in residency program at the Visual Arts Center, Alaska. Ms. Bowman received her Juris Doctor degree from the University of San Diego in 1989. During the summer of 1987, she attended USD's Institute on International and Comparative Law in Oxford, England.

Ms. Bowman was in private practice as a criminal defense attorney for eight years, handling both trials and appeals in state and federal courts. Ms. Bowman is a member of Volunteers in Parole ("VIP"), an organization based on the Big Brothers' paradigm, in which attorneys are matched with parolees from the California Youth Authority in an effort to offer positive mentoring. She also served on VIP's local and state-wide boards.

Ms. Bowman is a member of the California Bar (1990), and is admitted to the Supreme Court of the State of California, the United States District Court for the Southern District of California, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States.

**BRUCE BOYENS** earned his Juris Doctor degree from the University of Kentucky College of Law, while working in various industrial jobs to support his family. He also earned a Certificate in Environmental Policy and Management from Harvard University. Mr. Boyens has served as Of Counsel to the Firm since 2001. A private practitioner in Denver, Colorado since 1990, Mr. Boyens specializes in consulting with labor unions on issues relating to labor and environmental law, labor organizing, labor education, union elections, internal union governance and alternative dispute resolutions.

In this capacity, he was a Regional Director for the International Brotherhood of Teamsters elections in 1991 and 1995. He developed and taught collective bargaining and labor law courses for the George Meany Center, the United Mine

Workers of America, Transportation Workers Local 260, the Kentucky Nurses Association, among others. Previously, he was an Attorney Instructor at the University of Tennessee Legal Clinic in Knoxville, Tennessee (1977-1978) and an Assistant Professor at the West Virginia Institute of Technology in Montgomery, West Virginia (1975).

He served as a special arbitrator of securities fraud claims in Kentucky in the matter of *SEC v. Prudential Sec., Inc.*, (D. D.C.) Case No. 93-2164 (1993).

He served as the Western Regional Director and Counsel for the United Mine Workers from 1983-1990, where he was the chief negotiator in over 30 major agreements for the United Mine Workers, and represented the United Mine Workers in all matters before the National Labor Relations Board. From 1973-1977, he served as General Counsel to District 17 of the United Mine Workers Association and also worked as an underground coal miner during that time.

From 1978-1982, he served as the Assistant Regional Director/Inspection and Enforcement (Kentucky, Tennessee, Alabama and Georgia) for the United States Department of the Interior, Office of Surface Mining in Knoxville, Tennessee.

He has authored several articles in the areas of labor and environmental law, including: *Development of Foreign Coal by American Companies*, The National Coal Issue, West Virginia Law Review (Spring 1985), *Export of Coal, Jobs and Capital and Its Effects on the American Coal Industry*, Ninth Annual Seminar in Mineral Law, University of Kentucky College of Law (October 1984), and the *Guide to Black Lung Benefits* (December 1972). He has served as a member of the Editorial Board of the *Journal of Mineral Law & Policy*, University of Kentucky College of Law, from 1988-1999.

He is a member of the Tennessee and West Virginia Bars.

**JAMES CAPUTO** has focused his practice on the prosecution of complex litigation involving securities fraud and corporate misfeasance, consumer actions, unfair business practices, contamination and toxic torts, and employment and labor law violations. He has successfully served as lead or co-lead counsel in numerous class and consumer action litigation matters, including, for example: *In re S3 Sec. Litig.*, Case No. CV770003 (Cal. Super. Ct., Santa Clara County); *Santiago v. Kia Motors Am.*, Case No. 01CC01438 (Cal. Super. Ct., Orange County); Case No. 0988 MJJ (N.D. Cal.); *In re Fleming Co. Sec. Litig.*, Case No. 5:02-CV-178 (TJW) (E.D. Tex.); *In re Capstead Mortgage Corp. Sec. Litig.*, Case No. 3:98-CV-1716 (N.D. Tex.); *In re Valence Tech. Sec. Litig.*, Case No. C95-20459 (JW)(EAI) (N.D. Cal.); *In re THQ, Inc. Sec. Litig.*, Master File No. CV-00-01783-JFW (C.D. Cal.); and *In re ICN Pharm. Corp. Sec. Litig.*, Case No. CV-98-02433 (C.D. Cal.).

Mr. Caputo was formerly a partner at Spector Roseman & Kodroff. He was one of the trial counsels in the year-long trial of *Newman v. Stringfellow*, a toxic exposure case involving nearly 4,000 plaintiffs. That case ultimately settled for approximately $110 million. He was co-trial counsel in an employment law class action against Taco Bell, which settled for $14 million.

Mr. Caputo received a Bachelor of Science degree from the University of Pittsburgh in 1970 and a Masters degree from the University of Iowa in 1975. In 1984, he received his Juris Doctor degree, *magna cum laude*, from California Western School of Law, where he served as Editor-In-Chief of the *International Law Journal*. He also clerked for Presiding Justice Daniel J. Kremer of the California Court of Appeal from 1985-1987 and to Associate Justice Don R. Work of the California Court of Appeal from 1984-1985. He has co-authored *No Single Cause: Juvenile Delinquency and the Search for Effective*

*Treatment* (1985) and authored Comment, *Equal Right of Access in Matters of Transboundary Pollution: Its Prospects in Industrial and Developing Countries*, 14 Cal. West. Intl. L. J. 192 (1984). Mr. Caputo has also numerous presentations to various legal and professional groups regarding complex and class action litigation.

He is admitted to practice in the State of California and the United States District Courts for the Southern, Central and Northern Districts of California as well as numerous other jurisdictions. Mr. Caputo is a member of the San Diego County and American Bar Associations, the Consumer Attorneys of California, and the Association of Trial Lawyers of America.

**PATRICK J. COUGHLIN** is the Firm's Chief Trial Counsel, and has been lead counsel for several major securities matters, including one of the largest class action securities cases to go to trial, *In re Apple Computer Sec. Litig.*, Case No. C-84-20148(A)-JW (N.D. Cal.).

Additional prominent securities class actions prosecuted by Mr. Coughlin include the *Enron* litigation, in which $7.3 billion was recovered; the *Qwest* litigation, in which a $445 million recovery was obtained; and the *HealthSouth* litigation, in which a partial settlement of $554 million has been recovered to date.

Formerly, Mr. Coughlin was an Assistant United States Attorney in the District of Columbia and the Southern District of California, handling complex white-collar fraud matters. During this time, Mr. Coughlin helped try one of the largest criminal RICO cases ever prosecuted by the United States, *United States v. Brown*, Case No. 86-3056-SWR, as well as an infamous oil fraud scheme resulting in a complex murder-for-hire trial, *United States v. Boeckman*, Case No. 87-0676-K.

Mr. Coughlin's additional trials involving securities violations include cases against Wells Fargo and California Amplifier. Both cases settled in trial. Cases that settled on the eve of trial include cases against Alcatel and America West. Mr. Coughlin has tried more than 50 jury and non-jury trials, including a large private RICO trial against the major tobacco companies on behalf of hundreds of thousands of Ohio Taft-Hartley health and welfare fund participants. Mr. Coughlin also helped end the Joe Camel ad campaign, a cartoon ad campaign that targeted children and secured a $12.5-billion recovery for the cities and counties of California in the landmark 1998 state settlement with the tobacco companies.

**MARK DEARMAN** is a native Floridian. Mr. Dearman received his undergraduate degree from the University of Florida and his Juris Doctor degree from Nova Southeastern University. Upon graduation from law school in 1993, he worked in the Miami office of Ruden, McClosky, Smith, Schuster & Russell. After spending several years defending Fortune 500 companies in all aspects of litigation, with an emphasis in complex commercial litigation, consumer claims, and products liability, Mr. Dearman founded the firm of Dearman & Gerson where he continued to defend many publicly traded corporations for over 12 years. During the past 17 years of practice, Mr. Dearman obtained extensive jury trial experience throughout the United States.

Mr. Dearman holds an AV rating by Martindale-Hubbell, the highest rating available. He was also recognized by his peers in 2004 and 2006 as being in the top 1.5% of Florida Civil Trial Lawyers as published in *Florida Trend's* Florida Legal Elite. Mr. Dearman is licensed to practice law in the state courts of Florida, as well as in the United States District Courts for the Southern, Middle, and Northern Districts of Florida.

Mr. Dearman's extensive defense background and trial experience is a unique asset which Robbins Geller Rudman & Dowd LLP utilizes in protecting the rights of those who have been harmed by corporate misconduct.

**L. THOMAS GALLOWAY** received a Bachelor of Arts degree in History/Latin from Florida State University and received his Juris Doctor degree from the University of Virginia Law School in 1972, where he was a member of the Editorial Board of the *University of Virginia Law Review*.

Mr. Galloway is the founding partner of Galloway & Associates, a law firm that concentrates in the representation of institutional investors – namely, public and multi-employer pension funds.

Mr. Galloway has authored several books and articles, including: The American Response to Revolutionary Change: A Study of Diplomatic Recognition (AEI Institute 1978); America's Energy: Reports from the Nation (Pantheon 1980); Contributor, Coal Treatise (Matthew Bender 1981); Contributor, Mining and the Environment: A Comparative Analysis of Surface Mining in Germany, Great Britain, Australia, and the United States, 4 Harv. Envtl. L. Rev. 261 (Spring 1980); A Miner's Bill of Rights, 80 W. Va. L. Rev. 397 (1978); and Contributor, Golden Dreams, Poisoned Streams (Mineral Policy Center Washington D.C. 1997).

Mr. Galloway represents and/or provides consulting services for the following: National Wildlife Federation, Sierra Club, Friends of the Earth, United Mine Workers of America, Trout Unlimited, National Audubon Society, Natural Resources Defense Council, German Marshal Fund, Northern Cheyenne Indian Tribe and Council of Energy Resource Tribes. He is a member of the District of Columbia and Colorado State Bars.

**BYRON S. GEORGIOU** received his Bachelor of Arts degree with Great Distinction and with Honors in Social Thought and Institutions, from Stanford University in 1970 attending on an Alfred P. Sloan full academic scholarship. After a year co-founding and teaching 7th and 8th graders at the Mariposa School, which has thrived for 35 years as an alternative primary through middle school in rural Mendocino County, he attended

Harvard Law School, graduating *magna cum laude* in 1974. He was admitted to the California Bar in 1974 and served for one year as law clerk to the Honorable Robert F. Peckham, Chief Judge of the United States District Court for the Northern District of California. He is a member of the Bar of the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Eastern, Central and Southern Districts of California.

Mr. Georgiou was recently appointed as one of 10 members nationally to the Financial Crisis Inquiry Commission, which will report to the Congress in December 2010 its conclusions as to the causes of the global financial crisis.

Mr. Georgiou served from 1975-1980 in various capacities with the California Agricultural Labor Relations Board, defending the constitutionality of the law up through the United States and California Supreme Courts, and prosecuting unfair labor practice cases enforcing the collective bargaining rights of farm workers, who had been excluded from labor protection under the National Labor Relations Act.

From 1980-1983, Mr. Georgiou served as Legal Affairs Secretary to California Governor Edmund G. Brown Jr., responsible for litigation by and against the Governor, judicial appointments, liaison with the Attorney General, Judiciary and State Bar, legal advice to the Governor and members of his Cabinet, and exercise of the Governor's powers of extradition and clemency.

From 1983-1994, he was Managing Partner and co founder of the San Diego law firm of Georgiou, Tosdal, Levine & Smith, a general civil practice, with emphasis on litigation, appearances before executive and legislative governmental bodies, and representation of labor organizations and their members, including contract negotiations and enforcement for many California public and private sector labor organizations.

In 1994, he co-founded and served as President of American Partners Capital Group, concentrating on serving the needs of institutional investors through capital formation programs in a variety of alternative asset categories.

In 1981, Mr. Georgiou was honored as Public Official of the Year by the California Trial Lawyers Association and served as Chair of the Governor's Task Force on Alcohol, Drugs and Traffic Safety, one of the nation's first vehicles for enacting tough drunk driver legislation, sponsored by the Mothers Against Drunk Driving (MADD).

