IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAN BUETTGEN, on behalf of himself §
and all others similarly situated, §
　§
　　　Plaintiffs, §
　§　　　　Civil Action No.
v. §
　§　　　　3:09-CV-791-K
KATHERINE J. HARLESS, et al., §
　§　　　(Consolidated with 3:09-CV-938-K,
　§　　　3:09-CV-1049-K, and 3:09-CV-1552-K)
　　　Defendants. §

## MEMORANDUM OPINION AND ORDER

Before the Court is Lead Plaintiff Kentucky State District Counsel of Carpenters Pension Trust Fund ("Pension Trust Fund") and Plaintiff Kenneth Werring's Motion for Class Certification (Doc. No. 94) and Defendants Katherine Harless, Andrew Coticchio, Samuel Jones, Frank Gatto, and Scott Klein's (collectively "Defendants") Motion to Strike or, in the Alternative, for Leave to File a Surreply (Doc. No. 105). The Court has considered the motions, response, reply, pleadings on file, evidence submitted by the parties, and the applicable law. Because the Pension Trust Fund and Mr. Werring have met the requirements of Federal Rule of Civil Procedure 23 to certify a class action, the motion for class certification is **GRANTED.** The Court has reviewed Plaintiffs' reply and the supplemental report submitted by Dr. Steven Feinstein, Plaintiffs' economist, which are challenged by

Defendants in their motion to strike. Because the Court reaches the same decision whether or not the evidence and arguments are considered, the motion to strike is **DENIED as moot**.

I.      **Background**

This case arises from investments in a publicly-traded company named Idearc, Inc. ("Idearc"). Idearc was formed in 2006 as the publishing spin-off of Verizon Communications Inc. ("Verizon"), dealing mainly in yellow page directories with smaller operations in online directories and direct mail. Defendants Katherine Harless, Andrew Coticchio, Samuel Jones, Frank Gatto, and Scott Klein are all current or former executives of Idearc, primarily chief executive officers ("CEO") and chief financial officers ("CFO").

Idearc derived a large majority of its revenues from the sales of advertisements in its yellow page directories to local small- to medium-sized businesses. Like many other companies, Idearc would allow its customers to purchase these advertisements on credit, with a promise to pay in the future. Idearc's accounts receivable department was responsible for collecting fees from customers for services already rendered. In this case, that meant advertisements that had been run in local yellow page directories for which the customer did not pay before the directories were printed. Some of Idearc's customers would not honor these promises to pay. These dishonored promises to pay are what comprised this company's "bad debt." Bad debt

means money a company thought it was going to collect that never came in.

The bulk of the Proposed Class' allegations revolve around bad debt, cash flow, and a series of statements Idearc and its representatives made regarding these two items. At the time Idearc was spun-off from Verizon in 2006, its bad debt level was approximately 4.3%, meaning Idearc was collecting on almost 96% of its sales. Idearc conducted quarterly conference calls with analysts in August and November 2007 and in February, July, and October 2008 and filed several reports with the Securities and Exchange Commission ("SEC") during that period. The following is a summary of alleged public misrepresentations Idearc made:

(1) **August 9, 2007** - during an earnings conference call, Mr. Coticchio, Idearc's CFO and treasurer, spoke with analysts. He stated the company's bad debt provision, the money the company sets aside to cover bad debt expenses, "was running in the low 4% range for the first half of the year." Mr. Coticchio also said Idearc's free cash flow was $116 million, which he characterized as "strong."

(2) **November 1, 2007** - Mr. Jones, who replaced Mr. Coticchio as CFO and treasurer, stated Idearc's bad debt provision for the third quarter of 2007 had risen to 6%. However, he said the rise was a "one time adjustment" due to the recent switch from Verizon's billing system, which Idearc had used since the spin-off, to Idearc's new system. Mr. Coticchio, who still worked for Idearc, stated free cash flow through September 30, 2007 was $303 million, which he again called "strong."

