UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| JAN BUETTGEN, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE J. HARLESS, et al.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:09-cv-00791-K<br>(Consolidated with Nos. 3:09-cv-00938-K; 3:09-cv-1049-K and 3:09-cv-1552-K)<br><br>CLASS ACTION |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

I. BACKGROUND ....................1

A. Materials Considered by the Court ....................1

B. History of Litigation ....................1

C. The Parties and Their Counsel ....................4

D. Plaintiffs' Allegations ....................4

E. Defendants' Response ....................5

F. Class Certification ....................6

G. The Settlement ....................6

H. The Preliminary Approval Order ....................7

I. The Fairness Hearing ....................7

II. THE TERMS OF THE SETTLEMENT ....................8

A. The Settlement Fund ....................8

1. Expenses to Be Deducted from the Settlement Fund ....................8

2. The Plan of Distribution ....................8

B. Release Bar Orders ....................9

III. JURISDICTION ....................9

A. Subject Matter Jurisdiction ....................9

B. Personal Jurisdiction ....................9

IV. THE CLASS NOTICE SATISFIES ALL APPLICABLE REQUIREMENTS ....................10

A. Notice to Class Members ....................10

V. FAIRNESS OF THE SETTLEMENT ....................11

A. The Lack of Fraud or Collusion Behind the Settlement ....................11

B. The Complexity, Expense, and Likely Duration of the Litigation ....................11

C. The Stage of the Proceedings and the Amount of Discovery Completed ....................12

**Page**


D. The Probability of Plaintiffs' Success on the Merits ....................13

E. The Range of Possible Recovery ....................15

F. The Opinions of Lead Counsel, Class Representatives, and Absent Class Members ....................16

VI. FAIRNESS OF THE PLAN OF DISTRIBUTION ....................16

VII. ATTORNEY'S FEES AND EXPENSES SOUGHT BY LEAD COUNSEL ....................17

A. Attorney's Fees Sought by Lead Counsel ....................17

B. Lead Counsel's Requested Fee Is Consistent with Fee Awards in Comparable Cases from this District ....................18

C. The Requested Fee Is Consistent with Contingent Fee Arrangements Negotiated in Non-Class Litigation ....................18

D. The Reasonableness of Lead Counsel's Fee Request Is Confirmed Under the *Johnson* Factors ....................19

1. Time and Labor Required ....................20

2. Novelty and Difficulty of the Issues ....................20

3. Skill Required: the Experience, Reputation, and Ability of the Attorneys ....................20

4. Preclusion of Other Employment ....................21

5. The Customary Fee and Awards in Similar Cases ....................22

6. Whether the Fee Is Fixed or Contingent ....................22

7. Time Limitations Imposed by the Client or the Circumstances ....................23

8. The Amount Involved and the Results Obtained ....................23

9. The "Undesirability" of the Case ....................24

10. Time Limitations Imposed by the Client or the Circumstances and the Nature and Length of the Professional Relationship with the Client ....................24

E. Expenses Sought by Lead Counsel ....................24

**Page**

F. Plaintiff's Request for an Award ....................25

VIII. CONCLUSION ....................25

Plaintiffs and Defendants have submitted for approval a proposed settlement of this class action that is memorialized in a Settlement Agreement ("Stipulation"), dated June 7, 2013. For the reasons set out below, the Court has determined that the settlement is fair, reasonable and adequate, and should be approved. The Court makes the following findings of fact and conclusions of law. It has issued a Final Judgment and Order of Dismissal with Prejudice, approving the settlement and dismissing the complaint in this action with prejudice.

## I. BACKGROUND

### A. Materials Considered by the Court

In coming to its decision, this Court has considered the written memoranda submitted by the parties and all other Class Members, as well as oral arguments made by the parties and other Class Members in connection with the settlement. As discussed below, the parties have fully briefed the request for approval, and they have supported the request with numerous declarations or affidavits of fact, including from expert witnesses and the Court appointed Lead Plaintiff. Also, both Lead Counsel and counsel for Defendants made oral presentations at the November 12, 2013 Settlement Hearing.

### B. History of Litigation

On April 30, 2009, a class action lawsuit was filed against five of Idearc's top former executives (collectively, the "Defendants") alleging violations of the federal securities laws, namely §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This lawsuit was styled *Buettgen v. Harless, et al.*, Civil Action No. 3:09-cv-0791-K. Dkt. No. 1.

On July 1, 2009, the Court issued an Order of Consolidation that consolidated Civil Action No. 3:09-CV-0938-K, that was initiated on May 21, 2009, with and into Civil Action No. 3:09-CV-0791-K. Dkt. No. 6. Later, on September 30, 2009, the Court, by its own motion, ordered that *Jones*

*v. Jones*, Civil Action No. 3:09-CV-1552-K, also be consolidated into *Buettgen v. Harless, et al.*, Civil Action No. 3:09-CV-0791-K. Dkt. No. 30.

In July 2009, various class members filed motions and memoranda in support thereof for the appointment of lead plaintiffs and the approval of lead plaintiffs' choice of counsel. During July and August 2009, opposition and reply memoranda were filed in connection therein.

On November 9, 2009, the Court issued a Memorandum Opinion and Order granting Kentucky State District Council of Carpenters Pension Trust Fund's motion to be appointed Lead Plaintiff and approving its selection of Coughlin Stoia Geller Rudman & Robbins LLP (n/k/a Robbins Geller Rudman & Dowd LLP) as Lead Counsel and Kendall Law Group, LLP as Liaison Counsel. Dkt. No. 31.