Mr. Georgiou has been with the Firm since 2000 and serves as the primary liaison with a number of the Firm's principal institutional clients and has been actively involved in the historic litigations seeking recoveries for defrauded investors in *Enron, Dynegy, AOL Time Warner* and *WorldCom.*

**MITCHELL D. GRAVO** concentrates his practice in lobbying and government relations. He represents clients before the Alaska Congressional delegation, the Alaska Legislature, the Alaska State Government and the Municipality of Anchorage.

Mr. Gravo attended Ohio State University as an undergraduate before attending the University of San Diego School of Law. He came to Alaska in 1977, served briefly as an intern with the Municipality of Anchorage and then clerked a year for Superior Court Judge J. Justin Ripley. After his clerkship with Judge Ripley, he went back to the work for the Municipality of Anchorage, where he first served as the executive assistant to the Municipal Manager and then as the first lobbyist for the then Mayor of Anchorage, George M. Sullivan. Mr. Gravo has been described as one of the "top lobbyists in the state" by Alaska's major daily newspaper, *The Anchorage Daily News.*

His legislative clients include the Anchorage Economic Development Corporation, the Anchorage Convention and Visitors Bureau, UST Public Affairs, Inc., the International Brotherhood of Electrical Workers, Alaska Seafood International, Distilled Spirits Council of America, RIM Architects, Anchorage Police Department Employees Association, Fred Meyer and the Automobile Manufacturer's Association.

**HELEN J. HODGES** received her Bachelor of Science degree in accounting from Oklahoma State University in 1979. While attending Oklahoma State, Ms. Hodges obtained her private pilot's license and in 1980 was a member of Oklahoma State's flying team, which won top honors at the National Intercollegiate Flying Association competition. Ms. Hodges became a certified public accountant in 1982 and received her Juris Doctor degree from the University of Oklahoma in 1983, where she was the Managing Editor of the *Law Review.* She was admitted to the State Bars of Oklahoma in 1983 and California in 1987.

Ms. Hodges was a staff accountant with Arthur Andersen & Co. and served as the law clerk for the *Penn Square* cases in the Western District of Oklahoma. Ms. Hodges has been involved in numerous securities class actions, including: *Knapp v. Gomez*, Civ. No. 87-0067-H(M) (S.D. Cal.), in which a plaintiffs' verdict was returned in a Rule 10b-5 class action; *Nat'l Health Labs*, which was settled for $64 million; *Thurber v. Mattel*, which was settled for $122 million and *Dynegy*, which settled for $474 million. In the past several years, Ms. Hodges focused on the prosecution of *Enron*, where a record recovery ($7.3 billion) was obtained for investors.

Ms. Hodges is rated AV by Martindale-Hubbell (the highest rating available) and she was selected as a Super Lawyer in Southern California Super Lawyers 2007 – San Diego Edition. Ms. Hodges was elected to the Oklahoma State University Foundation Board of Governors in 2009.

**DAVID J. HOFFA** is Of Counsel to the Firm and a part of the Institutional Outreach Program. He

received his Bachelor of Arts degree from Michigan State University, and his Juris Doctor degree from Michigan State University College of Law.

Working closely with the Firm's partners, Mr. Hoffa is an integral part of the Firm's client outreach and business development programs. He advises public and multi-employer pension funds around the country on issues related to corporate fraud in the U.S. securities markets and "best practices" in the corporate governance of publicly traded companies. Mr. Hoffa is based in the Firm's Washington, D.C. office.

He is admitted in Michigan and the District of Columbia.

**NANCY M. JUDA** concentrates her practice in employee benefits law and works in the Firm's Institutional Investors Department. Ms. Juda received her Juris Doctor degree from American University in 1992 and her undergraduate degree from St. Lawrence University in 1988.

Prior to joining Robbins Geller Rudman & Dowd LLP, Ms. Juda was employed by the United Mine Workers of America Health & Retirement Funds, where she began her practice in the area of employee benefits law. Ms. Juda was also associated with union-side labor law firms in Washington, D.C., where she represented the trustees of Taft-Hartley pension and welfare funds on qualification, compliance, fiduciary and transactional issues under ERISA and the Internal Revenue Code.

Using her extensive experience representing union pension funds, Ms. Juda advises Taft-Hartley fund trustees regarding their options for seeking redress for losses due to securities fraud. Ms. Juda currently advises trustees of funds providing benefits for members of unions affiliated with the Building and Construction Trades Department of the AFL-CIO, including funds sponsored by the Operative Plasterers and Cement Masons International Association of America and Canada,

International Union of Painters and Allied Trades, United Union of Roofers, Waterproofers and Allied Workers and International Union of Elevator Constructors. Ms. Juda also represents workers in ERISA class actions involving breach of fiduciary duty claims against corporate plan sponsors and fiduciaries.

Ms. Juda is licensed to practice in Maryland (1992) and the District of Columbia (1995). She is a member of the National Coordinating Committee for Multi-Employer Plans, the International Foundation of Employee Benefit Plans, the Employee Benefits Committee of the American Bar Association's Section of Labor and Employment Law and the AFL-CIO Lawyers' Coordinating Committee.

**JEFFREY W. LAWRENCE** received his Bachelor of Arts degree, *magna cum laude*, from Tufts University in 1976. In 1979, Mr. Lawrence graduated *magna cum laude* with a Juris Doctor degree from Boston School of Law. He was a staff member of the *Boston University Law Review* from 1977-1978, and its editor from 1978-1979.

From September 1979 to September 1980, Mr. Lawrence served as a law clerk to the Honorable Walter Jay Skinner, United States District Court, District of Massachusetts. He was admitted to the Massachusetts Bar in 1979 and to the Bar of California in 1991. He is licensed to practice before the United States Court of Appeals, First and Ninth Circuits, the United States District Court, District of Massachusetts and the Northern District of California.

From 1983-1994, Mr. Lawrence was an Assistant United States Attorney, Criminal Division, where he obtained extensive trial experience in white-collar crimes, ranging from money-laundering to stock fraud.

**RUBY MENON** practice focuses on providing a variety of legal and consulting services to single and multi-employer pension funds. She also

serves as a member of the firm's advisory team and liaison between the firm's many individual and institutional investor clients in the United States and abroad.

For over 12 years Ms. Menon served as the chief legal counsel to two large multi-employer retirement plans, developing her expertise in many areas of employee benefits administration, including legislative initiatives and regulatory affairs, investments, tax, fiduciary compliance and plan administration.   One of her successful projects as General Counsel to the State of Indiana's Public Employees' Retirement Fund was to help develop the legal strategy and advocacy for the State's Referendum lifting the long-standing prohibitions on pension funds' investments in equity instruments.

She has lectured in law, ethics and communications, and is a frequent instructor for several certificate and training programs and seminars for pension fund trustees, administrators and other key decision makers of pension and employee benefit plans.   She is a member of several legal and professional organizations in the U.S. and abroad.

Ms. Menon received her Juris Doctor degree from Indiana University, School of Law, Bloomington, Indiana, and her bar affiliations and court admissions include: District of Columbia; New York; Colorado; Indiana; and the United States Supreme Court.

**MARK MILLKEY** received his Bachelor of Arts degree in English from Yale University in 1981, his Masters of Arts degree in English from the University of Virginia in 1983, and his Juris Doctor degree from the University of Virginia in 1987.

Prior to joining Robbins Geller Rudman & Dowd LLP, between 1996 and early 2009, Mr. Millkey was associated with two prominent Manhattan plaintiffs' class action firms, where his practice focused on consumer-fraud class actions against life insurance companies and complex securities class actions.   In 1995, Mr. Millkey assisted in a double derivative action involving a utility regarding overcharges for the provision of electricity.   And between 1987 and 1994, Mr. Millkey represented defendant corporations in complex commercial litigations.

Mr. Millkey has significant experience in the area of derivative litigation and contributes extensively to the prosecution of litigations.   For example, Mr. Millkey contributed in a major litigation against MetLife which resulted in a benefit to the class of approximately $1.7 billion, and assisted in a securities class action against Royal Dutch/Shell which settled for a minimum cash benefit to the class of $130 million and a contingent value of more than $180 million.   Mr. Millkey also has significant appellate experience with the federal court system and the state courts of New York.

Mr. Millkey is a member of the Bars of New York and Georgia and the United States District Courts for the Southern and Northern Districts of New York and the Northern District of Georgia.

**PAMELA M. PARKER** received her Bachelor of Arts degree in Political Science and French, with a concentration in International Politics, from the State University of New York at Binghamton, and was elected to Phi Beta Kappa.   Ms. Parker received a Juris Doctor degree from Harvard Law School, *cum laude,* in 1982.   While at Harvard, Ms. Parker was an Articles Editor of the *Civil Rights/Civil Liberties Law Review*.   After graduation, she served as a law clerk to the Honorable Frank J. Battisti, Chief Judge of the United States District Court, Northern District of Ohio.   Upon leaving the clerkship, Ms. Parker worked as an associate with the New York firm of Paul Weiss Rifkind Wharton & Garrison.   In 1988, Ms. Parker became associated with the New York firm of Lankenau Kovner & Bickford, concentrating her practice in representation of publications, libel defense, and First Amendment law.

For 13 years, Ms. Parker's practice has included appellate matters and environmental, consumer fraud and securities fraud litigation. Ms. Parker participated in the successful prosecution of several important actions, including: *In re The Exxon Valdez*, Case No. A89-095 (D. Ala.), in which she served as a member of the trial support team, and which resulted in a $5 billion jury verdict; *Pinney v. Great Western Bank,* Case No. CV-95-2100-I(RNBx) (C.D. Cal.), in which she served as one of the principal attorneys for plaintiffs and which resulted in a settlement of $17.2 million; and *Does I v. The Gap, Inc.,* Case No. 01 0031 (D. N. Mariana Islands), in which she was the lead prosecuting attorney and which resulted in a $20 million settlement, including a precedent-setting Monitoring Program to monitor labor and human rights practices in Saipan garment factories. In July 2003, Ms. Parker was named Trial Lawyer of the Year by the Trial Lawyers for Public Justice in recognition of her work on the case in the Northern Mariana Islands.

Ms. Parker is a member of the Appellate Practice Group of Robbins Geller Rudman & Dowd LLP. She has worked on a variety of appellate matters before numerous courts, including the United States Courts of Appeal for the Fifth, Sixth, Ninth, and Tenth Circuits and the appellate courts of California, Alabama, Ohio and Tennessee. She is a Lawyer Representative to the Ninth Circuit Judicial Conference.

Ms. Parker is admitted to practice in California and New York. She has been an active member of the Federal Bar Association, the San Diego County Bar Association and the Lawyers Club of San Diego, and also holds memberships with the American Bar Association and California Women Lawyers. She sits on the Board of Directors for the Legal Aid Society of San Diego.

**ROXANA PIERCE** is an international transactional lawyer whose practice focuses on negotiations, contracts, international trade, real estate transactions, and project development. She has represented clients in over 65 countries with extensive experience in the Middle East, Asia, Russia, the former Soviet Union, the Caribbean and India. She is presently acting as liaison to several international funds in the area of securities litigation.

Ms. Pierce has counseled international clients since 1994. She has spearheaded the contract negotiations for hundreds of projects, including several valued at over $1 billion, and typically conducts her negotiations with the leadership of foreign governments and the leadership of Fortune 500 corporations, foreign and domestic.

Ms. Pierce is a member of the District of Columbia Bar and the West Virginia State Bar. She is admitted to practice before the Supreme Court of Appeals of West Virginia, District of Columbia Court of Appeals, and the United States Court of Appeals, Fourth Circuit. Ms. Pierce has been awarded a Certification of Accomplishment by the Export-Import Bank of the United States for her accomplishments in international finance. In addition, Ms. Pierce is a member of the American Bar Association, the ABA International Law Advisory Panel, the American Society of International Law, and the Maryland Association of Realtors.

After receiving honors for her achievements in the study of French at the Sorbonne University in France, Roxana Pierce attended Pepperdine University, where she earned a Bachelor of Arts in International Affairs and Intercultural Relations in 1988. Ms. Pierce next earned a Paralegal Certificate with a focus on corporate law in 1989 from the University of San Diego before obtaining her Juris Doctorate from Thomas Jefferson School of Law in San Diego, where her study of the law focused on international practice.