(3) **February 7, 2008** - Mr. Jones reported that Idearc's bad debt provision had risen to 6.18% for the fourth quarter of 2007, which raised the year-end number to 5%. Mr. Jones reiterated that the bad debt increase was related to the billing system switch. The company also announced that free cash flow for the 2007 fiscal year was $323 million. In addition, announcements concerning a 6.7% drop in print advertising sales and slower-than-expected growth in internet sales were made.

Idearc's share price fell around 28% following these statements.

(4) **March 2008** - Mr. Jones makes statements, at the Bear Stearns Media Conference on March 11 and at the Lehman Brothers High Yield Bond and Syndicated Loan Conference on March 12, that Idearc has no short- to medium-term liquidity issues, meaning the company would be able to pay its bills.

(5) **May 2008** - Idearc hosted another conference call on May 1, stating once again that the bad debt levels were due to the billing system change. On May 8, Idearc's first quarter 2008 10-Q, the form publicly-traded companies are required to be filed with the SEC, stated Idearc had sufficient cash to meet all its needs for at least 12 months.

(6) **July 28, 2008** - Mr. Jones stated, during the earnings conference call reviewing results from the second quarter of 2008, that bad debt had risen to 6.25% for the quarter and that Idearc had revised its bad debt projections for 2008 up to 5.7%. Mr. Klein, who had recently replaced Ms. Harless as Idearc's CEO, stated Idearc's "credit policy was not as tight as it needed to be." Idearc also announced declines in quarterly revenue of 5.7% and the closing of 17 locations related to a cost-cutting plan. Share prices fell approximately 50% following these announcements.

(7) **October 30, 2008** - Mr. Klein announced that third quarter bad debt was up to 8.2% and that fiscal year 2008 projections had been raised to 6.5% from 5.7%. He also stated free cash flow for the first three quarters of 2008 was $340 million. Shares fell roughly 40% after this news.

Idearc declared bankruptcy on March 31, 2009 and re-emerged following reorganization as SuperMedia, Inc.

Idearc asserts that these increases in bad debt were due to external economic conditions in late 2007 and during 2008. The company argues small and medium businesses, Idearc's main source of advertising revenues, were failing and unable to

pay their bills during that period. Idearc claims the Plaintiffs are unreasonably ignoring the effects of the economic climate on Idearc's finances, the company's ability to collect overdue receivables, and the decline in Idearc's share price.

Plaintiffs contend that Idearc was aware of its rising bad debt level, cash flow problems, and conditions that would exacerbate these problems. Plaintiffs also assert Idearc concealed these issues from investors and regulators. Specifically, Plaintiffs argue that Idearc was not vigorously pursuing outstanding debts and the company had implemented several structural changes that made collecting on overdue accounts more difficult, including the transition to a new billing system and the closure of Idearc's collections department.

Plaintiffs filed suit on April 30, 2009 for violations of the Securities Exchange Act of 1934. The motion for class certification, submitted on November 1, 2010, covers the period of the alleged misrepresentations, from the August 9, 2007 earnings conference call until October 30, 2008, when Idearc announced it third quarter bad debt level for 2008. Defendants filed their motion to strike and, in the alternative, leave to file a surreply on March 10, 2011.

## II.    Standards for Class Certification

In order to be certified, a proposed class must meet all the requirements of Federal Rule of Civil Procedure 23(a) ("Rule 23(a)") and at least one of the three requirements of Federal Rule Civil Procedure 23(b) ("Rule 23(b)"). *In re Katrina*

*Canal Breaches Litig.*, 628 F.3d 185, 191 (5th Cir. 2010). Although a court does not reach the merits of the case in evaluating whether class treatment is appropriate, it may look past the pleadings to understand the claims, defenses, relevant facts and applicable substantive law to make a meaningful decision on class certification. *Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

Plaintiffs bear the burden of showing that class certification is appropriate. *Id.* at 320. Class certification is at the discretion of the district court, which has inherent power to manage and control pending litigation. *Fener v. Operating Eng'r Const. Indus. & Miscellaneous Pension Fund (Local 66)*, 579 F.3d 401, 406 (5th Cir. 2009).

## III. Analysis

To certify a class, the court must find that plaintiffs have established that all of Rule 23(a)'s requirements are met, and that at least one requirement of Rule 23(b) is also met. The court will examine each of the relevant factors.