On February 11, 2010, Lead Plaintiff filed the Consolidated Class Action Complaint for Violations of Federal Securities Laws (the "Complaint") against defendants Katherine J. Harless, Scott W. Klein, Andrew Coticchio, Samuel "Dee" Jones, and Frank P. Gatto. Dkt. No. 55. The Complaint alleged a Class Period of August 9, 2007 through October 30, 2008, and detailed Defendants' alleged violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder during that time.

On April 12, 2010, Defendants filed a Motion to Dismiss the Complaint. Dkt. No. 60. On May 27, 2010, Lead Plaintiff opposed. And on June 24, 2010, Defendants filed their reply memoranda. Thereafter, on August 11, 2010, the Court issued an Order: (1) denying Defendants' Motion to Dismiss the Complaint in its entirety; and (2) denying Lead Plaintiff's Motion to Strike or, in the Alternative, to Convert Defendants' Motion to Dismiss into a Motion for Summary Judgment. Dkt. No. 82.

Defendants filed their Answer to the Complaint on September 2, 2010. Dkt. No. 85.

On November 1, 2010, Plaintiffs filed their Motion for Class Certification, seeking the Court's certification of a class comprised of all persons who purchased the publicly-traded securities of Idearc during the Class Period of August 9, 2007 through October 30, 2008, and who were damaged thereby. Dkt. No. 94. Plaintiffs' Motion for Class Certification also requested the Court appoint both Lead Plaintiff and Mr. Kenneth Werring, an individual shareholder, as Class Representatives. On January 14, 2011, Defendants filed an Opposition to Plaintiffs' Motion for Class Certification. Dkt. No. 101. On February 25, 2011, Plaintiffs filed a reply. Thereafter, on May 19, 2011, the Court issued a Memorandum Opinion and Order granting Plaintiffs' Motion for Class Certification and appointing Lead Plaintiff and Mr. Werring as Class Representatives. Dkt. No. 113. Defendants petitioned the Fifth Circuit for leave to appeal, but on June 27, 2011, Defendants' petition was denied. Dkt. No. 134.

From August 2010, when the Court denied Defendants' Motion to Dismiss, until the close of discovery on August 10, 2012, the parties pursued discovery in this case. The parties exchanged numerous sets of document requests and interrogatories, subpoenaed over 30 third parties, and took or defended nearly 30 depositions of the parties, other Idearc employees and third party fact witnesses.

In addition to fact discovery, the parties exchanged multiple reports by and took or defended the depositions of four experts. On October 31, 2012, Plaintiffs moved to exclude the testimony of Defendants' experts and Defendants moved to exclude the testimony of one of Plaintiffs' experts. Dkt. Nos. 170, 172, 176. In November and December 2012, the parties exchanged opposition briefs and replies in support of their respective motions. Dkt. Nos. 181, 183, 185, 187-88, 190. On March 11, 2013, the Court denied the parties' motions to exclude. Dkt. No. 210.

On September 24, 2012, Defendants filed their motion for summary judgment. Dkt. No. 159. Defendants argued in support of their motion, *inter alia*, that Plaintiffs could not meet their burden

of proving scienter or loss causation. On October 15, 2012, Plaintiffs opposed. Dkt. No. 162. And on October 30, 2012, Defendants filed a reply. Dkt. Nos. 168-169. After a hearing on the motion on February 11, 2013, on February 20, 2013, the Court entered an order denying in full Defendants' motion for summary judgment.

### C. The Parties and Their Counsel

**Class Representatives.** Lead Plaintiff Kentucky State District Council of Carpenters Pension Trust Fund and Kenneth Werring were appointed Class Representatives in this case. Each purchased Idearc securities during the Class Period.

**Lead Counsel.** Class Representatives and the Class are represented by several experienced law firms, including Robbins Geller Rudman & Dowd LLP, Robbins Arroyo LLP, Glancy Binkow & Goldberg LLP and Kendall Law Group, LLP. Lead Counsel are knowledgeable about, and experienced in, federal securities fraud class actions.

**Defendants.** The Complaint named as defendants Idearc CEOs Katherine J. Harless and Scott W. Klein, CFOs Andrew Coticchio and Samuel "Dee" Jones, and Interim CEO Frank P. Gatto. Because Idearc had filed for bankruptcy on March 31, 2009, it was not named as a defendant in the Complaint.

**Defendants' Counsel.** Defendants are represented by Kirkland & Ellis LLP and Locke Lord LLP. These firms and the lawyers involved in this case have extensive experience in the defense of complex securities class action litigation.

### D. Plaintiffs' Allegations

The Complaint alleged a Class Period of August 9, 2007 through October 30, 2008, and detailed Defendants' alleged violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") by participating in an allegedly fraudulent scheme to misrepresent to investors Idearc's true financial condition. Plaintiffs

allege that Defendants understated Idearc's bad debt expense and allowance for doubtful accounts in light of the known and significant loosening of the Company's credit and collection policies to generate revenue in the near-term. Plaintiffs further allege Defendants misrepresented Idearc's ability to remain liquid – and thus avoid bankruptcy – for a specified period of time. Plaintiffs claimed that Defendants' allegedly false and misleading statements and material omissions caused the Company's stock price to be artificially inflated. When the truth finally reached the market, Idearc's stock price experienced significant declines, damaging Plaintiffs and Class Members.