Ms. Pierce is fluent in English and Farsi and has a working knowledge of French and Turkish. She is a volunteer for several local children's organizations. She organizes an annual mailing of supplies to orphanages in several African countries. She is a parent volunteer at The Woods

Academy. She also serves on various committees in the community.

**LEONARD B. SIMON** is admitted to practice in California, New York, and the District of Columbia.

Mr. Simon's practice has been devoted heavily to litigation in the federal courts, including both the prosecution and the defense of major class actions and other complex litigation in the securities and antitrust fields. He has also handled a substantial number of complex appellate matters, arguing cases in the United States Supreme Court, several federal Courts of Appeal, and several California appellate courts. He has also represented large, publicly traded corporations.

Mr. Simon served as plaintiffs' co-lead counsel *in In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz.) (settled for $240 million) and *In re NASDAQ Market-Makers Antitrust Litig.*, MDL No. 1023 (S.D.N.Y.) (settled for more than one billion dollars). He is currently in a leadership position in the private Microsoft Antitrust Litigation, and in the California Utilities Antitrust Litigation. He was centrally involved in the prosecution of *In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551(D. Ariz.), the largest securities class action ever litigated.

Mr. Simon is an Adjunct Professor of Law at Duke University, the University of San Diego, and the University of Southern California Law Schools. He has lectured extensively on securities, antitrust and complex litigation in programs sponsored by the American Bar Association Section of Litigation, the Practicing Law Institute, and ALI-ABA, and at the UCLA Law School, the University of San Diego Law School, and the Stanford Business School. He is an Editor of California Federal Court Practice and has authored a law review article on the Private Securities Litigation Reform Act of 1995.

Mr. Simon received his Bachelor of Arts degree from Union College in 1970 and his Juris Doctor degree from Duke University School of Law, Order of the Coif and with distinction, in 1973. He served as law clerk to the Honorable Irving Hill, United States District Judge for the Central District of California, in 1973-1974.

**LAURA S. STEIN** received her Bachelor of Arts degree in 1992 and her Juris Doctor degree in 1995 from the University of Pennsylvania. She is a member of the Bar in Pennsylvania, New Jersey and Washington D.C. Since 1995, Ms. Stein has practiced in the areas of securities class action litigation, complex litigation and legislative law.

Ms. Stein is Special Counsel to the Institute for Law and Economic Policy (ILEP), a think tank which develops policy positions on selected issues involving the administration of justice within the American legal system. Speakers at ILEP's yearly symposiums have included the most prominent legal scholars, judges, government officials and noted academics in the United States, including United States Senator Jon Kyl, the Honorable Harvey Goldschmid, Dwight Professor of Law at Columbia University School of Law, former SEC Commissioner, President Joel Seligman of the University of Rochester, formerly Dean of the Washington University School of Law, Professor James Cox of Duke University School of Law, Professor Lucian Bebchuk of Harvard Law School, Former SEC Chairman Arthur Levitt and SEC Commissioner Roel Campos, among many other distinguished speakers. Each year ILEP publishes the papers presented at its symposia in prominent law reviews, such as the *Columbia Law Review*, *Duke Law Journal*, *Hastings Law Journal*, *Vanderbilt Law Review*, *Arizona Law Review* and *Wisconsin Law Review*. Ms. Stein has served as Counsel to the Annenberg Institute of Public Service at the University of Pennsylvania.

In a unique partnership with her mother, attorney Sandra Stein, of counsel to Robbins Geller Rudman & Dowd LLP, the Steins are the Firm's

and the nation's top asset recovery experts. The Steins focus on minimizing losses suffered by shareholders due to corporate fraud and breaches of fiduciary duty. The Steins also seek to deter future violations of federal and state securities laws by reinforcing the standards of good corporate governance. The Steins work with over 500 institutional investors across the nation and abroad, and their clients have served as lead plaintiff in successful cases where billions of dollars were recovered for defrauded investors against such companies as: AOL Time Warner, TYCO, Cardinal Health, AT&T, Hanover Compressor, 1st Bancorp, Enron, Dynegy, Inc., Honeywell International and Bridgestone, to name a few.

Ms. Stein has been active in a number of organizations, including the National Association of Shareholder and Consumer Attorneys (NASCAT), National Association of State Treasurers (NAST), the AFL-CIO Lawyers Coordinating Committee, the National Coordinating Committee for Multi-Employer Plans (NCCMP) and the International Foundation for Employer Benefit Plans (IFEBP), among others.

Ms. Stein has addressed the Florida Public Pension Trustees Association, the Third District Regional Meeting of the International Brotherhood of Electrical Workers, the Ohio Building Trades, the New York Pipetrades and the Pennsylvania Treasurers Association among many others. Ms. Stein has also addressed the Pennsylvania, Nevada and Virginia AFL-CIO conventions, as well as hundreds of public and Taft-Hartley pension fund trustee boards across the country.

Ms. Stein resides in Los Angeles, California with her husband, Samuel Goldfeder, an attorney and NBA sports agent, and their two young children, Michael and Sabrina.

**SANDRA STEIN** received her Bachelor of Science degree from the University of Pennsylvania and

her Juris Doctor degree from Temple University School of Law, having attended both universities on full scholarship. She is a member of the Bar in Pennsylvania and Washington, D.C. Ms. Stein concentrates her practice in securities class action litigation, legislative law and antitrust litigation. She served as Counsel to United States Senator Arlen Specter of Pennsylvania. During her service in the United States Senate, Ms. Stein was a member of Senator Specter's legal staff and a member of the United States Senate Judiciary Committee staff.

Ms. Stein is the Founder of the Institute for Law and Economic Policy (ILEP), a think tank which develops policy positions on selected issues involving the administration of justice within the American legal system. Speakers at ILEP's yearly symposiums have included the most prominent legal scholars, judges, government officials and noted academics in the United States, including United States Senator Jon Kyl, the Honorable Harvey Goldschmid, Dwight Professor of law at Columbia University School of Law, former SEC Commissioner, President Joel Seligman of the University of Rochester, formerly Dean of the Washington University School of Law, Professor James Cox of Duke University School of Law, Professor Lucian Bebchuk of Harvard Law School, Former SEC Chairman Arthur Levitt, and SEC Commissioner Roel Campos, among many other distinguished speakers. Each year ILEP is invited to publish the papers presented at its symposia in prominent law reviews, such as *Columbia Law Review*, *Duke Law Journal*, *Hastings Law Journal*, *Vanderbilt Law Review*, *Arizona Law Review* and *Wisconsin Law Review*.

Ms. Stein served on the Board of Advisors of the Annenberg Institute of Public Service at the University of Pennsylvania. She has produced numerous public service documentaries for which she was nominated for an Emmy and received an ACE award, cable television's highest award for excellence in programming. Ms. Stein is a recipient of the National Federation of Republican

Women's "Best of America" award and has been honored by the White House, California State Senate and California State Assembly for her civic leadership.

In a unique partnership with her daughter, Laura Stein, also an attorney at Robbins Geller Rudman & Dowd LLP, the Steins are the Firm's and the nation's top asset recovery experts. The Steins focus on minimizing losses suffered by shareholders due to corporate fraud and breaches of fiduciary duty. The Steins also seek to deter future violations of federal and state securities laws by reinforcing the standards of good corporate governance. The Steins work with over 500 institutional investors across the nation and abroad, and their clients have served as lead plaintiff in successful cases where billions of dollars were recovered for defrauded investors against such companies as: AOL Time Warner, TYCO, Cardinal Health, AT&T, Hanover Compressor, 1st Bancorp, Enron, Dynegy, Inc., Honeywell International and Bridgestone, to name a few.

Ms. Stein has been active in a number of organizations, including the National Association of Shareholder and Consumer Attorneys (NASCAT), National Association of State Treasurers (NAST), the AFL-CIO Lawyers Coordinating Committee, the National Coordinating Committee for Multi-Employer Plans (NCCMP) and the International Foundation for Employer Benefit Plans (IFEBP), among others.

Ms. Stein has addressed the National Association of Auditors, Controllers and Treasurers on the subject of corporate governance and its role as a positive force in future class action securities settlements. She has also spoken before numerous AFL-CIO conventions and hundreds of public and multi-employer pension funds.

**JOHN J. STOIA, JR.** received his Bachelor of Science degree from the University of Tulsa in 1983. While working on his degree, Mr. Stoia

was elected President of the National Political Science Honor Society and graduated with highest honors. In 1986, Mr. Stoia received his Juris Doctor degree from the University of Tulsa and graduated in the top of his class. In 1987, Mr. Stoia graduated in the top of his class from the Georgetown University Law Center in Washington, D.C., receiving his Masters of Law in Securities Regulation. Thereafter, Mr. Stoia served as an enforcement attorney with the United States Securities and Exchange Commission prior to going into private practice. Mr. Stoia is one of the founding partners of what is now Robbins Geller Rudman & Dowd LLP.

Mr. Stoia worked on dozens of nationwide complex securities class actions, including *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz.), which arose out of the collapse of Lincoln Savings & Loan and Charles Keating's empire. Mr. Stoia was a member of plaintiffs' trial team, which obtained verdicts against Mr. Keating and his co-defendants in excess of $3 billion and settlements of over $240 million.

Mr. Stoia has been responsible for over $10 billion in recoveries on behalf of victims of insurance fraud due to deceptive sales practices such as "vanishing premiums," "churning," and discrimination in the sale of burial or debit insurance.

Mr. Stoia has been involved in over 40 nationwide class actions brought by policyholders against United States and Canadian life insurance companies seeking redress for deceptive sales practices during the 1980s and 1990s. Mr. Stoia was lead or co-lead counsel and actively involved in nationwide cases against, among others, Prudential ($4+ billion), Manufacturer's Life ($1.19 billion), New York Life ($600+ million), Transamerica Life Insurance Company ($250+ million), General American Life Insurance Company ($85+ million), Metropolitan Life ($2 billion), American General and subsidiaries ($500+ million), Allianz ($55+ million), Principal

Mutual Life ($380+ million) and Pacific Life Insurance Company ($200+ million).

Mr. Stoia was also involved in numerous cases brought against life insurance companies for racial discrimination involving the sale of debit or "industrial life" insurance policies during the 20th century. Mr. Stoia was lead counsel in *McNeil v. Am. Gen. Life Ins. Accident Ins. Co.*, the first major settlement involving discrimination claims which resulted in a $234 million recovery for class members. Mr. Stoia resolved other race-based insurance cases, including *Brown v. United Life Ins. Co.* ($40 million), *Morris v. Life Ins. Co. of Ga.* ($55 million), and *Thompson v. Metropolitan Life* ($145 million).

Mr. Stoia initiated the first cases against the property and casualty insurance brokerage industry and insurers exposing undisclosed kickbacks known as "contingent commissions" and illegal bid-rigging activities. He is one of the lead plaintiffs' counsel in the consolidated MDL proceedings pending in the United States District Court for the District of New Jersey (*In re Employee-Benefit Ins. Brokerage Antitrust Litig.*, Case No. 2:05-cv-1079(FSH), and *In re Ins. Brokerage Antitrust Litig.*, Case No. 2:04-cv-5184(FSH), MDL No. 1663). He was also the lead trial counsel representing the California Department of Insurance against five of the largest Employee Benefit Insurance companies (MetLife, Prudential, Hartford, Cigna and UnumProvident) for violating California Insurance Regulations for failing to disclose payments of contingent commissions to brokers in California and other improper activities. *The People of the State of California v. Universal Life Res.*, Case No. GIC838913 (Cal. Super. Ct., San Diego County). All five defendants have agreed to sweeping changes in their disclosure practices within California as a result of that action.

Mr. Stoia represented numerous large institutional investors who suffered hundreds of millions of dollars in losses as a result of major financial scandals, including AOL/Time Warner and WorldCom.

Currently, Mr. Stoia is court-appointed co-lead counsel in eight nationwide class actions against sellers of deferred annuities to senior citizens.

Mr. Stoia is also co-lead counsel on behalf of purchasers of and those exposed to hazardous toys (lead paint and magnets) manufactured and/or distributed by Mattel, Fisher Price and retailers such as Target, Wal-Mart and Toys R Us. That case ultimately settled for in excess of $50 million and provided full relief to class members, donations to children's charities and injunctive relief against Mattel that provides sweeping changes to Mattel's toy manufacturing processes worldwide.