### A. Rule 23(a) Requirements

Rule 23(a) requires that (1) the class be so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties be typical of the claims or defenses of the class (typicality); and (4) the representative parties fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

### 1. Numerosity

The numerosity requirement is met if the plaintiff provides some evidence of a reasonable numerical estimate of purported class members. *Pederson v. La. State Univ.,* 213 F.3d 858, 868 (5th Cir. 2000). Though the number of potential class members in this case is unknown, the estimates are very high. Idearc's average daily trading volume during the class period was 2.9 million shares. It is generally presumed that Rule 23(a)(1) has been met in suits involving nationally traded securities. *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1039 (5th Cir. 1981). Defendants do not dispute Plaintiffs' assertion that the numerosity requirement has been met. The Court finds the numerosity requirement to be satisfied.

### 2. Commonality

To show commonality, the plaintiff must allege that there exist "questions of law or fact common to the class." *James v. City of Dallas,* 254 F.3d 551, 570 (5th Cir. 2001). The threshold for commonality is not high. *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir. 1993). The plaintiff need only show that there is one common question of law or fact. *James,* 254 F.3d at 570. The commonality test is met where there is at least one issue whose resolution will affect all or a significant number of the putative class members. *Forbush,* 994 F.2d at 1106.

Plaintiffs claim that Defendants made misleading statements that incorrectly

inflated Idearc's share price during the class period and later made corrective disclosures that caused Idearc's share price to fall, damaging investors. All of these allegations are common to the proposed class. Plaintiffs have shown there is at least one common question of law or fact between all potential class members and Defendants do not dispute this point. Accordingly, the Court finds that the Rule 23(a) commonality requirement is met. *See James,* 254 F.3d at 570.

### 3.    Typicality

To meet the typicality requirement of Rule 23(a)(3), the claims of the proposed class representatives must be typical of the claims of the class. *James,* 254 F.3d at 571. This test focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir. 1999). The critical inquiry is whether the proposed class representatives' claims "have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James,* 254 F.3d at 571.

All of the claims of the proposed class stem from the same conduct alleged by the named plaintiffs. The type of proof required to support the claims of the named plaintiffs will also prove the claims of the proposed class, another point Defendants do not dispute. Therefore, this Court finds that Plaintiffs' claims meet the typicality

requirement of Rule 23(a).

### 4. Adequacy

Under Rule 23(a)(4), the court must find that the "representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "Differences between the named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *James,* 254 F.3d at 571. To satisfy the requirements of Rule 23(a)(4), the proposed class representatives must show that: (1) there are no conflicts of interest between them and the proposed class; (2) the proposed class representatives have the willingness and ability to play an active role in the litigation and vigorously represent the class, while protecting the interests of the absentee class members; and (3) that class counsel has the competence and ability to vigorously conduct the litigation. *Feder v. Electronic Data Systems Corp.,* 429 F.3d 125, 129-30 (5th Cir. 2005).

Idearc does not contend there are conflicts of interest between the Pension Trust Fund, Mr. Werring, and the proposed class nor that class counsel is incompetent or unable to conduct this litigation. Idearc only challenges the Pension Trust Fund and Mr. Werring's commitment to this lawsuit, and asserts the adequacy standard requires that "competent plaintiffs, rather than lawyers, direct such cases." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 484 (5th Cir. 2001).

That Fifth Circuit opinion, three paragraphs earlier, also notes that "class representatives need not be legal scholars and are entitled to rely on counsel" so long as they "know more than that they were 'involved in a bad business deal.'" *Id*. at 483 (citation omitted). The Pension Trust Fund's board of directors has been kept informed of the progress of this lawsuit, has moved this Court to appoint it lead plaintiff, has designated a representative for depositions, and is producing documents pursuant to discovery requests. App. to Pl. Mot. at 159–60. Mr. Werring showed initiative in attempting to join this lawsuit in June 2009. He has also already participated in a deposition for the purposes of choosing a class representative in December 2010. App. to Pl. Reply at 222. These actions demonstrate an ability and willingness to take an active role in the litigation and to protect the rights of the absentee plaintiffs by both the Pension Trust Fund and Mr. Werring. *See Feder*, 429 F.3d at 130. Therefore, the Court finds that both are adequate class representatives.