**E. Defendants' Response**

Defendants expressly deny any wrongdoing or liability in connection with any facts or claims that have been or could have been alleged in connection with this litigation. Defendants contend that they have substantial legal and factual defenses to Plaintiffs' claims and belief that they ultimately would have prevailed on the claims at trial. Specifically, Defendants argued that some of Plaintiffs' alleged misstatements were mere "puffery" and that others were forward looking and thus protected from liability. Defendants were also prepared to argue that any misstatement concerning Idearc's bad debt expense was immaterial when compared to Idearc's overall business. In addition, Defendants were also prepared to put forth evidence negating Plaintiffs' allegations of Defendants' scienter. Specifically, Defendants argued that the calculations for Idearc's bad debt expense originated in Idearc's accounting department and thus Defendants, as high level executives, were not a part of, nor aware of those calculations. In addition, Defendants were prepared to present evidence that they had relied on the approval of E&Y.

Defendants have represented to the Court that they nevertheless consider it desirable for the class action to be settled and dismissed to avoid the substantial burden, expense, and uncertainties that would be involved in protracted litigation, and to settle the Released Claims against them.

**F. Class Certification**

As discussed above, on May 19, 2011, the Court certified a class comprised of all persons who purchased the publicly-traded securities of Idearc during the Class Period of August 9, 2007 through October 30, 2008, and who were damaged thereby. Dkt. No. 113. Excluded from the Class are the Defendants and members of their immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party.

**G. The Settlement**

During this litigation, the parties participated in four mediation sessions with three different mediators. Only the last of these mediations was directly successful in bringing about the settlement. The first mediation was held in Boca Raton, Florida with mediator Judge Nicholas H. Politan (Ret.) on November 17, 2011. The second mediation was held in San Francisco, California with mediator Judge James S. Ware (Ret.) on January 23, 2013. The third mediation was held in Dallas, Texas with Magistrate Judge Paul D. Stickney on February 11, 2013, after the parties argued Defendants' motion for summary judgment before the Court.

On March 18, 2013, the parties returned in front of Magistrate Judge Stickney for a fourth mediation in Dallas, Texas. Lead Counsel and Plaintiffs attended the mediation and negotiated in good faith in an effort to settle the case. The case did not settle during the mediation. However, after the mediation, Judge Stickney made a mediator's proposal that the case should settle for $33.75 million. Each side was given time to consider and decide whether to accept the mediator's proposed settlement. The mediator's proposal was accepted.

On June 10, 2013, the parties submitted the signed Stipulation governing the settlement dated June 7, 2013. Dkt. No. 220. The proposed settlement provides, among other things, that Defendants would make a cash settlement payment of $33,750,000.00.

### H. The Preliminary Approval Order

On June 28, 2013, this Court, based upon its review of the Stipulation and the parties' joint application, entered an order which, among other things: (i) preliminarily approved the settlement; and (ii) found that the proposed forms and methods of notice met all the requirements of the Federal Rules of Civil Procedure, the PSLRA, and due process ("Preliminary Approval Order"). The Court scheduled a final hearing on the fairness of the proposed settlement for November 12, 2013.

As discussed in more detail below, consistent with the Court's June 28, 2013 order and subsequent amended orders dated July 2, 2013 and August 14, 2013, the parties provided notice of the proposed settlement to Class Members. The Court approved a class action claims administrator, Gilardi & Co. LLC ("Gilardi"), which arranged for the mailing of individual notices. Gilardi also had the notice published in the national edition of *Investor's Business Daily* and once over *Business Wire*.

### I. The Fairness Hearing

The parties filed submissions in support of the settlement on September 16, 2013. These submissions were accompanied by numerous declarations. Plaintiffs presented declarations from: (1) Debra J. Wyman, class counsel, in support of final approval of the settlement and an award of attorneys' fees and expenses and Plaintiff's expenses; (2) Debra J. Wyman, Lionel Z. Glancy, Thomas J. McKenna, Craig W. Smith, and Joe Kendall (separately) in support of applications for an award of attorneys' fees and expenses; (3) Kenneth F. Werring, class representative, in support of final approval of the settlement and an award of attorneys' fees and expenses; (4) David Tharp, of Lead Plaintiff Kentucky State District Council of Carpenters Pension Trust Fund, in support of final approval of the settlement and an award of attorneys' fees and expenses; and (5) Carole K. Sylvester, of Gilardi, concerning the dissemination and publication of notice to potential Class Members.

The Court held a hearing regarding the fairness, reasonableness and adequacy of the proposed settlement on November 12, 2013.

Both Lead Counsel and defense counsel made presentations in support of the settlement at the November 12, 2013 hearing. Parties objecting to the settlement made presentations as well.

## II. THE TERMS OF THE SETTLEMENT

The proposed settlement provides the Class with a substantial monetary recovery, which will be allocated among Class Members on the basis of their particular claims.

### A. The Settlement Fund

Pursuant to the terms of the Stipulation, the Defendants paid a total of Thirty-Three Million Seven Hundred and Fifty Thousand Dollars ($33,750,000) into a settlement fund from which relief will be provided to Class Members (the "Settlement Fund").

#### 1. Expenses to Be Deducted from the Settlement Fund

The Stipulation provides that notice and administration expenses, Lead Counsel's fees and expenses, and tax expenses (if any) will be paid from the Settlement Fund. The balance of the fund after payment of those amounts will be distributed to Class Members ("Net Settlement Fund").

The terms of the Stipulation provided that Lead Counsel could apply to the Court for an award of attorneys' fees and expenses. Lead Counsel committed in the Notice mailed to Class Members that they will seek an award of fees of 30% of the Settlement Fund. Plaintiffs and Lead Counsel have also applied for an award of litigation expenses in an amount equal to $1,680,094.10.