Mr. Stoia was selected as Litigator of the Month by *The National Law Journal* (July 2000). He is also a member of ALI-ABA's Commercial Law Advisory Panel and the Public Justice Class Action Preservation Project Committee. Mr. Stoia was also selected as a Super Lawyer in *Southern California Super Lawyers 2007 and 2008*. He was also voted a California Super Lawyer for 2007-2010.

Mr. Stoia is also a frequent lecturer on numerous legal topics:

Speaker, New York City: ABA Meeting: Deferred Annuity Sales Practices (August 8, 2008);

Speaker, San Francisco: Consumer Attorneys of California College of Trial Arts San Francisco Trial Lawyers Association – Class Action Hurdles From the Plaintiff's Perspective (March 5, 2008);

Speaker, New York City: PLI Annual Conference on Class Action Litigation (July 12, 2007);

Speaker, Bermuda: 2007 International Reinsurance Summit (June 6-8, 2007);

Speaker, Chicago: Insurance Industry and Financial Services Litigation (May 10-11, 2007);

Speaker, San Diego, CA: Association of Life Insurance Counsel (May 7, 2007);

Co-Chair and Speaker, 12th Annual ALI-ABA Conference on Life Insurance and Financial Services Industry Litigation (2007);

Speaker, Washington, DC: The Federalist Society's Corporations, Securities & Antitrust Practice Group – Class Action Fairness Act: Two Years Later (February 14, 2007);

Speaker, Conference on Insurance Industry Litigation 2007 (ALI-ABA);

Speaker, New York City: PLI Class Action Litigation Prosecution and Defense Strategies (July 27-28, 2006);

Speaker, Kona, Hawaii: IBA West Blue Ribbon Conference on Contingent Commissions (May 1, 2006);

Co-Chair and Speaker, Washington, DC: Co-Chair; ALI-ABA Conference on Life Insurance and Financial Services Industry Litigation (March 30-31, 2006);

Speaker, ATLA Annual Convention – Insurance Law Section, Broker/Dealer Liability (2006);

Speaker, ATLA Winter Convention – Securities Fraud: Rights and Remedies of Shareholders (2006);

Co-Chair and Speaker, ALI-ABA Program 11th Annual: Financial Services and Insurance Industry Litigation (2006);

Speaker, Quebec, Canada: Barreau du Quebec Class Action Seminar – Class Action Fairness Act (October 21, 2005);

Speaker, New York City: ACI Consumer Finance Class Actions Conference (September 26, 2005);

Speaker, Toronto, Canada: ATLA Annual Convention – Insurance Law Section, Broker/Dealer Liability (July 24, 2005);

Speaker, New York City: ALI-ABA Program: Financial Services and Insurance Industry Litigation (March 18, 2005); and

Speaker, ALI-ABA, Practicing Law Institute and American Trial Lawyers Association seminars and conferences: ALI-ABA Program: Life and Health Insurance Litigation (2004).

## SPECIAL COUNSEL

SUSAN K. ALEXANDER specializes in federal appeals of securities fraud class actions on behalf of investors. With over twenty years of federal appellate experience, Ms. Alexander has argued on behalf of defrauded investors in the Second, Fifth, Ninth, Tenth and Eleventh Circuits. Representative results include *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) (reversal of district court dismissal of securities fraud complaint, focused on loss causation); *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005), *reh'g denied*, 409 F.3d 653 (5th Cir. 2005) (reversal of district court dismissal of securities fraud complaint, focused on scienter); and *Piraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) (reversal of district court dismissal of securities fraud complaint, focused on scienter).

Ms. Alexander's prior appellate work was with the California Appellate Project ("CAP"), where she prepared appeals and petitions for writs of *habeas corpus* on behalf of individuals sentenced to death, as well as supervised private attorneys in their preparation of appeals and *habeas corpus petitions*. At CAP, and subsequently in private practice, Ms. Alexander litigated and consulted on death penalty direct and collateral appeals for 10 years. Representative results include *In re Brown*, 17 Cal. 4th 873 (1998) (reversal of first degree murder conviction, special circumstance finding, and death penalty), and *Odle v. Woodford*, 238 F.3d 1084 (9th Cir. 2001) (remand of death

penalty conviction for retrospective competency hearing). Ms. Alexander was previously associated with Bronson, Bronson & McKinnon, where she litigated professional malpractice and product liability cases on behalf of attorneys, doctors, and automobile manufacturers, including defense verdicts in two jury trials.

Ms. Alexander graduated with honors from Stanford University in 1983 and earned her Juris Doctor degree from the University of California, Los Angeles in 1986. Ms. Alexander is a member of the Bars of the State of California, the United States Supreme Court, the United States Court of Appeals, Second, Fifth, Eighth, Ninth, Tenth and Eleventh Circuits, and the United States District Courts for the Northern, Central, Eastern and Southern Districts of California and the District of Utah. In 2009, Ms. Alexander was selected as an appellate delegate to the Ninth Circuit Judicial Conference and is also a member of the Federal Bar Association, Appellate Division, as well as the Appellate Practice Section of the Bar Association of San Francisco.

Ms. Alexander is married with three teenage children.

**BRUCE GAMBLE** is a member of the Firm's institutional investor client services group. Mr. Gamble serves as liaison with the Firm's institutional investor clients in the United States and abroad, advising them on securities litigation matters. Mr. Gamble formerly served as Of Counsel to the Firm, providing a broad array of highly specialized legal and consulting services to public retirement plans. Prior to that, Mr. Gamble was General Counsel and Chief Compliance Officer for the District of Columbia Retirement Board, where he served as chief legal advisor to the Board of Trustees and staff. Mr. Gamble's experience also includes serving as Chief Executive Officer of two national trade associations and several senior level staff positions on Capitol Hill.

Mr. Gamble earned his Bachelor of Science in Economics from the University of Louisville and his Juris Doctor degree from Georgetown University Law Center. Mr. Gamble formerly served as a member of the Executive Board and co-chair of the investment section of the National Association of Public Pension Attorneys (NAPPA), a professional and educational organization whose membership consists exclusively of attorneys who represent public pension funds.

Mr. Gamble is admitted to practice in the District of Columbia, New York, Pennsylvania, and before the United States Supreme Court.

**TRICIA L. MCCORMICK** earned her Bachelor of Arts degree from the University of Michigan in 1995 and her Juris Doctor degree, *cum laude*, from the University of San Diego in 1998.

Ms. McCormick's practice focuses primarily on the prosecution of securities class actions. She is a member of the California Bar (1998), and is admitted to practice before the United States District Courts for the Southern and Central Districts of California.

Ms. McCormick has litigated numerous cases against public companies in the state and federal courts which resulted in hundreds of millions of dollars in recoveries to investors. She is also a member of a team that is in constant contact with clients who wish to become actively involved in the litigation of securities fraud. In addition, Ms. McCormick is active in all phases of the firm's lead plaintiff motion practice.

## FORENSIC ACCOUNTANTS

**R. STEVEN ARONICA** is a Certified Public Accountant licensed in the States of New York and Georgia and is a member of the American Institute of Certified Public Accountants, the Institute of Internal Auditors and the Association of Certified Fraud Examiners. He has been employed in the practice of accounting for 25

years, including: (1) public accounting where he was responsible for providing clients with a wide range of accounting and auditing services; (2) private accounting with Drexel Burnham Lambert, Inc., where he held positions with accounting and financial reporting responsibilities as a Vice President; and (3) various positions with the United States Securities and Exchange Commission ("SEC"). Mr. Aronica has extensive experience in securities regulation and litigation. At the SEC, Mr. Aronica reviewed and analyzed financial statements and related financial disclosures contained in public filings for compliance with generally accepted accounting principles, generally accepted auditing standards, and the accounting and auditing rules, regulations and policies of the SEC. Mr. Aronica was also an Enforcement Division Branch Chief, responsible for managing a group of investigators and accountants who initiated, developed and executed numerous investigations involving financial fraud, accounting improprieties and audit failures. Mr. Aronica has been instrumental in the prosecution of numerous financial and accounting fraud civil litigation claims against companies which include Lucent Technologies, Oxford Health Plans, Computer Associates, Aetna, WorldCom, Tyco, Vivendi, AOL Time Warner, Ikon, Thomas & Betts, InaCom and Royal Ahold. In addition, Mr. Aronica helped prosecute numerous claims against each of the major United States public accounting firms.

**ANDREW J. RUDOLPH** is a Certified Fraud Examiner and a Certified Public Accountant licensed to practice in California. He is an active member of the American Institute of Certified Public Accountants, California's Society of Certified Public Accountants, and the Association of Certified Fraud Examiners. His 20 years of public accounting, consulting and forensic accounting experience includes financial fraud investigation, auditor malpractice, auditing of public and private companies, business litigation consulting, due diligence investigations and taxation. Mr. Rudolph is the National Director of

Robbins Geller Rudman & Dowd LLP's Forensic Accounting Department, which provides the Firm with in-house forensic accounting expertise in connection with securities fraud litigation against national and foreign companies. Mr. Rudolph is the Director of Forensic Accounting at the Firm and has given numerous lectures and assisted with articles on forensic investigations and financial statement fraud. Mr. Rudolph has directed hundreds of financial statement fraud investigations which were instrumental in the recovered billions of dollars for defrauded investors. Prominent cases include *Qwest*, *HealthSouth*, *WorldCom*, *Boeing*, *Honeywell*, *Vivendi*, *Aurora Foods*, *Informix* and *Platinum Software*.

**CHRISTOPHER YURCEK** is one of the Firm's senior forensic accountants and provides in-house forensic accounting and litigation expertise in connection with major securities fraud litigation. Mr. Yurcek is a Certified Public Accountant with 19 years of accounting, forensic examination and consulting experience in areas including financial statement audit, fraud investigation, auditor malpractice, turn-around consulting, business litigation, and business valuation. Mr. Yurcek was responsible for overseeing the firm's forensic accounting investigation in *In re Enron Corp. Sec. Litig*. Mr. Yurcek provides the firm with in-house forensic accounting expertise and directs accounting investigations in connection with well-publicized securities fraud litigation, including cases such as *Enron*, *Vesta*, *Informix*, *Mattel*, *Coca Cola Company* and *Media Vision*. Mr. Yurcek's experience included providing forensic accounting expertise to bankruptcy trustees and audit and accounting services at a national CPA firm. Mr. Yurcek speaks at professional accounting seminars on topics such as financial statement fraud and fraud prevention and has co-authored articles on these subjects. Mr. Yurcek is a member of the American Institute of Certified Public Accountants and the California Society of CPAs.

App. 254



**FIRM RESUME**

Kendall Law Group was founded by former federal judge Joe Kendall.  It is a boutique trial law firm staffed by a former U.S. Attorney, federal law clerks, and experienced securities lawyers. Led by Judge Kendall, the group of experienced and highly specialized practitioners brings value-added assistance to their clients in complex class action, securities, and business litigation matters.

Since 2002, in class action securities fraud cases, the lawyers at Kendall Law Group have participated in obtaining over $800 million for shareholders.  The Kendall Law Group has served as lead or liaison counsel in numerous merger & acquisition, derivative, and securities class action matters, including: *In re Burlington Northern Santa Fe Corporation Shareholder Class Action Litigation,* Cause No. 348-241465-09,  (348th District Court, Tarrant County, Texas) *In re Affiliated Computer Services Derivative Litigation*, Master File No. 3:06-cv-1110-M (N.D. Tex.); *In re Cablevision Systems Corp. Shareholder Derivative Litigation*, Master File No. CV-06-4130 (E.D.N.Y.); *Ryan v. Flowserve Corp.,* Civil Action No. 3:03-CV-01769 (N.D. Tex.); *Blackmoss Investments v. Gravity Corp., et. al.,* Civil Action No. 1:05-CV-04804-LAP (S.D.N.Y.); *In re Guidant Corp. Securities Litigation*, Master File No. 1:05- CV-01658-SEB-WTL (S.D. Ind.); *In re 7-Eleven Shareholders Litigation*, No. 05-089344-M (District Court Dallas County, Texas);  *In re Impac Mortgage Holdings, Inc., Case No.* 8:06-cv-00091-CJC-RNB (C.D. Cal.);  *In re Fossil Derivative Litigation*, Cause No. 3:06-cv-01672-P (N.D. Tex.);  *Dillingham v. Schmitz,* Cause No. 2005C119934 (288th District Court, Bexar County, Texas);  *Alaska Electrical Pension Fund v. Brown, et al.*, Cause No. 6:04-CV-464 (E.D. Tex.);  *Holowach v. Gilliland,* et. al., Cause No. 017-221963-07 (17th District Court, Tarrant County, Texas); *Levy Investments v. Donald Steen, et. al.,*

1

Cause No. DC-07-00208 (101st District Court Dallas County, Texas); *In re Petco Animal Supplies, Inc., Shareholder Litigation,* Case No. GIC 869399 (Superior Court, San Diego, California); *Frank Capovilla v. Lone Star Technologies, Inc., et. al.,* Cause No. DC-07-002979 (14th District Court, Dallas County, Texas); *Louis Dudas v. Encore Medical Corporation, et. al.,* Cause No. NO. D-1-GN-002495 (345th District Court, Travis County, Texas); *Waggoner v. Ryan, et. al,* Cause No. CC-05-13893 (County Court at Law No. 2, Dallas County, Texas); *Evans v. Paulson, et. al,* Cause No. 05-01818-JMR-FLN (D. Minn.); and others.