### B. Rule 23(b) Requirements

The Pension Trust Fund and Mr. Werring contend that the class should be certified because, in addition to the requirements of Rule 23(a),they have also met the requirements of Rule 23(b)(3), which states that a class may be certified where common issues of law or fact "predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3);

*Unger,* 401 F.3d at 320. These requirements are commonly known as (1) predominance and (2) superiority.

### 1. Predominance

Before granting class certification, the district court must determine that the individual class members' fraud claims are not dependent upon proving individual reliance. *Unger,* 401 F.3d at 321. If the circumstances of each plaintiff's alleged reliance on fraudulent representations differ, then each individual plaintiff will have to prove reliance and the proposed class does not meet Rule 23(b)(3)'s predominance requirement. *Id.* at 321–22.

### a. Fraud-on-the-market theory of reliance

In a securities fraud case for violations § 10(b) of the Securities Exchange Act of 1934, like the one Plaintiffs are attempting to certify in this case, a plaintiff must show: (1) a material misrepresentation or omission was made; (2) scienter, or intent; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation. *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,* 597 F.3d 330, 335 (5th Cir. 2010).

A proposed class in a securities fraud class action may establish reliance by invoking the class-wide presumption of reliance permitted by the fraud-on-the-market theory. *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 310 n.2 (5th Cir. 2005) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 246 (1988)). The fraud-on-the-market theory

permits investors who cannot satisfy the traditional requirement of proving actual reliance on a fraudulent representation (i.e., those investors who did not read the documents or hear the statements alleged to contain the fraudulent representations) to maintain their fraud claims by "interpreting the reliance requirement to mean reliance on the integrity of the market price rather than reliance on the challenged disclosure." *Id.* at 310 n.2 (quoting Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory,* 74 Cornell L. Rev. 907, 908 (1989)).

To rely on the fraud-on-the-market presumption, the plaintiffs must show that (1) the defendant made public material misrepresentations; (2) the defendant's shares were traded in an efficient market; and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed. *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 661 (5th Cir. 2004), *citing Basic,* 485 U.S. at 248 n.27.

### i.      Material Misrepresentations

The first factor of *Greenberg*, whether a public material misrepresentation was made, basically comprises one half of the loss causation analysis. As discussed below under the loss causation analysis, for the purposes of this motion, the Court finds Defendants made public, material misrepresentations. These misrepresentations meet the first requirement of a fraud-on-the-market theory.

### ii.     Second and Third Factors

It is undisputed that the Pension Trust Fund, Mr. Werring, and the proposed class traded Idearc shares between August 9, 2007 and October 20, 2008.  *See* App. to Pl. Mot. at 164 (Pension Trust Fund acquired shares in November 2007); App. to Pl. Reply at 220 (Mr. Werring's purchases were in May 2008).  Plaintiffs have met the second requirement of a fraud-on-the-market theory.

Courts in this circuit consider a large number of factors to determine if a company's shares were traded in an efficient market, including average daily trading volume of the company's shares, market capitalization of the company, the number of analysts following a stock, and the reaction of the share price to company-specific news.  *Unger*, 401 F.3d at 323.

Plaintiffs have produced a report by their economist, Dr. Steven Feinstein, that analyzes the factors articulated in *Unger* for determining market efficiency.  Dr. Feinstein concluded Idearc was traded in an efficient market.  Idearc was traded on the New York Stock Exchange and had an average trading volume of 2.9 million shares, representing almost 10% of the total outstanding shares.  *See Krogman v. Sterritt,* 202 F.R.D. 467, 474 (N.D. Tex. 2001) (average trading volume is one of the most important factors in gauging market efficiency).  Idearc was followed by UBS, Credit Suisse, J.P. Morgan, and Merrill Lynch, among other analysts.  *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (the more security analysts that

follow a stock, the greater likelihood the public is relying on information a company is releasing when purchasing the stock). Plaintiffs have presented evidence that Idearc's share price reacted in a statistically significant manner to the release of information about Idearc. *See* Pl. App. at 19–31; *Cammer*, 711 F. Supp. at 1291 ("one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.") Defendants do not dispute that Idearc's shares were traded in an efficient market. The Court finds that third factors of *Greenberg*'s fraud-on-the-market test is met.