#### 2. The Plan of Distribution

The Stipulation provides that eligible Class Members who submit valid and timely proof of claim forms will receive distributions from the balance of the Settlement Fund in the form of cash. Those distributions are to be calculated pursuant to the Plan of Distribution prepared by Lead

Counsel. Neither the Defendants nor their counsel have had any role in, or responsibility for, the Plan of Distribution.

Pursuant to the Plan of Distribution, the Net Settlement Fund will be distributed to eligible Class Members who submit valid, timely Proof of Claim and Release forms ("Authorized Claimants"). The Plan of Distribution clearly identifies the circumstances by which Authorized Claimants may participate in the distribution of the Net Settlement Fund.

For purposes of determining the amount an Authorized Claimant may recover under the Plan of Distribution, Lead Counsel have consulted with their damages consultant.

### B. Release Bar Orders

In consideration of the comprehensive relief described above, the Stipulation contemplates that this Court will enter an Order approving the settlement that incorporates a release.

## III. JURISDICTION

### A. Subject Matter Jurisdiction

This Court has federal question jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331 and 1337(a).

### B. Personal Jurisdiction

This Court has in personam jurisdiction over Lead Plaintiffs and Class Members. The Court plainly may exercise personal jurisdiction over Class Members from Texas and over objectors as a result of their filing objections with this Court. And the Court has properly obtained personal jurisdiction over other out-of-state Class Members by giving them proper notice and a chance to opt out or to be heard. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *Calagaz v. Calhoon*, 309 F.2d 248 (5th Cir. 1962); *Robins v. Cli-Claque Co.*, No. 3:02-CV-1339-M, 2003 U.S. Dist. LEXIS 13695, at *15 (N.D. Tex. Aug. 5, 2003).

The Court therefore finds that all Class Members who did not request exclusion from the Class are subject to this Court's personal jurisdiction. *See Shutts*, 472 U.S. at 812-13.

## IV. THE CLASS NOTICE SATISFIES ALL APPLICABLE REQUIREMENTS

### A. Notice to Class Members

Beginning on July 15, 2013, Gilardi mailed 594,779 Claim Packages to potential Class Members, nominees and filers. Gilardi also established a toll-free number to accommodate potential Class Member inquiries and posted copies of the Notice, the Proof of Claim, and the Stipulation and Order Regarding Class Notice Procedures to Gilardi's website on July 15, 2013.

Beginning on August 21, 2013, Gilardi mailed 753,578 copies of the Court-approved Postcard to reasonably identifiable Class Members and in response to requests from potential Class Members, brokers and/or nominees. In addition, Gilardi has sent a total of 24,888 Amended Notices and Modified Claim Forms to potential Class Members, nominees and filers. Overall, Gilardi has mailed 773,169 original and amended Notices and Claim Forms.

Consistent with the Court's Preliminary Approval Order, the Notice included the text of the proposed Plan of Distribution and a Proof of Claim and Release form, which included instructions and requirements for filing a Proof of Claim. The Notice also included a general description of the dismissal, release and bar order provisions of the Stipulation.

In addition to mailing individual notices, Gilardi arranged to have the Court approved Summary Notice run in the national edition of *Investor's Business Daily* and over *Business Wire* on July 5, 2013.

The Postcard, the Amended Notice, the Modified Claim Form, and the Amended and Second Amended Orders Preliminarily Approving Settlement and Providing for Notice were also posted to Gilardi's website.

## V. FAIRNESS OF THE SETTLEMENT

The following factors have been cited as the pertinent criteria for evaluating the fairness of a proposed settlement in the Fifth Circuit: "(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." *Reed v. GMC*, 703 F.2d 170, 172 (5th Cir. 1983).

### A. The Lack of Fraud or Collusion Behind the Settlement

The lack of fraud or collusion supports the fairness of the settlement. This settlement was the result of arm's-length negotiations between the parties. Furthermore, this case has been vigorously litigated by both parties from start to finish. It was not until after the parties' fourth mediation session, after summary judgment and *Daubert* motions were denied and trial was weeks away, that the parties accepted the mediator's proposal and were able to come to an agreement to settle. The parties' hard fought litigation efforts and numerous settlement attempts demonstrate the lack of collusion behind this settlement.

### B. The Complexity, Expense, and Likely Duration of the Litigation

An analysis of the complexity, expense, and likely duration of further litigation, supports the Court's approval of the settlement.

But for the settlement, Plaintiffs would have continued preparing for trial. In an action of this complexity, the costs associated with trial, including preparation and the inevitable post-trial appeals – would be very high. Continuing the litigation would also have depleted insurance proceeds that were available to fund a settlement or satisfy a judgment in this action.

Moreover, one can easily conclude that this action, if taken to trial, would require an additional year, or possibly more, to conclude, necessitating many hours of counsel's and the Court's

time and resources. Any subsequent appeals could easily double or triple this time. In short, years might pass before the Class would receive a recovery, if any.

Thus, this factor also supports approval of the settlement.

**C. The Stage of the Proceedings and the Amount of Discovery Completed**

"There is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation." 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §11.45, at 127 (4th ed. 2002); *see also In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165 Section R(3), 2009 U.S. Dist. LEXIS 19210, at *39-*40 (E.D. La. Mar. 2, 2009) ("The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it."). Further, the trial court "may legitimately presume that counsel's judgment [that it has the information necessary to evaluate a settlement] is reliable." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981).