**JOE KENDALL**

Former United States District Judge Joe Kendall is the managing partner of Kendall Law Group.  Mr. Kendall served on the federal bench in the Northern District of Texas from 1992-2002, appointed by President George Herbert Walker Bush.  At the time of his appointment, he was the youngest U.S. District Judge in the country.  He also served as a state district judge on the 195th Judicial District Court in Dallas from 1987-2002.  In his judicial career, he has presided over approximately 500 jury trials and disposed of over 11,000 cases.  Mr. Kendall has a B.B.A. from the Cox School of Business at Southern Methodist University and a law degree from Baylor University.  Mr. Kendall served as a Commissioner on the United States Sentencing Commission from 1999 through 2002, appointed by President Bill Clinton.

Since leaving the bench and returning to trial work, Mr. Kendall has had tremendous success at the prosecution of patent, consumer and securities class action litigation either as lead, co-lead or liaison counsel: *Shields v. Bridgestone/Firestone, Inc., et al.*, Cause No. B-170,462 (Tex. Dist. Court, 172nd Judicial District - Jefferson County, Mar. 12, 2004) ($19 million recovery for class members); *Pirelli Armstrong Tire Corporation retiree Medical Benefits Trust v. Hanover Compressor Company, et al,* Cause No. H-02-0410 (S.D. Tex., Jan. 2003), ($85 million recovery for

2

shareholders); *Wahl v. Daisytek*, Cause No. 4:03-CV-00212, (E.D. Tex., Jul. 20, 2005) ($6 million recovery for shareholders); *Schwartz v. TXU Corp., et al,* Cause No. 3:02-CV-2243-K (N.D. Tex.) ($149.75 million recovery for shareholders); *In re Dynegy, Inc.  Securities Litigation,* Cause No. H-02-CV-1571 (S.D. Tex., April 2005), ($474 million recovery for shareholders).  He frequently serves as local counsel for out of state lawyers in all federal and state courts in Texas.

      While on the federal bench, Mr. Kendall handled numerous class actions of various types and presided over in excess of 100 civil jury trials, including complex litigation, securities, antitrust, qui tam, medical malpractice, products liability, and patent infringement cases.  He presided over a multi-district litigation case, and also handled environmental and CERCLA cases.  Author of more than 250 judicial opinions published in the federal reporters or legal research databases, his more notable cases include, *Ozee v. American Council on Gift Annuities* (an antitrust class action against the most prominent charities in the nation), *SBC Communications v. AT&T* (to determine the constitutionality of certain provisions of the Telecommunications Act of 1996), *American Airlines, Inc. v. Allied Pilots Association* (the pilots sickout dispute in 1999), and *Johnson v. City of Dallas* (a case brought by homeless persons to determine the constitutionality of a city ordinance prohibiting sleeping in public).  Before his elevation to the bench, Mr. Kendall was a trial lawyer in Dallas, and tried more than 100 jury trials to judgment.

      Additionally, Mr. Kendall taught new federal judges for the Federal Judicial Center in Washington, D.C. and has taught docket management techniques to experienced federal judges throughout the country.  He is a former board member of the Federal Judges Association and was editor of *In Camera*, the newsletter of the Federal Judges Association.

3

## SIGNIFICANT DECISIONS OF JUDGE JOE KENDALL

| | |
|---|---|
| 1. *Sharju Ltd. Partnership v. Choice Hotels International, Inc.*, Case No. 3:01-CV-2605-X | 2. *Smith v. Nine West Group, Inc.*, Case No. 3:98-CV-1331-X. |
| 3. *BKS Properties v. Shumate*, 271 B.R. 794. | 4. *Jones v. Prime, Inc.*, Case No. 3:99-CV-1514-X. |
| 5. *Kennedy v. Barnhart*, Case No. 3:00-CV-2472-X. | 6. *Sentry Insurance Co. v. Greenleaf Software, Inc.*, Case No. 3:99-CV-1232-X. |
| 7. *Loosier v. Anderson*, Case No. 3:00-CV-2528-X. | 8. *Poindexter v. R.J. Reynolds Tobacco Co.*, Case No. 3:99-CV-0262-X. |
| 9. *Gibson v. Atlantic Southeast Airlines*, Case No. 3:00-CV-2712-X. | 10. *Whitworth v. TNT Bestway Transportation, Inc.*, Case No. 3:96-CV-0382-X. |
| 11. *Methodist Hospitals v. Prudential Healthcare*, Case No. 3:01-CV-1999-X. | 12. *Media Farm, Inc. v. eToll, Inc.*, Case No. 3:99-CV-2578-X. |
| 13. *McMillon v. Fleming*, Case No. 4:01-CV-815-X. | 14. *In re Great Southern Life Insurance Co. Sales Practices Litigation*, MDL No. 1214. |
| 15. *United States v. Morris*, 176 F. Supp.2d 668. | 16. *Martin v. United States Postal Service*, Case No. 3:99-CV-0670-X. |
| 17. *Smith v. Tarrant County*, Case No. 4:99-CV-0657-X. | 18. *Taylor v. Underwood*, Case No. 3:99-CV-2632-X. |
| 19. *Wilkerson v. Wells Fargo Bank*, Case No. 3:01-CV-0117-X. | 20. *Harrison v. City of Dallas*, Case No. 3:99-CV-1209-X. |
| 21. *Martinez v. 291st Judicial District Court*, Case No. 3:01-CV-1907-X. | 22. *Kondos Employee Health Care Plan v. First Integrated Health, Inc.*, Case No. 3:99-CV-2190-X. |
| 23. *Ventura Vera v. Estrada*, Case No. 3:01-CV-1044-X. | 24. *Jones v. Fujitsu Network Communications, Inc.*, 81 F. Supp.2d 688. |
| 25. *Patt v. Sweetheart Cup Co.*, Case No. 3:99-CV-2443-X. | 26. *Sims v. Ware*, Case No. 3:95-CV-177-X. |
| 27. *Ross v. Massanari*, Case No. 3:00-CV-2454-X. | 28. *United States v. Hughes*, 71 F. Supp.2d 605. |
| 29. *Cunningham v. Gibson*, Case No. 3:01-CV-1522-X. | 30. *American Airlines, Inc. v. Allied Pilots Association*, 53 F. Supp.2d 909. |
| 31. *Ramirez v. Cornet Enterprises, Inc.*, Case No. 3:01-CV-1317-X. | 32. *Barrett v. Clarendon National Insurance Co.*, Case No. 3:93-CV-1451-X. |
| 33. *Collins v. Merck-Medco Prescription Services of Texas*, LLC, Case No. 3:00-CV-1852-X. | 34. *Heritage Worldwide, Inc. v. World Color Press, Inc.*, Case No. 3:96-CV-3356-X. |
| 35. *Cunningham v. Bienfang*, Case No. 3:00-CV-0448- | 36. *Seawright v. Charter Furniture Rental, Inc.*, 39 F. |

4

| | |
|---|---|
| X. | Supp.2d 795. |
| 37. *Transamerica Equipment Financial Services Corp. v. Amwest Surety Insurance Co.*, Case No. 3:00-CV-2321-X. | 38. *Lockhart v. AT&T*, Case No. 3:97-CV-3021-X. |
| 39. *Securities & Exchange Commission v. Bachani*, Case No. 3:01-CV-1744. | 40. *Golman-Hayden Co. v. Fresh Source Produce*, 27 F. Supp.2d 723. |
| 41. *Rogers v. Paquet*, Case No. 3:01-CV-0969-X. | 42. *Mayes v. LIN TV*, Case No. 3:96-CV-0396-X. |
| 43. *PriceWaterhouse Coopers, LLP v. Litzler (In re Harbor Financial Group, Inc.)*, Case No. 3:00-CV-1283-X. | 44. *Gossom v. J.O.S., Inc.*, Case No. 3:96-CV-0374-X. |
| 45. *Washington International v. Industry Insurance Co.*, Case No.3:00-CV-0196-X. | 46. *Morse v. Escobedo*, Case No. 3:98-CV-0686-X. |
| 47. *Estep v. Dallas County*, Case No. 3:95-CV-0799-X. | 48. *Richardson v. Apfel*, 9 F. Supp.2d 666. |
| 49. *Seppy v. City of Irving*, Case No.3:00-CV-0386-X. | 50. *Myers v. Top Tobacco Co., L.P.*, Case No. 3:97-CV-2464-X. |
| 51. *Friday v. Halter*, Case No. 3:01-CV-0901X. | 52. *Colbert v. Georgia-Pacific Corp.*, 995 F. Supp. 697. |
| 53. *Rodriguez v. Snider*, Case No. 3:01-CV-0688-X. | 54. *ARA Automobile Group v. Central Garage*, Case No. 3:89-CV-1389. |
| 55. *Kisiel v. RAS Securities Corp.*, Case No. 3:01-CV-0294-X. | 56. *Hanafy v. United States*, 991 F. Supp. 794. |
| 57. *Compana, L.L.C. v. Agile Software Corp.*, Case No. 3:01-CV-1164-X. | 58. *SBC Communications. v. Federal Communications Commission*, 981 F. Supp. 996. |
| 59. *Guan v. Harrington*, Case No. 3:00-CV-2347-X. | 60. *Gonzales v. Johnson*, 994 F. Supp. 759. |
| 61. *Management Insights, Inc. v. APG, Inc.*, Case No. 3:00-CV-2779-X. | 62. *Dippin' Dots v. Mosey*, Case No. 3:96-CV-1959-X. |
| 63. *Zurich Automobile Insurance Co. v. Boyes (In re Zurich Automobile Insurance Co.)*, Case No. 3:99-CV-2350-X. | 64. *Waste Control Specialists v. United States Department of Energy*, Case No. 7:97-CV-202-X. |
| 65. *Dalfort Aerospace, Inc. v. Airline Division of the International Brotherhood of Teamsters*, Case No. 3:01-CV-006-X. | 66. *In re Future Communications, Inc. Securities Litigation*, Case No. 3:93CV-2064X. |
| 67. *Martin Marietta Materials Southwest, Ltd v. St. Paul Guardian Insurance Co.*, 145 F. Supp. 2d 794. | 68. *Venable v. Keever*, Case No. 3:96-CV-0580-X. |
| 69. *Hooks v. Hilite Industries*, Case No. 3:00-CV-2358-X. | 70. *Richie v. American Council on Gift Annuities*, 943 F. Supp. 685. |