### b. Loss causation

Plaintiffs relying upon a fraud-on-the-market theory to prove reliance at the class certification stage must also demonstrate "loss causation" by a preponderance of the evidence. *Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269 (5th Cir. 2007). "Loss causation" means:

> "(1) that the negative 'truthful' information causing the decrease in price [was] related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline."

*Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009) (citation omitted).

Defendants argue that (1) no corrective disclosures were made and, even if

-14-

there were, (2) Plaintiffs cannot establish by a preponderance of the evidence that the corrective disclosures caused a significant decline in Idearc's share price.

A "corrective disclosure" is a truth, related to a defendant's fraud, that has emerged and proximately caused the depreciation in share price and the plaintiff's economic loss. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 256 (5th Cir. 2009). A corrective disclosure "need not precisely mirror an earlier misrepresentation." *Flowserve*, 572 F.3d at 230.

Plaintiffs point to statements made by Defendants on February 7, 2008, July 28, 2008, and October 30, 2008 that reported increases in Idearc's bad debt levels, and also to statements that attribute these increases to a change in Idearc's billing system and lax credit policies. Specifically, Plaintiffs assert Mr. Klein told analysts that Idearc's credit policies "were not as tight as they needed to be" and Idearc's "credit practices a year ago were not what they should have been." Plaintiffs argue that the combination of these statements reveal that Defendants were aware of increasing bad debt levels before these levels were reported to the market.

Defendants assert all of the disclosures merely announced higher than expected bad debt levels and did not correct previous statements. However, as the Fifth Circuit has noted, "a defendant could defeat liability by refusing to admit the falsity of its prior misstatements" if the standard was whether or not a defendant has confessed. *Flowserve*, 572 F.3d 230. Mr. Klein's statements concerning Idearc's

previous accounts receivable practices suggest the continual revising of the company's bad debt projections was not solely based on new information. The Court finds that the statements identified by Plaintiffs are corrective disclosures.

Second, Defendants assert that the movements in Idearc's share price were not due to the corrective disclosures but to other negative disclosures and market conditions. Defendants argue Dr. Steven Feinstein, Plaintiffs' economist, did not account for a number of factors, including related financial news and other statements about Idearc's financials. The Court has reviewed the reports of Dr. Feinstein and Dr. Christopher James, Defendants' economist. The Court need not agree with each conclusion reached by Dr. Feinstein. The Court, though, is persuaded that Plaintiffs have shown it is more probable than not that Defendants' corrective disclosures caused a significant decline in Idearc's share price. Plaintiffs provide sufficient analysis and explanation as to why significant portions of the decline in Idearc's share price following corrective disclosures on February 7, 2008, July 28, 2008, and October 30, 2008 were related to the disclosures. The Court finds Plaintiffs have established the second element of the loss causation test at the class certification phase as required by *Oscar* and *Flowserve*.

### 2. Superiority

When deciding whether or not a class action is the superior method for adjudicating a controversy, a court must consider: (1) the interest of members of the

class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. FED. R. CIV. P. 23(b)(3)(A)-(D); *Robinson v. Texas Automobile Dealers Assn.,* 387 F.3d 416, 425 (5th Cir. 2004). In considering the superiority requirement, the district court must possess an understanding of the relevant claims, defenses, factual and legal issues, and how the case will be tried. *Robinson,* 387 F.3d at 425. Class actions are considered superior when individual actions would be wasteful, duplicative, present managerial difficulty and be adverse to judicial economy. *Mullen,* 186 F.3d at 627.

Plaintiffs assert there is no indication class members wish to pursue actions individually. Plaintiffs admit there is one other case pending in Tarrant County, Texas involving Idearc shares, but against only half of the defendants in this lawsuit and involving different claims. The Court agrees there does not seem to be an interest by members of the proposed class in proceeding individually.