The extent of discovery completed and the stage of the proceedings also weighs in favor of the settlement. By the time the settlement was reached, Lead Counsel had sufficient knowledge and understanding of the merits of the claims alleged in the action and the defenses that would be asserted by Defendants to determine that the settlement confers a substantial benefit upon the Class. Lead Counsel obtained this knowledge through investigating and researching the facts and issues required to draft the initial and amended complaints; opposing the Motion to Dismiss, briefing class certification, litigating the class certification issue on appeal; reviewing and analyzing millions of pages of documents produced by Defendants and third parties during the course of discovery;

preparing for and/or conducting dozens of depositions; conferring with consultants and forensic accountants; working with experts, taking and defending expert depositions; briefing summary judgment motions and motions to exclude expert testimony; communicating with former Idearc employees with knowledge of Plaintiffs' allegations; drafting a detailed mediation statement; and preparing detailed presentations for use at mediation and oral argument. Lead Counsel then used the information to participate in arm's-length settlement negotiations with Defendants, including formal mediation with the assistance of experienced mediators, all of who are current or retired federal judges. The knowledge and insight gained by Lead Counsel during the four years this case has been pending provided more than sufficient information to evaluate the strengths and weaknesses of the Class's claims and Defendants' defenses.

### D. The Probability of Plaintiffs' Success on the Merits

Plaintiffs also faced numerous risks if they had continued to pursue the litigation. While Lead Counsel believed Plaintiffs would have prevailed on the merits at trial, Defendants were just as adamant that Plaintiffs would not have. There was a very real risk that Plaintiffs would not have convinced a jury that the alleged misrepresentations and omissions were materially false or misleading when made or that damages related to them.

For instance, while Plaintiffs firmly believed that the documentary and testimonial evidence they intended to offer at trial fully supported their claims, there is no way of predicting which interpretations, inferences or testimony a jury would accept. Further, Defendants have adamantly denied any culpability throughout the litigation and were prepared to mount aggressive defenses that could potentially bar a class recovery. If the jury sided with Defendants on their defenses, the Class could recover nothing.

For instance, Defendants were prepared to aggressively argue and present supporting evidence at trial that the alleged misstatements were not actionable. Specifically, Defendants argued

that some of Plaintiffs' alleged misstatements were mere "puffery" and that others were forward looking and thus protected from liability. While Plaintiffs disputed these contentions, if Defendants succeeded in these arguments, many of the alleged misstatements may have been excluded from the case.

Defendants were also prepared to argue that any misstatement concerning Idearc's bad debt expense was immaterial when compared to Idearc's overall business. Should this argument have succeeded, Plaintiffs would have been unable to prove that the Defendants made material false and misleading statements, a required element of Plaintiffs' claim. The settlement avoids the risk that these matters might have been viewed by the Court or jury as favorable to Defendants.

In addition, Defendants were also prepared to put forth evidence negating Plaintiffs' allegations of Defendants' scienter. Specifically, Defendants argued that the calculations for Idearc's bad debt expense originated in Idearc's accounting department and thus Defendants, as high level executives, were not a part of, nor aware of those calculations. In addition, Defendants were prepared to present evidence that they had relied on the approval of E&Y. Should Defendants' arguments have succeeded, Plaintiffs may have been unable to prove scienter. All of these issues of proof as to liability posed substantial risks to recovery at trial.

Moreover, absent settlement, Plaintiffs and the Class also faced the risk that the fact finder might have viewed the accounting issues in this case as overly technical and complex, thereby misunderstanding or dismissing the facts forming the basis of Plaintiffs' accounting claims.

Even if Plaintiffs succeeded in proving liability, a major risk going forward related to loss causation. Because the determination of loss causation and damages is a complicated process requiring expert testimony, these is a risk that the loss causation assessments of the parties' experts at trial would vary substantially, reducing this defense to a "battle of experts." One cannot predict which expert's testimony or methodology a jury would find reliable. If the jury agreed with

Defendants, Plaintiffs would have had their damages significantly reduced or their claims fail as a matter of law.

Finally, even though the Court certified a Class in this action despite the Fifth Circuit's prior requirement of proof of loss causation, Plaintiffs nevertheless faced the risk that the Court could subsequently decertify the Class. The settlement avoids any further disputes prior to trial relating to maintaining the certified Class.

As noted above, the proposed settlement provides that each eligible Class Member who files a valid Proof of Claim will receive, within a relatively short period of time following approval and final disposition of the case, a distribution from the Net Settlement Fund consistent with Lead Counsel's Plan of Distribution. That certainty of recovery clearly outweighs Plaintiffs' uncertain prospects of success through continued litigation. This factor therefore favors approval of the settlement.

### E. The Range of Possible Recovery

The amount offered in settlement was an important consideration in Plaintiffs' and Lead Counsel's decision to settle this action. While Plaintiffs estimate damages over $220 million in this case, Defendants contended that the Class suffered no actionable damages from the alleged misstatements and omissions.

Here, the settlement provides $33.75 million in cash in exchange for the release of all claims against Defendants. Therefore, without exposing the Class to the risks of potential litigation as described above, Lead Counsel obtained a substantial portion of the Class's theoretical damages.

Plaintiffs and the Class faced a significant risk relating to loss causation and that the jury or the Court might conclude there were no damages flowing from the alleged misrepresentations, and this risk has been avoided as a result of the settlement. Lead Counsel was aware that if Plaintiffs'

theory of loss causation and damages were to fail before a jury, the Class's opportunity for recovery would be significantly diminished, if not eliminated.

### F. The Opinions of Lead Counsel, Class Representatives, and Absent Class Members

The experience and views of counsel also weigh in favor of this Court's approval of the settlement. Lead Counsel is an experienced plaintiffs' class action firm. In addition, as set forth above, Lead Counsel is very knowledgeable regarding all the circumstances at issue. Lead Counsel has vigorously prosecuted this action against the Defendants for four years, and, in light of the risks involved in further litigation, believes that the settlement is in the best interests of the Class.

The reaction of the Class to the settlement has been supportive. In response to the notice procedures, only two Class Members have objected to the settlement.

## VI. FAIRNESS OF THE PLAN OF DISTRIBUTION

The standard for approving a plan of distribution is the same as the standard for approving the settlement: the plan must be "fair, adequate, and reasonable" and must not be "'the product of collusion between the parties.'" *In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1981) (citation omitted). This analysis is to be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *Id*. In addition, an allocation or distribution formula need only have a reasonable basis, particularly if recommended by experienced class counsel. *Taft v. Ackermans*, No. 02 Civ. 7951 (PKL), 2007 U.S. Dist. LEXIS 9144, at *27 (S.D.N.Y. Jan. 31, 2007).

Lead Counsel prepared the Plan of Distribution after careful consideration and analysis, and without reference to any particular trading patterns of any of the Plaintiffs.

The Plan of Distribution was also fully disclosed in the Notice, the Amended Notice and on Lead Counsel's and the Claims Administrator's website. Overall, if the total claims for all Authorized Claimants exceed the Net Settlement Fund, each Authorized Claimant's share of the Net

Settlement Fund will be determined based upon the percentage that his, her or its claim bears to the total of the claims for all Authorized Claimants. Wyman Decl., ¶¶141-144. *See In re Merrill Lynch & Co., Inc.*, No. 02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 9450, at *39 (S.D.N.Y. Feb. 1, 2007) ("A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is reasonable."); *see also In re Broadcom Corp. Sec. Litig.*, No. SACV 01-275 DT (MLGx), 2005 U.S. Dist. LEXIS 41976, at *17 (C.D. Cal. Sept. 12, 2005) (approving plan of distribution where the allocation was pro rata across the class).

For all of the reasons set out above, the Court finds that the Plan of Distribution proposed by Plaintiffs in this case is fair, reasonable and adequate.

## VII. ATTORNEY'S FEES AND EXPENSES SOUGHT BY LEAD COUNSEL

### A. Attorney's Fees Sought by Lead Counsel

Lead Counsel seek an award of attorneys' fees of 30% of the Settlement Fund.

Lead Counsel for the Class is entitled to a fee paid out of the common fund created for the benefit of the Class. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980) (Supreme Court has consistently recognized the common fund doctrine to permit attorneys who obtain a recovery for a class to be compensated from the benefits achieved as a result of their efforts).

As other district courts within this Circuit have noted, "since *Blum* was decided [in 1984], there has been no Fifth Circuit decision that would preclude this Court from employing the percentage of the fund approach endorsed in *Blum* and the circuit and district court decisions that followed and applied *Blum*." *In re Prudential-Bache Energy Income P'ships Sec. Litig.*, MDL No. 888, 1994 U.S. Dist. LEXIS 4786, at *11-*12 (E.D. La. Apr. 13, 1994) ("*Prudential I*"); *see also Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 967 n.15 (E.D. Tex. 2000) ("the Fifth Circuit has ***never*** . . . reversed a district court judge's decision to award a fee as a percentage") (emphasis in original); *Longden v. Sunderman*, 979 F.2d 1095, 1100 n.11 (5th Cir. 1992) (affirming district

court's percentage fee award in securities class action). Accordingly, numerous district courts within the Fifth Circuit have applied the percentage-of-recovery method in awarding fees. For example, the published opinions in *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 500 (N.D. Miss. 1996), and *Shaw*, 91 F. Supp. 2d at 966-67, list numerous class action cases as examples. Indeed, as this Court has noted in *Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K, 2005 U.S. Dist. LEXIS 27077, at *84 (N.D. Tex. Nov. 8, 2005), "there is a strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."

### B. Lead Counsel's Requested Fee Is Consistent with Fee Awards in Comparable Cases from this District

The requested fee award of 30% of the Settlement Fund is consistent with awards made in similar cases. *See, e.g.*, *Shaw*, 91 F. Supp. 2d at 972 ("based on the opinions of other courts and the available studies of class action attorneys' fees awards . . . this Court concludes that attorneys' fees in the range from twenty-five percent (25%) to [33-1/3%] have been routinely awarded in class actions"). In fact, district courts in this Circuit, including this one, have repeatedly awarded fees of 30% or more of the total recovery under the percentage-of-the-recovery method in securities class actions. *See Crowell v. Mannatech, Inc.*, No. 3:07-cv-00238-K, slip op. (N.D. Tex. Mar. 10, 2009) (awarding 30% of settlement fund) (Kinkeade, J.) (Compendium at 12); *Brody v. Zix Corp.*, No. 3-04-CV-1931-K, slip op. (N.D. Tex. June 16, 2008) (awarding 33-1/3% of settlement fund) (Kinkeade, J.) (Compendium at 3). Dkt. No. 237.

### C. The Requested Fee Is Consistent with Contingent Fee Arrangements Negotiated in Non-Class Litigation

The percentage method is also consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee ***is*** the 'market rate.'") (emphasis in original). In non-class

litigation, 33-1/3% contingency fees are typical. As Justices Brennan and Marshall observed in their concurring opinion in *Blum*: "In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery." *Blum v. Stenson*, 465 U.S. 886, 903*(1984). *See also In re Prudential-Bache Energy Income P'ships Sec. Litig.*, MDL No. 888, 1994 U.S. Dist. LEXIS 6621, at *4 (E.D. La. May 18, 1994) ("*Prudential II*") ("Were this not a class action, attorney's fees would range between 30% and 40%, the percentages commonly contracted for in contingency cases.").

### D. The Reasonableness of Lead Counsel's Fee Request Is Confirmed Under the *Johnson* Factors

Application of the *Johnson* factors also confirms that the requested fee is fair and reasonable. Some district courts within the Fifth Circuit have applied a hybrid approach in analyzing the fairness and reasonableness of requested fees, using the percentage method to set an initial percentage fee, and then adjusting that fee up or down based on the previously noted *Johnson* factors. *See In re Harrah's Entm't, Inc.*, No. 95-3925 SECTION "N", 1998 U.S. Dist. LEXIS 18774, at *20-*21 (E.D. La. Nov. 25, 1998); *see also Shaw*, 91 F. Supp. 2d at 967-68. An analysis of the *Johnson* factors demonstrates that an award of 30% of the Settlement Fund is reasonable in this case. The *Johnson* factors are as follows: (1) time and labor required; (2) novelty and difficulty of the issues; (3) skill required to perform the legal services properly; (4) preclusion of other employment; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). The relevance of each of the *Johnson* factors will vary in any particular case, and, rather than requiring a rigid application of each factor, the Fifth Circuit has left it to the

lower court's discretion to apply those factors in view of the circumstances of a particular case. *Brantley v. Surles*, 804 F.2d 321, 325-26 (5th Cir. 1986).

**1. Time and Labor Required**

Plaintiffs' Counsel have devoted a substantial amount of time and effort vigorously prosecuting this case. In turn, Defendants have fiercely fought this case for four years, and at virtually every stage of the litigation, Plaintiffs' Counsel have successfully responded to these defense strategies and tactics, while aggressively building Plaintiffs' case on the merits.

Plaintiffs' Counsel's substantial amount of time and effort expended in successfully prosecuting this case is also reflected in their lodestar, which amounts to over 33,000 hours of professional and paraprofessional time spent on this case.

**2. Novelty and Difficulty of the Issues**

The prosecution of this case has been complex, involving repeated rounds of briefing complicated issues of law regarding the adequacy of the pleadings and class certification, difficult and time consuming factual discovery (including grueling party and non-party depositions), expensive work with expert witnesses, and summary judgment and *Daubert* motions. Moreover, at the time the Class was certified, Fifth Circuit precedent required evidentiary proof of loss causation – the toughest standard in the nation. Lead Counsel obtained certification of the Class, something that was very rarely achieved under the governing law.

**3. Skill Required: the Experience, Reputation, and Ability of the Attorneys**

The third and the ninth *Johnson* factors, the skill required and the experience, reputation, and ability of the attorneys also support the requested fee award. Here, Lead Counsel performed their work diligently, skillfully and achieved a substantial recovery for the Class. Lead Counsel have many years of experience in complex federal civil litigation, particularly the litigation of securities and other class actions.

Lead Counsel's experience in the field also allowed them to obtain significant investigative materials in spite of the PSLRA's barriers to formal discovery, identify the complex issues involved in this case, and formulate strategies to successfully prosecute it effectively. *See TXU Corp.*, 2005 U.S. Dist. LEXIS 27077, at *99 ("Plaintiffs' counsel demonstrated that notwithstanding the barriers erected by the PSLRA, they would develop evidence to support a convincing case."). But for Lead Counsel's efforts, the Class's claims might have been dismissed at the pleading or summary judgment stage. Instead, Lead Counsel were able to secure a settlement of $33.75 million, representing a very good result for the Class.

The quality of opposing counsel is also important in evaluating the quality of services rendered by Lead Counsel. *See, e.g.*, *In re Aetna Inc. Sec. Litig.*, No. 1219, 2001 U.S. Dist. LEXIS 68, at *45-*46 (E.D. Pa. Jan. 4, 2001); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 195 (E.D. Pa. 2000). The defense attorneys in this case are aggressive, experienced, and highly skilled. Kirkland & Ellis LLP and Locke Lord are both excellent defense firms. In particular, Harriet Miers is recognized nationally as an excellent and persuasive litigator. *See TXU Corp.*, 2005 U.S. Dist. LEXIS 27077, at *100 (finding that skill factor supported the fee award because, *inter alia*, opposing counsel were "highly experienced lawyers from prominent and well-respected law firms"). The ability of Lead Counsel to develop their case and negotiate this excellent settlement in the face of this formidable opposition confirms the quality of Plaintiffs' representation.

**4. Preclusion of Other Employment**

The time spent by Lead Counsel on this case was at the expense of time that counsel could have devoted to other matters. Accordingly, to the extent applicable, this factor supports the requested percentage.

**5. The Customary Fee and Awards in Similar Cases**

As demonstrated above, a 30% fee is consistent with fee percentages that have been repeatedly awarded by courts in this Circuit and District as well as numerous other similar cases throughout the country.

**6. Whether the Fee Is Fixed or Contingent**

The contingent nature of the fee and the financial burden carried by Lead Counsel warrants the Court's approval of the requested attorneys' fees. Lead Counsel have litigated the action on a wholly contingent basis, and borne all the risk of this action – the risks of surviving a motion to dismiss, opposing a dispositive motion, obtaining class certification, proving liability, addressing Defendants' arguments on loss causation and damages, prevailing in the "battle of the experts," litigating the action through trial and possible appeals – expending many hours of work, at great expense, and never being paid. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to assure that sufficient attorney, expert, and paraprofessional resources were dedicated to the prosecution of the action and that funds were available to compensate staff and to pay for the considerable expenses which a case such as this entails. Further, because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation.

In addition to advancing litigation expenses and paying overhead, Lead Counsel faced the possibility they would receive no attorneys' fees. It is incorrect to presume that a law firm handling complex contingent litigation always wins. In fact, tens of thousands of hours have been expended

in losing efforts, and the factor labeled by the courts as "the risks of litigation" is not an empty phrase.

In addition to the time value of money and the deferred compensation, Lead Counsel have borne the substantial risk that they might not achieve success in this case and would therefore be paid nothing for their substantial efforts to obtain a recovery for the Class.

In numerous cases, plaintiffs' counsel in contingent cases such as this, have expended thousands of hours only to receive no compensation. Moreover, there have been many hard-fought lawsuits where, because of (i) the discovery of facts unknown when the case was commenced; (ii) changes in the law while the case was pending; or (iii) decisions of judges or juries following a trial on the merits, the excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. Losses such as these are exceedingly expensive. Further, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting many of contingent-fee counsel's pending cases. Thus, there existed a demonstrable risk that Lead Counsel would invest substantial efforts and receive nothing.

### 7. Time Limitations Imposed by the Client or the Circumstances

This factor does not pertain to this case and is thus neutral.

### 8. The Amount Involved and the Results Obtained

The benefit conferred to the class and the result achieved is an important factor in setting a fair fee. *See, e.g.*, *In re Terra-Drill P'ships Sec. Litig.*, 733 F. Supp. 1127, 1128 (S.D. Tex. 1990) (noting that the *Johnson* factors emphasize "the results obtained"). The settlement constitutes a fair, reasonable, and adequate recovery under any circumstances, which may not ultimately be matched, at the conclusion of lengthy and costly litigation several years down the road. When this recovery is viewed against the difficulties Plaintiffs would face proving liability and damages, and carrying their burdens at trial, this Court should find that it would have been very difficult for Plaintiffs to obtain a

greater recovery. *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985) ("[M]uch of the value of a settlement lies in the ability to make funds available promptly."), *aff'd in part and rev'd in part on other grounds*, 818 F.2d 179 (2d Cir. 1987).

In fact, the settlement obtained represents a recovery of approximately 15% of the Class's alleged maximum recoverable damages. *See* Wyman Decl., ¶¶167-169. This recovery is substantially greater than the average recovery in securities fraud cases. *See* Ellen M. Ryan, Laura E. Simmons, *Securities Class Action Settlements 2012 Review and Analysis*, at 8 (Cornerstone Research 2013) (in 2012, the median settlement amount, as a percentage of estimated damages, was 1.8%).

**9. The "Undesirability" of the Case**

The tenth *Johnson* factor, undesirability of the case, also supports the fee requested here. Securities cases have generally been recognized as "undesirable" due to the financial burden on counsel and the time demands of litigating class actions of this size and complexity. *Garza v. Sporting Goods Props.*, No. SA-93-CA-1082, 1996 U.S. Dist. LEXIS 2009, at *118 (W.D. Tex. Feb. 6, 1996) (factors such as financial burden on counsel and time demands of litigating class action of this size and complexity have caused cases to be considered "undesirable").

**10. Time Limitations Imposed by the Client or the Circumstances and the Nature and Length of the Professional Relationship with the Client**

These factors do not pertain to this case and are thus neutral.

**E. Expenses Sought by Lead Counsel**

Lead Counsel also request expenses of $1,680,094.10 in connection with the prosecution of the action on behalf of the Class, plus interest on such amount at the same rate as earned by the Settlement Fund.

The expenses incurred by Lead Counsel include in-house and private investigators, in-house damage consultants, expert fees, mediation fees, travel, photocopying of documents, on-line research, messenger service, postage, express mail and next day delivery, long distance and facsimile expenses, database maintenance for the nearly 3 million pages of documents produced by various parties, transportation, meals, and other incidental expenses directly related to the prosecution of this action.

The Court finds that these expenses were reasonably and necessarily incurred in prosecuting this action and achieving the proposed settlement. The expenses should therefore be awarded.

### F. Plaintiff's Request for an Award

Plaintiff Werring requests an award of $5,000 to compensate him for the time and expenses incurred in representing the Class in this action.

Reimbursement of such expenses should be allowed because it "encourages participation of plaintiffs in the active supervision of their counsel." *Varljen v. H.J. Meyers & Co.*, No. 97 CIV. 6742 (DLC), 2000 U.S. Dist. LEXIS 16205, at *14 n.2 (S.D.N.Y. Nov. 8, 2000). Moreover, courts "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *30 (S.D.N.Y. Oct. 24, 2005). Plaintiff Werring was actively involved in the litigation and is deserving of the requested amount.

## VIII. CONCLUSION

This settlement is comprehensive in scope, is fair and even-handed in its application and is of substantial monetary and non-monetary value to the Class. The Court therefore approves the settlement as fair, reasonable and adequate. The Court also finds reasonable and awards to Lead

Counsel the negotiated attorneys' fee of 30% of the Settlement Fund, the expense amount requested, plus interest, and an award to Plaintiff Werring.

IT IS SO ORDERED.

Signed November 13th, 2013.

Ed Kinkeade ______
ED KINKEADE
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 28, 2013.

s/ Debra J. Wyman
DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: debraw@rgrdlaw.com