5

| | |
|---|---|
| 71. *Weinberg v. Silber*, 140 F. Supp.2d 712. | 72. *Joseph N. Main P.C. v. Electronic Data Systems Corp.*, Case No. 3: 95-CV-1993-X. |
| 73. *Johnson v. City of Dallas*, 141 F. Supp.2d 645. | 74. *United States v. Grant*, 933 F. Supp. 610. |
| 75. *Rose v. Digital Convergence Communications, Inc.*, Case No. 3:00-CV-2057-X. | 76. *Calmes v. United States*, 926 F. Supp. 582. |
| 77. *Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc.*, Case No. 3:00-CV-1516-X. | 78. *Roberts v. Dayton Hudson Corp.*, 914 F. Supp. 1421. |
| 79. *Johnson v. Dillard Department Stores, Inc.*, Case No.3:00-CV-2674-X. | 80. *McDaniel v. Southern Pacific Transportation*, 932 F. Supp. 163. |
| 81. *Bank One Arizona, N.A. v. Wilton Partners Hurst, et al*, Case No. 3:00-CV-2254-X. | 82. *Burnett Plaza Associates v. NCNB Texas National Bank*, Case No. 3:89-CV-1290-X. |
| 83. *Williams v. GTE*, Case No. 3:00-CV-2380-X. | 84. *Holdbrook v. California Federal Bank*, 905 F. Supp. 367. |
| 85. *Harrison v. GMC*, Case No. 3:00-CV-1272-X. | 86. *Nelson v. Reddy*, 898 F. Supp. 409. |
| 87. *Alfaro v. Leather Center, Inc.*, Case No. 3:00-CV-2107-X. | 88. *Maxus Energy Corp. v. United States*, 898 F. Supp. 399. |
| 89. *Transamerica Equipment Financial Services Corp. v. Amwest Surety Insurance Co.*, Case No. 3:00-CV-2321-X. | 90. *DSC Communications Corp. v. DGI Technologies*, 898 F. Supp. 1183. |
| 91. *Hines v. AC & S, Inc.*, Case No. 3:00-CV-2637X. | 92. *Trinity Industries v. United Steelworkers*, 891 F. Supp. 342. |
| 93. *Chambless v. Travelers Lloyds of Texas Insurance Co.*, Case No. 3:00-CV-784-X. | 94. *Bluebonnet Savings Bank v. Federal Deposit Insurance Corporation*, 891 F. Supp. 332. |
| 95. *Mayfield-George v. Texas Rehabilitation Commission*, Case No. 3:99-CV-2735-X. | 96. *McCratic v. Bristol-Myers Squibb & Co.*, Case No. 3:95-CV-1122-X. |
| 97. *Southwest Materials Handling Co. v. Nissan Motor Co.*, Case No. 3:98-CV-2367-X. | 98. *Finlan v. City of Dallas*, 888 F. Supp. 779. |
| 99. *Foster v. Simpson*, Case No. 3:99-CV-2293-X. | 100. *Ozee v. American Council on Gift Annuities*, 888 F. Supp. 1318. |
| 101. *Fina Technologies, Inc. v. Ewen*, Case No. 3:93-CV-2529-X. | 102. *Dallas Fire Fighters Association v. City of Dallas*, 885 F. Supp. 915. |
| 103. *Vation v. Gainey Transportation Services*, Case No.3:99-CV-2388-X. | 104. *Maryland Casualty Co. v. Texas Commerce Bancshares*, 878 F. Supp. 939. |
| 105. *Hulett v. City of Dallas*, Case No. 3:98-CV-2301-X. | 106. *Thornton v. Micrografx*, 878 F. Supp. 931. |
| 107. *Doherty v. Center for Assisted Reproduction, P.A.*, 108 F. Supp.2d 672. | 108. *Scott v. City of Dallas*, 876 F. Supp. 852. |

6

| 109. *Aegis v. Shared Medical Systems Corp.*, Case No. 3:99-CV-2697-X. | 110. *Johnson v. J.C. Penney Co.*, 876 F. Supp. 135. |
| 111. *Payne v. Powers*, Case No. 3:99-CV-2182-X. | 112. *Black v. Callahan*, 876 F. Supp. 131 |
| 113. *Clear Entertainment, L.L.C. v. KPMG, L.L.P.*, Case No. 3:99-CV-2518-X. | 114. *Clark v. Collins*, 870 F. Supp. 132. |
| 115. *Searcy v. Texas Universal Health Plan, Inc.*, Case No. 3:99-CV-2380-X. | 116. *Figari & Davenport, L.L.P. v. Continental Casualty Co.*, 864 F. Supp. 11. |

**JAMES A. ROLFE**

Jim Rolfe was appointed by President Reagan as the United States Attorney for the Northern District of Texas. Mr. Rolfe's clients include Fortune 500 companies, CEOs, board members, corporate officers and citizens accused of misconduct. Mr. Rolfe offers a broad range of strategic legal advice and counsel based upon his extraordinary career as one of the country's pre-eminent trial attorneys. With over 40 years experience prosecuting and defending cases, Mr. Rolfe enjoys a national reputation as a masterful advocate.

Mr. Rolfe has tried jury cases in federal courts throughout the country and has also served as lead trial counsel in numerous state courts throughout Texas. He graduated from the University of Texas School of Law in 1968, and Austin College in 1965.

**KARL RUPP**

Mr. Rupp is one of the founding partners of the Kendall Law Group, LLP.  A fifteen-year lawyer, Mr. Rupp's highly specialized practice consists of complex litigation primarily in the federal courts. Licensed in Texas and California, as well as numerous federal trial and appellate courts, including the Federal Circuit and US Supreme Court, Mr. Rupp has personally tried numerous jury trials to judgment and successfully argued before various courts of appeal.

7

Born in Texas and educated in California, Mr. Rupp was raised in Colombia and reads, writes and speaks Spanish fluently. Mr. Rupp has dual degrees in telecommunications and international relations, and is comfortable communicating with both judges and juries.

**MARLO CADEDDU**

Marlo Cadeddu graduated magna cum laude from Georgetown Law School in Washington, D.C. where she was a recipient of the Order of the Coif and the CALI Excellence for the Future Award. After graduation, Ms. Cadeddu clerked for Chief Judge A. Joe Fish of the United States District Court for the Northern District of Texas.

Ms. Cadeddu graduated with departmental honors from the Johns Hopkins University in 1989 and received her master's degree in strategic studies and international economics from the Johns Hopkins School of Advanced International Studies. After graduate school, Ms. Cadeddu was an international banker. She completed the Chase Manhattan Bank Management Development Program in New York and was named Second Vice President in the Chase Manhattan International Private Banking Division. In that capacity, Ms. Cadeddu managed more than forty million dollars in assets of high net worth European and African clients. After three years in New York, Ms. Cadeddu left private banking for corporate finance. As an international corporate lender with the First National Bank of Maryland, an Allied Irish Bank subsidiary in Baltimore, Maryland, Ms. Cadeddu received training in corporate credit analysis and accounting.

Ms. Cadeddu, a native of New Orleans, Louisiana, has lived in a number of countries in Europe and the Middle East and she speaks both French and Italian. She is admitted to practice in all state courts in Texas, the United States District Courts for the Northern and Eastern Districts of Texas and the Fifth Circuit Court of Appeals.

**JAMIE MCKEY**

Jamie J. McKey earned her Bachelor of Arts in English from University of Texas—Pan American in 2003. Jamie graduated Magna Cum Laude from St. Mary's University School of Law in 2006. During her second year of law school, Jamie clerked for the Honorable Barbara Hervey at the Texas Court of Criminal Appeals. Following graduation, Jamie pursued her legal career as a Briefing Attorney for Judge Hervey at the Texas Court of Criminal Appeals.

After the one year commitment to the Court of Criminal Appeals, Jamie worked for The Law Offices of Albert M. Gutierrez, in San Antonio, Texas, where she gained valuable insight into both the practice of criminal law as well as civil law. In 2008, Jamie and her husband, Jeremy, who is also an attorney, moved to Dallas.

In 2008, Jamie joined The Bassett Firm, in Dallas. The primary emphasis of her practice at The Bassett Firm focused as a litigation appellate attorney for many high profile clients. The bulk of Jamie's practice focused on Business Litigation, Commercial Litigation, Employer Liability, ERISA claims, Motor Vehicle Accidents, Non-Subscriber Employer Liability, Premises Liability, Products Liability, Professional Liability, and Transportation Litigation.

Jamie is admitted to practice before all Texas state courts, as well as all Federal District Courts of Texas. Jamie is a member of the Dallas Bar Association, Dallas Bar Association Publications Committee, and the Texas Young Lawyer's Association.

**SCOTT KENDALL**

Scott Kendall attended Dallas Baptist University, majoring in Criminal Justice. Scott is a graduate of the Texas Wesleyan University School of Law, where he was invited to be on Law Review and was awarded the Hambleton Book Award for Excellence in Legal Research.

With over 12 years of hands-on litigation experience, Scott is a seasoned courtroom veteran

9

with a firmly entrenched and undeniable track record of trial success.  Before coming to the Kendall Law Group, Scott served the Dallas community for almost two decades as an officer of the Dallas Police Department, then as a Dallas County Assistant District Attorney, and later as an Assistant Public Defender investigating and litigating criminal cases of all kinds, including financial crimes. Scott also operated a successful solo law practice for over 10 years.

Scott is admitted to practice before all Texas state courts, as well as all Federal District Courts of Texas.

**DANIEL HILL**

Daniel Hill focuses on shareholder derivative actions and corporate merger and acquisition class actions.  Prior to joining the Kendall Law Group, Daniel was on a member of the Texas Attorney General's Civil Medicaid Fraud litigation team where he was involved in a number of high profile law suits against large pharmaceutical companies, including Solvay Pharmaceuticals, an Abbott Laboratories company, and Janssen, part of the Johnson & Johnson Family of Companies.

Daniel graduated with a Bachelor of Science degree in Communications from the University of Texas at Austin in 2003 where he graduated with honors and was named to the Dean's List for every semester in which he was eligible.  In 2009, Daniel graduated from the University of Texas School of Law, where he served as an editor for the Texas Environmental Law Journal, the treasurer for the University of Texas Chapter of the Texas Trial Lawyers Association, and the president of the Student Animal Legal Defense Fund.  During law school, Daniel served as a law clerk for the Hyundai Motors International Legal Team focusing on Antitrust/Competition Law litigation, attended a specialized Corporate Governance/Mergers and Acquisition course taught by Curtis Milhaupt, the Colombia Law School Parker Professor of Comparative Law, and focused on corporate and securities law coursework.

10

Prior to attending law school, Daniel worked for a number of Fortune 500 companies, including Dell Inc. and IBM's Tivoli Software.  Daniel also worked as a writer and producer for Arirang TV, a state-sponsored English language television broadcasting company in Seoul, Korea.

Daniel is admitted to practice before all Texas state courts, as well as all Federal District Courts of Texas.

CAUSE NO. 017  237208  09

| | | |
|---|---|---|
| JACK B. CORWIN AS TRUSTEE OF THE JACK B. CORWIN REVOCABLE TRUST, and CHARITABLE REMAINDER STEWARDSHIP COMPANY OF NEVADA, AS TRUSTEE OF THE JACK B. CORWIN 2006 CHARITABLE REMAINDER UNITRUST, | § § § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | TARRANT COUNTY, TEXAS |
| SCOTT KLEIN, SAMUEL D. JONES, CODY WILBANKS, DONALD B. REED, STEPHEN L. ROBERTSON, THOMAS S. ROGERS, and PAUL E. WEAVER, | § § § § § § § | |
| Defendants. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

Comes now Plaintiffs, Jack B. Corwin as Trustee of the Jack B. Corwin Revocable Trust, and Charitable Remainder Stewardship Company of Nevada, as Trustee of The Jack B Corwin 2006 Charitable Remainder Unitrust, and files this, their Original Petition against Defendants, Scott Klein, Samuel D. Jones, Cody Wilbanks, Donald B. Reed, Stephen L. Robertson, Thomas S. Rogers, Paul E. Weaver, and for cause of action would state as follows:

### Discovery Control Plan

Plaintiffs request entry of a Scheduling Order under Level 3 as provided by Rule 190.4 of the Texas Rules of Civil Procedure.

### Parties

1.      Plaintiff Jack B. Corwin ("Corwin") is an individual who resides in Los Angeles, California.  Corwin is Trustee of the Jack B. Corwin Revocable Trust. Charitable Remainder Stewardship Company of Nevada ("CRSC"), is a Nevada corporation which is the Trustee of the Jack B Corwin 2006 Charitable Remainder Unitrust (the "Trusts").  Corwin and CRSC bring this suit in their capacities as Trustees.  Corwin is the President of CRSC.

2.      Defendant Scott Klein ("Klein") is a natural person who resides at 6331 Deloache Ave., Dallas, Texas 75225, where he can be served with process.

3.      Defendant Samuel D. Jones ("Jones") is a natural person who resides in Tarrant County, Texas.  Jones can be served with process at his office at Idearc, Inc., 2200 W. Airfield Dr., DFW Airport, Texas 75261.

4.      Defendant Cody Wilbanks ("Wilbanks") is a natural person who resides in Tarrant County, Texas where he may be served with process at his office at Idearc, Inc., 2200 W. Airfield Dr., DFW Airport, Texas 75261.

5.      Defendants Klein, Jones and Wilbanks are the Chief Executive Officer, Chief Financial Officer, and Executive Vice President/General Counsel and Secretary, respectively, of Idearc, Inc. ("Idearc").  Klein and Wilbanks are also members of the

2

Board of Directors.   (They are sometimes referred to herein as the "Officer Defendants").

6.      Defendant Stephen L. Robertson is a resident of Anderson, Ohio where he may be served at his residence at 7460 Pinehurst Drive, Anderson, Ohio 45244.

7.      Defendant Paul E. Weaver is a resident of New Canaan, Connecticut where he may be served at his residence at 132 Lone Tree Farm Road, New Canaan, Connecticut 06840.

8.      Defendant Donald B. Reed is a resident of Charlotte, North Carolina where he may be served at his office at 9140 Arrowpoint Blvd., Charlotte, North Carolina  28217.

9.      Defendant Thomas S. Rogers is a resident of New York where he may be served at his residence at 3 Premium Pt., New Rochelle, New York  10801.

10.     The Defendants Reed, Robertson, Rogers and Weaver were directors of Idearc at all times material to this suit and are sometimes hereinafter referred to as the "Director Defendants."

**Jurisdiction and Venue**

1.      The Court has jurisdiction to hear this cause in that the damages are in excess of the minimum jurisdictional limits of the Court.  The Court has jurisdiction over all parties Defendant in that in serving as officers and/or directors of Idearc, whose principal place of business is in Tarrant County, Texas, they are subject to Texas jurisdiction pursuant to the Texas Long Arm Statute.

3

2.     All or a substantial part of the events and transactions giving rise to the causes of action occurred at the office of Idearc, Inc. at DFW Airport, Tarrant County, Texas, making venue proper in Tarrant County pursuant to Tex. Civ. Prac. & Rem. Code 15.002(a)(1).

3.     Venue is proper as to each defendant who participated in the transactions made the basis of this action, which occurred in Tarrant County, Texas, and thus, venue is proper as to all defendants in Tarrant County, pursuant to Tex. Civ. Prac. & Rem. Code 15.005.

### Factual Background

1.     Plaintiffs Corwin and CRSC are the Trustees of the Trusts. The Trusts, collectively, are the owners of more than 12 million shares of the common capital stock of Idearc, representing approximately 8% of all Idearc issued and outstanding shares. The Trusts, collectively, are the largest shareholders in Idearc. The shares purchased by The Jack B. Corwin 2006 Charitable Remainder Unitrust and the dates of such purchases are the following:

| July 30, 2008 | 56,145 |
|---|---|
| July 31, 2008 | 1,000,000 |
| August 1, 2008 | 681,700 |
| August 4, 2008 | 2,000,000 |
| August 5, 2008 | 346,237 |
| August 7, 2008 | 2,750 |
| August 22, 2008 | 7,550 |
| TOTAL SHARES OWNED | 4,094,382 |

4

2.     The shares purchased and sold by Jack B. Corwin Revocable Trust and

the dates of such purchase and sale are the following:

| October 8, 2008 | 500,918 |
|---|---|
| November 5, 2008 | 353,806 |
| November 10, 2008 | 50 |
| November 17, 2008 | 7,766,238 |
| December 11, 2008 (shares sold) | (395,665) |
| TOTAL SHARES OWNED | 8,225,347 |

3.     In making the foregoing purchases of Idearc shares, Corwin at all times

was relying upon information published by Idearc through filings with the U.S.

Securities and Exchange Commission, press releases and statements made in

conferences and conference calls by the Officer Defendants.     The Director

Defendants, knew or should have known of all such statements and either explicitly

approved them or acquiesced in their dissemination.     Idearc published "Corporate

Governance Guidelines" with regard to the Board of Directors, its composition and its

responsibilities.  Those Guidelines specifically state:

> "The Board is generally elected by the company's stockholders to
> oversee the company's management and to assure that the long term
> interests of the stockholders are being served.  The Board is responsible
> for oversight of the company's business, which is conducted under the
> direction of the company's senior executive officers."

If the Director Defendants now claim that they were unaware of the misinformation

campaign carried on by the Officer Defendants during 2008, then they failed in their

duty imposed upon them as a matter of law as well as that specifically described in the

5

"Corporate Governance Guidelines" quoted above to maintain oversight of the activities of senior executive officers.

    4.    Many of such statements and publications contained material misrepresentations of fact or omitted to state material facts which made their representations misleading. Specifically, such misrepresentations were made in the following SEC filings, press releases and/or conference calls attended by members of the securities industry and specifically analysts, brokers and dealers who in turn conveyed the false information to the investing public. Verbatim transcriptions of such conference calls were immediately available on Idearc's website which Corwin obtained shortly after their publication. Such misrepresentations include, but are not limited to, the following:

<u>SEC Filings</u>

| February 29, 2008 | Form 10-K | Under the title "Strong Cash Flow" at p. 2 after extolling the "large revenue base" it was stated "As a result, we generate strong cash flow to support our balanced capital allocation program to service our debt, pay dividends and invest in our business." |
| 1st quarter 2008 May 6, 2008 | Form 10-Q | "We believe the net cash provided by our operating activities, supplemented if necessary with borrowings under our revolving credit facility, and existing cash and cash equivalents will provide sufficient resources to meet our working capital requirements, estimated principal and interest debt service requirements and other cash needs for at least the next 12 months." |
| 2nd quarter 2008 August 11, 2008 | Form 10-Q | "We believe the net cash provided by our operating activities, supplemented if necessary |

6

| | | |
|---|---|---|
| | | with borrowings under our revolving credit facility, and existing cash and cash equivalents will provide sufficient resources to meet our working capital requirements, estimated principal and interest debt service requirements and other cash needs for at least the next 12 months." |
| November 6, 2008 | Form 10-Q | "We believe the net cash provided by our operating activities, supplemented if necessary with borrowings under our revolving credit facility and existing cash and cash equivalents will provide sufficient resources to meet our working capital requirements, estimated principal and interest debt service requirements and other cash needs for the next 12 months." |

In Press Releases and/or Conference Calls

| | | |
|---|---|---|
| February 7, 2008 | Press Release | Misrepresented "strong OIBITDA margins" and "strong and stable cash flows" |
| February 7, 2008 | Conference Call | Jones represented that Idearc maintained an established balanced capital allocation program which produced stable cash flow. Further that Idearc achieved "all that we said we would do with our capital allocation program" and intended to be consistent and "steadfast" with capital allocation in 2008. Jones further made misrepresentations by stating that "the Board and the senior team" evaluate all opportunities relative to the capital allocation program and "put forth a balanced approach." He further stated that "we are comfortable with the leverage and where we are in the market." |
| March 27, 2008 | Presentation to the Credit Suisse 2008 Global Leveraged Finance Conference in | Jones stated that "The set of assets that made this business an attractive investment are still there, still sound and still solid." Jones also stated that "Our view of 2008 is such that we anticipate mid-single digit percentage point declines in multi-product amortized revenue." Further at that conference, Jones made it clear that he did |

| | | |
|---|---|---|
| | Phoenix, Arizona | not foresee any near term liquidity issues for the company. He also stated "We are confident the multi-platform strategy will bring long-term value to stockholders, sales leads to advertisers and relevant local results to consumers." All of these statements of Jones were made available to the public on the Idearc website. |
| May 6, 2008 | Conference Call | In this conference call, Jones stated "looking forward through the remainder of the year, as we previously communicated on March 27, our view of year 2008 is such that we anticipate mid-single digit percentage point declines in multiproduct amortized revenue and we anticipate some operating margin contraction due to the shift in our mix of revenues." Jones also represented that "We continue seeing strong demand in the market place for these performance based products. In fact, the growth in sales results we are announcing for this set of products is significantly higher than in the past year." Further he stated "We are confident in our ability to deliver Internet growth in 2008 consistent with our expectations." In that conference call Jones further stated, in response to a question asking management's expectations for full year's Internet growth: "I think most folks have heard me talk about growth in the dot com side, in the 20-ish type range, we are not being terribly explicit with respect to that, but we expect it to be in that range for the full year." He furthermore stated that management expected "the Internet revenues to ramp up as we move through the year." In that same conference call Jones furthermore made misrepresentations as to the company's debt leverage target and capital allocation programs. He further stated that "we certainly evaluate opportunities to economically and efficiently change the capital structure of the business" and other similar statements concerning the company's risk profile. |
| July 29, 2008 | Press Release | Klein reiterates an optimistic forecast for Idearc |

8

| | | |
|---|---|---|
| | | by stating "I see opportunities everywhere" and that "We have already made significant changes that will improve performance." |
| July 29, 2008 | Conference Call | Klein assures the analysts that his comments on conference calls will "always be direct, straightforward and focused on telling it like it is." Klein stated that "We have committed to expense savings that exceed 10% of our total expense base of $1.6 billion on a go forward basis. Over $50 million of this will be reflected on our results over the balance of the year since most of our plans are well underway." He then stated "Our ability to deal with our debt obligations is absolutely secure." Jones states that "We foresee no near-term liquidity issues and continue to be confident in our ability and capacity to service our debt" and that he anticipated "mid single digit percentage point declines in multiproduct amortized revenue." Jones further stated in response to a question about the revenue decline reported for the second quarter 2008: "There wasn't anything inordinate about the quarter. . . . . But there wasn't anything of a substantial nature or that sort to be of concern with respect to the books that published in the second quarter, but we did have some books that moved around." And on the same subject stated: "Yes, I understand, but I don't see as a sign of concern in any particular front, it's simply a function of moving books around based on the marketplace." Klein then states "Our intent" to continue to accumulate cash and "give ourselves the opportunity to perhaps take advantage of opportunities in the market or to consider other alternatives." Jones stated that the expense increase in the prior quarter of approximately $20 million was principally the result of bad debt. Klein concludes the conference call by stating "Today, as a stand alone company, our opportunities are great and we are positioning ourselves well to |

| | | take advantage of them." |
|---|---|---|
| October 30, 2008 | Press Release | Klein states that management was acting aggressively and quickly to adjust the organization and its market approach. The press release then disclosed that Idearc had retained Merrill Lynch & Co. and Moelis & Company "as financial advisors in connection with the review of alternatives relating to the company's capital structure."  Immediately after that disclosure, Klein is quoted as saying "our objective (ostensibly in hiring the financial advisors) is to maximize opportunities to help insure that Idearc has an appropriate capital structure to support our strategic business objectives.  We intend to look closely at all available opportunities to strengthen our balance sheet and improve our risk profile.  At the same time we will continue to manage our financial resources prudently, with a focus on maintaining sufficient liquidity and flexibility as to work our way through the current challenging economic environment.  Fortunately, Idearc continues to generate significant cash flow." Klein concludes the release stating how pleased he was with the progress "we are making." He went on to say "we are re-energizing the company and we are on the road to redefining who we are.  Our objective is to address our challenges and introduce new ideas – in some cases, radical ideas – to help position the company as an industry leader in providing outstanding solutions and support to our clients." |
| October 30, 2008 | Conference Call | Klein opens the call by stating that the third quarter financial report was "disappointing," but that it did not reflect the positive result of the actions that had already been undertaken on the part of the company. He further stated "you will see and hear that we are taking a no-nonsense direct methodical attack in changing Idearc for the better and we are making real progress." . . and in that regard we are well on the way." He |

10

| | | emphasized that such changes would relate to addressing "our capital structure challenges" and went on to explain that the October 24, 2008 draw down of $247 million under the existing revolving credit facility was a positive sign and that at the same time the company continued to generate a significant amount of cash and would manage the cash prudently "in re-investing in the business when it is appropriate to do so." Klein went on to state that since the last conference call "we worked swiftly and strategically on implementing more programs to secure a successful long term future for Idearc.  He continued this optimistic forecast by stating "We are building the business that would be (in) position to flourish (in) both good economic times and bad and that "we are making progress every single day." Klein concluded his prepared remarks by stating "Please be assured that we intend to provide updates to you on this process (alternatives related to capital structure) on a timely and consistent basis as circumstance warrant."  Jones then repeated the previous representation that they would achieve an expense savings of approximately $50 million by year end.  In response to questions concerning the drawdown of $247 million on the revolving line of credit, Jones stated:  "With respect to revolver as we stated in the release, we drew down for general corporate purposes."  In answer to a question, Klein stated "We are just seeing a nice growth in the print sales.  We are seeing nice growth in the Internet sales side." |
|---|---|---|
| March 12, 2009 | Press Release | In the financial statements issued with the press release, management gave a false calculation of EBITDA in that the calculation used to pay management bonuses eliminated the deduction of $225 million of goodwill impairment in that definition of EBITDA. |

5.     As can be readily seen from the foregoing, the Defendants continued to project very positive and optimistic results for Idearc throughout the first three quarters of 2008 and early into the fourth quarter.  Those statements were false and Defendants knew or should have known of their falsity.  Defendants also omitted to state material facts which made their representations misleading.  Such misrepresentations and omissions were made with the intent that the investing public, including Corwin, rely upon them and maintain confidence in Idearc's financial stability and future prospects.  The Defendants intended, by making the false and misleading statements and by omitting to state material facts as described above, to cause the investing public, including the Plaintiffs, to buy Idearc shares, to continue to buy Idearc shares, to hold Idearc shares and thereby maintain an artificial market value for such shares.  Corwin indeed did rely upon those continuing optimistic statements made by Defendants which he read as they were published.  But for such reliance, Corwin would not have purchased any Idearc shares in the first place.  But for the representations of the Defendants made from time to time after Corwin's purchases of Idearc shares, Corwin would have disposed of all or substantially all of the Idearc shares he had purchased (in addition to the December 2008 sale of approximately 3% of the total shares) or otherwise attempted to mitigate his losses.  Following the recent bankruptcy filing by Idearc, Plaintiffs' shares are essentially worthless; representing a loss to Plaintiffs of more than $8 million.

12

6.     The falsity of the foregoing misrepresentations became apparent on or about March 31, 2009 when Idearc filed a Petition for relief under Chapter 11 of the United States Bankruptcy Act.  At that time, contrary to all of the optimistic reporting throughout 2008 by the Defendants, the Defendants stated that a combination of the downturn "facing the United States economy" and competition in this business "has significantly impaired the Debtor's liquidity and ability to perform in the future and significantly decreased their financial leverage, . . ."  This admission directly contradicted the earlier statements concerning the strong demand for the company's products, the company's debt leverage position, its capital allocation programs, its ability to service its debt and the like.

7.     On March 13 and 18, 2009, Corwin wrote to the Board of Directors of Idearc expressing his various concerns with the actions by management as well as the Board.  In response, the Defendant Wilbanks in his role as Executive Vice President, General Counsel and Secretary of Idearc, wrote Corwin on March 19, 2009 stating that "*The Board of Directors is and has been, prudently reviewing, investigating and analyzing these options and determining what alternatives are in the best interest of the company and its constituencies.  The Board of Directors is diligently and faithfully discharging all applicable fiduciary duties.*"  This statement was made by Defendant Wilbanks with full and complete knowledge that management, apparently as well as the Board of Directors, had already decided to put Idearc into bankruptcy, which he failed to disclose.  The purpose of Wilbanks' letter was to placate Corwin and thereby

prevent him from selling the stock owned by the Plaintiffs.   Corwin relied on Wilbanks' statements in the March 19, 2009 letter and took no action to sell shares in an attempt to mitigate the losses that he had suffered and that he suffered thereafter.

8.      Corwin and his counsel met with Defendant Donald B. Reed, who was the Chairman of the Board of Directors, at the Idearc offices in Tarrant County, Texas on March 27, 2009.  The purpose of the meeting was an effort on the part of Corwin to determine the intention of the Board and the executive officers.  The question was prompted by reason of the rumors circulating in the financial community that Idearc was on the verge of filing for bankruptcy protection.   In response to the direct question as to whether or not any decision had been made with respect to bankruptcy filing, Reed, at that time, stated unequivocally that no decision had been made with regard to a bankruptcy filing.  This statement was clearly false as evidenced by the fact that it was made on Friday, March 27, 2009, and that on the next business day, Monday, March 30, 2009, the Idearc Board of Directors executed a Resolution authorizing the filing by the executive officers of a bankruptcy petition.  Again, the misstatement by Reed was designed to placate Corwin, Idearc's largest shareholder, and prevent him from attempting to sell his shares or take any other action in an effort to mitigate his losses.  Corwin relied on that misrepresentation by Reed, and suffered his damages as a result thereof.

**Causes of Action**

**I.      Fraud**

1.      All previous allegations are incorporated herein by reference.

2.      Defendants knowingly and recklessly made false and material misrepresentations intended to be communicated to Plaintiffs, as described above. Defendants also omitted to state material facts which made their representations misleading.  Defendants knew that their representations were false when they were made, and/or made these misrepresentations recklessly.

3.      Defendants intended that Plaintiffs would act on their misrepresentations and omissions.

4.      Plaintiffs relied on the foregoing misrepresentations to the detriment of the Trusts, and Defendants have benefited from the plaintiffs' reliance.

5.      In particular, Plaintiffs relied on the defendants' false representations when he entered into the investment transactions described above.

6.      All of the foregoing acts of common law fraud were continuing in nature.

7.      As a result of the foregoing common law fraud by the Defendants, Plaintiffs have sustained actual damages in excess of the minimum jurisdictional limits of this Court.

**II.     Violations of the Texas Securities Act**

1.      All previous allegations are incorporated herein by reference.

15

2.    Pleading in the alternative, Plaintiffs would show that Defendants have violated the Texas Securities Act, Article 581-1, et. seq. of the Texas Revised Civil Statutes.

3.    All of the Defendants participated in the sale of securities to Plaintiffs, within the meaning of the terms "sale" and "security" as defined in Art. 581-4 of the Texas Securities Act. Defendants' participation was by means of untrue statements of material fact and/or omissions of material facts which made their statements misleading in the light of the circumstances in which they were made. These misrepresentations and omissions were in violation of Art. 581-33(A)(2).

4.    Plaintiffs relied on the foregoing material misrepresentations and/or missions to his and the Trusts' detriment.

5.    All Defendants were control persons of Idearc, Inc. at all times material to this cause of action. Defendants are therefore liable under Article 581-33(F)(1).

6.    Each Defendant aided and abetted the fraud of every other Defendant. Each Defendant had subjective knowledge of every other Defendant's improper activity. Defendants are, therefore, liable under Article 581-33(F)(1).

7.    The foregoing violations of the Texas Securities Act were continuing in nature.

8.    As a result of the foregoing violations of the Texas Securities Act, Plaintiffs have sustained actual damages in excess of the minimum jurisdictional limits of this Court.

9.     By reason of Defendants' violations of the Texas Securities Act, Plaintiffs are furthermore entitled to recover all reasonable and necessary attorneys' fees incurred by them in the investigation, filing and prosecution of this suit.

### III.    Violations of Texas Business Commerce Code, Section 27

1.     All previous allegations are incorporated herein by reference.

2.     The transactions at issue involve stock transactions in a corporation.

3.     Defendants made false representations of past or existing material facts to the Plaintiffs for the purpose of inducing the investing public, including Plaintiffs, to enter into transactions to purchase stock.  Plaintiffs relied on the foregoing false representations to the detriment of the Trusts when entering into the transactions to purchase stock, and Defendants have benefited from the Plaintiffs' reliance.

4.     Defendants also made false promises to do acts and said promises were material, made with the intent of not fulfilling the promises and made to the Plaintiffs for the purpose of inducing Plaintiffs to direct the Trusts to purchase stock.  Plaintiffs relied on the false promises to the detriment of the Trusts when entering into the transactions to purchase the stock, and Defendants have benefited from the Plaintiffs' reliance.

5.     When Defendants made the false representations and the false promises referred to above, the Defendants knew they were false or made them recklessly without any knowledge of the truth, and made them as positive assertions.

17

6.      As a result of the foregoing common law fraud by the Defendants, the Plaintiff Trusts have sustained actual damages in excess of the minimum jurisdictional limits of this Court.

7.      By reason of Defendants' violation of Section 27 of the Texas Business & Commerce Code, Plaintiffs are furthermore entitled to recover all reasonable and necessary attorneys' fees incurred by them in the investigation, filing and prosecution of this suit.

## IV.    **Negligent Misrepresentation**

1.      All previous allegations are incorporated herein by reference.

2.      Pleading in the alternative, Plaintiffs would show that Defendants have made negligent misrepresentations to the investing public, including the Plaintiffs.

3.      In the course of their business, Defendants made representations to Plaintiffs in which they supplied false information.

4.      Defendants made these false representations for the guidance of Plaintiffs, and Plaintiffs justifiably relied on those false representations.

5.      Defendants did not exercise reasonable care of competence in obtaining and communicating the false information to Plaintiffs.

6.      Defendants' negligence has proximately caused damage to Plaintiffs and the Trusts in excess of the minimum jurisdictional limits of this Court.

## V.     **Aiding and Abetting**

1.      All previous allegations are incorporated herein by reference.

18

2.    Each of the Defendants has aided, abetted and assisted each of the other Defendants in committing the tortuous conduct described above.

## VI.    Conspiracy

1.    All previous allegations are incorporated herein by reference.

2.    Defendants acted together to accomplish the wrongful acts described above.  Defendants had a meeting of the minds on the object of their wrongful acts, and on the course of action that they pursued to the detriment of Plaintiffs.

3.    Defendants are jointly and severally liable for all damages to Plaintiffs resulting from their conspiracy.

## VII.    Exemplary Damages

1.    All previous allegations are incorporated herein by reference.

2.    The harm to Plaintiffs from Defendants' tortuous conduct resulted from Defendants' fraud, malice and/or gross negligence.

3.    As permitted by Chapter 41 of the Texas Civil Practice & Remedies Code, Plaintiffs ask that the Court and Jury award exemplary damages in an amount sufficient to punish the Defendants and to set an example that will deter others from committing similar acts in the future.

## VIII.    Attorneys' Fees

1.    By reason of the wrongful acts of the Defendants hereinabove described, it has been necessary for Plaintiffs to employ the undersigned counsel to investigate, file and prosecute this lawsuit.  Plaintiffs are entitled to the recovery of all reasonable

19

and necessary attorneys' fees incurred in this case pursuant to Section 581-33D(7) of the Texas Securities Act and Section 27.01 of the Texas Business & Commerce Code.

## Jury Demand

1.      As permitted by Rule 216 of the Texas Rules of Civil Procedure, Plaintiffs demand trial by jury of all issues so triable.  Plaintiffs have deposited with the District Clerk the required jury fee.

## Prayer

WHEREFORE, PREMISES CONSIDERED, Jack B. Corwin as Trustee of the Jack B. Corwin Revocable Trust, and Charitable Remainder Stewardship Company of Nevada, as Trustee of the Jack B. Corwin 2006 Charitable Remainder Unitrust, Plaintiffs, pray for the following:

a.      That Defendants be cited to appear and answer;

b.      That, upon trial of the merits, Plaintiffs recover actual damages;

c.      That, upon trial on the merits, Plaintiffs recover exemplary damages; and

d.      That, upon trial on the merits, Plaintiffs recover attorney's fees, prejudgment interest, postjudgment interest, costs of court, and such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

THE COOK LAW FIRM

By:

Grant Cook
State Bar No. 04732000
5701 Woodway, Suite 330
Houston, Texas 77057
(713) 552-0700
(713) 552-1610 (FAX)

OF COUNSEL:

THOMPSON & KNIGHT LLP
E. Michael Sheehan
State Bar No. 18174600
801 Cherry Street, Unit #1
Burnett Plaza, Suite 1600
Fort Worth, TX 76102-6881
(817) 347-1700
(817) 347-1799 (FAX)

ATTORNEYS FOR PLAINTIFFS

21