As to the extent and nature of existing litigation, this case has been pending in the Northern District of Texas for nearly two years and a substantial amount of time and resources have been expended to bring it this far. It would also be desirable to concentrate the litigation in a single forum, which would promote judicial efficiency

by hearing common questions of law and fact in one case instead of scattering individual claims across the country.

Finally, there doesn't appear to be any greater difficulty in managing this lawsuit as a class action than as an individual claim. The same types and methods of proof would be used in a case with a single plaintiff or one with hundreds of plaintiffs. Defendants do not dispute that a class action is the superior method to adjudicate these claims. Therefore, the Court finds that Plaintiffs have satisfied the superiority requirement of Rule 23(b)(3).

## IV. Class Certification Information

### A. Definition of the Class

An order certifying a class action must define the class and the class claims, issues or defenses. FED. R. CIV. P. 23(c)((1)(B). A precise class definition is necessary to properly identify those entitled to relief, those bound by the judgment, and those entitled to notice. *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004).

The Proposed Class is comprised of persons who purchased publicly-traded securities of Idearc, Inc. between August 9, 2007 and October 30, 2008 and who were damaged thereby. The class period represents the time during which the alleged misrepresentations were made, from the earnings conference call on August 9, 2007 until the announcement of Idearc's third quarter bad debt levels for 2008 on October 30, 3008. Excluded from the Proposed Class are Defendants and members of their

immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party.

The class claims are the same as those described in Plaintiffs' Amended Complaint (Doc. No. 55):

(1)  Violations of § 10 (b) of the Securities Exchange Act of 1934; and

(2)  Violations of § 20 (a) of the Securities Exchange Act of 1934.

**B.  Appointment of Class Representatives and Counsel**

To determine whether the proposed class representatives are appropriate, the court must examine whether they are willing and able to take an active role in and control the litigation and to protect the interests of the absentees.  15 U.S.C. § 78u-4(a)(3)(B); *Berger,* 257 F.3d at 479, *clarified in* 279 F.3d 313 (5th Cir. 2002)

Under Federal Rule of Civil Procedure 23(g)(1)(A), a court that certifies a class must appoint class counsel.  The court should not disturb the lead plaintiff's choice of counsel unless it is necessary to protect the interests of the class.  *In re Enron Corp. Securities Litigation,* 206 F.R.D. 427, 441 (S.D. Tex. 2002).  However, even in the absence of opposition, the party seeking appointment of class counsel bears the burden of affirmatively proving that counsel is competent and qualified to represent the class.  *Berger,* 257 F.3d at 480-81; *Enron,* 206 F.R.D. at 441.  In appointing class counsel, the court must consider the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling class

actions, other complex litigation, and claims of the type asserted in the action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class. FED. R. CIV. P. 23(g)(1)(C).

In this motion for class certification, the Pension Trust Fund and Mr. Werring, an individual investor, are the proposed class representatives and Robbins, Geller, Rudman & Dowd LLP ("Robbins Geller") is proposed as class counsel. In a memorandum opinion and order issued November 9, 2009, this Court selected the Pension Trust Fund as lead plaintiff and approved Robbins Geller f/k/a Coughlin, Stoia, Geller, Rudman & Robbins LLP as lead counsel. The Court stands by its earlier determinations of the ability and willingness of the Pension Trust Fund and Mr. Werring to participate in this litigation and to protect the rights of absentee plaintiffs.

The Court also concludes, as before, that Robbins Geller is competent and will adequately represent the class. This firm has substantial experience in class actions in general and securities class actions in particular. The firm has demonstrated its knowledge of securities law and its willingness to expend resources to properly pursue this action.

## VI.   Conclusion

For the foregoing reasons, Plaintiffs' Motion for Class Certification is **GRANTED** and Defendants' Motion to Strike or, in the Alternative, for Leave to File

Surreply is **DENIED as moot**.  The following class is hereby certified:

All persons, without geographic limitation, who purchased Idearc, Inc. securities during the period from August 9, 2007 through and including October 30, 2008, and who were damaged by Defendants' alleged violations of sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934.  Excluded from the class are Defendants and members of their immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party.

**SO ORDERED.**

Signed May 19th, 2011.

_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE